UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

CAROTEK, INC.,

                     Plaintiff/Counter-defendant,

          -against-

KOBAYASHI VENTURES, LLC,

                    Defendant/Counter-plaintiff.

-----------------------------------------------------------x

07 Civ. 11163 (NRB) (RLE)

**DEFENDANT/COUNTER-PLAINTIFF'S ANSWER AND COUNTERCLAIM**

## ANSWER AND COUNTERCLAIM

Kobayashi Ventures, LLC ("Kobayashi Ventures"), by and through its attorneys, Stein, Sperling, Bennett, De Jong, Driscoll & Greenfeig, P.C., and Gallagher, Harnett & Lagalante LLP, hereby answers Plaintiff's Complaint, stating as follows:

To the specifically enumerated paragraphs of the Complaint, by like paragraphs, Kobayashi Ventures avers as follows:

1.    Kobayashi Ventures denies each and every allegation contained in paragraph 1 of the Complaint in that Plaintiff asserts a legal conclusion, and leaves Plaintiff to its burden with respect thereto.

2.    Kobayashi Ventures denies each and every allegation contained in paragraph 2 of the Complaint in that Plaintiff asserts a legal conclusion, and leaves Plaintiff to its burden with respect thereto.

3.    Kobayashi Ventures denies each and every allegation contained in paragraph 3 of the Complaint in that Plaintiff asserts a legal conclusion, and leaves Plaintiff to its burden with respect thereto.

4.      Kobayashi Ventures denies each and every allegation contained in paragraph 4 of the Complaint in that Plaintiff asserts a legal conclusion, and leaves Plaintiff to its burden with respect thereto.

5.      Kobayashi Ventures is without sufficient knowledge or information to either admit or deny the allegations contained in paragraph 5 of the Complaint.

6.      Kobayashi Ventures denies each and every allegation contained in paragraph 6 of the Complaint, except admits that it is a privately held limited liability company which is organized and existing under the laws of the State of Delaware.  Kobayashi Ventures admits that it is the assignee of, *inter alia*, all right, title, and interest in the License Agreement.

7.      Kobayashi Ventures denies each and every allegation contained in paragraph 7 of the Complaint and leaves the document referred to in paragraph 7 to speak for itself. Kobayashi Venture admits only that its counsel sent to Carotek a letter dated October 29, 2007.

8.      Kobayashi Ventures denies each and every allegation contained in paragraph 8 of the Complaint and leaves the document referred to in paragraph 8 to speak for itself. Kobayashi Venture admits only that its counsel sent to Carotek a letter dated November 26, 2007.

9.      Kobayashi Ventures denies each and every allegation contained in paragraph 9 of the Complaint and leaves the document referred to in paragraph 9 to speak for itself.

10.     Kobayashi Ventures denies each and every allegation contained in paragraph 10 of the Complaint, except admits that there is an actual and justiciable controversy between the parties as set forth in paragraphs 28 through 74, below.

AS AND FOR KOBAYASHI VENTURE'S RESPONSE
TO CAROTEK'S CLAIM FOR DECLARATION THAT
CATOTEK HAS NOT BREACHED THE
LICENSE AGREEMENT OF DECEMBER 8, 1998

11.      Kobayashi Ventures adopts and incorporates by reference its answers to paragraphs 1 through 10 above as if fully set forth herein.

12.      Kobayashi Ventures denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 12 of the Complaint.

13.      Kobayashi Ventures denies each and every allegation contained in paragraph 10 of the Complaint, except admits that there is an actual and justiciable controversy between the parties as set forth in paragraphs 28 through 74, below.

14.      Kobayashi Ventures denies each and every allegation contained in paragraph 14 of the Complaint in that Plaintiff asserts a legal conclusion, and leaves Plaintiff to its burden with respect thereto.

AS AND FOR KOBAYASHI VENTURE'S RESPONSE
TO CAROTEK'S CLAIM FOR MONETARY RELIEF

15.      Kobayashi Ventures adopts and incorporates by reference its answers to paragraphs 1 through 14 above as if fully set forth herein.

16.      Kobayashi Ventures denies each and every allegation contained in paragraph 16 of the Complaint.

17.      Kobayashi Ventures denies each and every allegation contained in paragraph 17 of the Complaint and leaves the document referred to in paragraph 17 to speak for itself.

18.      Kobayashi Ventures denies each and every allegation contained in paragraph 18 of the Complaint and leaves the document referred to in paragraph 18 to speak for itself.

19.    Kobayashi Ventures denies each and every allegation contained in paragraph 19 of the Complaint.

20.    Kobayashi Ventures denies each and every allegation contained in paragraph 20 of the Complaint and leaves the document referred to in paragraph 20 to speak for itself.

21.    Kobayashi Ventures denies each and every allegation contained in paragraph 21 of the Complaint and leaves the document referred to in paragraph 21 to speak for itself, except admits that it advised Carotek of its ownership of the Agreement and its intention to enforce the agreement.

22.    Kobayashi Ventures denies each and every allegation contained in paragraph 22 of the Complaint and leaves the document referred to in paragraph 22 to speak for itself.

23.    Kobayashi Ventures denies each and every allegation contained in paragraph 23 of the Complaint.

AS AND FOR A FIRST DEFENSE

24.    The Complaint fails to state a claim upon which relief can be granted.

AS AND FOR A SECOND DEFENSE

25.    Defendant further intends to rely upon all defenses, legal and/or equitable, which may be available to it based upon the facts as may become known before and during the trial of this matter.

AS AND FOR A THIRD DEFENSE

26.    Any and all other claims or allegations contained in the Complaint, not otherwise expressly admitted or denied herein, are hereby denied.

## AS AND FOR A FOURTH DEFENSE

27.    The Complaint is barred, in whole or in part, by fraud, illegality, and the statute of limitations.

## COUNTERCLAIM

28.    Counter-plaintiff Kobayashi Ventures, LLC ("Kobayashi Ventures"), by and through its attorneys, Stein, Sperling, Bennett, De Jong, Driscoll & Greenfeig, P.C., and Gallagher, Harnett & Lagalante LLP, hereby sues and demands injunctive relief and legal damages in its favor and against Counter-defendant Carotek, Inc. ("Carotek"), on grounds as follows:

## INTRODUCTION

29.    This is an action brought by Kobayashi Ventures for patent infringement since December 27, 2007, arising under the patent laws of the United States, Title 35, United States Code, and for unpaid royalties due since December 8, 1998 under a License Agreement which terminated on December 27, 2007. The licensor, Kobayashi Ventures, exclusively owns, among other things, three U.S. patents and a variety of foreign patents that relate to the invention(s) of synchronizing cameras to the speed of a moving web. Since at least December 27, 2007, Carotek willfully and materially has infringed upon such patents belonging to Kobayashi Ventures ("Kobayashi's Patented Technology," detailed in ¶ 36 below). Previously Carotek did not pay royalties it owed and which remain due and owing.

30.    Kobayashi's Patented Technology has been pivotal in the web monitoring industry and its direct customers, the paper, plastics and printing industries—facilitating digital monitoring and capturing of events during the manufacturing process to increase production efficiencies. Kobayashi's Patented Technology has accomplished that which

5

previously had not been possible, enabling the production of higher quality product at great savings to manufacturers and ultimately to consumers. With conscious disregard for the patent laws of the United States of America, the License Agreement, and Kobayashi's Patented Technology, Carotek has been violating U.S. patent laws, the License Agreement, and the legal rights of Kobayashi Ventures, among others. In this Counterclaim, Kobayashi Ventures seeks necessary injunctive relief and legal damages in its favor and against Carotek.

## PARTIES

31.     Kobayashi Ventures is a limited liability company organized and existing under the laws of the State of Delaware. The business of Kobayashi Ventures is to manage, market, consult, develop, manufacture, create, own, distribute, purchase, sell and/or license patents and other intellectual property.

32.     Upon information and belief, Carotek is a corporation organized and existing under the laws of the State of North Carolina, with its principal place of business in Matthews, North Carolina. Carotek provides event capturing camera products, equipment, systems and software (collectively, "Event Capturing Systems" or "ECS Systems" or "ECS" or "ECS II" or "ECS v.10" or "Mobile ECS" or "Shippable ECS" or "Portable Laptop ECS") used in the paper, printing and other web monitoring industries. These systems in fact incorporate and rely on Kobayashi's Patented Technology.

## JURISDICTION AND VENUE

33.     Subject matter jurisdiction is based on 28 U.S.C. §§ 1331, 1338, and 1367, and 35 U.S.C. § 281.

34.     This Court has personal jurisdiction over Carotek as Plaintiff/Counter-defendant in this action.

6

35.    Venue is proper under 28 U.S.C. § 1391 and 28 U.S.C. 1400(b).

## FACTUAL ALLEGATIONS

36.    On or about December 10, 2007, by written assignment executed and delivered

by Jacklin Associates, Inc. to Kobayashi Ventures, Kobayashi Ventures became, and now is,

the owner, *inter alia*, of all right, title, and interest in and to such letters patent (previously and

hereinafter referenced as "Kobayashi's Patented Technology"), having the exclusive right to

make, use, sell, offer for sale, and import into the U.S. the following inventions:

> U.S. Patent No. 5,717,456
> U.S. Patent No. 5,821,990
> U.S. Patent No. 6,211,905
> Australian Patent Application No. 38274/95
> Brazilian Patent Application No. PI 9510548-4
> Chilean Patent Application No. 1898-95
> Finnish Patent Application No. 973611
> Indonesian Patent Application No. P952441
> Japanese Patent Application No. 8-526826
> South Korean Patent Application No. 1997-706231
> Malaysian Patent Application No. PI9703058
> Mexican Patent Application No. 976703
> New Zealand Patent Application No. 295027
> Norwegian Patent Application No. 974012
> South African Patent Application No. 95/9613
> Canadian Patent Application No. 2,214,724

Attached hereto as <u>Exhibit 1</u> and incorporated herein by reference is the Patent

Assignment. Such Patent Assignment was recorded in the Patent and

Trademark Office on December 11, 2007 at Reel/Frame 020218/0844.

37.    On or about October 19, 2007, by written assignment executed and delivered

by International Paper Company ("International Paper") to Jacklin Associates, Inc., Jacklin

Associates became the owner, *inter alia*, of all right, title, and interest in and to such letters

patent (identified in ¶ 6 above), then having the exclusive right to make, use, and sell

Kobayashi's Patented Technology. Attached hereto as <u>Exhibit 2</u> and incorporated herein by

7

reference is the Patent Purchase Agreement, Exhibit D of which is the Assignment of Patent Rights. Such Assignment of Patent Rights was recorded in the Patent and Trademark Office on December 11, 2007 at Reel/Frame 020218/0823.

38.    International Paper became the owner of all right, title, and interest in and to such letters patent (identified in ¶ 6 above) by virtue of assignment from each of the inventors to its predecessor company Champion International Corporation ("Champion"), which became International Paper through a merger. The inventors' assignment was executed March 2, 1995 and recorded in the Patent and Trademark Office on March 6, 1995 at Reel/Frame 007382/0557, and the merger document was executed December 31, 2000 and recorded in the Patent and Trademark Office on November 26, 2007 at Reel/Frame 020143/0440.

39.    On or about December 8, 1998, Carotek entered into a License Agreement with Champion, acquiring patent rights to what is now known as Kobayashi's Patented Technology. Attached hereto as Exhibit 3 and incorporated herein by reference is the License Agreement.

"Article III—Royalties" of the License Agreement states in pertinent part as follows:

LICENSEE shall pay to CHAMPION a running royalty of FIVE PERCENT (5%) of the Net Sales Price of $CV^2$ System for each of said $CV^2$ Installations.

"Cost of Services" shall mean the cost of consulting, engineering, installing, supervising and like services performed by or for LICENSEE for the sale and installation of $CV^2$ System and shall be equal to TEN PERCENT (10%) of the total gross selling price for the $CV^2$ System.

"Net Sales Price" shall mean the sum of the Cost of Services and the gross price of Commercial Sales of $CV^2$ System less packaging charges, transportation charges; insurance against loss or damage in transit; sales, excise used and similar taxes directly incurred by LICENSEE in connection with the

8

relevant Commercial Sale; importation duties and levies and selling commissions by resellers and agents who are not Subsidiaries of LICENSEE. If $CV^2$ System are sold, licensed, installed, designed, leased or otherwise transferred as components of combined system, the Net Sales Price for $CV^2$ System shall be calculated by multiplying the Net Sales Price of said combined system as determined above by a fraction, the denominator of which is equal to the total list price of said combined system and the numerator of which is equal to the list price of said $CV^2$ System.

