**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------x
CAROTEK, INC.,                                  :
                                                :          07 Civ. 11163
                    Plaintiff/Counter-defendant :
                                                :          **DEFENDANT/COUNTER-**
                                                :          **PLAINTIFF'S**
         -against-                              :          **MOTION FOR PARTIAL**
                                                :          **SUMMARY JUDGMENT**
                                                :          **(Breach of License Agreement)**
                                                :
                                                :
KOBAYASHI VENTURES, LLC,                         :
                                                :
                    Defendant/Counter-plaintiff. :
------------------------------------------------------------------x


**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
**KOBAYASHI VENTURES, LLC'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES .................................................................................................. iii

I.   INTRODUCTION ..................................................................................................... 1

II.  NOT GENUINELY DISPUTED MATERIAL FACTS ........................................... 3

III. APPLICABLE LAW AND ARGUMENT ............................................................... 9

   A.   Standard for Grant of Summary Judgment ....................................................... 9

   B.   Carotek materially breached the License Agreement as to royalties, reporting and
        records access, and marking. ...................................................................... 10

   C.   The License Agreement terminated on December 27, 2007............................ 15

   D.   Carotek never has requested or received written consent for any assignment of the
        License Agreement ..................................................................................... 15

IV.  CONCLUSION........................................................................................................ 15

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

## <u>TABLE OF AUTHORITIES</u>

<u>**Cases**</u>

<u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249-50 (1985)..................................... 10

<u>ARP Films, Inc. v. Marvel Entn't Group, Inc.</u>, 952 F.2d 643, 649 (2d Cir. 1991)...................... 12

<u>Avia Group Int'l, Inc. v. L.A. Gear, California, Inc.</u>, 853 F.2d 1557, 1561 (Fed. Cir. 1988) ...... 10

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986) ......................................................... 9

<u>DeCarlo v. Archie Comic Publications, Inc.</u>, 127 F. Supp. 2d 497, 509 (S.D.N.Y. 2001).......... 14

<u>Lear, Inc. v. Adkins</u>, 395 U.S. 653 (1969)...................................................................... 13

<u>PPG Indus., Inc. v. Westwood Chem., Inc.</u>, 530 F.2d 700 (6th Cir. 1976) ................................... 13

<u>Precision Shooting Equip., Inc. v. Holless W. Allen, Inc.</u>, 492 F. Supp. 79 (C.D. Ill. 1980)....... 13

<u>Revson v. Claire's Stores, Inc.</u>, 120 F. Supp. 2d 322, 326-27 (S.D.N.Y. 2000) ......................... 13

<u>Studiengesellschaft Kohle, M.B.H. v. Shell Oil Co.</u>, 112 F.3d 1561, 1566-68 (Fed. Cir. 1997) . 13

<u>Wallace Clark & Co., Inc., v. Acheson Indus., Inc.</u>, 422 F. Supp. 20, 22 (D.C.N.Y. 1976) ........ 12

STEIN, SPERLING, BENNETT, DE JONG, DRISCOLL & GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

I.    INTRODUCTION

Carotek, Inc. ("Carotek") has been materially breaching its License Agreement with impunity for at least several years, and likely dating back to the inception of the License Agreement on December 8, 1998.  This Motion for Partial Summary Judgment seeks liability judgment in favor of Kobayashi Ventures, LLC ("Kobayashi Ventures") and against Carotek for Carotek's material breaches of the License Agreement.  The material facts, which in part are undisputed and in remaining part are not genuinely disputed, are detailed in Section II below, with the applicable legal authorities immediately following thereafter.

Kobayashi Ventures owns the License Agreement and all rights therein.  The License Agreement pertains to a certain event capturing monitoring system which in this case has been identified as "Kobayashi's Patented Technology."[1]  From December 8, 1998 to December 27, 2007, Carotek was the licensee under the License Agreement.

In its pleading in this case, Carotek unequivocally has admitted that it is in the business of providing systems used in the paper, printing, and other web monitoring industries, that "in fact incorporate and rely on Kobayashi's Patented Technology."  Incorporation and reliance on Kobayashi's Patented Technology is not an issue for purposes of Carotek's liability to Kobayashi Ventures under the License Agreement.  Nonetheless, Carotek's admission is among the facts which suggest that the damages which necessarily flow from Carotek's material breaches of the License Agreement likely are far greater in amount than Carotek would have Kobayashi Ventures and the Court believe.

Carotek had material obligations under the License Agreement, including payment of royalties, reporting and records access necessarily associated with proper accounting and

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

---

[1] As defined in Kobayashi Ventures' Answer and Counterclaim.

payment of royalties, and marking of systems to ensure compliance. There is no genuine dispute of material fact that without legal justification or excuse, Carotek materially breached the License Agreement by, among other things, failing to pay royalties since at least June of 2005, failing to provide the requisite reporting and record availability, and failing to mark its systems. Carotek made some royalty payments under the License Agreement, usually the minimum royalty payment as set forth in the License Agreement, with the last payment having been made in or about the Spring of 2005.[2]

In this Motion for Partial Summary Judgment, Kobayashi Ventures respectfully requests that the Court enter summary judgment in favor of Kobayashi Ventures and against Carotek as to both Kobayashi Ventures' Third Counterclaim (breach of license agreement) and Carotek's declaratory judgment claim regarding breach of the License Agreement, including the following:

(i)    A declaration and judgment that Carotek materially breached the License Agreement as to royalties, reporting and records access, and marking;

(ii)    A declaration and judgment that the License Agreement terminated on December 27, 2007;

(iii)    A declaration and judgment that Carotek never has requested or received written consent for any assignment of the License Agreement;

(iv)    Judgment that $75,000 immediately is due and payable by Carotek to Kobayashi Ventures for minimum royalty payments owed for years 2005, 2006, and 2007, plus pre-judgment interest, with the additional sums owed for such

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

---

[2] A minimum royalty payment of $25,000.00 per year was owed by Carotek regardless of actual sales of such systems.

2

years based on actual sales of covered systems to be determined in the damages phase of this litigation; and

(v)    A judgment ordering unfettered access by Kobayashi Ventures to examine Carotek's business records and ascertain and verify the license fee payments that became due and payable.

II.    NOT GENUINELY DISPUTED MATERIAL FACTS

License Agreement:  December 8, 1998 to December 27, 2007

1.    On or about December 8, 1998, Carotek entered into a License Agreement ("License Agreement") with Champion International Corporation ("Champion"), acquiring patent rights to what is now known as Kobayashi's Patented Technology.[3]

2.    The License Agreement was in effect until termination on December 27, 2007.[4]

Kobayashi Ventures as Licensor

3.    Kobayashi Ventures has all rights and obligations that the original licensor, Champion, had under the License Agreement.[5]

Carotek's Incorporation and Reliance on Kobayashi Ventures' Patented Technology

4.    Carotek unequivocally admitted the following in answer to Kobayashi Ventures' Counterclaim at ¶ 32:

Carotek provides event capturing camera products, equipment, systems and software (collectively, "Event Capturing Systems" or "ECS Systems" or " ECS"

---

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

[3] Carotek's Reply to Counterclaim, docket entry no. 12, at ¶¶ 39 and 51.
[4] Carotek's Amended Declaratory Judgment Complaint, docket entry no. 22, at ¶ 29(h)(viii); Deposition of Addison Bell, CEO, Carotek and 50% owner, taken May 12, 2008 (pertinent parts cited herein as "A. Bell dep." and collected at Exhibit 1 hereto) at 64; see also R. Castello's letter dated April 30, 2008 ("Carotek had a license agreement with Champion International Corporation and its assignees until at least December 27, 2007[.]") and R. Castello's letter dated May 7, 2008 ("There is no doubt that Carotek was licensed per the 1998 agreement until at least December 27, 2007.), both of which are attached to Declaration of Alexia Kent Bourgerie, Exhibit 2 hereto.
[5] Carotek's Reply to Counterclaim at ¶ 81.

3

or "ECS II" or "ECS v.10" or "Mobile ECS" or "Shippable ECS" or "Portable Laptop ECS") used in the paper, printing and other web monitoring industries. These systems in fact incorporate and rely on Kobayashi's Patented Technology.[6]

<u>Royalties Owed Under the License Agreement:  Previously Paid and then Stopped</u>

5.      As to royalties,  the License Agreement in Article III states in pertinent part as

follows:

LICENSEE shall pay to CHAMPION a running royalty of FIVE PERCENT (5%) of the Net Sales Price of $CV^2$ System for each of said $CV^2$ Installations.

"Cost of Services" shall mean the cost of consulting, engineering, installing, supervising and like services performed by or for LICENSEE for the sale and installation of $CV^2$ System and shall be equal to TEN PERCENT (10%) of the total gross selling price for the $CV^2$ System.

"Net Sales Price" shall mean the sum of the Cost of Services and the gross price of Commercial Sales of $CV^2$ System less packaging charges, transportation charges; insurance against loss or damage in transit; sales, excise used and similar taxes directly incurred by LICENSEE in connection with the relevant Commercial Sale; importation duties and levies and selling commissions by resellers and agents who are not Subsidiaries of LICENSEE.  If $CV^2$ System are sold, licensed, installed, designed, leased or otherwise transferred as components of combined system, the Net Sales Price for $CV^2$ System shall be calculated by multiplying the Net Sales Price of said combined system as determined above by a fraction, the denominator of which is equal to the total list price of said combined system and the numerator of which is equal to the list price of said $CV^2$ System.

Therefore:

<u>Royalty Due Per $CV^2$ System Sold to bona fide purchaser</u> =  0.05 x 1.10 x [Gross Price of Commercial Sale – Directly Incurred LICENSEE costs (packaging + transport + transport insurance + taxes + duties + third party commissions)][7]

6.      Carotek made some royalty payments under the License Agreement.[8]

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

---

[6] Plaintiff's Reply to Counterclaim at ¶ 32 (admitting Answer and Counterclaim, docket entry no. 12, at ¶ 32).
[7] Carotek's Reply to Counterclaim at ¶¶ 39 and 51.  License Agreement referenced therein, Exhibit 3 to Kobayashi Ventures' Answer and Counterclaim, also is attached hereto as <u>Exhibit 3</u>.
[8] Carotek's Reply to Counterclaim at ¶ 40.

7.     Carotek calculated royalties and generally if not always paid the minimum payment, which was due whether the patents were used or not.

