IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| CAROTEK, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action. No. 07 11163 |
| v. | ) | |
| | ) | |
| KOBAYASHI VENTURES, LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| ——————————————— | ) | |
| | ) | |
| EVENT CAPTURING SYSTEMS, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| KOBAYASHI VENTURES, LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| ——————————————— | ) | |

MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
OF NON-LIABILITY UNDER THE CHAMPION LICENSE AGREEMENT BASED ON
PATENT INVALIDITY AND NON-INFRINGEMENT

# TABLE OF CONTENTS

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

I.      Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        A.      Historical Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        B.      The Carotek/Event Capturing Systems Monitoring Product . . . . . . . . . . . . . . . . . 3

II.     Legal Standard for Summary Judgment  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

III.    Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        A.      The Claims of the Champion Patents Reciting Means-plus-function
                Language Are Invalid Because They Do Not Disclose Sufficient
                Structure For Performing the Functions Recited in the Claims . . . . . . . . . . . . . . 6

                1.      The Champion Patents Disclose No Algorithm That
                        Performs the Functions of the "Control Means" Limitations  . . . . . . . . . . 9

                2.      The Champion Patents Share The Same Disclosure Since
                        They Are Divisional Applications And Accordingly All Of
                        The Asserted Claims Of The Champion Patents Are Invalid  . . . . . . . . . 15

                3.      The Champion Patents Claims That Do Not Recite Means-
                        Plus-Function Language For A "Control Means" Still
                        Invoke 35 U.S.C. §112 ¶6 Language And Are Accordingly
                        Indefinite  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

        B.      Carotek's Event Capturing system Product Does Not Literally Or
                Equivalently Infringe Any Claim Reciting Means-Plus-Function
                Language Of The Champion Patents Because Every Claim Of The
                Champion Patents Recites Extracting The Video Clip Corresponding
                To The Deviation Event, Whereas The ECS Monitoring System
                Does Not Extract Any Video Data  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

        C.      The ECS Monitoring System Does Not Literally Or Equivalently
                Infringe Any Non-Means-plus-function Claim Of The Champion Patents . . . . . 22

IV.     Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

## TABLE OF AUTHORITIES

**Cases**

Castle Rock Entm't., Inc. v. Carol Publ'g Group, Inc., 150 F.3d 132 (2d Cir. 1998) . . . . . . . . . . 5

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Cleveland v. Policy Management Systems Corporation, 526 U.S. 795 (1999) . . . . . . . . . . . . . . 5

McCoy v. Mitsuboshi Cutlery, Inc., 67 F.3d 917 (Fed. Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . 6

Carborundum Co. v. Molten Metal Equipment Innovations, Inc., 72 F.3d 872
   (Fed. Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Linzer Products Corp. v. Sekar, 499 F. Supp.2d 540 (S.D.N.Y. 2007) . . . . . . . . . . . . . . . . . . . 6

In re Donaldson, 16 F.3d 1189 (Fed. Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Medtronic, Inc. v. Advanced Cardiovascular sys., Inc., 248 F.3d 1303
   (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Aristocrat Technologies Aus. Pty Ltd. v. Int'l Game Technology, 521 F.3d 1328   (Fed. Cir.
   2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

WMS Gaming Inc. v. Int'l Game Technology, 184 F.3d 1339 (Fed. Cir. 1999) . . . . . . . . . . . . 8

Biomedino, LLC v. Waters Techs. Corp., 490 F.3d 946 (Fed. Cir. 2007) . . . . . . . . . . . . . . . . . 8

Medical Instrumentation & Diagnostics Corp. v. Elekta AB, 344 F.3d 1205 (Fed. Cir. 2003) . . 8

Seal-Flex, Inc. v. Athletic Track and Court Construction, 172 F.3d 836 (Fed. Cir. 1999) . . . . . 15

Personalized Media Communications LLC v. ITC, 161 F.3d 696 (Fed. Cir. 1998) . . . . . . . . . . 15

Mas-Hamilton Group v. LaGard Inc., 156 F.3d 1206, 1213 (Fed. Cir. 1998) . . . . . . . . . . . . . . 15

Symbol Technologies, Inc. v. Opticon, Inc., 935 F.2d 1569, 1575 (Fed. Cir. 1991) . . . . . . . . . 16

JVW Enters v. Interact Accessories, Inc., 424 F.3d 1324, 1330 (Fed. Cir. 2005) . . . . . . . . . . . 16

Lockheed Martin Corp. v. Space Sys./Loral, Inc., 324 F.3d 1308 (Fed. Cir. 2003) . . . . . . . . . 17

Kemco Sales, Inc. V. Control Papers Co., 208 F.3d 1352 (Fed. Cir. 2000) . . . . . . . . . . . . . . . . 17

Hilton Davis Chem. Co. v. Warner-Jenkinson Co., 62 F.3d 1512
  (Fed. Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Chiuminatta Concrete Concepts, Inc. v. Cardinal Industries, Inc.,
  145 F.3d 1303 (Fed. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Texas Instruments, Inc. v. U.S. Int'l Trade Comm'n, 805 F.2d 1558 (Fed. Cir. 1986) . . . . . . . 18

Warner-Jenkinson Company, Inc. v. Hilton Davis Chemical Co.,
  520 U.S. 17  (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

**Rules**

Fed. R. Civ. P. 56(c)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

35 U.S.C. §112 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 13, 14, 15, 16, 17

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ———————————————— )<br>CAROTEK, INC.,                                    )<br>                                                 )<br>          Plaintiff,                             )<br>                                                 )<br>     v.                                          )<br>                                                 )<br>KOBAYASHI VENTURES, LLC,                         )<br>                                                 )<br>          Defendant.                             )<br>————————————————————)<br>                                                 )<br>EVENT CAPTURING SYSTEMS, INC.                    )<br>                                                 )<br>          Plaintiff,                             )<br>                                                 )<br>     v.                                          )<br>                                                 )<br>                                                 )<br>KOBAYASHI VENTURES, LLC,                         )<br>                                                 )<br>          Defendant.                             )<br>————————————————————) | Civil Action. No. 07 11163 |

---

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT OF NON-LIABILITY UNDER THE CHAMPION LICENSE AGREEMENT
BASED ON PATENT INVALIDITY AND NON-INFRINGEMENT**

COMES NOW, Plaintiffs Carotek, Inc. ("Carotek") and Event Capturing Systems, Inc.