Therefore:

Royalty Due Per $CV^2$ System Sold to bona fide purchaser = 0.05 x 1.10 x [Gross Price of Commercial Sale – Directly Incurred LICENSEE costs (packaging + transport + transport insurance + taxes + duties + third party commissions)]

40.     Carotek alleges having made some royalty payments under the License Agreement.

41.     "Article XII—Most Favored License" of the License Agreement states as follows:

12.1     If Champion hereafter grants a license to a third party (other than a Subsidiary of LICENSEE) to practice all of the subject matter licensed under this Agreement and subject to more favorable royalty terms than those set forth in ARTICLE III of this Agreement, CHAMPION shall promptly notify LICENSEE in writing of said more favorable royalty terms. Upon written request given by LICENSEE in writing within sixty (60) days after receipt of such notice, LICENSEE shall be entitled to the benefit of such more favorable terms as and from the date they became effective and only so long as they remain in effect with such third party; provided, however, that LICENSEE accepts all other applicable terms and conditions of such third party license; and provided further that in comparing royalty or other terms CHAMPION may assign a reasonable monetary value to any rights received from said third party by way of consideration for such third party license.

[Underscore added.]

42.     On June 7, 2005, Carotek, by its CEO J. Addison Bell, sent a letter to International Paper by its Chief Counsel Richard C. Stewart, II taking an erroneous position based on the most favored license provision at Article XII of the License Agreement that

9

another licensee Papertech, Inc. "ha[d] not paid any royalties on the patents for a considerable time period[,]" and therefore Carotek had no obligation to make royalty payments and was entitled to recover royalty payments previously made. Attached hereto as <u>Exhibit 4</u> and incorporated herein by reference is this letter.

43.    On October 29, 2007, Kobayashi Ventures provided to Carotek a letter stating as follows:

> This law firm has been engaged to represent Kobayashi Ventures, LLC, assignee of all right, title and interest of Champion International Corporation pursuant to that certain License Agreement between your company and Champion dated December 8, 1998 (the "Agreement"). Kobayashi is in the process of assessing and pursuing its claims arising, inter alia, out of that Agreement and out of the patent rights associated with the proprietary process monitoring system referenced therein.

> Please provide me within ten (10) days of the date of this letter with a copy of your most recent license agreement with Champion International Corporation, along with an accounting of any and all payments made by your company either pursuant to the Agreement or otherwise as a result of your use of the proprietary process monitoring system and related technology as referenced therein. To the extent you have not already done so, please provide promptly the minimum guaranteed annual fees set forth in Paragraph 3.4 of the license agreement for each of the years since the execution of that agreement. These funds should be made payable to Kobayashi Ventures, LLC, and remitted to my attention within the same ten (10) day period delineated above. Upon receipt of the minimum royalty payments, we will apply those sums to your company's account, which will more fully be assessed upon receipt of the documents requested herein.

> Thank you for your anticipated cooperation and for your immediate attention to this matter. I look forward to hearing from you.

Attached hereto as <u>Exhibit 5</u> and incorporated herein by reference is this letter.

44.    On October 31, 2007, by letter from Carotek to Kobayashi Ventures, Carotek referred Kobayashi Ventures to counsel Joe C. Young.

45.    On November 9, 2007, Kobayashi Ventures provided to Carotek, by its counsel Joe C. Young, a letter stating in pertinent part as follows: .

> In light of the fact that you now have this matter and presumably have had a chance to review the referenced Agreement, I would appreciate hearing from you promptly regarding the issues raised in my letter. Of particular importance is the need to bring current the arrearage on the minimum royalty payments set forth in the Agreement.

Attached hereto as Exhibit 6 and incorporated herein by reference is this letter.

46.    On November 26, 2007, Kobayashi Ventures provided to Carotek, by its CEO J. Addison Bell and its counsel Joe C. Young, a default notice letter stating in pertinent part as follows:

> I wrote to Mr. Bell on October 29, 2007, and I wrote in follow up to Mr. Young on November 9, 2007. As of this date, I have not received a substantive response to my two attempts to have Carotek reconcile its responsibilities under the Agreement, including but not limited to making the overdue royalty payments owed pursuant to Article 3 thereof. As a result, Carotek is hereby placed upon formal notice of default, for its breaches, *inter alia* of Articles 3, 4 and 5 of the Agreement. Further pursuant to §16.2, this Agreement shall terminate on the thirty-first (31st) day after the date of this letter.

> Please note that pursuant to §16.5 of the Agreement, upon termination, Carotek must immediately cease the design, manufacture, sale and installation of the technology or any derivation thereof covered under the following patents to monitor any continuous process, including but not limited to paper, pulp, printing, non-woven, films, rubber, metals, plastics, glass or any other continuous processes (the "Technology"):

> U.S. Patent No. 5,717,456
> U.S. Patent No. 5,821,990
> U.S. Patent No. 6,211,905
> Australian Patent Application No. 38274/95
> Brazilian Patent Application No. PI 9510548-4
> Chilean Patent Application No. 1898-95
> Finish Patent Application No. 973611
> Indonesian Patent Application No. P952441
> Japanese Patent Application No. 8-526826
> South Korean Patent Application No. 1997-706231
> Malaysian Patent Application No. PI9703058
> Mexican Patent Application No. 976703
> New Zealand Patent Application No. 295027
> Norwegian Patent Application No. 974012
> South African Patent Application No. 95/9613
> Canadian Patent Application No. 2,214,724

As made clear in §16.4, upon termination, Carotek remains obligated, *inter alia* for the royalty payments which have accrued prior to the effective date of termination.

Absent a timely cure of Carotek's defaults, Carotek must immediate notify its customers of the license termination effective thirty-one (31) days from the date of this letter, and of the prohibition on any Carotek customer's use of the referenced licensed Technology for any purpose. Please provide written confirmation of that notification so Kobayashi may be assured that its intellectual property is being protected.

Thank you for your anticipated cooperation and for your immediate attention to this matter.

Attached hereto as <u>Exhibit 7</u> and incorporated herein by reference is this default notice letter.

47.    Section 16.5 of the License Agreement states in pertinent part, "in the event that this Agreement is terminated pursuant to Paragraph 16.2, LICENSEE shall immediately cease the design, manufacture, sale and installation of CV2 System, except where such design, manufacture, sale, installation, license or lease would not infringe a claim of Patent Rights which as not been held invalid in a final unappealable judgment of a court of competent jurisdiction." This section of the License Agreement makes it abundantly clear that Carotek proactively was given an effective actual notice of infringement by way of termination of the License Agreement, if it chose to continue to make, cause to be made, used, sold, and offered for sale products embodying the Kobayashi Patented Technology.

48.    The License Agreement terminated on December 27, 2007.

49.    After termination of the License Agreement, Carotek continued and continues to this day—without permission—to make, cause to be made, use, sell, and offer for sale products embodying Kobayashi's Patented Technology.

12

50.    A number of times, including the above mentioned letters, Carotek has been

notified in writing of its failure to make royalty payments, and its infringement of

Kobayashi's Patented Technology since December 27, 2007.

51.    In summary, Carotek's actions include the following:

o    1998: Entered into the License Agreement;

o    1998 to License Agreement termination: Failed to pay all royalties due under the License Agreement and upon information and belief knowingly grossly underpaid royalties owed;

o    1998 to License Agreement termination: Failed to file the mandatory reports as required under section 4.3 of the License Agreement detailing all systems sold incorporating  Kobayashi's Patented Technology;

o    2005: Attempted to avoid royalty payments and sought return of royalty payments based on an objectively erroneous interpretation of most favored license provision of the License Agreement;

o    2007: Ignored requests for payment due under the License Agreement prior to termination; and

o    Since at least December 27, 2007 to present: Willfully infringing upon Kobayashi's Patented Technology and benefiting to the detriment of the licensees who have paid nearly $2,250,000 in royalties from an unfair advantage in the marketplace by its willful infringement of Kobayashi's Patented Technology.

52.    Through its actions such as those identified hereinabove, Carotek willfully is

infringing upon Kobayashi's Patented Technology.

53. Further, at all times relevant hereto, Carotek has been obligated, among other

things, to mark on its products and integrated systems which use Kobayashi's Patented

Technology the words, "U.S. Patent(s) [and the number(s) of the patent rights applicable

thereto]" or such other patent marking as Carotek reasonably may have been directed from the

then holder of Kobayashi's Patented Technology.  Upon information and belief, Carotek

consistently has failed to do so.

54.    Further, at all times relevant hereto, Carotek has been obligated, among other

things, to submit a semiannual report detailing all sales of systems incorporating Kobayashi's

Patented Technology.  Section 4.3 of the License Agreement states in part, "Accompanying

each royalty payment shall be a written report showing the computation of such royalty

payment with supporting information in sufficient detail for CHAMPION to understand the

basis for computation.  LICENSEE shall render such written statement even if no royalty

payment is due and payable to CHAMPION for a Reporting Period."  Upon information and

belief, Carotek consistently has failed to file these mandatory reports.

55.    Since at least December 27, 2007, Carotek has, with full knowledge of the

ownership by others identified above, of Kobayashi's Patented Technology, infringed upon

Kobayashi's Patented Technology by engaging in conduct such as the following:

(a)    making, causing to be made, using, selling, and offering for

sale, without marking, license, permission and/or payment, products such as

the following:  synchronizing event capturing systems, cameras and

enclosures, and lights and enclosures, including mobile ECS and shippable

ECS, portable laptop ECS, and ECS v. 10.  These products among others,

marketed and sold by Carotek, embody Kobayashi's Patented Technology in a

manner such that the technology utilized by Carotek is substantially identical

or sufficiently similar to Kobayashi's Patented Technology, and/or such

products otherwise are within and therefore embody Kobayashi's Patented

Technology; and

14

(b)     actively inducing and causing others, such as manufacturers and

owner operators of such products:  (i) to make, cause to be made, use, sell, and

offer for sale products that embody Kobayashi's Patented Technology, without

marking, license, permission, and/or payment, and/or (ii) to modify such

products so that they embody Kobayashi's Patented Technology.

56.     Carotek will continue its acts of infringement unless enjoined by this Court.

At the least, Carotek should be immediately barred from the continued use of technology it

admittedly agreed to license under the License Agreement subsequently terminated.

57.     Carotek has installed numerous ECS Systems embodying Kobayashi's

Patented Technology.  Unknowingly, the end customers who have purchased the systems

have become unwitting accomplices to Carotek's willful infringement as Carotek has induced

these parties into believing that Kobayashi's Patented Technology incorporated into the ECS

marketed and sold by Carotek have been appropriately licensed, paid for and marked.

58.     Absent entry of an injunction, the rights of the web monitoring industry and its

direct customers, the paper, plastics and printing industries, likely will be irreparably harmed.

Specifically, failure to provide to Kobayashi Ventures the equitable relief requested herein

would allow Carotek to force its unfair advantage upon the marketplace as Carotek's

competitors are under a royalty fee obligation.  If Carotek's infringement effectively were to

be condoned by not granting to Kobayashi Ventures the equitable relief sought herein, then

Carotek will continue to gain market share at the expense of its royalty paying competitors

and use its infringement to further its unfair competitive advantage.  Such unfair competitive

advantage would be harmful to the web monitoring industry as a whole, to the paper,

packaging, plastics, and printing industries, and to Kobayashi Ventures and the licensees of

Kobayashi's Patented Technology, and ultimately to the downstream consumers.

59.    Remedies available at law are inadequate to compensate for an injury such as

that described in herein.

60.    The balance of hardships between Kobayashi Ventures and Carotek warrants

granting to Kobayashi Ventures an equitable remedy.  Denying the legitimate royalty paying

operators in the web monitoring industry and Kobayashi Ventures the equitable relief sought

herein will cause Kobayashi Ventures to suffer additional immediate and real irreparable

harm.  This is due to the fact that for example there are multiple pending web monitoring

projects up for competitive bid at this time.  A failure to grant the equitable relief sought

herein would amount to a tacit consent allowing Carotek to win business at the expense of the

other legitimate royalty-paying bidders in the industry.  Carotek should not be purporting to

legitimately bid on these contracts since it lacks a valid license to Kobayashi's Patented

Technology.  Granting to Carotek not only the ongoing ability to bid but also the ongoing

ability to benefit from a significant pricing advantage as a direct result of its ill-gotten price

disparity would be doubly damaging to the market.  The resulting damage to the web

monitoring industry and its customers would be impossible to reverse after the fact, given that

the legitimate winning bid amount and bidder would be indeterminate and the well poisoned.

In contrast, granting the limited equitable relief sought simply would place Carotek in the

rightful position it chose to be in by failing to timely cure its default.  Absent the relief sought,

Carotek would continue to profit from its infringement at the expense of the legitimate

licensees and customers in the web monitoring industry.

61.    For reasons described hereinabove, the public interest would be well served by granting to Kobayashi Ventures the equitable relief sought herein.  The very purpose of the United States Patent and Trademark Office as well as the statutory scheme governing intellectual property rights throughout the United States of America will be threatened if companies are permitted to misappropriate protected, patented and/or otherwise proprietary technology for themselves without cost or ramification.  A denial of the equitable relief sought herein materially would also disserve the public interest in the manner described in ¶¶ 57 and 59 above.  Additionally, should an infringer such as Carotek gain sufficient market share that it drives legitimate, properly acting competitors out of business, this would have an anticompetitive effect by reducing the number of options available to consumers.