> Q. In calculating the royalties to pay, you, in fact, determined how much dollar volume of sales took place in a given year of—of products covered by the license agreement and then computed the royalty, and if it was under $25,000, you paid the 25, correct?
> A. Yes.[9]

8.     With a letter dated August 3, 2004, Carotek by its CEO and co-owner James Addison Bell represented in pertinent part that due to an accounting system problem, required minimum royalty payments had not been made in January of 2002 or January of 2003, and, "In fact, 2003 had a slight amount due above the minimum[.]"  The letter goes on to state in pertinent part, "Accounting has corrected this error and in the future you will receive the quarterly statements with appropriate payments as called for in the agreement, beginning with the third quarter of 2004.  We have assigned a staff person to insure the quarterly payments are properly tracked."[10]

9.     Carotek has not paid royalties since at least June of 2005.[11]

Reports Owed Under the License Agreement:  Not Provided since at least June of 2005; and Records Access Denied

10.     As to reporting and records,  the License Agreement in Articles IV and V states in pertinent part as follows:

> 4.3 Accompanying each royalty payment shall be a written report showing the computation of such royalty payment with supporting information in sufficient detail for [LICENSOR] to understand the basis for such computation. LICENSEE shall render such written statement even if no royalty payment is due and payable to [LICENSOR] for a Reporting Period.

> 5.1 LICENSEE shall keep full, true and accurate books of accounts and other records containing all particulars which may be necessary to properly ascertain

STEIN, SPERLING, BENNETT, DE JONG, DRISCOLL & GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

---

[9] A. Bell dep. at 46, l. 17 to 47, l. 1.; see also A. Bell dep. at 34, ll. 10-21; at 34, l. 22 to 35, l. 7; and at 48, l. 19 to 49, l. 1.
[10] A. Bell dep. at 54.
[11] A. Bell dep. at 58.

5

and verify the license fee payments due and payable to [LICENSOR] by
LICENSEE hereunder.  LICENSEE shall upon [LICENSOR'S] written request to
LICENSEE, permit Champion to examine or have examined, at reasonable times
during regular business hours, such of LICENSEE's business records and those of
LICENSEE's Subsidiaries as may be necessary to determine the accuracy of any
written statement or license fee payment.

This provision survives termination of the License Agreement.[12]

11.    Carotek has not provided required reports relating to calculation of royalties since

at least June of 2005.[13]

12.    Kobayashi Ventures' numerous written requests for such review of records have

been denied by Carotek.[14]

Most Favored License:  Carotek's Excuse for Non-payment of Royalties

13.    "Article XII—Most Favored License" of the License Agreement states as follows:

12.1    If Champion hereafter grants a license to a third party (other than a
Subsidiary of LICENSEE) to practice all of the subject matter licensed under this
Agreement and subject to more favorable royalty terms than those set forth in
ARTICLE III of this Agreement, CHAMPION shall promptly notify LICENSEE
in writing of said more favorable royalty terms.  Upon written request given by
LICENSEE in writing within sixty (60) days after receipt of such notice,
LICENSEE shall be entitled to the benefit of such more favorable terms as and
from the date they became effective and only so long as they remain in effect with
such third party; provided, however, that LICENSEE accepts all other applicable
terms and conditions of such third party license; and provided further that in
comparing royalty or other terms CHAMPION may assign a reasonable monetary
value to any rights received from said third party by way of consideration for such
third party license.

[Underscore added.]

14.    "[H]ereafter" means, "a word of futurity, always used in statutes and legal

documents as indicative of future time, excluding both the present and the past."[15]

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

---

[12] License Agreement.
[13] A. Bell dep. at 59, ll. 4-7.
[14] See Declaration of Alexia Kent Bourgerie.
[15] Black's Law Dictionary at 653.

6

15.     Carotek claims that its royalty payment obligations went to zero because it learned that a competitor, Papertech, Inc., was not paying royalties.[16]

16.     Papertech, Inc. ("Papertech") was granted a license agreement on November 12, 1998--before Carotek was granted a license.

17.     In any event, Papertech has been sued for its failure to pay royalties, and has never been granted more favorable royalty terms than Carotek.[17]

Marking Required Under the License Agreement:  Previously Paid and then Stopped

18.     As to marking, the License Agreement in Article XIV states in pertinent part as follows:

> 14.1    LICENSEE and Subsidiaries of LICENSEE shall mark all CV2 System sold by them in the  United States under the license granted herein with the words "U.S. patent" or "U.S. Patents" and the number(s) of the Patent Rights applicable thereto, or with such other patent marking as [LICENSOR] may from time to time reasonably direct.

19.     As to marking, Carotek's CEO and co-owner, Addison Bell, testified in pertinent part as follows:

> Q.     [] Did you understand that license agreement to require that you mark products that you were selling?
> A.     Yes.
>
> Q.     And did you, in fact, ever mark products you were selling?
> A.     I'm not sure.  We could have marked them sometimes but not always.[18]

Termination Based on Material Breach of License Agreement

20.     On November 26, 2007, Kobayashi Ventures provided to Carotek, by its CEO J. Addison Bell and its counsel Joe C. Young, a default notice letter stating in pertinent part as follows:

STEIN, SPERLING, BENNETT, DE JONG, DRISCOLL & GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

[16] A. Bell dep. at 33,  64.
[17] Kobayashi Ventures, LLC v. Papertech, Inc., Civil Case No. 1:08-cv-4450 (S.D.N.Y.).
[18] A. Bell dep. at 42, ll. 4-11.

As you know, this law firm represents Kobayashi Ventures, LLC, assignee of all right, title and interest of Champion International Corporation pursuant to that certain license agreement between Carotek, Inc. and Champion dated December 8, 1998 (the "Agreement"). I am taking the liberty of writing to both of you since it is unclear from Mr. Bell's correspondence whether Mr. Young is indeed representing Carotek in this matter and since Mr. Young has not responded to my November 9, 2007 letter. Please let me know with whom I should communicate going forward.

I wrote to Mr. Bell on October 29, 2007, and I wrote in follow up to Mr. Young on November 9, 2007. As of this date, I have not received a substantive response to my two attempts to have Carotek reconcile its responsibilities under the Agreement, including but not limited to making the overdue royalty payments owed pursuant to Article 3 thereof. As a result, Carotek is hereby placed upon formal notice of default, for its breaches, *inter alia* of Articles 3, 4 and 5 of the Agreement. Further pursuant to §16.2, this Agreement shall terminate on the thirty-first (31st) day after the date of this letter.

Please note that pursuant to §16.5 of the Agreement, upon termination, Carotek must immediately cease the design, manufacture, sale and installation of the technology or any derivation thereof covered under the following patents to monitor any continuous process, including but not limited to paper, pulp, printing, non-woven, films, rubber, metals, plastics, glass or any other continuous processes (the "Technology"):

[PATENTS LISTED]

As made clear in §16.4, upon termination, Carotek remains obligated, *inter alia* for the royalty payments which have accrued prior to the effective date of termination.

Absent a timely cure of Carotek's defaults, Carotek must immediate notify its customers of the license termination effective thirty-one (31) days from the date of this letter, and of the prohibition on any Carotek customer's use of the referenced licensed Technology for any purpose. Please provide written confirmation of that notification so Kobayashi may be assured that its intellectual property is being protected.

Thank you for your anticipated cooperation and for your immediate attention to this matter.[19]

21.    Carotek first claimed invalidity or gave notice of intent to claim invalidity at or about the filing of its Amended Complaint on July 24, 2008.

STEIN, SPERLING, BENNETT, DE JONG, DRISCOLL & GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

8

<u>Assignment Prohibited by Agreement</u>

22.     As to assignability, the License Agreement in Article XXII states in pertinent part as follows:

> 22.1     LICENSEE may not assign this Agreement without [LICENSOR's] express prior written consent by an authorized officer, provided, however, that LICENSEE may assign this agreement without [LICENSOR's consent to the successor of LICENSEE's business provided that such successor agrees in writing to assume each and every duty and obligation of LICENSEE under this Agreement and to be bound to the terms and conditions of this Agreement to the same extent that LICENSEE is bound. A copy of the assumption agreement shall be promptly provided to [LICENSOR].

23.     Carotek never has requested or received express prior written consent for any assignment of the License Agreement.[20]

III.     <u>APPLICABLE LAW AND ARGUMENT</u>

    A.     <u>Standard for Grant of Summary Judgment</u>

    The Federal Rules of Civil Procedure provide for the entry of judgment, "forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A defending party, "may, at any time, move with or without supporting affidavits for a summary judgment in the party's favor as to all or any part thereof." Fed. R. Civ. P. 56(b). Defendants' burden simply is to show that there is an absence of evidence to support Plaintiff's case. <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986).

    The Supreme Court of the United States has interpreted Fed. R. Civ. P. 56 as follows:

STEIN, SPERLING, BENNETT, DE JONG, DRISCOLL & GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

---

[19] Answer and Counterclaim at ¶ 46, admitted by Carotek in Reply to Counterclaim at ¶ 46.
[20] <u>See</u> A. Bell dep. at 49, ll. 2-14.

The Federal Rules of Civil Procedure have for almost 50 years authorized motions for summary judgment upon proper showings of the lack of a genuine, triable issue of material fact. Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed "to secure the just, speedy and inexpensive determination of every action." Before the shift to "notice pleading" accomplished by the Federal Rules, motions to dismiss a complaint or to strike a defense were the principal tools by which factually insufficient claims or defenses could be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources. But with the advent of "notice pleading," the motion to dismiss seldom fulfills this function any more, and its place has been taken by the motion for summary judgment.

Id. at 327 (citations omitted). The summary judgment rule should be interpreted in a way that allows it to accomplish one of its principal purposes—to isolate and dispose of factually unsupported claims. Id. at 323-24. The plain language of Rule 56(c) "mandates" the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. [] [T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1985) (citations omitted). "[S]ummary judgment is as appropriate in a patent case as in any other." Avia Group Int'l, Inc. v. L.A. Gear, California, Inc., 853 F.2d 1557, 1561 (Fed. Cir. 1988) (citations omitted). "It is no longer debatable that the issues in a patent case are subject to summary judgment." Id.