("ECS") and file this Memorandum in support of their Motion for Summary Judgment against

Defendant Kobayashi Ventures, Inc. ("Kobayashi").  Carotek and ECS present three separate

bases on which the Court should grant summary judgment:

(1)    There is a minimum liability, under the license agreement because the Champion

       Patents are invalid for failure to provide sufficent disclosure in the specification

       as required by 35 U.S.C. § 112 (page 5);

    (2)      Carotek and ECS do not literally infringe the Champion Patents (page 15); and

    (3)      Carotek and ECS do not infringe the Champion Patents under the doctrine of equivalents (page 15).

In support of their Motion, Carotek and ECS respectfully state the following to the Court.

## I.    STATEMENT OF FACTS

### A.    Historical Summary

Carotek is a licensee under a license agreement ("License Agreement") entered into with Champion Paper in 1998 that granted Carotek a non-exclusive license to make, use, and sell certain products allegedly covered under a group of certain patents referred to in this Memorandum as the "Champion Patents." [Ex. 1]. The license agreement included a minimum royalty payment of $25,000 per year regardless of the sales of Carotek's Monitoring System ¶ 3.4, Ex. 1].

Kobayashi has accused Carotek of infringing the Champion Patents, [Counterclaim, dated February 8, 2008, at p. 17], and has sent letters to numerous of its customers all the way back to 1998, raising the specter of infringement claims against those customers as well. ["Customer Letters", Ex. 2, and 3].

Carotek sold the part of its business relating to the Carotek License Agreement to Event Capturing Systems (ECS), Inc. on December 31, 2007.[1] [Bell Depo. p. 12, l. 14-17, Ex. 4]. ECS

---

[1]Kobayashi has variously taken the position that ECS is a separate company and has sought to dismiss patent infringement claims against Carotek on these grounds. Now Kobayashi has taken the position that "ECS is a fradulently (sic) created entity, created with a sham transaction, and in connection with an effort by Carotek to avoid liability for, among other things, patent infringement." [Kobayashi Answer and Counterclaim in ECS case, dated September 2, 2008, ¶ 58]. According to Kobayashi, ECS and Carotek are one in the same, and therefore, ECS is entitled to join in this action.

has also been threatened with suit for infringement by Kobayashi, and has filed is own

Declaratory Judgment action with this court, which is now consolidated with the prior-filed

Carotek action.   [ECS Decl. Judg., dated June 24, 2008, and Court Order, dated July 17, 2008].

### B.    The Carotek/Event Capturing Systems Monitoring Product

The ECS Monitoring System previously made and sold by Carotek and now made and

sold by ECS is a monitoring system used for monitoring the production of paper in a

manufacturing facility. [Tam Decl. at ¶ 2, Ex. 5].  The ECS Monitoring System allows an

operator to review the production process if a paper break occurs.  Id. The ECS Monitoring

System provides multiple cameras positioned about a manufacturing line and the cameras are

configured to record the manufacturing of a product.  Id. at ¶ 3.  At the instance when a paper

break occurs, at least one trigger is positioned about the manufacturing line and is configured to

output a signal when a deviation is detected.  Id.  The signal that is output by the trigger is a

simple 0/1 logic signal, and outputs 0 under normal operating conditions and 1 when the trigger

is initiated.  Id.

An ECS Monitoring System computer records video continuously and saves the video in

file segments on a computer's hard disk.  Id. at ¶ 4.  Each file segment is of a fixed time length

(called the pre-event time) that corresponds to the total time for the paper to travel from the

beginning to the end of a paper machine.  Id.  For example, if the total travel time along the

machine is 30 seconds, then each video segment is 30 seconds long.  Id.

Upon receiving a trigger signal, the video segment in recording will continue to record

for a predetermined additional amount of time (called the post-event time).  Id. at ¶ 5.  The ECS

Monitoring System then time-stamps the trigger signal and simply renames the current segment

3

and the previous segment from the existing video buffer using the timestamp as the main body of the file name structure.  Id.  The deviation file is saved within the exact same directory as a non-deviation event file would be saved.  Id at ¶ 6.

For an ECS Monitoring System with multiple cameras, multiple computers are connected to an ECS Monitoring System master computer.  Id. at ¶ 7.  As the master computer receives the trigger signal, video files corresponding to the event trigger time are saved from each camera, and collectively these video files form an ECS Monitoring System paper-break event.  Id.  This event is available for the operator to review at any time.  Id at ¶ 9.  There is no need to look for and then extract the relevant image frames from the video buffer in each of the recording computers because any relevant image frames from that video camera related to this paper break event must be included in the two renamed video files from each computer.  Id at ¶ 8.