### AS AND FOR A FIRST COUNTERCLAIM
Patent Infringement

62.    Kobayashi Ventures incorporates herein by reference the allegations set forth in ¶¶ 28 through 61 above.

63.    Since at least December 27, 2007,Carotek has committed acts of infringement pursuant to 35 U.S.C. § 271, including without authority, making, using, offering to sell, and/or selling Kobayashi's Patented Technology.

64.    Pursuant to 35 U.S.C. § 271 Kobayashi Ventures reserves all rights to amend its COUNTERCLAIM to encompass additional acts of Patent Infringement including but not limited to discovery of unreported sales resulting from Carotek's failure to comply with the mandatory reporting requirements of Section 4.3 of the License Agreement.

65.    Carotek's patent infringement proximately has caused and continues to cause Kobayashi Ventures to sustain damages, and Kobayashi Ventures is threatened with the injury described and inferred from the allegations herein.

## AS AND FOR A SECOND COUNTERCLAIM
Patent Infringement (Inducement)

66.     Kobayashi Ventures incorporates herein by reference the allegations set forth in ¶¶ 28 through 65 above.

67.     Carotek has committed acts of infringement pursuant to 35 U.S.C. § 271, including without authority, actively inducing and causing others, such as manufacturers and owner operators of such products, (i) to make, cause to be made, use, sell, and offer for sale products which embody Kobayashi's Patented Technology, and/or (ii) to modify such products so that they embody Kobayashi's Patented Technology.

68.     Pursuant to 35 U.S.C. § 271 Kobayashi Ventures reserves all rights to amend its counterclaim to encompass additional acts of Patent Infringement (Inducement) including but not limited to discovery of unreported sales resulting from Carotek's failure to comply with the mandatory reporting requirements of Section 4.3 of the License Agreement.

69.     Carotek's patent infringement proximately has caused and continues to cause Kobayashi Ventures to sustain damages, and Kobayashi Ventures is threatened with the injury described and inferred from the allegations herein.

## AS AND FOR A THIRD COUNTERCLAIM
Breach of License Agreement

70.     Kobayashi Ventures incorporates herein by reference the allegations set forth in ¶¶ 28 through 69 above.

71.     Under the License Agreement, Carotek had contractual obligations to, among other things, make royalty payments pursuant to Articles III and IV; maintain and make available pertinent records relating to license fee payments, royalties and the like pursuant to Article V; maintain confidentiality pursuant to Article VII; mark pursuant to Article XIV;

upon termination immediately cease design, manufacture, sale and installation of subject

products pursuant to Section 16.5; *et cetera.*

72.     Carotek materially breached the License Agreement by failing to perform as

required by the License Agreement, including but not limited to failure to comply with the

Articles/Sections identified in ¶ 68 above.

73.     Carotek's material breaches of the License Agreement proximately have

caused damages to Kobayashi Ventures estimated at $720,000.

74.     Kobayashi Ventures and its predecessor Licensors duly have performed all

duties required of Licensor under the License Agreement.

WHEREFORE, Counter-plaintiff, Kobayashi Ventures, L.L.C. respectfully requests

that this Honorable Court grant to it the following relief:

A.     A preliminary injunction followed by a permanent injunction (i)
enjoining Carotek from engaging in patent infringement as
detailed in this Complaint, (ii) enjoining Carotek from inducing
others to engage in patent infringement as detailed in this
Complaint, and (iii) mandating that Carotek provide immediate
written notice of the infringement to customers to whom
Carotek has sold products and/or systems containing
Kobayashi's Patented Technology since December 27, 2007;

B.     An interim order mandating Carotek to escrow five (5%)
percent of the "net sales price" (as defined in the License
Agreement) of all products and systems it has at any time sold
which use Kobayashi's Patented Technology and for which the
appropriate royalty payment was not made, including pre-
judgment interest calculated from the due dates of the respective
royalty payments to the present at the applicable prime interest
rate(s);

C.     An order requiring Carotek to account for and pay to Kobayashi
Ventures damages for patent infringement since December 27,
2007, including interest on damages;

D.     Treble damages as applicable pursuant to 35 U.S.C. § 284;

E.      An order granting to Kobayashi Ventures costs and reasonable attorneys' fees to be assessed against Carotek, particularly in view of ongoing, willful infringement;

F.      An order granting to Kobayashi Ventures damages in an amount to be determined at the close of discovery and currently estimated to be up to at least $720,000, pre-judgment interest as allowable by applicable law, post-judgment interest, and costs, and such other and further relief which the Court deems just and proper; and

G.      Such other and further relief which the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Kobayashi Ventures, LLC elects a trial by jury of all issues and claims in this action.

Dated: February 8, 2008

GALLAGHER, HARNETT & LAGALANTE LLP
Attorneys for Defendant/Counter-plaintiff
Kobayashi Ventures, LLC

By:      _____

Brian K. Gallagher (BG 6377)
(A Member of the Firm)
380 Lexington Avenue, Suite 2120
New York, New York 10168
(212) 983-9700

-and-

STEIN, SPERLING, BENNETT, DE JONG,
DRISCOLL & GREENFEIG, P.C.
25 West Middle Lane
Rockville, Maryland 20850
(301) 340-2020

TO:    Raymond Castello
       Fish & Richardson, PC
       Citigroup Center – 52nd Floor
       153 East 53rd Street
       New York, NY 10022-4661

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x

CAROTEK, INC.,                              :

                              :       07 Civ. 11163 (NRB) (RLE)

               Plaintiff/Counter-defendant   :

                              :       **AFFIDAVIT**
                              :       **OF SERVICE**

      -against-                          :

                              :

KOBAYASHI VENTURES, LLC,                     :

                              :

             Defendant/Counter-plaintiff.  :
-------------------------------------------------------------x

STATE OF NEW YORK     )
                       ss.:
COUNTY OF NEW YORK )

         DEVIN R. ROBINSON, being duly sworn, deposes and says:

         1.     I am not a party to this action. I am over the age of eighteen and I reside in Kings County, New York. My business address is 380 Lexington Avenue, Suite 2120, New York, NY 10168.

         2.     On February 8, 2008, I served upon Plaintiff/Counter-defendant the annexed Answer and Counterclaim, dated February 8, 2008, with Exhibits 1 through 7 annexed thereto, by sending a true copy thereof by regular mail, securely sealed in a postage prepaid envelope, addressed to Raymond Castello, Esq., Fish & Richardson, PC, Citigroup Center – 52nd Floor, 153 East 53rd Street, New York, NY 10022-4661, this being the address designated for such purpose by Plaintiff/Counter-defendant's counsel in the prior papers herein.

                                                        DEVIN R. ROBINSON

Sworn to before me this
8th day of February, 2008

      Notary Public

BRIAN J. BURNS
Notary Public, State of New York
No. 5041069
Qualified in Westchester County
Term Expires March 27, _____
2011

## PATENT ASSIGNMENT

WHEREAS, Jacklin Associates, Inc., with a principal business office of 259 North Radnor Chester Road, Suite 210, Wayne, Pennsylvania 19087 are the owners of those Patents set forth on the attached Exhibit A, which include a United States Patent No. for each Patent and the date of issuance (the "Patents").

WHEREAS, Kobayashi Ventures LLC referred to as "Assignee" and whose principal business office address is Kobayashi Ventures, LLC, 12587 Fair Lakes Circle, Suite 308, Fairfax, Virginia 22033,

is desirous of acquiring the entire right, title and interest in and to said Patents.

NOW, THEREFORE, in consideration of the sum of Ten Dollars ($10.00) in hand paid and other valuable consideration, the receipt whereof is hereby acknowledged, Jacklin Associates, Inc. have sold, assigned and transferred, and by these presents do sell, assign and transfer unto Assignee the full and exclusive right, title and interest in and to the Patents.

Jacklin Associates, Inc. hereby authorizes and requests the United States Patent and Trademark Office officials to send all future correspondence pertaining to the Patents to said Assignee.

IN TESTIMONY WHEREOF, I have hereunto set my hand as of this _10 th_ day of _December_, 2007.

Jacklin Associates, Inc.

By: _John N Irwin_

On this _10_ day of _Dec_, 2007, personally appeared before me the above named President of Jacklin Associates, Inc. to me known and known to me to be the person described in, and who executed, the foregoing instrument and acknowledged the same to be his free act and deed in and for the purposes set forth in said instrument.

(SEAL)

_Nancy Vanning_
NOTARY PUBLIC

My Commission Expires: 

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
Nancy N Vanning, Notary Public
Radnor Twp, Delaware County
My commission expires Aug 23, 2011

MAR-19-1996  05:54                                                            P.02/02

Exhibit A

5,821,990  System for monitoring a continuous manufacturing process
5,899,959  Measurement of visual characteristics of paper
6,613,195  Method for conditioning paper and paperboard webs
6,207,020  Method for conditioning paper and paperboard webs
5,717,456  System for monitoring a continuous manufacturing process
6,211,905  System for monitoring a continuous manufacturing process

The above Patents, together with all divisions, continuations, reexaminations, foreign counterparts and
continuations-in-part of said patents, and any patents reissuing on any of the aforesaid patents, as well as all
license agreements and other entitlements to receive royalties to which Seller is a party with respect to the
patents ("Patent Materials").

PATENT PURCHASE AGREEMENT

This Patent Purchase Agreement (this "Agreement") is entered into, as of the Effective Date (defined below), by and between International Paper Company, a New York corporation ("Seller") and Jacklin Associates, Inc., a Pennsylvania corporation ("Purchaser").

RECITALS

WHEREAS, Seller is the owner of record of certain patent rights;

WHEREAS, Seller wishes to sell to Purchaser all of Seller's right, title, and interest in such patent rights; and

WHEREAS, Purchaser wishes to purchase from Seller all of Seller's right, title, and interest in such patent rights, free and clear of any restrictions, liens, claims, and encumbrances.

NOW THEREFORE, upon such consideration as set forth herein and all other good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, the parties hereby agree as follows:

1.    Definitions

"Assigned Agreements" means those agreements set forth on Exhibit A ("Listed Agreements") or other agreements pursuant to which Seller has granted to any third party a license or covenant not to sue under the Assigned Patent Rights ("Unlisted Agreements"); provided, that if Seller is or becomes aware of any Unlisted Agreement, Seller shall promptly notify Purchaser and, 30 days thereafter, such agreement shall be deemed a Listed Agreement.

"Assigned Patent Rights" means (a) all patents listed on Exhibit B; (b) reissues, reexaminations, extensions; and (c) foreign patents and counterparts relating to any patent listed in Exhibit B, including, without limitation, certificates of invention, utility models, industrial design protection, design patent protection, and other governmental grants or issuances.

"Contract Year" means an annual period beginning on the Effective Date or anniversary of the Effective Date.

"Deliverables" means  prosecution history files for the Assigned Patent Rights and the files for the Assigned Agreements maintained by the Seller's Intellectual Property Legal Group.

"Effective Date" means the date set forth as the Effective Date on the signature page of this Agreement.

"Minimum Payment" has the meaning set forth in Paragraph 2.2(a).

"Net Royalty Collections" means the sum of all aggregate gross revenue or payments in-kind  received by Purchaser in connection with the grant of any rights under any of the Assigned Patent Rights including without limitation from all license and/or royalty agreements (including, without limitation, the Assigned Agreements) during the Term, less all aggregate reasonable out-of-pocket costs (including, without limitation, fees and expenses for travel, attorneys, patent maintenance, third party experts and consultants and court costs) actually paid after the Effective Date by or on behalf of Purchaser in the reasonable and good faith furtherance of the negotiation or enforcement of royalty and/or license agreements (including, without limitation, the Assigned Agreements) for third party services performed after the Effective Date or the assertion and prosecution of infringement claims during the Term. Such out-of-pocket costs specifically do not include Purchaser's internal overhead such as Purchaser's salaries of employees and infrastructure.

"Seller's Net Royalty Payment" has the meaning set forth in Paragraph 2.2(a).

"Term" means the term of this Agreement, which shall begin on the Effective Date and end on the last to expire patent within the Assigned Patent Rights.

2.    Payments

2.1    Initial Payment. Within thirty (30) days after the Effective Date, Purchaser will pay to Seller Seventy-Five Thousand Dollars ($75,000.00) via certified or cashier's check sent to Seller's address set forth in Paragraph 8.6.