B.    Carotek materially breached the License Agreement as to royalties, reporting and records access, and marking.

Carotek has been materially breaching its License Agreement with impunity for at least several years, and likely dating back to the inception of the License Agreement on

STEIN, SPERLING, BENNETT, DE JONG, DRISCOLL & GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

December 8, 1998.    The undisputed and not genuinely disputed material facts demonstrating this are detailed in Section II above and summarized in pertinent part below:

· The License Agreement is a valid and enforceable agreement. *Neither party ever has disputed this.*

· The pertinent provisions of the License Agreement cited in Section II above are unambiguous. *Neither party ever has disputed this.*

· Carotek paid royalties in certain previous years and has paid no royalties for three years. *Neither party ever has disputed this.*

· Carotek has not provided any reporting for at least three years and has maintained its refusal to cooperate and comply with written requests for examination of business records as necessary to properly ascertain and verify the license fee payments due and payable under the License Agreement. *Carotek admits its failures to report since at least June of 2005, and cannot genuinely dispute that it has declined to cooperate and comply with written requests for examination of business records as necessary properly to ascertain and verify royalty payments due and payable under the License Agreement.*

· Carotek's CEO and co-owner testified in pertinent part that he <u>knew</u> that Carotek had a marking obligation under the License Agreement and Carotek <u>could have</u> marked product sometimes, though he was <u>not sure</u>. *These material facts further establishing liability for material breach of the License Agreement are undisputed.*

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

Breaches of a contract such as failure to tender payment generally are deemed material breaches of contract. See generally ARP Films, Inc. v. Marvel Entn't Group, Inc., 952 F.2d 643, 649 (2d Cir. 1991) ("the district court correctly concluded that the breach by plaintiffs in failing to make the payments and provide the reports required by the 1976 Agreement was material as a matter of law, thus authorizing Marvel to terminate the contract."). See also Wallace Clark & Co., Inc., v. Acheson Indus., Inc., 422 F. Supp. 20, 22 (D.C.N.Y. 1976) (partial summary judgment for minimum royalty payments with interest). Carotek's breaches of the License Agreement are material, undisputed in part and not genuinely disputed in remaining part, and Kobayashi Ventures is entitled to liability judgment in its favor as to these material breaches of the License Agreement.

Kobayashi Ventures anticipates that Carotek will argue that nonetheless liability judgment should not be entered in favor of Kobayashi Ventures based on (i) Carotek's recently asserted and filed claims of patent invalidity; and/or (ii) suggesting that application of the Article XII-Most Favored License ("MFL") section of the License Agreement entitles Carotek to supplant the Article III-Royalties obligations under the License Agreement with a zero royalty. In anticipation of these misguided arguments, Kobayashi Ventures directly addresses them here.

As to the first anticipated misguided argument, Kobayashi Ventures anticipates that Carotek will suggest that it recently asserted and filed a challenge to the validity of the patents and therefore may avoid certain liability under the License Agreement. That concept has been raised and discussed in case law, but is entirely inapposite to Carotek's situation, and is not the law. If a licensee ceases royalty payments for the then stated purpose of challenging patent validity, then the royalty payment obligation may suspend for such claim to be litigated and decided. See Studiengesellschaft Kohle, M.B.H. v. Shell Oil Co., 112 F.3d 1561, 1566-68 (Fed.

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

Cir. 1997) (in deciding certified question concerning the effect of an invalidity finding on unpaid royalties, the Federal Circuit enforced the license agreement, allowing recovery of royalties, stating in pertinent part, "Following the reasoning of *Diamond Scientific*, this court must prevent the injustice of allowing Shell to exploit the protection of the contract and patent rights and then later to abandon conveniently its obligations under those same rights. *See <u>Diamond Scientific</u>*, 848 F.2d at 1224-25; *see also <u>Cordis Corp.</u>*, 780 F.2d at 995 (quoting <u>*Warner-Jenkinson Co. v. Allied Chem. Corp.*</u>, 567 F.2d 184, 188, 193 USPQ 753, 757 (2d Cir. 1977) ("It would not be fair for the [licensee] to be allowed simultaneously to reap all the benefits of the licensing agreement and to deprive the licensor of all his royalties."); and further, "a licensee, such as Shell, cannot invoke the protection of the <u>Lear</u> doctrine until it (i) actually ceases payment of royalties, and (ii) provides notice to the licensor that the reason for ceasing payment of royalties is because it has deemed the relevant claims to be invalid.  Other circuits addressing this issue have arrived at the same conclusion."); <u>PPG Indus., Inc. v. Westwood Chem., Inc.</u>, 530 F.2d 700 (6th Cir. 1976) (not relieved of liability for royalties until cease payment <u>for purpose of prompting an early adjudication of invalidity of patent</u> (emphasis added) (interpreting <u>Lear, Inc. v. Adkins</u>, 395 U.S. 653 (1969)); and <u>Revson v. Claire's Stores, Inc.</u>, 120 F. Supp. 2d 322, 326-27 (S.D.N.Y. 2000). <u>See also</u> <u>Precision Shooting Equip., Inc. v. Holless W. Allen, Inc.</u>, 492 F. Supp. 79 (C.D. Ill. 1980).

Carotek never has taken the position with its licensor that it ceased royalty payments for such a stated purpose of claimed patent validity.  Carotek first raised a claim of patent invalidity <u>ten</u> <u>years</u> after entering into the License Agreement and months after termination of the License Agreement for Carotek's material breaches of the License Agreement.    As such, Carotek's

STEIN, SPERLING, BENNETT, DE JONG, DRISCOLL & GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

recently asserted patent invalidity claims are ineffective to avoid the entry of liability judgment under the License Agreement to which Kobayashi Ventures now is entitled.[21]

The second anticipated misguided argument of Carotek is that application of MFL section of the License Agreement entitles Carotek to supplant the Article III-Royalties obligations under the License Agreement with a zero royalty.  As detailed in Section II above, Carotek's CEO and co-owner testified that he claims that Carotek's royalty payments went to zero because it learned that a competitor, Papertech was not paying royalties.  The disputes with Papertech currently are being litigated in this Court, in Kobayashi Ventures, LLC v. Papertech, Inc., Civil Case No. 1:08-cv-4450.  That litigation has no bearing on Carotek's liability for material breaches of its License Agreement for at least one self evident reason.  By the express, unambiguous terms of the Most Favored License ("MFL") section of the License Agreement, the MFL section does not conceivably arise unless the licensor "hereafter" had granted a more favorable license to a licensee.  As stated in Section II above, Black's Law Dictionary defines "hereafter" as, "a word of futurity, always used in statutes and legal documents as indicative of future time, excluding both the present and the past."  The only license Papertech ever was granted regarding this technology predated Carotek's license.  Subsequent to that time, Papertech simply stopped paying and thereby breached its license agreement.  Therefore the MFL section of the License Agreement does not apply.  Papertech has been sued for non-payment of royalties and material breach of its License Agreement, and hardly can be deemed somehow to have been granted a more favorable license. To suggest otherwise

STEIN, SPERLING, BENNETT, DE JONG, DRISCOLL & GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

---

[21] Basic principles of estoppel suggest that Carotek, having acknowledged and paid royalties historically cannot now claim it did so erroneously.  See DeCarlo v. Archie Comic Publications, Inc., 127 F. Supp. 2d 497, 509 (S.D.N.Y. 2001).

would mean that the MFL section is triggered any time another licensee breaches its agreement.

C.    The License Agreement terminated on December 27, 2007.

The License Agreement was not terminated until December 27, 2007.  As detailed in Section II above, Carotek has admitted this in pleading.  Therefore Kobayashi Ventures seeks a judgment of this finding as a component of this Motion for Partial Summary Judgment.

D.    Carotek never has requested or received written consent for any assignment of the License Agreement.

Carotek never has requested or received written consent for any assignment of the License Agreement.  As detailed in Section II above, Carotek has admitted this.  As to assignability, the License Agreement in Article XXII states in pertinent part as follows:

> LICENSEE may not assign this Agreement without [LICENSOR's] express prior written consent by an authorized officer, provided, however, that LICENSEE may assign this agreement without [LICENSOR's] consent to the successor of LICENSEE's business provided that such successor agrees in writing to assume each and every duty and obligation of LICENSEE under this Agreement and to be bound to the terms and conditions of this Agreement to the same extent that LICENSEE is bound.  A copy of the assumption agreement shall be promptly provided to [LICENSOR].

Therefore Kobayashi Ventures seeks a judgment of this finding as a component of this Motion for Partial Summary Judgment.

IV.    CONCLUSION

Based on the material facts identified above, which in part are undisputed and in remaining part are not genuinely disputed, and the applicable law described herein, Kobayashi Ventures, LLC respectfully submits that as a matter of law it is entitled to liability judgment in its favor and against Carotek, Inc. as to both the Third Counterclaim

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

(breach of license agreement) and Carotek's declaratory judgment claim regarding breach of the License Agreement, including the following:

(i)    A declaration and judgment that Carotek materially breached the License Agreement as to royalties, reporting and records access, and marking;

(ii)    A declaration and judgment that the License Agreement terminated on December 27, 2007;

(iii)    A declaration and judgment that Carotek never has requested or received written consent for any assignment of the License Agreement;

(iv)    Judgment that $75,000 immediately is due and payable by Carotek to Kobayashi Ventures for minimum royalty payments owed for years 2005, 2006, and 2007, plus pre-judgment interest, with the additional sums owed for such years based on actual sales of covered systems to be determined in the damages phase of this litigation; and

(v)    A judgment ordering unfettered access by Kobayashi Ventures to examine Carotek's business records and ascertain and verify the license fee payments that became due and payable.

Respectfully submitted,


By:    _____/s/_____
        Jeffrey M. Schwaber (NY Bar #4529699)
        Alexia Kent Bourgerie, *pro hac admission*
        Attorneys for Kobayashi Ventures, LLC
        Stein, Sperling, Bennett, De Jong, Driscoll & Greenfeig, P.C.
        25 West Middle Lane
        Rockville, Maryland  20850
        Telephone:  (301) 838-3210 (Jeffrey Schwaber)
        Facsimile:  (301) 354-8110 (Jeffrey Schwaber)
        Email: jschwaber@steinsperling.com

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

Telephone: (301) 838-3232 (Alexia Kent Bourgerie)
Facsimile:  (301) 354-8132 (Alexia Kent Bourgerie)
Email:  abourgerie@steinsperling.com

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

17

<u>CERTIFICATE OF SERVICE</u>

      I HEREBY CERTIFY that on this 3rd day of September, 2008, I will electronically file the foregoing with the Clerk of the Court using the ECF system, which will then send a notification of such filing (NEF) to the following:

             Raymond R. Castello
             Fish & Richardson P.C.
             153 East 53rd Street, 52nd Floor
             New York, NY 10022

             Gregory A. Madera
             Fish & Richardson P.C.
             225 Franklin Street
             Boston, MA  02110

             W. Thad Adams, III
             Adams Intellectual Property Law, P.A.
             201 South College Street
             Suite 2350 Charlotte Plaza
             Charlotte, NC   28244

And I hereby certify that I will mail the document by U.S. mail to the following non-filing user(s):

             John Garretson
             Fish & Richardson P.C.
             153 East 53rd Street, 52nd Floor
             New York, NY 10022

                 By:                 /s/
                         Jeffrey M. Schwaber (NY Bar #4529699)
                         Alexia Kent Bourgerie, *pro hac admission*
                         Attorneys for Defendant/Counter-plaintiff
                         Kobayashi Ventures, LLC
                         Stein, Sperling, Bennett, De Jong, Driscoll & Greenfeig, P.C.
                         25 West Middle Lane
                         Rockville, Maryland  20850
                         Telephone:  (301) 838-3210 (Jeffrey Schwaber)
                         Facsimile:  (301) 354-8110 (Jeffrey Schwaber)
                         Email: jschwaber@steinsperling.com
                         Telephone: (301) 838-3232 (Alexia Kent Bourgerie)
                         Facsimile:  (301) 354-8132 (Alexia Kent Bourgerie)
                         Email:  abourgerie@steinsperling.com

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

L:\CLIENTS\K\KobayashiVentures.LLC\Carotek.002\146.msj.p&a.rev-1-TOC&TOA.doc

18

# EXHIBIT 1

1

1      IN THE UNITED STATES DISTRICT COURT

2     FOR THE SOUTHERN DISTRICT OF NEW YORK

3

CAROTEK, INCORPORATED,                     **CERTIFIED**

4                                             **COPY**

            Plaintiff,

5

        vs.                    CIVIL ACTION NO. 07CIV11163

6

KOBAYASHI VENTURES, LLC,

7

            Defendant.