As an event is loaded on a video window, video files from each camera are loaded onto different video windows.  Id.  The camera associated with the trigger source is called the anchor camera and is loaded first and then the video frame at event trigger time is displayed.  Id. at ¶ 9. The remaining cameras are opened up by a linear sequencing program in different video windows at a time frame offset from the anchor camera so that the image frame shown in each window is time-offset based on the relative locations of this camera as compared with the anchor camera along the paper machine.  Id.  Alternatively, the operator may open each additional image frame on the same video windows.  Id.  Each video monitor window plays a file corresponding to the camera associated with that video window, and the operator of the ECS Monitoring System will have to view multiple files to view the monitoring sequence.  Id.  Unlike the Champion Patents which require that each monitoring sequence be extracted from each hard

4

drive and then spliced together to form one continuous video, there is no splicing of data clips together to form one video file.  Id. at ¶ 11.

As is explained below, none of the claims of the Champion Patents asserted against Carotek or ECS cover the accused ECS Monitoring System.

## II.    LEGAL STANDARD FOR SUMMARY JUDGMENT

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  On a motion for summary judgment, the facts are viewed in the light most favorable to the non-moving party, and the Court must draw all reasonable inferences in its favor.  Castle Rock Entm't, Inc. v. Carol Publ'g Group, Inc., 150 F.3d 132, 137 (2d Cir.1998).

The non-moving party, however, may not rest upon mere denials or allegations in the pleadings, but must set forth specific facts sufficient to raise a genuine issue for trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  Summary judgment for a defendant is appropriate when the plaintiff fails to make a showing sufficient to establish the existence of an element essential to its case, and on which it will bear the burden of proof at trial.  Cleveland v. Policy Management Systems Corporation, 526 U.S. 795, 805-06 (1999) citing Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548 (1986).

Summary judgment is appropriate in this case because by definition, Carotek cannot have infringed the Defendants' patent during the term of the license agreement.  The very purpose of

the license agreement was to permit Carotek to make, use, sell and offer for sale the claimed subject matter of the Champion Patents. McCoy v. Mitsuboshi Cutlery, Inc., 67 F.3d 917, 920 (Fed.Cir.1995) ("A licensee, of course, has an affirmative defense to a claim of patent infringement ."). In fact, the license agreement expressly granted "the worldwide, non-transferable, non-exclusive right and license under Patent Rights to make, use, and sell CV2 system." [¶ 2.1, Ex. 1]. A license agreement such as the one between Champion and Carotek is an absolute defense to a claim of patent infringement. Carborundum Co. v. Molten Metal Equipment Innovations, Inc. 72 F.3d 872, 878 (Fed. Cir.1995). Similarly, Carotek would only be required to pay royalties above the minimum royalty obligation under the license agreement on products covered by the Champion Patents, and would not be liable for a royalty calculation if the patents are found non-infringed, and would likewise not be liable for any royalty obligations from the filing date of this suit if the patent is found invalid, not withstanding the most favored licensee, standing, and ownership issues raised in the contemporaneously filed motion for summary judgment on those issues. Linzer Products Corp. v. Sekar, 499 F.Supp.2d 540, 550 (S.D.N.Y. 2007). Accordingly, a finding of non-infringement or patent invalidity is crucial to the liability of Carotek under the license agreement.

## III.    ARGUMENT

### A.    The Claims of the Champion Patents Reciting Means-plus-function Language Are Invalid Because They Do Not Disclose Sufficient Structure For Performing the Functions Recited in the Claims

The Champion Patents[2] are directed to a video monitoring system that can be used in

---

[2]United States Letters Patent No. 5,717,456 was issued on February 10, 1998 to Robert J. Rudt, et al on an application filed on March 6, 1995 for "System for Monitoring a Continuous Manufacturing Process" (the '456 patent). United States Letters Patent No. 5,821,990 was

applications as broad as monitoring people entering or leaving a building or monitoring a process for manufacturing products. ['456 patent, col. 5, lines 29-44, Ex. 6]. In the Champion Patents, an operation is monitored with video cameras, the video is digitized and stored on computer hard drives, and the video is reviewed when a "deviation" occurs. Id. at Abstract. A deviation is some sort of malfunction or unintended event found in the normal manufacturing process. Id. at col. 5, lines 8-15. The system disclosed in the patents retrieves video from around the time and the physical location of the deviation so that an operator can determine what went wrong. Id. at col. 8, lines 2-10.

The Champion Patents utilized a form of claim called a "means-plus-function" claim as permitted in 35 U.S.C. § 112, ¶ 6. Means-plus-function language is a functional method of patent claiming which requires specific structure within the specification to carry out the functional language. As the Federal Circuit has stated:

> Although [§ 112, ¶ 6] statutorily provides that one may use means-plus-function language in a claim, one is still subject to the requirement that a claim "particularly point out and distinctly claim" the invention [§ 112, ¶ 2]. Therefore, if one employs means-plus-function language in a claim, one must set forth in the specification an adequate disclosure showing what is meant by the claim language. If an applicant fails to set forth an adequate disclosure, the applicant has in effect failed to particularly point out and distinctly claim the invention as required by the second paragraph of section 112.

In re Donaldson, 16 F.3d 1189, 1195 (Fed. Cir. 1994).

_____

issued on October 13, 1998 to Robert J. Rudt, et al on an application filed on September 3, 1997 for "System for Monitoring a Continuous Manufacturing Process" (the '990 patent). United States Letters Patent No. 6,211,905 was issued on April 3, 2001 to Robert J. Rudt, et al on an application filed on July 30, 1998 for "System for Monitoring a Continuous Manufacturing Process (the '905 patent)." The '990 and '905 patents are divisional patent applications sharing the same disclosure as the '456 patent, and all of these applications are termed the "Champion Patents" and are attached as Exhibit 6. Due to the duplicative disclosure of the patents, reference will be made to the '456 patent specification throughout this paper.