2.2    Ongoing Payments.

(a)    During the Term, Purchaser may pay to Seller a minimum payment of Twenty-Five Thousand Dollars ($25,000.00) per Contract Year within thirty (30) days after the end of each Contract Year (each such payment, a "Minimum Payment"). The Minimum Payments shall be creditable against any other payments made by Purchaser to Seller pursuant to Paragraph 2.2(b). Notwithstanding the foregoing, if Seller's Net Royalty Payment exceeds the Minimum Payment in a Contract Year, each dollar over and above the Minimum Payment shall be credited against succeeding Contract Years' Minimum Payment requirement. When aggregate payments made by Purchaser under this Agreement to Seller equal or exceed Two Hundred Thousand Dollars ($200,000.00), Purchaser shall irrevocably, fully, and completely own all right, title, and interest in, to, and under the Assigned Patent Rights and all minimum payment requirements shall be fully satisfied. In the event that funds from Net Royalty Collections payable to Seller under the terms hereof are insufficient in any year to satisfy the Minimum Payment obligations, Purchaser may advance its funds to satisfy such Minimum Payment obligations. In the event that Purchaser advances its funds to satisfy the Minimum Payment obligations, Purchaser shall be entitled to recoup such advances from future Net Royalty Collections which would be distributable to Seller, it being understood that Purchaser's advances would be made to satisfy the annual Minimum Payment timing differences that might arise rather than as payments which would be in excess of Seller's percentage interest in Net Royalty Collections.

(b)    During the Term, Purchaser will pay to Seller, within thirty (30) days after the end of each Contract Year, fifty percent (50%) of the aggregate Net Royalty Collections received by Purchaser during such Contract Year ("Seller's Net Royalty Payment").

As an example:

| Year | 1 | 2 | 3 |
|---|---|---|---|
| Beginning Net | 0 | -50,000 | 0 |
| Amount obtained from licensees | 100,000 | 200,000 | 800,000 |
| Cost of collections, etc. | 125,000 | 125,000 | 100,000 |
| Payment of 50% Net to IP | 0 | 12,500 | 350,000 |
| Minimum Payment to IP | 25,000 | 12,500 | 0 |
| Ending Net | -50,000 | 0 | 0 |

2.3    Statements and Payments. All payments hereunder shall be paid to Seller, without discount or offset, in United States of America Dollars. Accompanying each payment shall be a written report showing the computation of the payment with supporting information in sufficient detail for Seller to understand the basis for such computation. Payments and rendering of written statements shall be made at the address provided herein below or at such other

location as may be specified from time to time by notice in writing given to Purchaser by Seller. Acceptance by Seller of any payment tendered hereunder, whether or not the amount thereof shall be in dispute, shall not constitute acceptance of the account or written statement on which such payment is based.

  2.4  Records.  Purchaser shall keep full, true and accurate books of accounts and other records containing all particulars which may be necessary to properly ascertain and verify the payments due and payable to Seller by Purchaser hereunder. Purchaser shall upon Seller's written request to Purchaser, permit Seller to examine or have examined, at reasonable times during regular business hours, such of Purchaser's business records as may be necessary to determine the accuracy of any written statement or payment.

3.  Transfer of Rights

Seller hereby sells, assigns, transfers, and conveys to Purchaser, free and clear of any and all restrictions, liens, claims, and other encumbrances, all of Seller's right, title, and interest in and to the following:

  (i) the Assigned Patent Rights (Exhibit B) together with all causes of action (whether known or unknown, asserted or unasserted, or whether currently pending, filed, or otherwise) and other enforcement rights under, or on account of, any of the Assigned Patent Rights and any existing   rights to apply in any or all countries of the world for patents, certificates of invention, utility models, industrial design protections, design patent protections, or other governmental grants or issuances of any type. Within thirty (30) days of the Effective Date, Seller will execute and deliver to Purchaser executed and notarized assignments suitable for recording Purchaser's ownership in the applicable patent offices throughout the world in the form attached hereto (as to the United States) or equivalent form of assignment for other jurisdictions;

  (ii) the Assigned Agreements together with the right to collect royalties, license fees or other payments under or on account of any of the Assigned Agreements. Within thirty (30) days of the Effective Date, Seller will notify, pursuant to the notice requirements under the Assigned Agreements, the parties to the Assigned Agreements of such transfer and, subsequent to such notice, Seller shall have no responsibility or obligations for any liability with respect to the Assigned Agreements, except to the extent any claims, demands or causes of action are the result of Seller's breaches of or defaults under the Assigned Agreements. Purchaser accepts no, and shall not have any, responsibilities or obligations of any kind with respect to any liability, claims, demands or causes of actions that may have accrued or existed under the Assigned Agreements, or otherwise, prior to the date notice is given under the Assigned Agreements but shall be responsible for such liability, claims, demands or causes of actions that accrue with respect to Listed Agreements subsequent to the date of such notice. Any correspondence from such parties to Seller shall be immediately forwarded to Purchaser. Notwithstanding the foregoing, with respect to any agreement of which Seller is unaware and which is an Unlisted Agreement on the Effective Date, (a) Seller's obligations with respect to the assignment thereof shall be limited to such assignment as is legally permissible and (b) to the extent such assignment is not legally permissible, Seller agrees to enforce such agreement as directed by Purchaser, at Purchaser's expense, pay all resulting proceeds to Purchaser, such expenses and proceeds then being treated as having been incurred by and accrued to Purchaser for purposes of Section 2.2 hereof.

4.  PARAGRAPH INTENTIONALLY DELETED

5.  Representations and Warranties of Seller

5.1  Seller hereby represents and warrants to Purchaser, as of the Effective Date, that (i) Seller is duly formed, validly existing, and in good standing under the laws of the jurisdiction of its formation, (ii) Seller is the owner of record of the Assigned Patent Rights, and (iii) Seller has all requisite power and authority to enter into, execute, and deliver this Agreement and perform fully its obligations hereunder.

5.2  Except as expressly provide in paragraph 5.1, Assigned Patent Rights and Assigned Agreements are assigned to Purchaser by Seller "AS IS".  Seller makes no warranties or representations whatsoever with respect to

the Assigned Patent Rights and Assigned Agreements, including but not limited to. (i)a warranty of merchantability; (ii) a warranty of fitness for a particular purpose; (iii) a warranty that any particular result will be obtained through exercise of the rights granted hereunder;(iv) a warranty or representation as to the validity or scope of any Assigned Patent Rights; and (v) a warranty or representation that the Assigned Patent Rights or any use, license or sublicense thereof or any other exercise of the rights granted hereunder will be free of infringement of any patents or other proprietary rights of a third party.

6.      Representations and Warranties of Purchaser

Purchaser hereby represents and warrants to Seller, as of the Effective Date, that:

6.1     Purchaser is duly formed, validly existing, and in good standing under the laws of the jurisdiction of its formation.

6.2     Purchaser has all requisite power and authority to (i) enter into, execute, and deliver this Agreement and (ii) perform fully its obligations hereunder.

7.      License

7.1     <u>License Grant</u>. Subject to the terms and conditions of this Agreement, Purchaser hereby grants to Licensee a fully paid, perpetual, world wide, non-exclusive, nonsublicenseable, nontransferable license, under the Assigned Patent Rights, to make, have made, use, have used, sell, have sold, offer for sale, have offered for sale, have imported and import any product. Furthermore, where Licensee hereafter acquires a product from a third party vendor ("Vendor"), solely for Licensee's own internal business use but not for resale to or use by any other person, (a) Purchaser shall not enforce the Assigned Patents against such Vendor with respect to such product acquisition by Licensee and (b) Six Percent (6%) of the price paid by Licensee shall be credited against Purchaser's Minimum Payments otherwise due to Seller. As used in this subsection, "Licensee" means Seller and other entities as to which Seller possesses either majority voting control or, in the case of any entity in a foreign jurisdiction that prohibits, by law, majority control by a United States entity, the maximum percentage of control which is legally permitted.

7.2     <u>No Other Rights</u>. No right or license under any intellectual property rights is granted or shall be granted by either party by implication. All such rights or licenses are or shall be granted only as expressly provided in the terms of this Agreement.

8.      Miscellaneous

8.1     <u>Limitation of Liability</u>. NEITHER PARTY'S TOTAL LIABILITY UNDER THIS AGREEMENT WILL EXCEED ONE HALF OF THE PAYMENTS SET FORTH IN PARAGRAPHS 2.1 AND 2.2 OF THIS AGREEMENT.    THE PARTIES ACKNOWLEDGE THAT THE LIMITATIONS ON POTENTIAL LIABILITIES SET FORTH IN THIS PARAGRAPH 8.1 WERE AN ESSENTIAL ELEMENT IN SETTING CONSIDERATION UNDER THIS AGREEMENT.

8.2     <u>Limitation on Consequential Damages</u>. NEITHER PARTY WILL HAVE ANY OBLIGATION OR LIABILITY (WHETHER IN CONTRACT, WARRANTY, TORT (INCLUDING WITHOUT LIMITATION NEGLIGENCE) OR OTHERWISE, AND NOTWITHSTANDING ANY FAULT, NEGLIGENCE (WHETHER ACTIVE, PASSIVE OR IMPUTED), REPRESENTATION, STRICT LIABILITY OR PRODUCT LIABILITY), FOR ANY INCIDENTAL, INDIRECT OR CONSEQUENTIAL, MULTIPLIED, PUNITIVE, SPECIAL, OR EXEMPLARY DAMAGES OR LOSS OF REVENUE, PROFIT, SAVINGS OR BUSINESS ARISING FROM OR OTHERWISE RELATED TO THIS AGREEMENT, EVEN IF A PARTY OR ITS REPRESENTATIVES HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.    THE PARTIES ACKNOWLEDGE THAT THESE EXCLUSIONS OF POTENTIAL DAMAGES WERE AN ESSENTIAL ELEMENT IN SETTING CONSIDERATION UNDER THIS AGREEMENT.

8.3    Compliance With Laws.  Notwithstanding anything contained in this Agreement to the contrary, the obligations of the parties with respect to the consummation of the transactions contemplated by this Agreement shall be subject to all laws, present and future, of any government having jurisdiction over the parties and this transaction, and to orders, regulations, directions or requests of any such government.

8.4    Confidentiality.  For a period of three (3) years from the Effective Date, the parties hereto will keep the terms and existence of this Agreement and the identities of the parties hereto and their affiliates, as well as all information (including but not limited to Common Interest Material), documents, materials and things exchanged and assigned as contemplated herein, including without limitation the Assigned Patent Rights, Assigned Agreements, and Deliverables, confidential and will not now or hereafter divulge any of this information to any third party except (a) with the prior written consent of the other party; (b) as otherwise may be required by law or legal process, including, without limitation, in confidence to legal and financial advisors in their capacity of advising a party in such matters or potential successors-in-interest or acquirers; (c) during the course of litigation, so long as the disclosure of such terms and conditions is restricted in the same manner as is the confidential information of other litigating parties; (d) in confidence to its employees, consultants, legal counsel, accountants, banks and financing sources and their advisors solely in connection with complying with its obligations under this Agreement; (e) by Purchaser, in order to perfect Purchaser's interest in the Assigned Patent Rights with any governmental patent office (including, without limitation, recording the Executed Assignments in any governmental patent office); or (f) to enforce Purchaser's right, title, and interest in and to the Assigned Patent Rights; provided that, in (b) and (c) above, (i) to the extent permitted by law, the disclosing party will use all legitimate and legal means available to minimize the disclosure to third parties, including, without limitation, seeking a confidential treatment request or protective order whenever appropriate or available; and (ii) the disclosing party will provide the other party with at least ten (10) days' prior written notice of such disclosure. Without limiting the foregoing, Seller will cause its agents involved in this transaction to abide by the terms of this Paragraph 8.4, including, without limitation, ensuring that such agents do not disclose or otherwise publicize the existence of this transaction with actual or potential clients in marketing materials, or industry conferences.

8.5    Governing Law; Venue/Jurisdiction.  This Agreement will be interpreted, construed, and enforced in all respects in accordance with the laws of the State of New York, without reference to any choice or conflict of law principle that would result in the application of the laws of any State other than the State of New York.

8.6    Notices.  All notices given hereunder will be given in writing and will refer to Purchaser and to this Agreement and will be delivered to the address set forth below by (i) personal delivery, or (ii) delivery postage prepaid by the following international express courier services: FedEx, U.S.P.S., DHL or UPS.

> If to Purchaser
> Jacklin Associates, Inc.
> Attention: President
> 259 North Radnor Chester Road
> Suite 210
> Wayne, Pennsylvania 19087

> If to Seller
> International Paper Company
> Attention: Chief Counsel, Intellectual Property
> 6285 Tri-Ridge Blvd.
> Loveland, OH 45140

Notices are deemed given on (a) the date of receipt if delivered personally or by express courier or, if such delivery refused, the date of refusal.  Either party may from time to time change its address for notices under this Agreement by giving the other party written notice of such change in accordance with this Paragraph 8.6.

8.7    Severability.  If any provision of this Agreement is found to be invalid or unenforceable, then the remainder of this Agreement will have full force and effect, and the invalid provision will be modified, or partially enforced, to the maximum extent permitted to effectuate the original objective.

8.8    Waiver. Failure by either party to enforce any term of this Agreement will not be deemed a waiver of future enforcement of that or any other term in this Agreement or any other agreement that may be in place between the parties.

8.9    Successors and Assigns. Each party may sell, transfer, assign, delegate, pledge or otherwise dispose of this Agreement as such party, in its sole discretion, deems fit. Any assignment inconsistent with this Paragraph 8.9 shall be null, void, and of no effect. All validly assigned and delegated rights and obligations of the parties hereunder shall be binding upon and inure to the benefit of and be enforceable by and against the successors and permitted assigns of each of the parties, as the case may be.