8

9    VIDEOTAPE

10   DEPOSITION OF:   JAMES ADDISON BELL

11   DATE:            May 12, 2008

12   TIME:            9:39 a.m.

13   LOCATION:        A. William Roberts, Jr. & Associates

14                    6047 Tyvola Glen Circle

15                    Charlotte, North Carolina

16   REPORTED BY:     CINDY A. HAYDEN, RMR, CRR

17

18

19

20

21

22



L.A.D.
REPORTING &
DIGITAL VIDEOGRAPHY

1100 Connecticut Avenue, NW  •  Suite 850, Washington, D.C. 20036
Tel: 202.861.3410  •  800.292.4789  •  Fax: 202.861.3425
Web: ladreporting.com  •  E-mail: lisa@ladreporting.com
Additional Offices: Rockville, MD  •  Baltimore, MD  •  Greenbelt, MD  •  McLean, VA

VIDEOTAPED DEPOSITION OF JAMES ADDISON BELL
CONDUCTED ON MONDAY, MAY 12, 2008

33

1      Q.    And what happened in June of 2005 that

2  led you to consider the license agreement no longer

3  to be in effect?

4      A.    I wrote a letter to Mr. Stewart, the

5  attorney for International Paper at the time, and

6  inquired of him as to if it was true that Papertech

7  was no longer paying royalties.

8      Q.    Did you get a response to that letter?

9      A.    No.

10      Q.    And so as a result of that nonresponse,

11  you considered the agreement to no longer be in

12  force and effect?

13          MR. ADAMS:  Objection.  Same objection.

14  You're asking -- you're asking the witness to give

15  legal opinions.

16  BY MR. SCHWABER:

17      Q.    Do you understand my question?

18      A.    I did not.

19      Q.    As a result of the nonresponse from

20  Mr. Stewart, you considered the agreement to no

21  longer be in force and effect?

22      A.    I really didn't think about it one way

VIDEOTAPED DEPOSITION OF JAMES ADDISON BELL
CONDUCTED ON MONDAY, MAY 12, 2008

34

1    or the other.   Time passed, and I simply never got

2    a response from him.

3         Q.   Up until the time you wrote to

4    Mr. Stewart, were you paying royalties on behalf of

5    Carotek?

6         A.   Yes.

7         Q.   Strike that.   Was Carotek paying

8    royalty?

9         A.   Yes.

10        Q.   Okay.   And on what were you paying

11   royalties?

12        A.   We had agreed to $25,000 a year

13   minimum.

14        Q.   $25,000 a year minimum?

15        A.   Yes.

16        Q.   And is that according to the license

17   agreement?

18        A.   Yes.

19        Q.   All right.   And is that what you were

20   paying?

21        A.   To my knowledge, yes.

22        Q.   Okay.   And on what product or products

VIDEOTAPED DEPOSITION OF JAMES ADDISON BELL
CONDUCTED ON MONDAY, MAY 12, 2008

42

1        Q.    In fact, you agreed to be bound by all

2    the terms of the license agreement, correct?

3        A.    Yes.

4        Q.    Okay.  Did you understand that license

5    agreement to require that you mark products that

6    you were selling?

7        A.    Yes.

8        Q.    And did you, in fact, ever mark

9    products you were selling?

10       A.    I'm not sure.  We could have marked

11   them sometimes but not always.

12            MR. ADAMS:  Well, I'm going to object

13   to the characterization of the question.  The

14   license agreement doesn't require any such thing.

15   It requires marking of products covered by the

16   patents, the CV2s or whatever.

17            MR. SCHWABER:  Counsel, that's a

18   speaking objection, which I would ask you not to

19   make.  You can simply say objection or you could

20   say objection, calls for a legal conclusion, but

21   that objection is designed to give the witness an

22   answer to a question.

VIDEOTAPED DEPOSITION OF JAMES ADDISON BELL
CONDUCTED ON MONDAY, MAY 12, 2008

46

1    understand?

2        A.    Um-hum.

3        Q.    Is that a yes?

4        A.    Yes.

5        MR. ADAMS:  Why don't you just say the

6    latter and be done with it.

7        MR. SCHWABER:  I will attempt to say

8    the latter going forward, but I've noticed that

9    I've used the phrase both ways.  I'm responding at

10   times to your phrasing when you say it doesn't

11   contain the patent or it doesn't have the patent.

12   BY MR. SCHWABER:

13       Q.    When you were calculating the royalties

14   to pay, did you always pay the minimum royalty?

15       A.    We paid the minimum, and we may have

16   paid more.  I don't recall.

17       Q.    In calculating the royalties to pay,

18   you, in fact, determined how much dollar volume of

19   sales took place in a given year of -- of products

20   covered by the license agreement and then computed

21   the royalty, and if it was under $25,000, you paid

22   the 25, correct?

VIDEOTAPED DEPOSITION OF JAMES ADDISON BELL
CONDUCTED ON MONDAY, MAY 12, 2008

48

1    license agreement came out to less than $25,000,

2    the royalty due, then you'd still have to pay

3    $25,000, right?

4        A.    Yes.

5        Q.    And if you sold product covered by the

6    license agreement where the royalty as computed was

7    over 25,000, you would have to pay the actual

8    royalty?

9        A.    Yes.

10        Q.    Okay.  So, to make sure I'm clear, you

11    never paid a royalty of $25,000 despite a

12    calculation that said we didn't sell any product at

13    all this year that was covered by the license

14    agreement --

15            MR. ADAMS:  Objection.

16    BY MR. SCHWABER:

17        Q.    -- correct?

18        A.    I don't understand the question.

19        Q.    For each of the years that you paid the

20    $25,000 minimum royalty, you calculated actual

21    sales of product made that you believed were

22    covered by the license agreement, correct?

VIDEOTAPED DEPOSITION OF JAMES ADDISON BELL
CONDUCTED ON MONDAY, MAY 12, 2008

49

1          A.    Yes.

2          Q.    In the context of your sale of your ECS

3    business from Carotek to the company known as ECS,

4    did you transfer any rights or obligations pursuant

5    to this license agreement that's been marked as

6    Exhibit 1?

7               MR. ADAMS:   Objection, calls for a

8    legal conclusion.

9          A.    No.

10         Q.    Did you assign -- did you understand

11   that you assigned any rights under this license

12   agreement or obligations?

13         A.    The license agreement was terminated

14   December 2007.

15         Q.    So is it your belief that -- that

16   because the license agreement was terminated you

17   didn't have to transfer it?

18               MR. ADAMS:   Objection.

19         A.    I don't know.

20         Q.    Was it your intention to transfer

21   rights or obligations under this license agreement

22   if it hadn't been terminated by Kobayashi?

VIDEOTAPED DEPOSITION OF JAMES ADDISON BELL
CONDUCTED ON MONDAY, MAY 12, 2008

54

1      Q.    Okay.  Do you recall writing to

2  International Paper and tendering a check to bring

3  Champion current pursuit to its obligations as you

4  understood them?

5      A.    Yes.

6      Q.    So there was a time where you believed

7  Champion -- I'm sorry -- you believed Carotek had

8  fallen in arrears on its financial obligation?

9      A.    I'll respond -- I don't remember.  My

10  letter would speak for itself.

11      Q.    I'll show it to you.

12          (A. BELL EXH. 2, LETTER DATED 8/3/04 TO

13  MR. RICHARD C. STEWART II FROM ADDISON BELL, was

14  marked for identification.)

15  BY MR. SCHWABER:

16      Q.    Mr. Bell, take as long as you need to

17  read this letter and then tell me when you're done

18  reading it.

19      A.    I'm familiar with it.

20      Q.    Okay.  This is the letter that I was

21  just asking you about.

22      A.    Okay.

VIDEOTAPED DEPOSITION OF JAMES ADDISON BELL
CONDUCTED ON MONDAY, MAY 12, 2008

58

1    pursuant to the license agreement, correct?

2           A.    Yes.

3           Q.    And those obligations were the same

4    regardless of whether you were invoiced?

5           A.    Yes.

6           Q.    Okay.  And, in fact, you said that you

7    had an internal error that you had now corrected to

8    make sure that quarterly statements and payments as

9    called for in the agreement would be made, correct?

10          A.    Yes.

11          Q.    Did that happen going forward?

12          A.    I don't recall.  I think it did.

13          Q.    Soon after this letter you stopped

14   making payments altogether, correct?

15                MR. ADAMS:  Objection.

16          A.    I don't recall.

17          Q.    You told me earlier that at least as of

18   June 2005 you had stopped making payments, correct?

19          A.    That's correct.

20          Q.    So you don't recall whether there were

21   payments made after August 3rd, 2004?

22          A.    I do not.

VIDEOTAPED DEPOSITION OF JAMES ADDISON BELL
CONDUCTED ON MONDAY, MAY 12, 2008

59

1      Q.    But you know that no payments were made

2  after June of 2005?

3      A.    That's correct.

4      Q.    And can I assume from your testimony

5  that you know that no reports were tendered after

6  June of 2005?

7      A.    That's correct.

8      Q.    Okay.  Because you believed you didn't

9  have to?

10      A.    I'm sorry.  What was the question

11  again?

12      Q.    You didn't pay money -- royalty money

13  or tender reports after June of 2005 because you

14  believed you no longer had to?

15      A.    I believed that Mr. Stewart as counsel

16  for International Paper had a contractual and

17  ethical obligation or duty to reply to my letter

18  and return my telephone call, and he never did.

19  And he never sent me a bill or never raised the

20  issue that we owed them royalties, the 25,000 even.