Such functional claiming would appear to be very broad and cover any means for performing the function, however, pure functional claiming is prohibited. Rather, a means-plus-function limitation covers only the structure described in the patent specification that performs the function in the claim (i.e., those structures are imported into the claim operation of law), and it thus requires, as a *quid pro quo* from the patentee, the disclosure of structure for performing the function ***and*** a clear link from the recited function and the disclosed structure. Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc., 248 F.3d 1303 (Fed. Cir. 2001) (structure in specification is not relevant unless it is "clearly linked or associated" to the claimed function, even if the structure does perform the claimed function).

The Champion Patents all claim a "control means" for performing a computer function. As understood from the patents, "control means" is used to generically claim the computer system used to control the many processes that occur in the Champion Patents. This represents a specific example of means-plus-function claiming. In the context of functions that are implemented by a computer or similar programmable system, the "corresponding structure" is the particular algorithm (i.e., sequence of well-defined steps, typically shown in a flow chart) disclosed in the specification that carries out the function. See, e.g., Aristocrat Technologies Aus. Pty Ltd. v. Int'l Game Technology, 521 F.3d 1328, 1333 (Fed. Cir. 2008); WMS Gaming Inc. v. Int'l Game Technology, 184 F.3d 1339, 1348-49 (Fed. Cir. 1999).

When a patentee does not disclose a corresponding structure or clearly link the claimed function to a structure in the specification, the claim is invalid. Biomedino, LLC v. Waters Techs. Corp., 490 F.3d 946, 948 (Fed. Cir. 2007); Medical Instrumentation & Diagnostics Corp. v. Elekta AB, 344 F.3d 1205, 1211 (Fed. Cir. 2003). This is especially true when a patentee fails

8

to disclose an algorithm for a function that is performed on a computer:

> In cases involving a computer-implemented invention in which the inventor has invoked means-plus-function claiming, this court has consistently required that the structure disclosed in the specification be more than simply a general purpose computer or microprocessor. . . .  For a patentee to claim a means for performing a particular function and then to disclose only a general purpose computer as the structure designed to perform that function amounts to pure functional claiming [which is prohibited]. Because general purpose computers can be programmed to perform very different tasks in very different ways, simply disclosing a computer as the structure designated to perform a particular function does not limit the scope of the claim to "the corresponding structure, material, or acts" that perform the function, as required by section 112 paragraph 6.

Aristocrat, 521 F.3D at 1333.

Where the specification is not clear as to the structure that the patentee intends to correspond to the claimed function, the patentee has not satisfied the requirements for the convenience of using a means-plus-function limitation.  Instead, the patentee is improperly attempting to claim in functional terms unbounded by any reference in the specification. Biomedino, 490 F.3d at 948 citing Medical Instrumentation & Diagnostics Corp. v. Elekta AB, 344 F.3d 1205, 1211 (Fed. Cir. 2003).

Champion used the "means-plus-function" claim format, but broke the cardinal rule of patent law  in failing to provide the *quid pro quo* of sufficient disclosure to allow a person having ordinary skill in the art to reproduce the claimed invention.  Accordingly, the asserted claims of Champion Patents are invalid.  We focus here on a case dispositive limitation.

**1.    The Champion Patents Disclose No Algorithm That Performs the Functions of the "Control Means" Limitations.**

9

The Champion Patents each contain "independent claims" and they are referenced by each of the other "dependent" claims. If any independent claim is invalid under Section 112, all of the dependent claims fall with the independent claim. The '456 patent contains independent



FIG. I

claims 1 and 8; the '990 patent contains independent claims 1, 25, 38, 45, and 52; and the '905 patent contains independent claims 1, 16, 21, 38, and 43. [Ex. 6]. Each of these claims except for claims 21, 38, and 43 of the '905 patent recite "control means." Id.

In the one and only figure of all of the Champion Patents, the "control means" is shown as an empty box labeled "CONTROL MEANS" that sits at the center of a system of a collection of other boxes labeled "monitoring means," "storage means," and "display means":

[Fig. 1, Ex. 6]

The "control means" is required to "locate the data clip containing data of such event, to extract such data clip and to display said data clip." ['456 patent, col. 6, lines 53-57, Ex. 6].  For example, claims 1 and 8 of the '456 patent recite functions performed by the control means as "controlling" the monitoring system, "identifying" a video segment that corresponds to a deviation, "extracting" one or more video clips for the deviation to make a display clip, and "displaying" the display clip, as follows:

| Claim 1 | Claim 8 |
|---|---|
| [1] "controlling the operations of said monitoring system" | [1] "controlling said monitoring system" |
| in response to a control system transmitting to the control means a deviation signal that includes the time, date and location of the deviation event: | |
| [2] "identifying the digitized data segment corresponding to said deviation event," | [2] "identifying data storage means containing said digitized data segment corresponding to the time and the location of said deviation event" |
| [3] "extracting the deviation event clip, the preceding clip preceding said break event clip to form a display clip"[1] | [3a] "extracting one or more digitized data clips on receipt of said deviation event signal to form one or more extracted clips"<br><br>[3b] "extracting said deviation event clip to form a display clip" |
| [4] "displaying said display clip on a video monitor" | [4] "displaying said display clip" |

Id.