8.11    Independent Contractors. Seller and Purchaser are independent contractors. Neither Seller nor Purchaser nor their respective employees, members, consultants, contractors or agents are agents, fiduciaries, employees or joint venturers of the other party, nor do they have any authority to bind the other party by contract or otherwise to any obligation.

8.12    Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument. One or more copies of this Agreement may be executed but it shall not be necessary, in making proof of the existence of this Agreement, to provide more than one original copy. Facsimile signatures shall be acceptable to render this agreement binding, but those providing facsimile signatures shall follow up with original signatures by mail within a reasonable time.

8.13    Payment of Maintenance Fees. Subject to this subsection, the payment of maintenance fees of any patent within the scope of any Assigned Patent Rights shall be the responsibility of Purchaser. In the event that Purchaser decides to discontinue the payment of maintenance fees of any patent within the scope of any Assigned Patent Rights, then all right, title and interest in such patent shall forthwith and automatically revert to Seller. Purchaser shall, within at least four (4) months before the date of any payment due, provide to Seller written notice of such decision, and shall maintain any such Assigned Patent Rights in active status up to such date of payment. Upon receipt of such notice, Seller shall have the right but shall have no obligation, to take any action at its own expense, required to such Assigned Patent Right in active status. If Seller upon receipt of such notice, decides to maintain the said patent or patent application in active status, Purchaser shall, at the written request and expense of Seller, give assistance and information as it can reasonably supply from its records, and shall execute or cause to be executed such documents as Seller may reasonably required to maintain the active status of said Assigned Patent Rights in the name of Seller.

8.14    Revocation of Sale of Assigned Patents and Assigned Agreements. If Purchaser shall fail to pay any annual minimum payment when due, then Seller, may at its option, and in addition to any other remedies which it may have at law or in equity, revoke the sale of Assigned Patent Rights and Assigned Agreements to Purchaser by giving written notice thereof to Purchaser to such effect. In that event, the entire right, title and interest in and to the said Assigned Patent Rights and Assigned Agreements shall automatically revert to Seller. Within thirty (30) days after revocation of this Agreement, Purchaser shall submit to Seller a report in accordance with the provisions of paragraph 2.3 for the Contract Year in which revocation took place and therewith shall remit the amount of Seller's Net Royalty Payment then due for such Contract Year, if any and thereafter Purchaser shall have no responsibility or obligations with respect to the Assigned Agreements or payments, minimum or otherwise, of any kind or amount.

8.15    Miscellaneous. This Agreement, including its exhibits, constitutes the entire agreement between the parties with respect to the subject matter hereof and merges and supersedes all prior and contemporaneous agreements, understandings, negotiations, and discussions. Neither of the parties will be bound by any conditions, definitions, warranties, understandings, or representations with respect to the subject matter hereof other than as expressly provided herein. The paragraph headings contained in this Agreement are for reference purposes only and will not affect in any way the meaning or interpretation of this Agreement. No amendments or modifications will be effective unless in a writing signed by authorized representatives of both parties.

*[Signature Page Follows]*

In witness whereof, intending to be legally bound, the parties have executed this Patent Purchase Agreement as of the Effective Date.

SELLER:                                        PURCHASER:

International Paper Company                     Jacklin Associates, Inc.

By:_____                   By:_____

Name:_____                   Name:_____

Title:_____                  Title:_____


Effective Date:  August _____, 2007

EXHIBIT A

ASSIGNED AGREEMENTS

Carotek
Monitoring Technology Corporation
Sensodec-OY
Papertech

EXHIBIT B

ASSIGNED PATENTS

| Patent or Application No. | Serial No. | Country | Filing Date | Title of Patent and First Named Inventor |
|---|---|---|---|---|
| [Patent numbers] | For applications | [Country] | [Filing date(s)] | [Title of patent and name of first named inventor] |
| 5,821,990 | | U.S. | | |
| 5,899,959 | | U.S. | | |
| 6,363,621 | | U.S. | | |
| 6,613,195 | | U.S. | | |
| 6,207,020 | | U.S. | | |
| 5,717,456 | | U.S. | | |
| 6,211,905 | | U.S. | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

EXHIBIT C

<u>DELIVERABLES</u>

Seller will cause the following to be delivered to Purchaser, or Purchaser's representative prior to or at the Effective Date:

Agreement Files and Prosecution History Files maintained in Seller's Law Department.

EXHIBIT D
## ASSIGNMENT OF PATENT RIGHTS

For good and valuable consideration, the receipt of which is hereby acknowledged, International Paper Company, a New York corporation ("Assignor"), does hereby sell, assign, transfer, and convey unto Jacklin ("Assignee"), or its designees, all right, title, and interest that exist today and may exist in the future in and to any and all of the following (collectively, the "Patent Rights"):

(a)     the provisional patent applications, patent applications and patents listed in the table below (the "Patents");

(b)     all reissues, reexaminations, extensions, continuations, continuations in part, continuing prosecution applications, requests for continuing examinations, divisions, registrations of any item in any of the foregoing categories (a);

(c)     all foreign patents, patent applications, and counterparts relating to any item in any of the foregoing categories (a) through (b), including, without limitation, certificates of invention, utility models, industrial design protection, design patent protection, and other governmental grants or issuances;

(d)     all rights to apply in any or all countries of the world for patents, certificates of invention, utility models, industrial design protections, design patent protections, or other governmental grants or issuances of any type related to any item in any of the foregoing categories (a) through (c), including, without limitation, under the Paris Convention for the Protection of Industrial Property, the International Patent Cooperation Treaty, or any other convention, treaty, agreement, or understanding;

(e)     all causes of action (whether known or unknown or whether currently pending, filed, or otherwise) and other enforcement rights under, or on account of, any of the Patents and/or any item in any of the foregoing categories (b) through (d), including, without limitation, all causes of action and other enforcement rights for

(i)     damages,
(ii)    injunctive relief, and
(iii)   any other remedies of any kind for past, current, and future infringement; and
(iv)    all rights to collect royalties and other payments under or on account of any of the Patents and/or any item in any of the foregoing categories (b) through (h).

| Patent or Application No. | Serial No. | Country | Filing Date | Title of Patent and First Named Inventor |
|---|---|---|---|---|
| [Patent numbers] | For applications | [Country] | [Filing date(s)] | [Title of patent and name of first named inventor] |
| | | | | |
| 5,821,990 | | U.S. | | |
| 5,899,959 | | U.S. | | |
| 6,613,195 | | U.S. | | |
| 6,207,020 | | U.S. | | |
| 5,717,456 | | U.S. | | |
| 6,211,905 | | U.S. | | |

MAR-19-1996  05:55                                                              P.02/02

Assignor represents warrants and covenants the above as set forth in Paragraphs 5.1 and 5.2.

IN WITNESS WHEREOF this Assignment of Patent Rights is executed at *Loveland, OH* on *10-19-2007*.

ASSIGNOR:

INTERNATIONAL PAPER COMPANY

By: _____
Name: *NORMAN MARSOLAN*
Title: *DIRECTOR, R & D*
*(Signature MUST be notarized)*

STATE OF *OHIO*        )
                       ) ss.
COUNTY OF *CLERMONT*   )

On *10-19-2007*, before me, *JANE A. Tomlinson*, Notary Public in and for said State, personally appeared *NORMAN MARSOLAN*, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her authorized capacity, and that by his/her signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

Signature _____    (Seal)



Jane A. Tomlinson
Notary Public, State of Ohio
My Commission Expires
June 19, 2012

## LICENSE AGREEMENT

THIS AGREEMENT, made and entered into this 8th day December, 1998 between **CHAMPION INTERNATIONAL CORPORATION**, a New York Corporation having an office at One Champion Plaza, Stamford, Connecticut 06921 (hereinafter referred to as "CHAMPION", or the "Party") and **CAROTEK. INC.** a corporation organized and existing under the laws of North Carolina, having an office at 700 Sam Newell Road, P.O Box 1395, Matthews, North Carolina 28106 (hereinafter referred to as "LICENSEE" or the "Party").

## WITNESSETH THAT:

WHEREAS, CHAMPION is the owner by assignment of certain patents and patent applications (hereinafter referred to and defined as "Patent Rights") involving a proprietary process monitoring system (hereinafter referred to and defined as "$CV^2$ System");

WHEREAS, LICENSEE desires the non-exclusive right under said Patent Rights to make, use and sell $CV^2$ System and the right to further develop such System;

WHEREAS, CHAMPION is willing to grant such non-exclusive right and license to the extent that CHAMPION has the right to do so.

NOW, THEREFORE, in consideration of the promises and mutual covenants herein contained, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I - DEFINITIONS

As used herein, the following terms shall have the following meanings:

1.1     "Effective Date of this Agreement" shall mean the date first hereinabove written.

1.2     "Patent Rights" shall mean the United States and foreign patent(s) and patent application(s) listed in attached Schedule A, as well as any patent(s) issuing on the said applications and any divisionals, continuations and reissues and extensions thereof.

1.3     "$CV^2$ System" shall mean the process monitoring system claimed in Patent Rights and shall include but not be limited to all equipment sold, leased or otherwise transferred by LICENSEE under this Agreement, whether manufactured or created by LICENSEE or by a third party, such as video cameras, computers for capturing and viewing, data storage devices (i.e., disks, tapes, CD-ROMS), networking equipment (i.e. hubs, routers, bridges), switching units, power supplies, interconnecting panels and cables, and wiring for connecting various components together.

1.4     "Cost of Services" shall mean the cost of consulting, engineering, installing, supervising and like services performed by or for LICENSEE for the sale and installation of $CV^2$ System and shall be equal to TEN PERCENT (10%) of the total gross selling price for $CV^2$ System.

1.5     "Fully Absorbed Manufacturing and Installation Cost" shall mean the most favorable price offered by LICENSEE or Subsidiary of LICENSEE and accepted by a third party other than the price for the first (1st) sale of $CV^2$ System in each country, within six (6) months prior to the date

of sale to LICENSOR or Subsidiary of LICENSOR for the sale, installation, license, lease or other transfers of CV$^2$ System less twenty-five percent (25%) of such most favorable price, which Cost shall be subject to audit by CHAMPION on an open book basis during normal business hours upon reasonable prior notice.

    1.6    "Subsidiary" shall mean:

        1.6.1  Any corporation or other juridical business entity owning, or directly or indirectly controlling at least twenty percent (20%) of the stock of a Party entitled to vote for election of directors; and

        1.6.2    Any corporation or other juridical business entity at least twenty percent (20%) of whose stock, entitled to vote for election of directors, is owned, or directly or indirectly controlled by a Party.

    1.7    "CV$^2$ System Installation" shall mean the design, sale, installation, license, lease and/or other transfer of a single CV$^2$ System for monitoring the operation of a single unitary, integrated and stand alone process or apparatus used in the conduct of such process, whether in the paper, printing or other industry, (i.e. paper making machine, off machine coater, super calender, winder, etc.) or upgrades to a single existing installed CV$^2$ System.

    1.8    "Reporting Period" shall mean each semiannual period during the term of this Agreement, the first of which shall commence on the Effective Date of this Agreement and shall end on December 31, 1998, the second of which shall be from January 1, 1999 until June 30, 1999, the third of which shall be from July 1, 1999 until December 31, 1999, and the subsequent periods from January 1 until June 30 and July 1 until December 31 of the following years of the term of this agreement.

    1.9    "Commercial Sale" shall mean the CV$^2$ System Installation by LICENSEE and/or Subsidiaries of LICENSEE to a bona fide purchaser in good faith who is the user of the CV$^2$ System and does not include internal sales or transfers by and between LICENSEE and Subsidiaries of LICENSEE.

    1.10  "Net Sales Price" shall mean the sum of the Cost of Services and the gross price of Commercial Sales of CV$^2$ System less packaging charges, transportation charges; insurance against loss or damage in transit; sales, excise use and similar taxes directly incurred by LICENSEE in connection with the relevant Commercial Sale; importation duties and levies and selling commissions by resellers and agents who are not Subsidiaries of LICENSEE. If CV$^2$ System are sold, licensed, installed, designed, leased or otherwise transferred as components of a combined system, the Net Sales Price for CV$^2$ System shall be calculated by multiplying the Net Sales Price of said combined system as determined above by a fraction, the denominator of which is equal to the total list price of said combined system and the numerator of which is equal to the list price of said CV$^2$ System.

ARTICLE II-LICENSE GRANT

OCT-18-2006   23:48

P.38/61

2.1    Effective as of the Effective Date of this Agreement, CHAMPION grants to LICENSEE and LICENSEE accepts the worldwide, non-transferable, non-exclusive right and license under Patent Rights to make, use, and sell $CV^2$ System.

2.2    LICENSEE shall have the right to grant sublicenses to customers of the $CV^2$ System from LICENSEE and Subsidiaries of LICENSEE provided that a royalty has been paid to CHAMPION in accordance with ARTICLES III and IV below.