21        Mr. Stewart was present at a meeting we

22  had in 1998 along with Mr. Piela, a director of

VIDEOTAPED DEPOSITION OF JAMES ADDISON BELL
CONDUCTED ON MONDAY, MAY 12, 2008

64

1          Q.    Did you believe that with the

2     agreement -- so you believed that the agreement

3     remained in force and effect at least until

4     Kobayashi terminated it?

5          A.    Yes.

6          Q.    And you believed that within the

7     confines of that agreement you were within your

8     rights not to pay royalties or submit reports?

9          A.    Without an answer from Mr. Stewart, we

10     believed under the most favored nation clause that

11     we should pay the same royalties Papertech was

12     paying, which was apparently zero.

13          Q.    And that was based on your

14     understanding of the most favored nation clause?

15          A.    Yes.

16          Q.    And was your understanding that if

17     Papertech was paying zero simply because they were

18     not honoring their obligations that you still

19     wouldn't have to pay royalties?

20          A.    Would you restate that, please?

21          Q.    You said your -- your belief was based

22     on your understanding of the most favored nation

# CAROTEK, INC.

August 3, 2004



EXHIBIT CAU
A. Bell
2

Mr. Richard C. Stewart II
Chief Counsel
Intellectual Property Department
International Paper
Manufacturing Technology Center
6285 Tri-Ridge Boulevard
Loveland, OH  45150-8318

Re:     License Agreement Dated December 8, 1998 Between Champion International
        and Carotek, Inc.

Dear Mr. Stewart:

We enclose our check for $57,739.89 to bring us current on our royalty payments.  Our
accounting system is set up to make payments on the submittal of invoices and I simply forgot to
remind us that we have an annual January minimum payment of $25,000.  Our records show that
we did not make the required payment in January of 2002 or January of 2003.  In fact, 2003 had
a slight amount due above the minimum, as you will note.  2004 has accrued $5,800.54 payable
YTD, all in the first quarter.  A detail is attached for specifics.

Accounting has corrected this error and in the future you will receive the quarterly statements with
appropriate payments as called for in the agreement, beginning with the third quarter of 2004.
We have assigned a staff person to insure the quarterly payments are properly tracked.

We attach a spreadsheet which we will use as our quarterly reporting form hereafter.  This will
identify our job number, the CV2 patent functions utilized, the date the job was commissioned,
our selling price and royalty due.  To date we have commissioned only 8 systems which utilize
some functions covered under the applicable patents.

We have not been successful with the product to date and we plan to review the feasibility of
remaining in the business by the end of this year.  If we decide to terminate the business we will
advise you at that time.

As I'm sure you are aware, the paper industry has invested very little capital for process
improvements for the last several years.  To make matters worse, additional competitors entering
our arena continue to drive the market prices down.  It also appears that industry consolidation
will continue to shrink the size of this market for some time to come.  We are hopeful that the
industry will buy more systems with an improved economy but we are doubtful as to the future of
the business.

This type of system requires continuous technology upgrades to the software systems.  So it is a
continuing, expensive R & D endeavor for us to engage.  New technologies from the "Smart
Camera" manufacturers such as Monitoring Technologies (sold thru ABB) of Fairfax, VA, Cognex
of Natick, MA and DVT of Atlanta, GA concern us because they market cameras as low as
$4,000.

Mr. Richard C. Stewart, II
August 3, 2004
Page 2

In reviewing our license again we notice that reference is made to confidential technical information that may be available from IP on these patents. You may be able to help us with this technology if you do have any technical information other than what is stated in the public Patents. That is, any technology or innovation that we could use to further the product would certainly be of help to us.

We apologize for dropping the ball on the royalty payments. Please feel assured that we will comply with our obligations in the future.

Best regards,

CAROTEK, INC.


Addison Bell
CEO

AB:hf

cc:  Mr. Deryl Bell, President – Carotek, Inc.

EXHIBIT 2

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

```
-------------------------------------------------x
                                                 :
CAROTEK, INC.,                                   :
                                                 :     Civil Action No. 07 Civ. 11163(NRB)(RLE)
              Plaintiff/Counter-defendant        :
                                                 :
        v.                                       :     DECLARATION OF
                                                 :     ALEXIA KENT BOURGERIE
KOBAYASHI VENTURES, LLC,                          :
                                                 :
              Defendant/Counter-plaintiff.       :
-------------------------------------------------x
```

ALEXIA KENT BOURGERIE, being duly sworn, deposes and says that:

1.    I am a member of Stein, Sperling, Bennett, De Jong, Driscoll & Greenfeig, P.C., attorneys for Defendant/Counter-plaintiff, Kobayashi Ventures, LLC, ("Kobayashi Ventures") in this case.  As such, I am familiar with the facts and circumstances set forth herein.  I make this affidavit in support of Kobayashi Ventures, LLC's Motion for Partial Summary Judgment.

2.    On April 4, 2008, Kobayashi Ventures, by counsel, wrote to Carotek, Inc. ("Carotek") by counsel in pertinent part as follows:

> Please be reminded that separate and apart from Carotek's discovery obligation in this litigation, completely and properly to respond to Kobayashi Venture's discovery requests, the License Agreement imposed on Carotek a mandatory duty to, among other things, "keep full, true and accurate books of accounts and other records containing all particulars which may be necessary to properly ascertain and verify the license fee payments due and payable to [LICENSOR] by LICENSEE hereunder."

3.    On May 1, 2008, Kobayashi Ventures made another demand on Carotek for the inspection of documents relating to the payment of licensing fees, again specifically referring to §5.1 of the Licensing Agreement, which requires as follows:

> 5.1 LICENSEE shall keep full, true and accurate books of accounts and other records containing all particulars which may be necessary to properly ascertain and verify the license fee payments due and payable to [LICENSOR] by LICENSEE hereunder.  LICENSEE shall upon [LICENSOR'S] written request to

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

LICENSEE, permit [LICENSOR] to examine or have examined, at reasonable times during regular business hours, such of LICENSEE's business records and those of LICENSEE's Subsidiaries as may be necessary to determine the accuracy of any written statement or license fee payment.

3.     To date, Carotek has failed to comply with these written requests for compliance with Section 5.1 of the License Agreement.

4.     True and correct copies of letters received by Kobayashi Ventures' counsel from Carotek, by counsel, dated April 30 and May 7, 2008, are attached hereto. Both state in pertinent part that Carotek was licensed per the 1998 License Agreement until at least December 27, 2007.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on September 3, 2008.

_/s/_
_____
ALEXIA KENT BOURGERIE

L:\CLIENTS\K\Kobayashi Ventures.LLC\Carotek.002\pleadings\146 MSJ. AKB Declaration.doc

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

2

# FISH & RICHARDSON P.C.

Citigroup Center
153 East 53rd Street,
52nd Floor
New York, New York
10022-4611

Frederick P. Fish
1855-1930

Telephone
212 765-5070

W.K. Richardson
1859-1951

BY EMAIL AND FEDERAL EXPRESS

Facsimile
212 258-2291

April 30, 2008

Web Site
www.fr.com

Jeffrey M. Schwaber, Esq.
Stein, Sperling, Bennet, De Jong, Driscoll & Greenfeig, P.C.
25 West Middle Lane
Rockville, MD 20850-2204

Re:    Re: *Carotek, Inc. v. Kobayashi Ventures, LLC*

Dear Jeffrey:

I write regarding a letter that you sent to J.D. Irving, Limited.  To say the least I was shocked that you sent such a letter, and I was especially shocked at the false and misleading statements that you made therein.

The first thing that Carotek and I need to know and are entitled to know is your source of information that J.D. Irving, Limited is a former customer of Carotek.  The timing of your letter suggests that your basis is our document production.

Next, we need to know and are entitled to know the extent of your improper letter writing campaign against Carotek.  Especially in light of the falsehoods that you are spreading, we need to know and are entitled to know to whom you have sent and to whom you intend to send such obviously false and defamatory statements.

We also demand to know the basis for the false and misleading statements that you have made.  For example, you know that Carotek sued Kobayashi Ventures LLC.  What is your basis for claiming that it was Kobayashi that sued Carotek?  Why did you mislead our former customer by omitting that important fact?

More importantly, you know that Carotek had a license agreement with Champion International Corporation and its assignees until at least December 27, 2007, the date that Kobayashi claims to have unilaterally terminated such agreement.  What is your basis for claiming that Carotek provided unlicensed products?

In addition, what is your basis for threatening our former customer with litigation?  What is your basis for your statement that Carotak's business plan has anything to do with J.D. Irving Limited's possible liability for patent infringement?

ATLANTA

AUSTIN

BOSTON

DALLAS

DELAWARE

MUNICH

NEW YORK

SAN DIEGO

SILICON VALLEY

TWIN CITIES

WASHINGTON, DC

FISH & RICHARDSON P.C.

Jeffrey M. Schwaber, Esq.
April 30, 2008
Page 2

I need a response to this letter by 5:00 PM on May 2, 2008 because of the imminent and irreparable harm that you are causing to Carotek. I also demand that Kobayashi and you send no further letters to former customers of Carotek, and that you and your client provide no further false and/or misleading communications about Carotek to *anyone*.

I do look forward to your reply.

Sincerely,

Raymond R. Castello

RRC/pfs

cc:     Alexia Kent Bourgerie, Esq.
        W. Thad Adams III (by Email)
        Addison Bell (by Email)

30415214.doc

# FISH & RICHARDSON P.C.

Citigroup Center
153 East 53rd Street,
52nd Floor
New York, New York
10022-4611

Telephone
212 765-5070

Facsimile
212 258-2291

Web Site
www.fr.com

Frederick P. Fish
1855-1930

W.K. Richardson
1859-1951

FR

ATLANTA

AUSTIN

BOSTON

DALLAS

DELAWARE

MUNICH

NEW YORK

SAN DIEGO

SILICON VALLEY

TWIN CITIES

WASHINGTON, DC

BY EMAIL AND FEDERAL EXPRESS

May 7, 2008

Jeffrey M. Schwaber, Esq.
Stein, Spurling, Bennet, De Jong, Driscoll & Greenfeig, P.C.
25 West Middle Lane
Rockville, MD 20850-2204

Re:     *Carotek, Inc. v. Kobayashi Ventures, LLC*

Dear Jeffrey:

I write in response to your letter dated May 2, 2008, which purports to respond to my letter dated April 30, 2008. Though you claim to respond to my letter, you did not respond to most of my concerns, questions and demands.