Each and every additional independent claim of the Champion Patents recites similar functions for the control means.  All of this claim language is functional language and does not provide sufficient structure to allow one skilled in the art to reproduce the claimed invention.  Likewise, sufficient structure and disclosure is missing from the specification.  Kobayashi cannot

rely on any flow charts typically found in patents reciting a "control means" or "computer" as

disclosing necessary algorithms because there are no such figures—the block diagram

reproduced above is the only figure in any of the Champion Patents.  As for the textual

description for the operation of the "control means 20," only a casual mention is found in the

Champion Patents, and excerpted below:

> On receipt of the deviation event signal, control means 20 is capable of identifying the clip most likely to have digitized data relating to the deviation event, and extracting such clip and displaying the extracted clip with display means 26. For example, control means 20 can perform this function by coordinating the time at which deviation event detector 38 detected the deviation event with the clip or clips corresponding in time. This coordination can be done in any suitable manner. For example, control 20 can scan all digitized data storage means 18, select clips from all means 18 containing data collected at the appropriate time and can then scan each clip to identify the deviation event and display same. Alternatively, control means 20 can identify the monitoring means 10 most proximate to the location of the deviation event, select a clip or clips from the digitized data storage means 18 for such monitoring means 10 and display such clip. In order to insure that all suitable data is displayed in the fastest possible time, preferably control means 20 will also extract digitized data clips immediately preceding and following the clip or clips most likely containing data for the deviation event and will splice the deviation event clip and the following and preceding clips into a display clip for display.  (Emphasis added).  By splicing the event, preceding and following clips, the operation of the machine prior to, during and subsequent to the deviation event can be observed. After a deviation is detected, the machine is usually stopped and the digitized data storage means 18 is frozen to prevent loss of critical data.

> The clips can be displayed automatically or manually at any suitable speed. The clips can be displayed frame by frame, in various sizes. The clips can also be viewed in reversed mode. This function combined with a pause, playback and resizing can enhance the ability of the operators to locate the exact point of interest on the display clip, for study showing the deviation event as it occurred. Of course, many other functions may be provided by control means 20 including zooming, edge enhancement, image sharpening, gradient edge enhancement, de-specking, filtering, cropping, desizing, dithering, interpolation, image intensity, format conversion, color inversion, contrast control, brightness control, embossing and the like. Manual/automatic control of all functions may be provided.

> In this manner, the control means 20 becomes the driver which also manages the logistics of the system including monitoring, displaying, storage,

etc., and can additionally be used to supervise the status of each device in the system as desired. In addition, other peripherals can be provided as needed.

['456 patent, col. 7, line 52, to Col. 8, line 36, Ex. 6]

Nothing in this passage (or any other part of the patent) describes an algorithm by which the control means "controls the monitoring system" at the general level (function 1 of the claims in the table above).[3] The passage refers to "identifying" (function 2) and "extracting" (function 3) as "this function," while the claims recite them as two separate functions, so there is no clear linking of the claimed functions to anything in the specification. The only disclosure of a defined multi-step process (an algorithm) are the steps of extracting, identifying, and displaying—but that cannot be an algorithm for the recited functions because it is the recited functions themselves. In short, the passage at most provides repetition of the claims, but discloses no algorithms for performing any of the four functions recited in the claims.

The function of "identifying the digitized data segment corresponding to the deviation event" provides a perfect example of the lack of any corresponding structure in the form of an algorithm. The Champion Patents state, several times, that the control means is capable of

_____

[3] The entirety of the remaining patent disclosure on this point says that the control means can be anything that performs the function. It improperly attempts to cover function only and, at best, identifies an analog or digital computer, but does nothing to explain what algorithm runs on the computer, as required by *Aristocrat* and other cases from the Federal Circuit:

> Control means 20 functions to control the system. Useful control means 20 may vary widely, the only requirement is that means 20 is in the event of a deviation event able to locate the data clip containing data of such event, to extract such data clip and to display said data clip. Illustrative of useful control means 20 are analog control system and a digital computer.

['456 patent, col. 6, lines 52-58, Ex. 6]

identifying the digitized data segment corresponding to the deviation event, ['456 patent col. 7, line 53 to col. 8, line 2, Ex. 6], but it says little about how the control means effects such an identification, and certainly provides no algorithm for causing the clip to be identified.  For example, does the control means identify the display clip immediately after the deviation event? If so, how long is the identified clip, how is a non-deviation clip distinguished from a deviation event clip, how does the control system know that a deviation signal has been received, and are the clips themselves identified and then scanned within the clip for the deviation event, or are the clips themselves identified with no further scanning within the clip?  These are just a few of numerous examples of questions that one having ordinary skill in the art would have after reading the disclosure of the Champion Patents.

In *Aristocrat,* the Federal Circuit recently found insufficient disclosure of Aristocrat's United States Patent No. 6,093,102 ('102 patent).  Aristocrat's '102 patent was directed to a slot machine claiming a "game control means being arranged to pay a prize...." [Aristocrat Patent, Ex. 7].  As the Federal Circuit in *Aristocrat* reiterated, one must "look at the disclosure of the patent and determine if one of skill in the art would have understood that disclosure to encompass software [to perform the function] and been able to implement such a program, *not simply whether one of skill in the art would have been able to write such a software program*." *Aristocrat, 521 F.3d at 1337;* citing Medical Instrumentation, 344 F.3d at 1212 (Emphasis added).  It is apparent that the patent in *Aristocrat* disclosed substantially more structure linked to "control means" than do the Champion Patents, and the Federal Circuit had no difficulty in finding that disclosure inadequate under 35 U.S.C. § 112, ¶ 6.  Id. at 1133-1335.  [For example, see Figures 1-4, Tables 1-3, and col. 4, l. 13-23, Ex. 7].  As previously discussed, the Champion

14

Patents contain only one generic diagram of the entire system, without a single figure, diagram, flow chart, or table directed solely to "control means" and only a generic paragraph in the specification directed to those control means. [Fig. 1, Ex. 6].