2.3    Except as expressly set forth in this ARTICLE II, no other licenses or rights are granted to LICENSEE or any other party under this Agreement with respect to any patent, patent application, trade secret, copyright, proprietary information or any other property right belonging to CHAMPION.

## ARTICLE III - ROYALTIES

3.1    During the term of this Agreement for each $CV^2$ System Installation by LICENSEE and Subsidiaries of LICENSEE to person, business, corporation, partnership or the like which is not a bona fide purchaser in good faith who is the user of the System of said $CV^2$ System Installation (i.e. distributors, resellers, and the like other than Subsidiaries of Licensee), LICENSEE shall pay to CHAMPION a running royalty of EIGHT PERCENT (8%) of the Net Sales Price of $CV^2$ System for each of said $CV^2$ Installations.

3.2    During the term of this Agreement for each $CV^2$ System Installation by LICENSEE and Subsidiaries of LICENSEE to person, business, corporation, partnership or the like which is a bona fide purchaser in good faith who is the user of the System of said $CV^2$ System Installation (i.e. printers, paper makers, article manufacturers and the like), LICENSEE shall pay to CHAMPION a running royalty of FIVE PERCENT (5%) of the Net Sales Price of $CV^2$ System for each of said $CV^2$ Installations.

3.3.    Internal sales and transfers by and between LICENSEE and Subsidiaries of LICENSEE as set forth in Paragraph 1.9. are excluded from Paragraphs 3.1. and 3.2. and do not require a royalty payment hereunder where the purchaser or transferee of the $CV^2$ System is not the manufacturer of product for commercial sale.

3.4    During the term of this Agreement and beginning January 1, 1999, LICENSEE shall pay to LICENSOR minimum guaranteed annual fees of TWENTY-FIVE THOUSAND DOLLARS ($25,000.00) per calendar year. Minimum guaranteed annual fees shall be paid to LICENSOR within thirty (30) days after the end of the calendar year for which such fees are due and payable. With respect to any calendar year, LICENSEE shall be entitled to a credit for any royalties under paragraphs 3.1 and 3.2 actually paid to LICENSOR under this Article III during such calendar year against minimum guaranteed annual fees for such year.

## ARTICLE IV-STATEMENTS AND PAYMENTS

4.1    LICENSEE shall render to CHAMPION all royalties fees due and payable to CHAMPION on account of sales of $CV^2$ System during the preceding Reporting Period. All payments of royalties and fees shall be paid to CHAMPION, without discount or offset, in United States of America Dollars.

Caroteck.$CV^2$ License                    3

4.2     All royalties due and payable on account of sales where the currency of sale is other than United States of America Dollars shall be converted into United States Dollars at the rate of exchange quoted in the Wall Street Journal on the business day of the sale. All payments of royalties and fees shall be net, and any taxes, duties, fees, and imposts of any and every kind which may be levied by any taxing authority by reason of the execution and performance of this Agreement or of payment of any royalty or fee hereunder including but not limited to income taxes, turnover taxes, Value Added Taxes and any other taxes of a similar kind shall be borne and paid by LICENSEE, except taxes imposed directly on CHAMPION or its Subsidiaries by any taxing authority.

4.3     Accompanying each royalty payment shall be a written report showing the computation of such royalty payment with supporting information in sufficient detail for CHAMPION to understand the basis for such computation. LICENSEE shall render such written statement even if no royalty payment is due and payable to CHAMPION for a Reporting Period. Payments of royalty and rendering of written statements shall be made at the address provided in Article XXI hereof or at such other location as may be specified from time to time by notice in writing given to LICENSEE by CHAMPION.

4.4 Acceptance by CHAMPION of any payment tendered hereunder, whether or not the amount thereof shall be in dispute, shall not constitute acceptance of the account or written statement on which such payment is based.

## ARTICLE V - RECORDS

5.1 LICENSEE shall keep full, true and accurate books of accounts and other records containing all particulars which may be necessary to properly ascertain and verify the license fee payments due and payable to CHAMPION by LICENSEE hereunder. LICENSEE shall upon CHAMPION's written request to LICENSEE, permit CHAMPION to examine or have examined, at reasonable times during regular business hours, such of LICENSEE's business records and those of LICENSEE's Subsidiaries as may be necessary to determine the accuracy of any written statement or license fee payment.

## ARTICLE VI - COMMERCIALIZATION EFFORTS

6.1     It is understood by the parties hereto that the license fees due and payable to CHAMPION hereunder is dependent upon the efforts exerted by LICENSEE to commercialize $CV^2$ System. LICENSEE shall promote and commercially exploit $CV^2$ System and satisfy the demand for said $CV^2$ System as it does with its other major business activities and in accordance with its regular practices of promoting and exploiting its major process monitoring systems. In the performance of LICENSEE's duties and obligations under this ARTICLE VI, LICENSEE shall have the right to use its own business and promotion names in accordance with its normal practices.

## ARTICLE VII - CONFIDENTIALITY

7.1     As used herein, "Confidential Information" shall include any and all information disclosed to LICENSEE by or through CHAMPION, including any information obtained by LICENSEE visually through an inspection of any sample, device, document or like tangible thing submitted to LICENSEE by or through CHAMPION or by observation at facilities of CHAMPION or CHAMPION Subsidiaries excluding, however, such information which:

7.1.1  Is at the time of disclosure, or thereafter becomes, a part of the public domain through no act or omission by LICENSEE, or its employees; or

7.1.2  Had been independently developed by the LICENSEE or was otherwise in LICENSEE's lawful possession prior to disclosure, as shown by written records; or

7.1.3  Is hereafter lawfully disclosed to the LICENSEE by a third party which did not acquire the information under an obligation of confidentiality from or through CHAMPION.

7.1.4  Is disclosed by LICENSEE pursuant to judicial action or governmental regulation or requirement; provided that LICENSEE shall notify CHAMPION of any order or request to disclose information in sufficient time to allow CHAMPION a reasonable time to oppose the disclosure.

For the purposes of this Paragraph 7.1, specific disclosures made to LICENSEE shall not be considered to be within the exceptions above merely because they are embraced by general disclosures in the public domain.  In addition, any combination of features disclosed to LICENSEE shall not be considered to be within the exceptions above merely because individual features are separately in the public domain.

7.2     During the term of this Agreement and for a period of ten (10) years from the termination date of this Agreement or any extensions thereto, LICENSEE  shall hold Confidential Information in confidence employing the same precautions, but not less than reasonable precautions, that LICENSEE employs to maintain the confidentiality of its own information of like character and shall not disclose the same to any third party, without the prior written consent of the CHAMPION by an authorized officer.  Notwithstanding the foregoing, LICENSEE may disclose Confidential Information to the minimum number of its directors, officers and/or employees who require access thereto for the purposes hereof and to Subsidiaries of LICENSEE assisting LICENSEE in the exercise of its rights and the performance of its obligations hereunder, provided, however, that prior to such disclosure each such director, officer, employee,  Subsidiary shall be informed of his/its obligations under this Agreement relative to the confidentiality and to the restricted use of Confidential Information, and further provided that prior to such disclosure each such Subsidiary shall execute or shall have executed written agreements obligating such Subsidiary to comply with each and every obligation of LICENSEE under this ARTICLE VII and each such director, employee and/or officer shall execute or shall have executed LICENSEE's standard employment agreement which LICENSEE warrants and represents obligates each such director, employee and/or officer to comply with the terms and conditions of confidentiality and restricted use set forth in this ARTICLE VII.

7.3     LICENSEE shall use Confidential Information only for the purposes of this Agreement, and shall make no other use of such Confidential Information without the prior written consent of CHAMPION by an authorized officer.

7.4     LICENSEE agrees that all documentary, electronic or like tangible Confidential Information, including drawings, designs, specifications, computer programs, flowsheets , sketches, descriptions, data an the like obtained from or through CHAMPION and documentary, electronic or like tangible Confidential Information which is generated by or for LICENSEE which embodies or is based upon Confidential Information are and shall remain the exclusion property of CHAMPION, and LICENSEE shall maintain the said documentary, electronic or like tangible Confidential Information at all times in its custody and subject to its control.  Promptly on termination or

Caroteck.CV$^2$ License                    5

expiration of this Agreement, Recipient shall return all such documentary, electronic or like tangible Confidential Information, as well as all copies thereof, to CHAMPION.

## ARTICLE VIII - THE INSTALLATION OF $CV^2$ SYSTEM AT FACILITIES OF CHAMPION AND CHAMPION SUBSIDIARIES

8.1    LICENSEE hereby grants to CHAMPION an option to purchase and install, in CHAMPION facilities and the facilities of CHAMPION Subsidiaries, up to ten (10) units of the $CV^2$ System at a cost not to exceed the Fully Absorbed Manufacturing and Installation Cost of such units and subject to the terms and conditions generally required by Champion in its equipment purchase agreements and agreed to by LICENSEE. The option granted to CHAMPION hereunder shall remain in force and effect in perpetuity or until the purchase and installation of the aforesaid ten (10) units of $CV^2$ System. CHAMPION may at anytime exercise its option for purchase of up to ten (10) units of the $CV^2$ System by providing written notice to LICENSEE to such effect. In such event, LICENSEE shall sell to CHAMPION or a CHAMPION Subsidiary and install at the relevant facility the very next available $CV^2$ System manufactured or have manufactured by LICENSEE or by Subsidiary of LICENSEE.

8.2    CHAMPION may purchase units of $CV^2$ System in addition to the said ten (10) units of the $CV^2$ System. The terms and conditions of such purchase sale or installation shall be no less favorable to CHAMPION than the most favorable terms and conditions offered to a third party for the purchase sale or installation a $CV^2$ System as of the date of purchase/sale or license to CHAMPION less the license fee which would have been due and payable to CHAMPION if such purchase/sale had been made to a third party.

8.3    All $CV^2$ System sold to CHAMPION or to Subsidiaries of CHAMPION hereunder shall meet mutually agreeable performance specification and guarantees, and shall be warranted by LICENSEE. The said performance specification, guarantees and warranties shall be at least as favorable to CHAMPION or to Subsidiaries of CHAMPION as the most favorable specifications, guarantees and warranties granted by LICENSEE to its other customers for $CV^2$ System as of the date of sale or license of $CV^2$ System to CHAMPION or to Subsidiaries of CHAMPION.

8.4    All persons selected and sent to facilities of a party to this Agreement in connection with any purchase, sale or installation of a $CV^2$ System under this Article VIII shall remain the employees of their respective employers as the case may be. All such persons shall observe such safety and other regulations as have been established at such facilities. Each employer shall indemnify, defend and hold harmless a party to this Agreement and its directors, officers, agents and employees against any and all loss, cost, expense or liability arising out of or resulting from any visit to facilities of such other party, by reason of injury or loss suffered by, or claim brought by, or on behalf of, any employee of such employer sent to facilities of a party pursuant to the provisions of this Agreement.

## ARTICLE IX - PUBLICITY AND PROMOTION

9.1    LICENSEE shall have no right to use any business name or trademark of CHAMPION or the name of any CHAMPION employee in any manner whatsoever, including use for any publicity or promotion of the $CV^2$ System, publications pertaining to the $CV^2$ System and the like without the prior written consent of CHAMPION by an authorized officer.

## ARTICLE X - MAINTENANCE AND FILING OF PATENTS

10.1    CHAMPION shall not be obligated to pay any charges or perform any acts whatsoever, whether required by law or otherwise, for the purpose of maintaining active or enforceable any Patent Rights, and failure of CHAMPION to do so shall not relieve LICENSEE of any obligation hereunder.

## ARTICLE XI - REPRESENTATIONS AND WARRANTIES

11.1    CHAMPION WARRANTS AND REPRESENTS THAT IT IS THE OWNER OF PATENT RIGHTS BY ASSIGNMENT AND HAS THE LAWFUL RIGHT AND AUTHORITY TO GRANT THIS LICENSE. EXCEPT AS EXPRESSLY SET FORTH IN THE PRECEDING SENTENCE, THERE ARE NO WARRANTIES OR REPRESENTATIONS WHATSOEVER, EITHER EXPRESSED OR IMPLIED, WITH RESPECT TO $CV^2$ SYSTEM OR PATENT RIGHTS, INCLUDING BUT NOT LIMITED TO:

11.1.1 A WARRANTY OF MERCHANTABILITY;

11.1.2 A WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE;

11.1.3 A WARRANTY THAT ANY PARTICULAR RESULT WILL BE OBTAINED THROUGH EXERCISE OF THE RIGHTS GRANTED HEREUNDER;

11.1.4 A WARRANTY OR REPRESENTATION AS TO THE VALIDITY OR SCOPE OF ANY PATENT RIGHTS; AND

11.1.5 A WARRANTY OR REPRESENTATION THAT $CV^2$ SYSTEM OR PATENT RIGHTS, OR ANY USE, LICENSE OR SUBLICENSE THEREOF OR ANY OTHER EXERCISE OF THE RIGHTS GRANTED HEREUNDER WILL BE FREE OF INFRINGEMENT OF ANY PATENTS OR OTHER PROPRIETARY RIGHTS OF A THIRD PARTY.