Most importantly, you did not provide me the identities of those companies to whom you sent and intend to send letters containing false, misleading and defamatory statements. You also did not inform me that you will honor my demands that you send no further letters to customers and former customers of Carotek, and that you provide no further false and/or misleading communications about Carotek to *anyone.*

While it is within your client's rights as a patent holder to notify companies of its "concerns about the unauthorized use of its technology", your client has no right to make false, misleading and defamatory statements when it does so. Whether or not a product is marked and whether or not a royalty is paid is irrelevant when determining whether a product is licensed. For example, you cannot claim royalties pursuant to a license agreement (as your client has done) unless the agreement is in effect and product made pursuant to it is licensed. There is no doubt that Carotek was licensed per the 1998 agreement until at least December 27, 2007. I again demand that you provide to me by May 8 at 5:00 PM the list of anyone to whom you sent letters such as the one sent to J.D. Irving, Limited. I also demand your assurance that you have ceased this improper letter writing campaign.

Second, you did not respond to my demand that you provide your basis for claiming that Kobayashi sued Carotek when you know that it was Carotek who initiated this action. You also did not explain why you misled our customer by omitting this very significant fact. Please do so by May 8 at 5:00 PM.

FISH & RICHARDSON P.C.

Jeffrey M. Schwaber, Esq.
May 7, 2008
Page 2

Frankly we are concerned that, when your client sends letters that contain false, misleading and defamatory statements, especially at a time when your client is seeking business from those to whom such letters are addressed, the purpose of the letter is not to inform anyone of rights but to instead harm Carotek. Your response to our demands will shed some light on the true purpose of these letters.

I look forward to your response.

Sincerely,

Raymond R. Castello

RRC/pfs

30416767.doc

EXHIBIT 3

<u>LICENSE AGREEMENT</u>

THIS AGREEMENT, made and entered into this 8th day December, 1998 between **CHAMPION INTERNATIONAL CORPORATION**, a New York Corporation having an office at One Champion Plaza, Stamford, Connecticut 06921 (hereinafter referred to as "CHAMPION", or the "Party") and **CAROTEK. INC.** a corporation organized and existing under the laws of North Carolina, having an office at 700 Sam Newell Road, P.O Box 1395, Matthews, North Carolina 28106 (hereinafter referred to as "LICENSEE" or the "Party").

<u>WITNESSETH THAT:</u>

WHEREAS, CHAMPION is the owner by assignment of certain patents and patent applications (hereinafter referred to and defined as "Patent Rights") involving a proprietary process monitoring system (hereinafter referred to and defined as "$CV^2$ System");

WHEREAS, LICENSEE desires the non-exclusive right under said Patent Rights to make, use and sell $CV^2$ System and the right to further develop such System;

WHEREAS, CHAMPION is willing to grant such non-exclusive right and license to the extent that CHAMPION has the right to do so.

NOW, THEREFORE, in consideration of the promises and mutual covenants herein contained, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

<u>ARTICLE I - DEFINITIONS</u>

As used herein, the following terms shall have the following meanings:

1.1    "Effective Date of this Agreement" shall mean the date first hereinabove written.

1.2    "Patent Rights" shall mean the United States and foreign patent(s) and patent application(s) listed in attached Schedule A, as well as any patent(s) issuing on the said applications and any divisionals, continuations and reissues and extensions thereof.

1.3    "$CV^2$ System" shall mean the process monitoring system claimed in Patent Rights and shall include but not be limited to all equipment sold, leased or otherwise transferred by LICENSEE under this Agreement, whether manufactured or created by LICENSEE or by a third party, such as video cameras, computers for capturing and viewing, data storage devices (i.e., disks, tapes, CD-ROMS), networking equipment (i.e. hubs, routers, bridges), switching units, power supplies, interconnecting panels and cables, and wiring for connecting various components together.

1.4    "Cost of Services" shall mean the cost of consulting, engineering, installing, supervising and like services performed by or for LICENSEE for the sale and installation of $CV^2$ System and shall be equal to TEN PERCENT (10%) of the total gross selling price for $CV^2$ System.

1.5    "Fully Absorbed Manufacturing and Installation Cost" shall mean the most favorable price offered by LICENSEE or Subsidiary of LICENSEE and accepted by a third party other than the price for the first (1st) sale of $CV^2$ System in each country, within six (6) months prior to the date

of sale to LICENSOR or Subsidiary of LICENSOR for the sale, installation, license, lease or other transfers of $CV^2$ System less twenty-five percent (25%) of such most favorable price, which Cost shall be subject to audit by CHAMPION on an open book basis during normal business hours upon reasonable prior notice.

1.6     "Subsidiary" shall mean:

1.6.1  Any corporation or other juridical business entity owning, or directly or indirectly controlling at least twenty percent (20%) of the stock of a Party entitled to vote for election of directors; and

1.6.2     Any corporation or other juridical business entity at least twenty percent (20%) of whose stock, entitled to vote for election of directors, is owned, or directly or indirectly controlled by a Party.

1.7     "$CV^2$ System Installation" shall mean the design, sale, installation, license, lease and/or other transfer of a single $CV^2$ System for monitoring the operation of a single unitary, integrated and stand alone process or apparatus used in the conduct of such process, whether in the paper, printing or other industry, (i.e. paper making machine, off machine coater, super calender, winder, etc.) or upgrades to a single existing installed $CV^2$ System.

1.8     "Reporting Period" shall mean each semiannual period during the term of this Agreement, the first of which shall commence on the Effective Date of this Agreement and shall end on December 31, 1998, the second of which shall be from January 1, 1999 until June 30, 1999, the third of which shall be from July 1, 1999 until December 31, 1999, and the subsequent periods from January 1 until June 30 and July 1 until December 31 of the following years of the term of this agreement.

1.9     "Commercial Sale" shall mean the $CV^2$ System Installation by LICENSEE and/or Subsidiaries of LICENSEE to a bona fide purchaser in good faith who is the user of the $CV^2$ System and does not include internal sales or transfers by and between LICENSEE and Subsidiaries of LICENSEE.

1.10 "Net Sales Price" shall mean the sum of the Cost of Services and the gross price of Commercial Sales of $CV^2$ System less packaging charges, transportation charges; insurance against loss or damage in transit; sales, excise use and similar taxes directly incurred by LICENSEE in connection with the relevant Commercial Sale; importation duties and levies and selling commissions by resellers and agents who are not Subsidiaries of LICENSEE. If $CV^2$ System are sold, licensed, installed, designed, leased or otherwise transferred as components of a combined system, the Net Sales Price for $CV^2$ System shall be calculated by multiplying the Net Sales Price of said combined system as determined above by a fraction, the denominator of which is equal to the total list price of said combined system and the numerator of which is equal to the list price of said $CV^2$ System.

## ARTICLE II-LICENSE GRANT

Caroteck.$CV^2$ License                    2

2.1    Effective as of the Effective Date of this Agreement, CHAMPION grants to LICENSEE and LICENSEE accepts the worldwide, non-transferable, non-exclusive right and license under Patent Rights to make, use, and sell $CV^2$ System.

2.2    LICENSEE shall have the right to grant sublicenses to customers of the $CV^2$ System from LICENSEE and Subsidiaries of LICENSEE provided that a royalty has been paid to CHAMPION in accordance with ARTICLES III and IV below.

2.3    Except as expressly set forth in this ARTICLE II, no other licenses or rights are granted to LICENSEE or any other party under this Agreement with respect to any patent, patent application, trade secret, copyright, proprietary information or any other property right belonging to CHAMPION.

<u>ARTICLE III - ROYALTIES</u>

3.1    During the term of this Agreement for each $CV^2$ System Installation by LICENSEE and Subsidiaries of LICENSEE to person, business, corporation, partnership or the like which is not a <u>bona fide</u> purchaser in good faith who is the user of the System of said $CV^2$ System Installation (i.e. distributors, resellers, and the like other than Subsidiaries of Licensee), LICENSEE shall pay to CHAMPION a running royalty of EIGHT PERCENT (8%) of the Net Sales Price of $CV^2$ System for each of said $CV^2$ Installations.

3.2    During the term of this Agreement for each $CV^2$ System Installation by LICENSEE and Subsidiaries of LICENSEE to person, business, corporation, partnership or the like which is a <u>bona fide</u> purchaser in good faith who is the user of the System of said $CV^2$ System Installation (i.e. printers, paper makers, article manufacturers and the like), LICENSEE shall pay to CHAMPION a running royalty of FIVE PERCENT (5%) of the Net Sales Price of $CV^2$ System for each of said $CV^2$ Installations.

3.3.    Internal sales and transfers by and between LICENSEE and Subsidiaries of LICENSEE as set forth in Paragraph 1.9. are excluded from Paragraphs 3.1. and 3.2. and do not require a royalty payment hereunder where the purchaser or transferee of the $CV^2$ System is not the manufacturer of product for commercial sale.

3.4    During the term of this Agreement and beginning January 1, 1999 , LICENSEE shall pay to LICENSOR minimum guaranteed annual fees of TWENTY-FIVE THOUSAND DOLLARS ($25.000.00) per calendar year. Minimum guaranteed annual fees shall be paid to LICENSOR within thirty (30) days after the end of the calendar year for which such fees are due and payable. With respect to any calendar year, LICENSEE shall be entitled to a credit for any royalties under paragraphs 3.1 and 3.2 actually paid to LICENSOR under this Article III during such calendar year against minimum guaranteed annual fees for such year.

<u>ARTICLE IV-STATEMENTS AND PAYMENTS</u>

4.1    LICENSEE shall render to CHAMPION all royalties fees due and payable to CHAMPION on account of sales of $CV^2$ System during the preceding Reporting Period. All payments of royalties and fees shall be paid to CHAMPION, without discount or offset, in United States of America Dollars.

Caroteck.$CV^2$ License                    3

CAR 0030

4.2    All royalties  due and payable on account of sales where the currency of sale is other than United States of America Dollars shall be converted into United States Dollars at the rate of exchange quoted in the Wall Street Journal on the business day of the sale. All payments of royalties and fees shall be net, and any taxes, duties, fees, and imposts of any and every kind which may be levied by any taxing authority by reason of the execution and performance of this Agreement or of payment of any royalty or fee hereunder including but not limited to income taxes, turnover taxes, Value Added Taxes and any other taxes of a similar kind shall be borne and paid by LICENSEE, except taxes imposed directly on CHAMPION or its Subsidiaries by any taxing authority.

4.3    Accompanying each royalty payment shall be a written report showing the computation of such royalty payment with supporting information in sufficient detail for CHAMPION to understand the basis for such computation.  LICENSEE shall render such written statement even if no royalty payment is due and payable to CHAMPION for a Reporting Period.  Payments of royalty and rendering of written statements shall be made at the address provided in Article XXI hereof or at such other location as may be specified from time to time by notice in writing given to LICENSEE by CHAMPION.

4.4 Acceptance by CHAMPION of any payment tendered hereunder, whether or not the amount thereof shall be in dispute, shall not constitute acceptance of the account or written statement on which such payment is based.