In summary, the Champion Patents provide only a cursory mention of the claimed monitoring systems, and say nothing about particular algorithms, which the law requires when an applicant chooses, as Champion did here, to use the "means-plus-function" claiming format.

> **2.    The Champion Patents Share The Same Disclosure Since They Are Divisional Applications And Accordingly All Of The Asserted Claims Of The Champion Patents Are Invalid.**

All of the Champion Patents share the same disclosure since they are all divisional applications.  The '456 application was the first to be filed on March 6, 1995. [Ex. 6].  The '990 was subsequently filed as a divisional application on September 3, 1997 as a divisional of the '456 application.  Id.  The '905 application was subsequently filed as a divisional application on July 30, 1998 as a divisional of the '990 application.  Id.  Divisional applications are filed during the pendency of a prior application continuing the same disclosure but with claims directed to an invention that differs from the original application.  Divisional applications are usually filed in response to a Restriction Requirement from the USPTO but are in some instances filed because the Applicant determines that several inventions may be claimed from the single disclosure.

All of the Champion Patents recite means-plus-function language directed to "control means."  Accordingly, if the disclosure is insufficient to recite sufficient 35 U.S.C. § 112 ¶ 6 structure in any one of the Champion Patents reciting "control means", then all of the Champion Patents' claims reciting either "control means" are invalid.

**3**.    **The Champion Patents Claims That Do Not Recite Means-Plus-Function Language For A "Control Means" Still Invoke 35 U.S.C. § 112 ¶ 6 Language And Are Accordingly Indefinite.**

Claims 21, 38, and 43 of the '905 patent recite a "computer" instead of control means. ['905 patent, Ex. 6].  It is presumed that this language is not means-plus-function language because of the lack of the words "means."  However, claims that do not recite "means" may be still invoke the requirements of 35 U.S.C. § 112 ¶ 6.  Seal-Flex, Inc. v. Athletic Track and Court Construction, 172 F.3d 836, 850 (Fed. Cir. 1999) (Radar, J., concurring) ("claim elements without express step-plus-function language may nevertheless fall within 35 U.S.C. § 112 ¶ 6 if they merely claim the underlying function without recitation of acts for performing that function.").  Personalized Media Communications LLC v. ITC, 161 F.3d 696 (Fed. Cir. 1998); Mas-Hamilton Group v. LaGard Inc., 156 F.3d 1206, 1213 (Fed. Cir. 1998) ("lever moving element for moving the lever" and "movable link member for holding the lever…and for releasing the lever" were construed as means-plus-function limitations invoking 35 U.S.C. 112, sixth paragraph since the claimed limitations were described in terms of their function not their mechanical structure).

The claim element "computer .... configured to" is functional language.  For example, claim 38 reads "at least one computer in communication with the at least one digital data storage device and the plurality of deviation detectors, and configured to extract a deviation digitized video signal from at least one of the segments of digitized video signals after the deviation signal is received, and further configured to transmit the extracted deviation digitized video signal for display." ['905 patent, claim 38, Ex. 6].

16

The claim language does nothing more than recite the same functions that are loosely described in the specification and does not recite structure for performing that function. Accordingly, these claims invoke the requirements of 35 U.S.C. § 112 ¶ 6. Considering that the requirements under 35 U.S.C. § 112 ¶ 6 are invoked, the applications fail to disclose adequate structure to enable one skilled in the art to reproduce the invention and therefore these claims are indefinite as discussed in Section 2, *supra*.

> B.    Carotek's Event Capturing System Product Does Not Literally Or Equivalently Infringe Any Claim Reciting Means-Plus-Function Language Of The Champion Patents Because Every Claim Of The Champion Patents Recites Extracting The Video Clip Corresponding To The Deviation Event, Whereas The ECS Monitoring System Does Not Extract Any Video Data.

Since the claims of the Champion Patents are written in means-plus-function format, the claim scope includes corresponding structures disclosed in the specification, and equivalents thereof. Symbol Technologies, Inc. v. Opticon, Inc., 935 F.2d 1569, 1575 (Fed. Cir. 1991). Claim construction of a means-plus-function limitation includes two steps. First, the court must determine the claimed function. JVW Enters v. Interact Accessories, Inc., 424 F.3d 1324, 1330 (Fed. Cir. 2005). Second, the court must identify the corresponding structure in the written description of the patent that performs that function. Id. Literal infringement of a means-plus-function claim limitation requires that the relevant structure in the accused device perform the *identical function* recited in the claim and be identical or equivalent to the corresponding structure in the specification. Lockheed Martin Corp. v. Space Sys./Loral, Inc., 324 F.3d 1308, 1320 (Fed. Cir. 2003). (Emphasis added). Once the relevant structure in the accused device has been identified, a party may prove it is equivalent to the disclosed structure by showing that the two perform the identical function in substantially the same way, with

substantially the same result.  Kemco Sales, Inc. v. Control Papers Co., 208 F.3d 1352, 1364 (Fed. Cir. 2000).

It is only necessary to review the independent claims.  If no infringement exists of the independent claims, then there can be no infringement of any of the claims.  This is because dependant claims, by statute, incorporate by reference all of the limitations in the claim or claims from which they depend, either directly or indirectly.  In other words, a dependent claim must have a more narrow claim scope than the independent claim from which it depends as required by 35 U.S.C. §112 ¶ 4:

> "[a] claim in dependent form shall contain a reference to a claim previously set forth and then specify a further limitation of the subject matter claimed.  A claim in dependent form shall be construed to incorporate by reference all the limitations of the claim to which it refers.