11.2    IN NO EVENT SHALL CHAMPION BE RESPONSIBLE OR LIABLE FOR ANY DAMAGES, LOSSES, CLAIMS, DEMANDS OR EXPENSES WHATSOEVER RESULTING FROM OR ARISING OUT OF THE SALE, LEASE, LICENSE OR OTHER TRANSFER OF, OR MANUFACTURE OR INSTALLATION OF, OR USE OF THE $CV^2$ SYSTEM BY CUSTOMERS OF LICENSEE OR SUBSIDIARIES OF LICENSEE INCLUDING ANY DIRECT, INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSSES, CLAIMS, DEMANDS OR EXPENSES.

11.3. NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS AGREEMENT, IN NO EVENT SHALL LICENSEE BE RESPONSIBLE OR LIABLE FOR ANY INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSSES, CLAIMS, DEMANDS OR EXPENSES WHATSOEVER RESULTING FROM OR ARISING OUT OF THIS AGREEMENT.

## ARTICLE XII- MOST FAVORED LICENSE

12.1 If Champion hereafter grants a license to a third party (other than a Subsidiary of LICENSEE) to practice all of the subject matter licensed under this Agreement and subject to more favorable royalty

terms than those set forth in ARTICLE III of this Agreement, CHAMPION shall promptly notify LICENSEE in writing of said more favorable royalty terms. Upon written request given by LICENSEE in writing within sixty (60) days after receipt of such notice, LICENSEE shall be entitled to the benefit of such more favorable terms as and from the date they became effective and only so long as they remain in effect with such third party; provided, however, that LICENSEE accepts all other applicable terms and conditions of such third party license; and provided further that in comparing royalty terms CHAMPION may assign a reasonable monetary value to any rights received from said third party by way of consideration for such third party license.

## ARTICLE XIII- DISCLAIMER AND NEGATION OF AGENCY

13.1    It is agreed and understood by the parties hereto that LICENSEE is an independent contractor, and that nothing herein contained shall be deemed to create an agency, partnership, joint venture or like relationship between the parties. Neither party hereto is authorized or empowered to act as the agent for the other party for any purpose, and shall not on behalf of such other party enter into any contract, undertaking or agreement of any sort or make any promise, warranty or representation with respect to any matter.

13.2    It is mutually understood and agreed that any act or failure to act under this Agreement by or on behalf of LICENSEE or Subsidiaries of LICENSEE including but not limited to the design, manufacture, installation and use of and sale, lease, license or the transfer of $CV^2$ System is solely under the supervision, direction and control of LICENSEE or Subsidiaries of LICENSEE, and CHAMPION shall not be responsible for any such activities. LICENSEE assumes all responsibility for any and all warranties and for any and all costs, expenses, damages, judgments, claims and liabilities resulting from or arising out of any action or failure to take any action under this Agreement by or on behalf of LICENSEE or Subsidiaries of LICENSEE, and agrees to hold CHAMPION harmless, and to defend and indemnify CHAMPION, from any such costs, expenses, judgments, damages, claims or liabilities resulting from or arising out of the manufacture, installation, use or sale of $CV^2$ System, including but not limited to claims of patent or trade secret infringement or claims of customers, end-users, of the public or of any government or agency thereof, except in cases which are set forth in Paragraph 11.3 above.

## ARTICLE XIV - PATENT MARKING

14.1    LICENSEE and Subsidiaries of LICENSEE shall mark all $CV^2$ System sold by them in the United States under the license granted herein with the words "U.S. Patent" or "U.S. Patents" and the number(s) of the Patent Rights applicable thereto, or with such other patent marking as CHAMPION may from time to time reasonably direct.

## ARTICLE XV - GOVERNMENT MARKETING CLEARANCE

15.1    Prior to marketing any $CV^2$ System in any country, LICENSEE and Subsidiaries of LICENSEE shall have such System cleared for marketing by the responsible government agencies of that country requiring such clearance.

## ARTICLE XVII - TERM AND TERMINATION

16.1    This Agreement shall commence on the Effective Date of this Agreement, and shall continue in full force and effect for the term of the last to expire Patent Rights unless this Agreement is earlier terminated as herein provided.

16.2    If LICENSEE shall fail to make any payment of a royalty owed to CHAMPION under ARTICLE III hereof or shall default in or breach any other term or provision of this Agreement, and also shall fail to remedy such default or breach within thirty (30) days after receipt of written notice specifying the default or breach and the particulars thereof from CHAMPION, then CHAMPION may at its option and in addition to any other remedies which it may have at law or in equity terminate this Agreement by giving written notice thereof to LICENSEE to such effect, in which event, this Agreement shall terminate on the thirty-first (31st) day after sending such notice.

16.3    LICENSEE shall have the right to terminate this Agreement upon thirty (30) days prior written notice to CHAMPION to such effect in the event that:

16.3.1   All the material claims of Patent Rights have been held invalid in a final unappealable judgment of a court of competent jurisdiction; or

16.3.2   A patent or proprietary right infringement dispute arises with respect to Patent rights between CHAMPION or its Subsidiary and a third party, based upon the facts of which an intellectual property attorney of ordinary skill in the art could conclude should be resolved in said third party's favor; or

16.3.3   Other material events or reasons making it impossible or unreasonable for LICENSEE to continue its performance under this Agreement.

16.4    No termination of this Agreement pursuant to this ARTICLE shall release either party from any obligations which have accrued prior to the effective date of termination including but not limited to obligations under ARTICLE III hereof to make payments due or which become due and under ARTICLE VII hereof to maintain the confidentiality of Confidential Information.

16.5    In the event that this Agreement is terminated pursuant to Paragraph 16.2, LICENSEE shall immediately cease the design, manufacture, sale and installation of $CV^2$ System, except where such design, manufacture, sale, installation, license or lease would not infringe a claim of Patent Rights which has not been held invalid in a final unappealable judgment of a court of competent jurisdiction.

16.6    If during the term of this Agreement, party shall become bankrupt or insolvent, or is subject to liquidation, or if the business of party shall be placed in the hands of a receiver or trustee, whether by the voluntary act of party or otherwise, or if party is obliged to make an assignment of assets for the benefit of creditors, or if party takes or is subject to any other action under law based on its inability to meet its financial obligations or if substantially all of party 's assets are seized or attached in connection with any action against party or are sold or attempted to be sold, this Agreement shall terminate automatically without notice.

16.7    Failure on the part of CHAMPION to notify LICENSEE of any default or breach of this Agreement, or to terminate this Agreement because of any default or breach that would give CHAMPION the right to terminate, shall not constitute a condonation of such breach or default or a waiver of future breaches or defaults.

Caroteck.$CV^2$ License                                9

## ARTICLE XVII - SEVERABILITY

17.1    If any provision of this Agreement shall be held to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

## ARTICLE XVIII - GOVERNING LAW

18.1    This Agreement shall be construed and the legal relations between the parties shall be determined, in accordance with the laws of the State of New York, without recourse to the conflict of laws of said State which would direct the use of laws of another jurisdiction.  Any suit brought by either party against the other party on the basis of any controversy or claim arising out of or relating to this Agreement or a breach thereof shall be brought in the United States District Court for the Southern District of New York, and, if the United States District Court declines jurisdiction for any reason then in the Supreme Court First Department of the State of New York. The parties hereby consent to the personal jurisdiction of the courts and hereby designate the Secretary of State of the State of New York for receipt of service of process.

## ARTICLE XIX - HEADINGS

19.1    The heading of each ARTICLE is inserted for convenience of reference only, and is not intended to be a part of or to affect the meaning or interpretation of this Agreement.

## ARTICLE XX - AGREEMENT MODIFICATION

20.1    Any agreement changing the terms of this Agreement in any way shall be valid only if the change is made in writing executed by authorized representative of the Parties hereto.

## ARTICLE XXI - COMMUNICATIONS

21.1    It shall be sufficient giving any notice, report, or other communication hereunder, if the party giving same shall deposit a copy thereof in the Post Office in a registered or certified envelope, by postage prepaid certified mail, or delivered by messenger or air courier addressed to the other party at the address provided hereinbelow or at such other address as may hereafter be designated in writing.

If to CHAMPION:          For Business Matters:
                         Champion International Corporation
                         1 CHAMPION Plaza
                         Stamford, CT 06921

                              ATTN:      Richard Piela
                                         Director, Capital Project
                                         Support and MRO

                         For Legal Matters:
                         Champion International Corporation
                         1 Champion Plaza
                         Stamford, CT 06921

                              ATTN:      Richard C. Stewart, II
                                         Chief Patent Counsel

If to LICENSEE:

                         Carotek Inc.
                         700 Sam Newell Road
                         P.O. Box 1395
                         Matthews, North Carolina 28106

                         ATTN: Addison Bell


Payments shall be made to the address indicated hereinabove for notices relating to business matters. The date of giving any such notice, invoice or other communication, and the date of making any such payment, provided that such payment is received, shall be the date on which such envelope is deposited. The Post Office receipt showing the date of such deposit shall be prima facie evidence of these facts.

### ARTICLE XXII - ASSIGNABILITY

22.1    LICENSEE may not assign this Agreement without CHAMPION's express prior written consent by an authorized officer, provided, however, that LICENSEE may assign this agreement without CHAMPION's consent to the successor of LICENSEE's business provided that such successor agrees in writing to assume each and every duty and obligation of LICENSEE under this Agreement and to be bound to the terms and conditions of this Agreement to the same extent that LICENSEE is bound. A copy of the assumption agreement shall be promptly provided to CHAMPION.

22.2    CHAMPION may assign this Agreement and the rights granted to CHAMPION as CHAMPION in its sole discretion deems fit; provided, however, that if this Agreement is assigned to a competitor of LICENSEE or its Subsidiaries, LICENSEE shall have the right to terminate this

Agreement forthwith by giving written notice thereof to CHAMPION and assignee and subject to the terms and conditions of Paragraphs 16.4 and 16.5.

22.3    Except as expressly provided in this ARTICLE XXII, any purported assignment shall be null and void.

### ARTICLE XXIII - BINDING EFFECT - BENEFIT

23.1    This Agreement shall insure to the benefit of and be binding upon the parties hereto and their respective successors in interest and permitted assigns.

### ARTICLE XXIV - ENTIRE AGREEMENT

24.1    This Agreement represents the entire understanding and agreement between the parties hereto with respect to the subject matter hereof, and supersedes all prior agreements, discussions and writings with respect thereto, either expressed or implied, between the parties.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their authorized representatives.

CHAMPION INTERNATIONAL
CORPORATION

By: _Gerard P. Closet_

Name: _GERARD P. CLOSET_

Title: _VICE PRESIDENT_

CAROTEK INC.

By: _J. Addison Bell_

Name: _J. Addison Bell_

Title: _CEO_

## SCHEDULE A

## PATENT RIGHTS

1) U.S. Patent No. 5, 717, 456;

2) U.S. Patent No. 5, 821, 990;

3) Australian Patent Application No. 38274/95;

4) Brazilian Patent Application No. PI 9510548-4;

5) Chilean Patent Application No. 1898-95;

6) Finnish Patent Application No. 973611;

7) Indonesian Patent Application No. P952441;

8) Japanese Patent Application No. 8-526826;

9) South Korean Patent Application No. 1997-706231;

10) Malaysian Patent Application No. PI9703058;

11) Mexican Patent Application No. 976703;

12) New Zealand Patent No.295027;

13) Norwegian Patent Application No. 974012;

14) South African Patent No 95/8613; and

15) European Patent Application No. 95 936 260.9.

16) Canadian Patent Application No. 2,214,724

17) US Patent No.5,821,990
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

# CAROTEK, INC.

June 7, 2005

JUN 14 2005

Mr. Richard C. Stewart, II
Chief Counsel
International Property Department
International Paper
Manufacturing Technology Center
6285 Tri-Ridge Boulevard
Loveland, OH  45140-8318

Re:    License Agreement Dated September 8, 1998 Between Champion International and
       Carotek, Inc.

Dear Mr. Stewart:

It is our understanding that Papertech, Inc., whom we believe is a licensee of Champion's $CV_2$ System Patents, has not paid any royalties on the patents for a considerable time period.

We are aware that Papertech has sold numerous systems in the United States and abroad and since they are not paying royalties it places Carotek at a competitive disadvantage.

We attach a letter from our intellectual property attorneys stating their advice to Carotek. We would appreciate your review.