## ARTICLE V - RECORDS

5.1 LICENSEE shall keep full, true and accurate books of accounts and other records containing all particulars which may be necessary to properly ascertain and verify the license fee payments due and payable to CHAMPION by LICENSEE hereunder. LICENSEE shall upon CHAMPION's written request to LICENSEE, permit CHAMPION to examine or have examined, at reasonable times during regular business hours, such of LICENSEE's business records and those of LICENSEE's Subsidiaries as may be necessary to determine the accuracy of any written statement or license fee payment.

## ARTICLE VI - COMMERCIALIZATION EFFORTS

6.1    It is understood by the parties hereto that the license fees due and payable to CHAMPION hereunder is dependent upon the efforts exerted by LICENSEE to commercialize $CV^2$ System.  LICENSEE shall promote and commercially exploit $CV^2$ System and satisfy the demand for said $CV^2$ System as it does with its other major business activities and in accordance with its regular practices of promoting and exploiting its major process monitoring systems.  In the performance of LICENSEE's duties and obligations under this ARTICLE VI, LICENSEE shall have the right to use its own business and promotion names in accordance with its normal practices.

## ARTICLE VII - CONFIDENTIALITY

7.1    As used herein, "Confidential Information" shall include any and all information disclosed to LICENSEE by or through CHAMPION, including any information obtained by LICENSEE visually through an inspection of any sample, device, document or like tangible thing submitted to LICENSEE by or through CHAMPION or by observation at facilities of CHAMPION or CHAMPION Subsidiaries excluding, however, such information which:

CAR 0031

7.1.1  Is at the time of disclosure, or thereafter becomes, a part of the public domain through no act or omission by LICENSEE, or its employees; or

7.1.2  Had been independently developed by the LICENSEE or was otherwise in LICENSEE's lawful possession prior to disclosure, as shown by written records; or

7.1.3  Is hereafter lawfully disclosed to the LICENSEE by a third party which did not acquire the information under an obligation of confidentiality from or through CHAMPION.

7.1.4  Is disclosed by LICENSEE pursuant to judicial action or governmental regulation or requirement; provided that LICENSEE shall notify CHAMPION of any order or request to disclose Information in sufficient time to allow CHAMPION a reasonable time to oppose the disclosure.

For the purposes of this Paragraph 7.1, specific disclosures made to LICENSEE shall not be considered to be within the exceptions above merely because they are embraced by general disclosures in the public domain. In addition, any combination of features disclosed to LICENSEE shall not be considered to be within the exceptions above merely because individual features are separately in the public domain.

7.2  During the term of this Agreement and for a period of ten (10) years from the termination date of this Agreement or any extensions thereto, LICENSEE shall hold Confidential Information in confidence employing the same precautions, but not less than reasonable precautions, that LICENSEE employs to maintain the confidentiality of its own information of like character and shall not disclose the same to any third party, without the prior written consent of the CHAMPION by an authorized officer. Notwithstanding the foregoing, LICENSEE may disclose Confidential Information to the minimum number of its directors, officers and/or employees who require access thereto for the purposes hereof and to Subsidiaries of LICENSEE assisting LICENSEE in the exercise of its rights and the performance of its obligations hereunder; provided, however, that prior to such disclosure each such director, officer, employee,  Subsidiary shall be informed of his/its obligations under this Agreement relative to the confidentiality and to the restricted use of Confidential Information, and further provided that prior to such disclosure each such Subsidiary shall execute or shall have executed written agreements obligating such Subsidiary to comply with each and every obligation of LICENSEE under this ARTICLE VII and each such director, employee and/or officer shall execute or shall have executed LICENSEE's standard employment agreement which LICENSEE warrants and represents obligates each such director, employee and/or officer to comply with the terms and conditions of confidentiality and restricted use set forth in this ARTICLE VII.

7.3  LICENSEE shall use Confidential Information only for the purposes of this Agreement, and shall make no other use of such Confidential Information without the prior written consent of CHAMPION by an authorized officer.

7.4  LICENSEE agrees that all documentary, electronic or like tangible Confidential Information, including drawings, designs, specifications, computer programs, flowsheets , sketches, descriptions, data an the like obtained from or through CHAMPION and documentary, electronic or like tangible Confidential Information which is generated by or for LICENSEE which embodies or is based upon Confidential Information are and shall remain the exclusion property of CHAMPION, and LICENSEE shall maintain the said documentary, electronic or like tangible Confidential Information at all times in its custody and subject to its control.  Promptly on termination or

Caroteck.CV$^2$ License                    5

expiration of this Agreement, Recipient shall return all such documentary, electronic or like tangible Confidential Information, as well as all copies thereof, to CHAMPION.

## ARTICLE VIII - THE INSTALLATION OF $CV^2$ SYSTEM AT FACILITIES OF CHAMPION AND CHAMPION SUBSIDIARIES

8.1    LICENSEE hereby grants to CHAMPION an option to purchase and install, in CHAMPION facilities and the facilities of CHAMPION Subsidiaries, up to ten (10) units of the $CV^2$ System at a cost not to exceed the Fully Absorbed Manufacturing and Installation Cost of such units and subject to the terms and conditions generally required by Champion in its equipment purchase agreements and agreed to by LICENSEE. The option granted to CHAMPION hereunder shall remain in force and effect in perpetuity or until the purchase and installation of the aforesaid ten (10) units of $CV^2$ System. CHAMPION may at anytime exercise its option for purchase of up to ten (10) units of the $CV^2$ System by providing written notice to LICENSEE to such effect. In such event, LICENSEE shall sell to CHAMPION or a CHAMPION Subsidiary and install at the relevant facility the very next available $CV^2$ System manufactured or have manufactured by LICENSEE or by Subsidiary of LICENSEE.

8.2    CHAMPION may purchase units of $CV^2$ System in addition to the said ten (10) units of the $CV^2$ System. The terms and conditions of such purchase sale or installation shall be no less favorable to CHAMPION than the most favorable terms and conditions offered to a third party for the purchase sale or installation a $CV^2$ System as of the date of purchase/sale or license to CHAMPION less the license fee which would have been due and payable to CHAMPION if such purchase/sale had been made to a third party.

8.3    All $CV^2$ System sold to CHAMPION or to Subsidiaries of CHAMPION hereunder shall meet mutually agreeable performance specification and guarantees, and shall be warranted by LICENSEE. The said performance specification, guarantees and warranties shall be at least as favorable to CHAMPION or to Subsidiaries of CHAMPION as the most favorable specifications, guarantees and warranties granted by LICENSEE to its other customers for $CV^2$ System as of the date of sale or license of $CV^2$ System to CHAMPION or to Subsidiaries of CHAMPION.

8.4    All persons selected and sent to facilities of a party to this Agreement in connection with any purchase, sale or installation of a $CV^2$ System under this Article VIII shall remain the employees of their respective employers as the case may be. All such persons shall observe such safety and other regulations as have been established at such facilities. Each employer shall indemnify, defend and hold harmless a party to this Agreement and its directors, officers, agents and employees against any and all loss, cost, expense or liability arising out of or resulting from any visit to facilities of such other party, by reason of injury or loss suffered by, or claim brought by, or on behalf of, any employee of such employer sent to facilities of a party pursuant to the provisions of this Agreement.

## ARTICLE IX - PUBLICITY AND PROMOTION

9.1    LICENSEE shall have no right to use any business name or trademark of CHAMPION or the name of any CHAMPION employee in any manner whatsoever, including use for any publicity or promotion of the $CV^2$ System, publications pertaining to the $CV^2$ System and the like without the prior written consent of CHAMPION by an authorized officer.

CAR 0033

## ARTICLE X - MAINTENANCE AND FILING OF PATENTS

10.1    CHAMPION shall not be obligated to pay any charges or perform any acts whatsoever, whether required by law or otherwise, for the purpose of maintaining active or enforceable any Patent Rights, and failure of CHAMPION to do so shall not relieve LICENSEE of any obligation hereunder.

## ARTICLE XI - REPRESENTATIONS AND WARRANTIES

11.1    CHAMPION WARRANTS AND REPRESENTS THAT IT IS THE OWNER OF PATENT RIGHTS BY ASSIGNMENT AND HAS THE LAWFUL RIGHT AND AUTHORITY TO GRANT THIS LICENSE. EXCEPT AS EXPRESSLY SET FORTH IN THE PRECEDING SENTENCE, THERE ARE NO WARRANTIES OR REPRESENTATIONS WHATSOEVER, EITHER EXPRESSED OR IMPLIED, WITH RESPECT TO $CV^2$ SYSTEM OR PATENT RIGHTS, INCLUDING BUT NOT LIMITED TO:

11.1.1 A WARRANTY OF MERCHANTABILITY;

11.1.2 A WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE;

11.1.3 A WARRANTY THAT ANY PARTICULAR RESULT WILL BE OBTAINED THROUGH EXERCISE OF THE RIGHTS GRANTED HEREUNDER;

11.1.4 A WARRANTY OR REPRESENTATION AS TO THE VALIDITY OR SCOPE OF ANY PATENT RIGHTS; AND

11.1.5 A WARRANTY OR REPRESENTATION THAT $CV^2$ SYSTEM OR PATENT RIGHTS, OR ANY USE, LICENSE OR SUBLICENSE THEREOF OR ANY OTHER EXERCISE OF THE RIGHTS GRANTED HEREUNDER WILL BE FREE OF INFRINGEMENT OF ANY PATENTS OR OTHER PROPRIETARY RIGHTS OF A THIRD PARTY.

11.2    IN NO EVENT SHALL CHAMPION BE RESPONSIBLE OR LIABLE FOR ANY DAMAGES, LOSSES, CLAIMS, DEMANDS OR EXPENSES WHATSOEVER RESULTING FROM OR ARISING OUT OF THE SALE, LEASE, LICENSE OR OTHER TRANSFER OF, OR MANUFACTURE OR INSTALLATION OF, OR USE OF THE $CV^2$ SYSTEM BY CUSTOMERS OF LICENSEE OR SUBSIDIARIES OF LICENSEE INCLUDING ANY DIRECT, INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSSES, CLAIMS, DEMANDS OR EXPENSES.

11.3. NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS AGREEMENT, IN NO EVENT SHALL LICENSEE BE RESPONSIBLE OR LIABLE FOR ANY INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSSES, CLAIMS, DEMANDS OR EXPENSES WHATSOEVER RESULTING FROM OR ARISING OUT OF THIS AGREEMENT.