In addition to §112 ¶ 6 equivalents, the doctrine of equivalents can also be applied to claim language invoking a means-plus-function limitation.  The doctrine of equivalents is a judicially created doctrine designed to ensure fairness to a patentee by prohibiting an alleged infringer to escape infringement by only a small insubstantial change in the accused product when compared with the patented claims.  A claim may be infringed under the doctrine of equivalents if the differences between the claim and the accused device are insubstantial.  Hilton Davis Chem. Co. v. Warner-Jenkinson Co., 62 F.3d 1512, 1521-22 (Fed. Cir. 1995).  35 U.S.C. § 112 ¶ 6  equivalents and infringement under the doctrine of equivalents are confusingly similar. The Federal Circuit has offered guidance on this issue, stating:

> Both § 112, ¶ 6, and the doctrine of equivalents protect the substance of a patentee's right to exclude by preventing mere colorable differences or slight improvements from escaping infringement, the former, by incorporating

equivalents of disclosed structures into the literal scope of a functional claim limitation, and the latter, by holding as infringements equivalents that are beyond the literal scope of the claim. They do so by applying similar analyses of insubstantiality of the differences.

Chiuminatta Concrete Concepts, Inc. v. Cardinal Industries, Inc., 145 F.3d 1303, 1310 (Fed. Cir. 1998).

Not every claim is entitled to a range of equivalents. In fact, Courts have repeatedly pointed out that "the determination of equivalency by its nature is inimical to the basic precept of patent law that the claims are the measure of the grant....The doctrine of equivalents ...exists solely for the equitable purpose of preventing an infringer from the stealing the benefit of an invention." Texas Instruments, Inc. v. U.S. Int'l Trade Comm'n, 805 F.2d 1558 (Fed. Cir. 1986). Equally important, infringement under the Doctrine of Equivalents exists only if an equivalent of *every limitation* of the claim is found in the accused device. Warner-Jenkinson Company, Inc. v. Hilton Davis Chemical Co., 520 U.S. 17, 29 (1997). (Emphasis added).

Therefore, in order to determine infringement for claims invoking the requirements of means-plus-function claiming, the specification must be examined to determine claim scope. Based on the limited amount of disclosure for the claim elements "control means" and "computer", the ECS Monitoring System does not infringe any claim of the Champion Patents because the ECS Monitoring System does not extract a video clip as required by each of the claims of the Champion Patents. In the context of functions that are implemented by a computer or similar programmable system, the "corresponding structure" is the particular algorithm (i.e., sequence of well-defined steps, typically shown in a flow chart) disclosed in the specification that carries out the function. See, e.g., Aristocrat, 521 F.3D at 1333; WMS Gaming Inc., 184 F.3d at 1348-49.

The ECS Monitoring System does not infringe any means-plus-function claim of the Champion Patents because each and every independent claim recites either a control means or a computer for or configured to *identify and extract a deviation video signal* from one of the segments of video. [Ex. 6]. It is also clear from the specification of the Champion Patents that the only requirement of control means is to "locate the data clip containing data of such event, to extract such data clip and to display said data clip." ['456 patent, col. 6, line 53-57, Ex. 6]. If there is an algorithm corresponding to "control means" or "computer," it must be read to include the requirements laid out in the Champion Patents specification, namely "locate... extract ... and display." Id. The steps of identifying and extracting the video clip are completely missing from the ECS Monitoring System. [Tam Decl. ¶ 6, Ex. 5].

The step of identifying and extracting a video signal from the video buffer is critical to the system claimed in the Champion Patents. The Champion Patents are directed to a system that has a series of video segments each comprising a plurality of video clips. ['456 patent, col. 6, line 36-43, Ex. 6]. As stated in the Champion patent specifications, the video segments are preferably 15 to 30 minutes long, and the clips are preferably 5 to about 10 seconds. Id. Upon receiving a deviation, the Champion system records the time of that deviation. Id. at col. 6, lines 8-11. The Champion system subsequently identifies and then extracts the clips from different cameras along the paper machine that are relevant to the newly received deviation. Id. at col. 6, lines 11-16. Due to the relatively long length of the Champion video segments of the Champion Patents (15 to 30 minutes), the claimed Champion system *must identify* the rather small portion of the video segment corresponding to the deviation event, and then *must extract* that rather small portion to form a video file of length suitable for quick viewing by the operator. Id. at col.

20

6, lines 36-43.  The Champion System then compiles extracted clips from each camera and splices all of those extracted clips together to form one continuous video file.  Id. at col. 8, lines 2-13.  The ECS Monitoring System does not perform any such identification, extraction, or splicing to form one continuous video file. [Tam Decl. ¶ 6 and 8, Ex. 5].

Put simply, the ECS Monitoring System continuously records data in a series of time segments corresponding to the period of time that the manufacturing process takes to complete one manufacturing cycle.  Id. at ¶ 3.  Each of these segments are saved in a video buffer ring of a predetermined length.  Id. at ¶ 4.  Once the video buffer ring has reached storage capacity, the oldest video segment is cycled out and saved over by the newest segment.  Id.  However, the ECS Monitoring System will not record over a video segment corresponding to a deviation event because these segments are automatically time stamped and saved to the ECS Monitoring System hard drive.  Id.  Upon receiving a deviation signal, the time segment currently in recording, and the previous time segment are saved to the ECS Monitoring System hard drive. Id.  In this manner, the ECS Monitoring System has no uncertainty about which segment of video data contains the deviation event; the ECS Monitoring System only saves the video segment corresponding to the deviation event and the previous time segment.  Id.  The ECS Monitoring System uses a recording clip having a length only about as long as the time required to run one manufacturing cycle, and, therefore, no extraction is necessary from a larger video segment since the recording clip is already in a suitable length, i.e. a length long enough to cover one cycle of the manufacturing process.  Id. at ¶ 3.  For this same reason, the ECS Monitoring System does not have to identify the segment corresponding to the deviation event.