Very truly yours,

J. Addison Bell
CEO

JAB:hf

Enc.

cc:  Deryl Bell, President – Carotek, Inc.
     Joe C. Young, Attorney

700 Sam Newell Road / P. O. Box 1395 / Matthews, North Carolina 28106
Office: (704) 847-4406    FAX: (704) 847-4485

F

## STEIN, SPERLING, BENNETT, DE JONG, DRISCOLL & GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850-2204

www.steinsperling.com

———

TELEPHONE (301) 340-2020

———

WRITER'S DIRECT DIAL:
(301) 838-3210

WRITER'S DIRECT FAX:
(301) 354-8110

WRITER'S E-MAIL ADDRESS:
jschwaber@steinsperling.com

FRED A. BALKIN•
MILLARD S. BENNETT•
ALEXIA KENT BOURGERIE•
DAVID S. DE JONG•
JOLIE S. DEUTSCHMAN◊
DAVID C. DRISCOLL, JR.•
STUART S. GREENFEIG•
ANN G. JAKABCIN•
JEFFREY M. SCHWABER•
DARCY A. SHOOP•
DONALD N. SPERLING•
PAUL T. STEIN•

RONALD M. BOLT•
E. ANDREW COLE•
JAMES W. DAWSON, JR.•
BRIAN R. DELLA ROCCA•
FRANK W. DUNHAM, III≈
JEFFREY FENSTER•
ROBERT J. GARAGIOLA•
MELIHA PÉREZ HALPERN◊
MONICA G. HARMS•
JONATHAN F. LIEBERMAN◊
IVONNE C. LINDLEY◊
MARY CRAINE LOMBARDO≈
DARLA J. MCCLURE•
DEANNA L. PETERS•
DIEGO J. ROJAS•
DAVID A. ROSEN•
KAREN N. SHAPIRO•

MD., DC., VA., FL.•
MD., DC., VA., NY.≈
MD., DC., PA., NJ.≈
MD., DC., VA.◊
MD., DC., NY.≈
MD., VA., NC.●
MD., DC.•
MD. ONLY°

OF COUNSEL:
KEVIN P. FAY•
ALAN S. KERXTON•
SUE ANN MAHAFFEY•
BETH McINTOSH IRVING•
DAVID R. PODOLSKY•
WILLIAM J. SCOTT•

OUR FILE NUMBER

October 29, 2007

**_VIA FEDERAL EXPRESS & FIRST CLASS MAIL_**
J. Addison Bell
Chief Executive Officer
Carotek, Inc.
700 Sam Newell Road
P.O. Box 1395
Matthews, NC 28106

RE:    _Royalty Payments due to Kobayashi Ventures_

Dear Mr. Bell:

This law firm has been engaged to represent Kobayashi Ventures, LLC, assignee of all right, title and interest of Champion International Corporation pursuant to that certain License Agreement between your company and Champion dated December 8, 1998 (the "Agreement"). Kobayashi is in the process of assessing and pursuing its claims arising, inter alia, out of that Agreement and out of the patent rights associated with the proprietary process monitoring system referenced therein.

Please provide me within ten (10) days of the date of this letter with a copy of your most recent license agreement with Champion International Corporation, along with an accounting of any and all payments made by your company either pursuant to the Agreement or otherwise as a result of your use of the proprietary process monitoring system and related technology as referenced therein. To the extent you have not already done so, please provide promptly the minimum guaranteed annual fees set forth in Paragraph 3.4 of the license agreement for each of the years since the execution of that agreement. These funds should be made payable to Kobayashi Ventures, LLC, and remitted to my attention within the same ten (10) day period delineated above. Upon receipt of the minimum royalty payments, we will apply those sums to your company's account, which will more fully be assessed upon receipt of the documents requested herein.

STEIN, SPERLING, BENNETT, DE JONG, DRISCOLL & GREENFEIG, P.C.

J. Addison Bell
October 29, 2007
Page 2

Thank you for your anticipated cooperation and for your immediate attention to this matter. I look forward to hearing from you.

Very truly yours,

Jeffrey M. Schwaber

JMS:cgv
cc:    John Larkin (via Federal Express and first class mail)
L:\CLIENTS\K\KobayashiVentures.LLC\343 Oct 29 Demand letter to Carotek.doc

STEIN, SPERLING, BENNETT, DE JONG, DRISCOLL & GREENFEIG, P.C.

FRED A. BALKIN*
MILLARD S. BENNETT*
ALEXIA KENT BOURGERIE*
DAVID S. DE JONG*
JOLIE S. DEUTSCHMAN*
DAVID C. DRISCOLL, JR.*
STUART S. GREENFEIG*
ANN G. JAKABCIN*
JEFFREY M. SCHWABER*
DARCY A. SHOOP*
DONALD N. SPERLING*
PAUL T. STEIN*

MD., DC., VA., FL.*
MD., DC., VA., NY.*
MD., DC., PA., NJ.*
MD., DC., VA.*
MD., DC., NY.*
MD., VA., NC.*
MD., DC.*
MD. ONLY*

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850-2204

www.steinsperling.com

———

TELEPHONE (301) 340-2020

———

WRITER'S DIRECT DIAL:
(301) 838-3210

WRITER'S DIRECT FAX:
(301) 354-8110

WRITER'S E-MAIL ADDRESS:
jschwaber@steinsperling.com

RONALD M. BOLT*
E. ANDREW COLE*
JAMES W. DAWSON, JR.*
BRIAN R. DELLA ROCCA*
FRANK W. DUNHAM, III*
JEFFREY FENSTER*
ROBERT J. GARAGIOLA*
MELIHA PÉREZ HALPERN*
MONICA G. HARMS*
JONATHAN F. LIEBERMAN*
IVONNE C. LINDLEY*
MARY CRAINE LOMBARDO*
DARLA J. McCLURE*
DEANNA L. PETERS*
DIEGO J. ROJAS*
DAVID A. ROSEN*
KAREN N. SHAPIRO*

OF COUNSEL:
KEVIN P. FAY*
ALAN S. KERXTON*
SUE ANN MAHAFFEY*
BETH McINTOSH IRVING*
DAVID R. PODOLSKY*
WILLIAM J. SCOTT*

November 9, 2007

OUR FILE NUMBER
2071656-1

**_VIA FEDERAL EXPRESS_**
Joe C. Young
Joe C. Young, P.A.
1515 Mockingbird Lane, Suite 520
Charlotte, NC 28209

RE:    _Royalty Payments due from Carotek, Inc. to Kobayashi Ventures_

Dear Mr. Young:

This law firm represents Kobayashi Ventures, LLC with regard to its claim against your client Carotek, Inc. I am receipt of an October 31, 2007 letter from J. Addison Bell on behalf of Carotek, Inc. in response to my letter dated October 29, 2007. I have enclosed Mr. Bell's letter as well as my October 29, 2007 letter for your convenient reference. Mr. Bell indicated he was leaving the country for a few weeks, but also indicated that he had referred the matter to you as his counsel. In light of the fact that you now have this matter and presumably have had a chance to review the referenced Agreement, I would appreciate hearing from you promptly regarding the issues raised in my letter. Of particular importance is the need to bring current the arrearage on the minimum royalty payments set forth in the Agreement.

To the extent for some reason you need to wait for Mr. Bell's return to the country, please let me know what is that reason as well as when specifically he is expected to return.

STEIN, SPERLING, BENNETT, DE JONG, DRISCOLL & GREENFEIG, P.C.

Joe C. Young
November 9, 2007
Page 2

Thank you for your immediate attention to this matter.

Very truly yours,

Jeffrey M. Schwaber

JMS:cgv
Enclosures
L:\CLIENTS\K\Kobayashi Ventures LLC\Recovery of Royalties.001\Carotek\54-1 young ltr.doc

*F*

## STEIN, SPERLING, BENNETT, DE JONG, DRISCOLL & GREENFEIG, P.C.

FRED A. BALKIN·
MILLARD S. BENNETT·
ALEXIA KENT BOURGERIE·
DAVID S. DE JONG·
JOLIE S. DEUTSCHMAN·
DAVID C. DRISCOLL, JR.·
STUART S. GREENFEIG·
ANN G. JAKABCIN·
JEFFREY M. SCHWABER·
DARCY A. SHOOP·
DONALD N. SPERLING·
PAUL T. STEIN·

MD., DC., VA., FL.·
MD., DC., VA., NY.·
MD., DC., PA., NJ.ᴿ
MD., DC., VA.
MD., DC., NY.◄
MD., VA., NC.·
MD., DC.·
MD. ONLY*

### ATTORNEYS AT LAW
### 25 WEST MIDDLE LANE
### ROCKVILLE, MARYLAND  20850-2204

www.steinsperling.com

———

TELEPHONE (301) 340-2020

———

WRITER'S DIRECT DIAL:
(301) 838-3210

WRITER'S DIRECT FAX:
(301) 354-8110

WRITER'S E-MAIL ADDRESS:
jschwaber@steinsperling.com

RONALD M. BOLT·
E. ANDREW COLE·
JAMES W. DAWSON, JR.·
BRIAN R. DELLA ROCCA·
FRANK W. DUNHAM, III◄
JEFFREY FENSTER·
ROBERT J. GARAGIOLA·
MELIHA PÉREZ HALPERN·
MONICA G. HARMS·
JONATHAN F. LIEBERMAN·
IVONNE C. LINDLEY·
MARY CRAINE LOMBARDO◄
DARLA J. MCCLURE·
DEANNA L. PETERS·
DIEGO J. ROJAS·
DAVID A. ROSEN·
KAREN N. SHAPIRO·

OF COUNSEL:
KEVIN P. FAY·
ALAN S. KERXTON·
SUE ANN MAHAFFEY·
BETH McINTOSH IRVING·
DAVID R. PODOLSKY·
WILLIAM J. SCOTT·

OUR FILE NUMBER
2070656-1

November 26, 2007

*VIA FEDERAL EXPRESS & FIRST CLASS MAIL*
J. Addison Bell
Chief Executive Officer
Carotek, Inc.
700 Sam Newell Road
P.O. Box 1395
Matthews, NC  28106

Joe C. Young
Joe C. Young, P.A.
1515 Mockingbird Lane, Suite 520
Charlotte, NC  28209

RE:    *Default Notice to Carotek, Inc. from Kobayashi Ventures, LLC*

Gentlemen:

As you know, this law firm represents Kobayashi Ventures, LLC, assignee of all right, title and interest of Champion International Corporation pursuant to that certain license agreement between Carotek, Inc. and Champion dated December 8, 1998 (the "Agreement").  I am taking the liberty of writing to both of you since it is unclear from Mr. Bell's correspondence whether Mr. Young is indeed representing Carotek in this matter and since Mr. Young has not responded to my November 9, 2007 letter.  Please let me know with whom I should communicate going forward.

STEIN, SPERLING, BENNETT, DE JONG, DRISCOLL & GREENFEIG, P.C.

J. Addison Bell
Joe C. Young
November 26, 2007
Page 2

I wrote to Mr. Bell on October 29, 2007, and I wrote in follow up to Mr. Young on November 9, 2007. As of this date, I have not received a substantive response to my two attempts to have Carotek reconcile its responsibilities under the Agreement, including but not limited to making the overdue royalty payments owed pursuant to Article 3 thereof. As a result, Carotek is hereby placed upon formal notice of default, for its breaches, *inter alia* of Articles 3, 4 and 5 of the Agreement. Further pursuant to §16.2, this Agreement shall terminate on the thirty-first (31st) day after the date of this letter.

Please note that pursuant to §16.5 of the Agreement, upon termination, Carotek must immediately cease the design, manufacture, sale and installation of the technology or any derivation thereof covered under the following patents to monitor any continuous process, including but not limited to paper, pulp, printing, non-woven, films, rubber, metals, plastics, glass or any other continuous processes (the "Technology"):

U.S. Patent No. 5,717, 456

U.S. Patent No. 5,821,990

U.S. Patent No. 6,211,905

Australian Patent Application No. 38274/95

Brazilian Patent Application No. PI 9510548-4

Chilean Patent Application No. 1898-95

Finish Patent Application No. 973611

Indonesian Patent Application No. P952441

Japanese Patent Application No. 8-526826

South Korean Patent Application No. 1997-706231

Malaysian Patent Application No. PI9703058

Mexican Patent Application No. 976703

New Zealand Patent Application No. 295027

Norwegian Patent Application No. 974012

South African Patent Application No. 95/9613

Canadian Patent Application No. 2,214,724

STEIN, SPERLING, BENNETT, DE JONG, DRISCOLL & GREENFEIG, P.C.

J. Addison Bell
Joe C. Young
November 26, 2007
Page 3


As made clear in §16.4, upon termination, Carotek remains obligated, *inter alia* for the royalty payments which have accrued prior to the effective date of termination.

Absent a timely cure of Carotek's defaults, Carotek must immediate notify its customers of the license termination effective thirty-one (31) days from the date of this letter, and of the prohibition on any Carotek customer's use of the referenced licensed Technology for any purpose. Please provide written confirmation of that notification so Kobayashi may be assured that its intellectual property is being protected.

Thank you for your anticipated cooperation and for your immediate attention to this matter.

Very truly yours,

Jeffrey M. Schwaber

JMS:cgv
cc:     Kobayashi Ventures, LLC
L:\CLIENTS\K\Kobayashi Ventures.LLC\Recovery of Royalties.001\Carotek\54-1 bell.young.ltr.doc