## ARTICLE XII- MOST FAVORED LICENSE

12.1 If Champion hereafter grants a license to a third party (other than a Subsidiary of LICENSEE) to practice all of the subject matter licensed under this Agreement and subject to more favorable royalty

Caroteck.$CV^2$ License                7

terms than those set forth in ARTICLE III of this Agreement, CHAMPION shall promptly notify LICENSEE in writing of said more favorable royalty terms. Upon written request given by LICENSEE in writing within sixty (60) days after receipt of such notice, LICENSEE shall be entitled to the benefit of such more favorable terms as and from the date they became effective and only so long as they remain in effect with such third party; provided, however, that LICENSEE accepts all other applicable terms and conditions of such third party license; and provided further that in comparing royalty terms CHAMPION may assign a reasonable monetary value to any rights received from said third party by way of consideration for such third party license.

## ARTICLE XIII- DISCLAIMER AND NEGATION OF AGENCY

13.1    It is agreed and understood by the parties hereto that LICENSEE is an independent contractor, and that nothing herein contained shall be deemed to create an agency, partnership, joint venture or like relationship between the parties. Neither party hereto is authorized or empowered to act as the agent for the other party for any purpose, and shall not on behalf of such other party enter into any contract, undertaking or agreement of any sort or make any promise, warranty or representation with respect to any matter.

13.2    It is mutually understood and agreed that any act or failure to act under this Agreement by or on behalf of LICENSEE or Subsidiaries of LICENSEE including but not limited to the design, manufacture, installation and use of and sale, lease, license or the transfer of $CV^2$ System is solely under the supervision, direction and control of LICENSEE or Subsidiaries of LICENSEE, and  CHAMPION shall not be responsible for any such activities.  LICENSEE assumes all responsibility for any and all warranties and for any and all costs, expenses, damages, judgments, claims  and liabilities resulting from or arising out of any action or failure to take any action under this Agreement by or on behalf of LICENSEE or Subsidiaries of LICENSEE, and agrees to hold CHAMPION harmless, and to defend and indemnify CHAMPION, from any such costs, expenses, judgments, damages, claims or liabilities resulting from or arising out of the manufacture, installation, use or sale of $CV^2$ System, including but not limited to claims of patent or trade secret infringement or claims of customers, end-users, of the public or of any government or agency thereof, except in cases which are set forth in Paragraph 11.3 above.

## ARTICLE XIV - PATENT MARKING

14.1    LICENSEE and Subsidiaries of LICENSEE shall mark all $CV^2$ System sold by them in the United States under the license granted herein with the words "U.S. Patent" or "U.S. Patents" and the number(s) of the Patent Rights applicable thereto, or with such other patent marking as CHAMPION may from time to time reasonably direct.

## ARTICLE XV - GOVERNMENT MARKETING CLEARANCE

15.1    Prior to marketing any $CV^2$ System in any country, LICENSEE and Subsidiaries of LICENSEE shall have such System cleared for marketing by the responsible government agencies of that country requiring such clearance.

## ARTICLE XVII - TERM AND TERMINATION

Caroteck.$CV^2$ License                                      8

CAR 0035

16.1    This Agreement shall commence on the Effective Date of this Agreement, and sha continue in full force and effect for the term of the last to expire Patent Rights unless this Agreement is earlier terminated as herein provided.

16.2    If LICENSEE shall fail to make any payment of a royalty owed to CHAMPION under ARTICLE III hereof or shall default in or breach any other term or provision of this Agreement, and also shall fail to remedy such default or breach within thirty (30) days after receipt of written notice specifying the default or breach and the particulars thereof from CHAMPION, then CHAMPION may at its option and in addition to any other remedies which it may have at law or in equity terminate this Agreement by giving written notice thereof to LICENSEE to such effect, in which event, this Agreement shall terminate on the thirty-first (31st) day after sending such notice.

16.3    LICENSEE shall have the right to terminate this Agreement upon thirty (30) days prior written notice to CHAMPION to such effect in the event that:

16.3.1    All the material claims of Patent Rights have been held invalid in a final unappealable judgment of a court of competent jurisdiction; or

16.3.2    A patent or proprietary right infringement dispute arises with respect to Patent rights between CHAMPION or its Subsidiary and a third party, based upon the facts of which an intellectual property attorney of ordinary skill in the art could conclude should be resolved in said third party's favor; or

16.3.3    Other material events or reasons making it impossible or unreasonable for LICENSEE to continue its performance under this Agreement.

16.4    No termination of this Agreement pursuant to this ARTICLE shall release either party from any obligations which have accrued prior to the effective date of termination including but not limited to obligations under ARTICLE III hereof to make payments due or which become due and under ARTICLE VII hereof to maintain the confidentiality of Confidential Information.

16.5    In the event that this Agreement is terminated pursuant to Paragraph 16.2, LICENSEE shall immediately cease the design, manufacture, sale and installation of $CV^2$ System, except where such design, manufacture, sale, installation, license or lease would not infringe a claim of Patent Rights which has not been held invalid in a final unappealable judgment of a court of competent jurisdiction.

16.6    If during the term of this Agreement, party shall become bankrupt or insolvent, or is subject to liquidation, or if the business of party shall be placed in the hands of a receiver or trustee, whether by the voluntary act of party or otherwise, or if party is obliged to make an assignment of assets for the benefit of creditors, or if party takes or is subject to any other action under law based on its inability to meet its financial obligations or if substantially all of party 's assets are seized or attached in connection with any action against party or are sold or attempted to be sold, this Agreement shall terminate automatically without notice.

16.7    Failure on the part of CHAMPION to notify LICENSEE of any default or breach of this Agreement, or to terminate this Agreement because of any default or breach that would give CHAMPION the right to terminate, shall not constitute a condonation of such breach or default or a waiver of future breaches or defaults.

Caroteck.$CV^2$ License                              9

## ARTICLE XVII - SEVERABILITY

17.1    If any provision of this Agreement shall be held to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

## ARTICLE XVIII - GOVERNING LAW

18.1    This Agreement shall be construed and the legal relations between the parties shall be determined, in accordance with the laws of the State of New York, without recourse to the conflict of laws of said State which would direct the use of laws of another jurisdiction.  Any suit brought by either party against the other party on the basis of any controversy or claim arising out of or relating to this Agreement or a breach thereof shall be brought in the United States District Court for the Southern District of New York, and, if the United States District Court declines jurisdiction for any reason then in the Supreme Court First Department of the State of New York. The parties hereby consent to the personal jurisdiction of the courts and hereby designate the Secretary of State of the State of New York for receipt of service of process.

## ARTICLE XIX - HEADINGS

19.1    The heading of each ARTICLE is inserted for convenience of reference only, and is not intended to be a part of or to affect the meaning or interpretation of this Agreement.

## ARTICLE XX - AGREEMENT MODIFICATION

20.1    Any agreement changing the terms of this Agreement in any way shall be valid only if the change is made in writing executed by authorized representative of the Parties hereto.

## ARTICLE XXI - COMMUNICATIONS

21.1    It shall be sufficient giving any notice, report, or other communication hereunder, if the party giving same shall deposit a copy thereof in the Post Office in a registered or certified envelope, by postage prepaid certified mail, or delivered by messenger or air courier addressed to the other party at the address provided hereinbelow or at such other address as may hereafter be designated in writing.

CAR 0037

If to CHAMPION:       For Business Matters:
                   Champion International Corporation
                   1 CHAMPION Plaza
                   Stamford, CT 06921

                   ATTN:     Richard Piela
                               Director, Capital Project
                               Support and MRO

       For Legal Matters:
                   Champion International Corporation
                   1 Champion Plaza
                   Stamford, CT 06921

                   ATTN:     Richard C. Stewart, II
                               Chief Patent Counsel

If to LICENSEE:

                   Carotek Inc.
                   700 Sam Newell Road
                   P.O. Box 1395
                   Matthews, North Carolina 28106

                   ATTN: Addison Bell

Payments shall be made to the address indicated hereinabove for notices relating to business matters. The date of giving any such notice, invoice or other communication, and the date of making any such payment, provided that such payment is received, shall be the date on which such envelope is deposited. The Post Office receipt showing the date of such deposit shall be prima facie evidence of these facts.

<u>ARTICLE XXII - ASSIGNABILITY</u>

22.1    LICENSEE may not assign this Agreement without CHAMPION's express prior written consent by an authorized officer; provided, however, that LICENSEE may assign this agreement without CHAMPION's consent to the successor of LICENSEE's business provided that such successor agrees in writing to assume each and every duty and obligation of LICENSEE under this Agreement and to be bound to the terms and conditions of this Agreement to the same extent that LICENSEE is bound. A copy of the assumption agreement shall be promptly provided to CHAMPION.

22.2    CHAMPION may assign this Agreement and the rights granted to CHAMPION as CHAMPION in its sole discretion deems fit; provided, however, that if this Agreement is assigned to a competitor of LICENSEE or its Subsidiaries, LICENSEE shall have the right to terminate this

Caroteck.CV$^2$ License           11

CAR 0038

Agreement forthwith by giving written notice thereof to CHAMPION and assignee and subject to the terms and conditions of Paragraphs 16.4 and 16.5.

22.3    Except as expressly provided in this ARTICLE XXII, any purported assignment shall be null and void.

<u>ARTICLE XXIII - BINDING EFFECT - BENEFIT</u>

23.1    This Agreement shall insure to the benefit of and be binding upon the parties hereto and their respective successors in interest and permitted assigns.

<u>ARTICLE XXIV - ENTIRE AGREEMENT</u>

24.1    This Agreement represents the entire understanding and agreement between the parties hereto with respect to the subject matter hereof, and supersedes all prior agreements, discussions and writings with respect thereto, either expressed or implied, between the parties.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their authorized representatives.

CHAMPION INTERNATIONAL
CORPORATION

By: _Gerard P. Clouet_

Name: _GERARD P. CLOUET_

Title: _VICE PRESIDENT_

CAROTEK INC.

By: _J. Addison Bell_

Name: _J. Addison Bell_

Title: _CEO_

Caroteck.CV$^2$ License                12

## SCHEDULE A

## PATENT RIGHTS

1) U.S. Patent No. 5, 717, 456;

2) U.S. Patent No. 5, 821, 990;

3) Australian Patent Application No. 38274/95;

4) Brazilian Patent Application No. PI 9510548-4;

5) Chilean Patent Application No. 1898-95;

6) Finnish Patent Application No. 973611;

7) Indonesian Patent Application No. P952441;

8) Japanese Patent Application No. 8-526826;

9) South Korean Patent Application No. 1997-706231;

10) Malaysian Patent Application No. PI9703058;

11) Mexican Patent Application No. 976703;

12) New Zealand Patent No.295027;

13) Norwegian Patent Application No. 974012;

14) South African Patent No 95/9613; and

15) European Patent Application No. 95 936 260.9.

16) Canadian Patent Application No. 2,214,724

17) US Patent No.5,821,990
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

Caroteck.CV$^2$ License                    13

CAR 0040