21

To find infringement under the Doctrine of Equivalents, an equivalent of every limitation of the claim must be found in the accused device. Warner-Jenkinson, 520 U.S. at 29. The absence of the steps of identifying and extracting as required by the control means mandates that no infringement under the doctrine of equivalents can be found.

### C.    The ECS Monitoring System Does Not Literally Or Equivalently Infringe Any Non-Means-plus-function Claim Of The Champion Patents.

Claims 21, 38, and 43 of the '905 patent each recite a computer instead of control means. For example, claim 21 recites "at least one computer in communication with said digital data storage means, and configured to *extract* a deviation digitized data from one or more of said segments of digitized data after receipt of a signal of a deviation from said predetermined characteristics, and further configured to display said extracted deviation digitized data." ['905 patent, claim 21, Ex. 6].

Similarly, Claim 38 recites "at least one computer in communication with the digital data storage means, and configured to receive a deviation signal in the event of a deviation from said predetermined characteristics and to *extract* a deviation digitized video signal from at least one of the segments of digitized video signals after the deviation signal is received, and further configured to display the extracted deviation digitized video signal." ['905 patent, claim 38, Ex. 6].

Finally, claim 43 recites "at least one computer in communication with the at least one digital data storage device and the plurality of deviation detectors, and configured to *extract* a deviation digitized video signal from at least one of the segments of digitized video signals after

22

the deviation signal is received, and further configured to transmit the extracted deviation digitized video signal for display." ['905 patent, claim 43, Ex. 6].

Each of these claims recites that the computer is in communication with the data storage device and/or deviation detectors, and is configured to extract a deviation segment, and then further configured to transmit the extracted deviation signal for display. The ECS Monitoring System does not literally or equivalently infringe the above claim language.

As previously discussed, the ECS Monitoring System does not extract any image frames from the storage device upon receiving a deviation event. [Tam. decl. at ¶ 12, Ex. 5 and section (B) of this paper, *supra*]. Instead, the ECS Monitoring System renames the current video segment under recording and the previous video segment to a new filename. Id. at ¶ 5. Then, in a subsequent ECS Monitoring System review session, the video segments from each camera are loaded into a monitor screen with multiple video windows, each assigned to a specific recording camera. Id. at ¶ 8. The video footage available for the user to review from each camera covers the entire time span for the paper to travel from one end to the other end of the paper machine. Id. at ¶ 4. This is different from the Champion Patents where "preferably control means 20 will also extract digitized data clips immediately preceding and following the clip or clips most likely containing data for the deviation event and will splice the deviation event clip and the following and preceding clips into a display clip for display." ['456 patent, col. 8, lines 3-8, Ex. 6].

In the ECS Monitoring System, upon receiving a deviation signal, the time segment currently in recording, and the previous time segment are saved to the ECS Monitoring System hard drive. [Tam Decl. at ¶ 5, Ex. 5]. In this manner, the ECS Monitoring System has no uncertainty about which segment of video data contains the deviation event; the ECS Monitoring

System only saves the video segment corresponding to the deviation event and the previous time segment. <u>Id</u> at ¶ 6. The ECS Monitoring System uses a recording clip having a length only about as long as the time required to run one manufacturing cycle, and, therefore, no extraction is necessary from a larger video segment since the recording clip is already in a suitable length, i.e. a length long enough to cover one cycle of the manufacturing process. <u>Id</u>. at ¶ 12. For this same reason, the ECS Monitoring System does not have to identify the segment corresponding to the deviation event. <u>Id</u>.

The absence of the steps of extracting as required by the control means mandates that no infringement under the doctrine of equivalents can be found. Accordingly, no literal or equivalent infringement of the Champion Patents exists for the ECS Monitoring System.

## IV.    CONCLUSION

For the reasons stated above, Plaintiffs respectfully asks the Court to enter summary judgment in favor of Plaintiffs, holding that the Plaintiffs are not liable above the $25,000 minimum royalty obligation of the license agreement because the Champion Patents are invalid and not infringed, notwithstanding the contemporaneously filed summary judgment motion for summary judgment on the most favored licensee provision, standing, and ownership issues.

Respectfully submitted,
__/s/ Raymond R. Castello _____
Raymond R. Castello (RC 2106)
Fish & Richardson P.C.
Citigroup Center - 52nd Floor
153 East 53rd Street
New York, NY 10022-4611
Telephone: 212-765-5070

24

*Attorney for Plaintiffs Carotek, Inc. and*
*Event Capturing Systems, Inc.*

OF COUNSEL:

W. Thad Adams, III, Esq. (N.C. Bar Number 00,020)
ADAMS INTELLECTUAL PROPERTY LAW, P.A.
201 South College Street, Suite 2350 Charlotte Plaza
Charlotte, NC   28244
Tel:  (704) 375-9249
Fax: (704) 375-0729
litigation@adamspat.com

25

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing **MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT OF NON-LIABILITY UNDER THE CHAMPION LICENSE AGREEMENT BASED ON PATENT INVALIDITY AND NON-INFRINGEMENT** was served on the Defendant by sending copies by E-Mail:

> Alexia Bourgerie
> Jeffrey Schwaber
> Stein, Sperling, Bennett, De Jong & Greenfeig, PC
> 25 West Middle Lane
> Rockville, MD 20850
> abourgerie@steinsperling.com
> jschwaber@steinsperling.com

on September 3, 2008.

/s/ Miranda Perkins