**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| CAROTEK, INC.,                                     )<br>                                                            )<br>         Plaintiff,                                    )<br>                                                            )<br>         v.                                               )<br>                                                            )<br>KOBAYASHI VENTURES, LLC,          )<br>                                                            )<br>         Defendant.                                )<br>_____)<br>                                                            )<br>EVENT CAPTURING SYSTEMS, INC.  )<br>                                                            )<br>         Plaintiff,                                    )<br>                                                            )<br>         v.                                               )<br>                                                            )<br>KOBAYASHI VENTURES, LLC,          )<br>                                                            )<br>         Defendant.                                )<br>_____) | Civil Action. No. 07 11163 |

**STATEMENT OF MATERIAL FACTS**
**PURSUANT TO LOCAL CIVIL RULES 56.1**
**IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY**
**JUDGMENT ON STANDING, OWNERSHIP AND**
**MOST FAVORED LICENSEE ISSUES**

1.       Carotek is a licensee under a license agreement ("Carotek License Agreement") entered

into with Champion Paper in 1998 that granted Carotek a non-exclusive license to make, use,

and sell certain products allegedly covered under a group of certain patents referred to in this

Memorandum as the "Champion Patents." [Ex. 1].

2.    The Carotek License Agreement contained a most favored licensee clause that provided

that:

>"If Champion hereafter grants a license to a third party (other than a Subsidiary of
>LICENSEE) to practice all of the subject matter licensed under this Agreement
>and subject to more favorable royalty terms than those set forth in ARTICLE III
>of this Agreement, CHAMPION shall promptly notify LICENSEE in writing of
>said more favorable royalty terms.  Upon written request given by LICENSEE in
>writing within sixty (60) days after receipt of such notice, LICENSEE shall be
>entitled to the benefit of such more favorable terms as and from the date they
>became effective and only so long as they remain in effect with such third party;
>provided, however, that LICENSEE accepts all other applicable terms and
>conditions of such third party license; and provided further that in comparing
>royalty terms CHAMPION may assign a reasonable monetary value to any rights
>received from said third party by way of consideration for such third party
>license.**"

[Carotek License Agreement, para.12.1, Ex. 1]

3.    Beginning in 2000, Champion Paper extended more favorable license terms under the

same Champion Patents to another licensee by allowing that party to practice under a license

agreement without paying any royalties.   [Kobayashi Memo in Papertech case, Ex. 2]. The other

party, Papertech, Inc., ("Papertech") is claimed by Kobayashi to have never properly terminated

its License Agreement with Champion.  Id. at p. 6.

4.     Accordingly, Kobayashi claims that the License Agreement with Papertech is still in

effect, meaning that for five years Carotek paid royalties to Champion while Papertech did not.

Id.

5.    Carotek learned in 2005 that Papertech had not paid royalties since 2000 and inquired of

Champion regarding its rights under the Carotek License Agreement. [Ex. 3].

6.    Champion failed to respond until 2007, when Kobayashi, which claims to be the owner

by assignment of the Caroteck License Agreement, sent Carotek a letter, dated November 27,

2007,  notifying Carotek of an alleged default.   [Ex. 4].

7.      Kobayashi claims to have purchased the Carotek License Agreement from the prior owner on December 10, 2007. [Ex. 5].

8.      Kobayashi did not own the Carotek License Agreement as it said it did in the pre-December 10, 2007 letters purporting to terminate the license. [Ex. 4].

9.      Carotek filed this Declaratory Judgment Action against Kobayashi on December 11, 2007, seeking a declaratory judgment that Carotek was entitled to those more favorable licensee terms and that Carotek was owed overpaid royalties from the time of the extension of those more favorable terms beginning in 2000 to the present. [Carotek Decl. Judg. Complaint of December 11, 2007].

10.     Carotek sold the part of its business relating to the Carotek License Agreement to ECS, on December 31, 2007. [Bell Depo. p. 12, l. 14-17,  Ex. 6].

11.     ECS has also been threatened with suit for infringement by Kobayashi, and has filed its own Declaratory Judgment action with this Court, which is now consolidated with the prior-filed Carotek action. [ECS Decl. Judg. Complaint of June 24, 2008].

12.     United States Letters Patent No. 5,717,456 was issued on February 10, 1998 to Robert J. Rudt, et al on an application filed on March 6, 1995 for "System for Monitoring a Continuous Manufacturing Process" (the '456 patent).  United States Letters Patent No. 5,821,990 was issued on October 13, 1998 to Robert J. Rudt, et al on an application filed on September 3, 1997 for "System for Monitoring a Continuous Manufacturing Process" (the '990 patent).  United States Letters Patent No. 6,211,905 was issued on April 3, 2001 to Robert J. Rudt, et al on an application filed on July 30, 1998 for "System for Monitoring a Continuous Manufacturing Process (the '905 patent)."  The '990 and '905 patents are divisional patent applications sharing

the same disclosure as the '456 patent, and all of these applications are termed the "Champion

Patents." [collectively the "Champion Patents", Ex. 7].

13.    On December 8, 1998, Carotek and Champion International Corporation executed a

license agreement granting  a non-exclusive right under the Champion Patents to make, use, and

sell the subject matter covered by the Champion Patents.  [Ex. 1].

14.    The Carotek License Agreement provides for payment of royalties to Champion on the

manufacture and sale of products covered by the Carotek License Agreement.  [Ex. 1].

15.    Carotek has fully complied with all of the terms of the Carotek License Agreement, and

paid royalties to Champion until 2005.  Champion later merged to become International Paper,

Inc. ("International Paper"). [Kobayashi Answer and Counterclaim of February 8, 2008, ¶ 38].

16.    On October 19, 2007, Jacklin Associates ("Jacklin") and International Paper executed a

"Patent Purchase Agreement" purporting to transfer all of "Seller's right, title, and interest in

such patent rights."   [Ex. 5].

17.    The Jacklin agreement explicitly recited a "Transfer of Rights" clause that included "(i)

the Assigned Patent Rights together with all causes of action" and "(ii) the Assigned Agreements

together with the right to collect royalties, license fees or other payments under or on account of

any of the Assigned Agreements." Id. at p. 3, para. 3(i).

18.    The Agreement was transferred in consideration of $75,000 and an accounting of half of

all collected royalties.   Id. at p. 2, ¶ 2.1.  Just weeks later, Jacklin then sold the assets it had just

purchased to Kobayashi for $80,000. [Dechman Depo, p. 111, line 22, Ex. 8].

19.    Kobayashi Ventures sent demand letters to Carotek on October 29, November 9 and

November 26, 2007, demanding payment of allegedly due royalty arrearage. [Ex. 9, 10, and 4].

20.    The November 26, 2007 letter purported to place Carotek on notice of default.

Kobayashi Ventures had not been assigned any interest in the Champion Patents or the Carotek Agreement at the time of mailing any of the letters.

21.     On December 10, 2007, Kobayashi Ventures, Inc. and Jacklin Associates executed a "patent assignment" purporting to transfer "the right, title and interest in and to the Patents." [Ex. 5].  The Agreement makes no mention of a transfer of rights to the Agreement or to the transfer of rights to sue for past infringement.

22.     Shortly after Carotek filed suit against Kobayashi on December 11, 2007, Kobayashi filed a patent infringement suit against Papertech on or about December 27, 2007 in the Eastern District of Virginia, claiming that a 2000 letter from Papertech to Champion had terminated the license agreement, and that Papertech was therefore an infringer of the Champion Patents.  [Ex. 11].

23.     Papertech responded by filing a Motion to Dismiss, asserting that the Virginia Federal Court lacked personal jurisdiction over Papertech, or in the alternative, seeking transfer to this Court. [Papertech Brief in Support of Motion to Dismiss, Ex. 12].

24.     The Virginia Federal Court addressed the issue of whether Kobayashi had legal title to the Champion Patents.   After reciting the transactional history, including the above-referenced Jacklin transfer, the Court noted that while Jacklin appeared to have acquired the right to sue for past infringement, Jacklin clearly had not transferred those rights to Kobayashi:

> This language [transfer language in the Jacklin to Kobayashi Assignment] in contrast, clearly is not sufficient under the standard articular in Minco and Arachnid to assign Jacklin Associates' right to sue for past infringement to Kobayashi.  The "Patent Assignment" contains no reference to past infringement whatever and makes no reference to the respective rights of Kobayashi and Jacklin Associates to sue for infringement that took place before the assignment was consummated.  Therefore, this Court may only exercise personal jurisdiction over Papertech if Kobayashi's claims arise out of Papertech's activities in Virginia after December 10, 2007.

[Order of May 7, 2007 at 8-9, Ex. 13].

25.     The suit between Kobayashi and Papertech was transferred to this district because Kobayashi did not acquire the right to sue for past patent infringement of the Champion Patents predating December 10, 2007, and since Papertech had not sold any systems that could potentially infringe the Champion Patents after December 10, 2007, then personal jurisdiction could not be established over Papertech in Virginia.  Id.

26.     Kobayashi alleges that Papertech had terminated the license agreement between Papertech and Champion in 2000.  Id. at 9-11.

27.     Kobayashi has not appealed or otherwise challenged the Order and Opinion of the Virginia Federal Court, and Kobayashi is precluded on the basis of issue preclusion from attempting to relitigate any issues litigated and resolved in that action.  Accordingly, the present posture of this case is that Kobayashi apparently owns the Carotek License Agreement as of December 10, 2007, but Jacklin retains the right to sue for infringements occurring before that date.

Respectfully submitted,

   /s/ Raymond R. Castello
Raymond R. Castello (RC 2106)
Fish & Richardson P.C.
Citigroup Center - 52nd Floor
153 East 53rd Street
New York, NY 10022-4611
Telephone: 212-765-5070

*Attorney for Plaintiffs Carotek, Inc.  and
Event Capturing Systems, Inc.*

**OF COUNSEL:**

W. Thad Adams, III, Esq. (N.C. Bar Number 00,020)
**ADAMS INTELLECTUAL PROPERTY LAW, P.A.**
201 South College Street, Suite 2350 Charlotte Plaza
Charlotte, NC   28244
Tel:  (704) 375-9249
Fax: (704) 375-0729
litigation@adamspat.com

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that the foregoing **STATEMENT OF MATERIAL FACTS** was served on the Defendant by sending copies by E-Mail:

> Alexia Bourgerie
> Jeffrey Schwaber
> Stein, Sperling, Bennett, De Jong & Greenfeig, PC
> 25 West Middle Lane
> Rockville, MD 20850
> abourgerie@steinsperling.com
> jschwaber@steinsperling.com

on September 3, 2008.

_____
      /s/ Miranda Perkins

# EXHIBIT 1

FEB-27-2008 17:09 STEIN SPERLING 301 838 3250 P.19/42
Case 1:07-cv-11163-NRB Document 31-2 Filed 09/03/2008 Page 2 of 48

OCT-18-2006 23:47 P.36/61

## LICENSE AGREEMENT

THIS AGREEMENT, made and entered into this 8th day December, 1998 between CHAMPION INTERNATIONAL CORPORATION, a New York Corporation having an office at One Champion Plaza, Stamford, Connecticut 06921 (hereinafter referred to as "CHAMPION", or the "Party") and CAROTEK. INC. a corporation organized and existing under the laws of North Carolina, having an office at 700 Sam Newell Road, P.O Box 1395, Matthews, North Carolina 28106 (hereinafter referred to as "LICENSEE" or the "Party").

## WITNESSETH THAT:

WHEREAS, CHAMPION is the owner by assignment of certain patents and patent applications (hereinafter referred to and defined as "Patent Rights") involving a proprietary process monitoring system (hereinafter referred to and defined as "$CV^2$ System");

WHEREAS, LICENSEE desires the non-exclusive right under said Patent Rights to make, use and sell $CV^2$ System and the right to further develop such System;

WHEREAS, CHAMPION is willing to grant such non-exclusive right and license to the extent that CHAMPION has the right to do so.

NOW, THEREFORE, in consideration of the promises and mutual covenants herein contained, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I - DEFINITIONS

As used herein, the following terms shall have the following meanings:

1.1    "Effective Date of this Agreement" shall mean the date first hereinabove written.

1.2    "Patent Rights" shall mean the United States and foreign patent(s) and patent application(s) listed in attached Schedule A, as well as any patent(s) issuing on the said applications and any divisionals, continuations and reissues and extensions thereof.

1.3    "$CV^2$ System" shall mean the process monitoring system claimed in Patent Rights and shall include but not be limited to all equipment sold, leased or otherwise transferred by LICENSEE under this Agreement, whether manufactured or created by LICENSEE or by a third party, such as video cameras, computers for capturing and viewing, data storage devices (i.e., disks, tapes, CD-ROMS), networking equipment (i.e. hubs, routers, bridges), switching units, power supplies, interconnecting panels and cables, and wiring for connecting various components together.

1.4    "Cost of Services" shall mean the cost of consulting, engineering, installing, supervising and like services performed by or for LICENSEE for the sale and installation of $CV^2$ System and shall be equal to TEN PERCENT (10%) of the total gross selling price for $CV^2$ System.

1.5    "Fully Absorbed Manufacturing and Installation Cost" shall mean the most favorable price offered by LICENSEE or Subsidiary of LICENSEE and accepted by a third party other than the price for the first (1st) sale of $CV^2$ System in each country, within six (6) months prior to the date

of sale to LICENSOR or Subsidiary of LICENSOR for the sale, installation, license, lease or other transfers of CV² System less twenty-five percent (25%) of such most favorable price, which Cost shall be subject to audit by CHAMPION on an open book basis during normal business hours upon reasonable prior notice.

1.6 "Subsidiary" shall mean:

1.6.1 Any corporation or other juridical business entity owning, or directly or indirectly controlling at least twenty percent (20%) of the stock of a Party entitled to vote for election of directors; and

1.6.2 Any corporation or other juridical business entity at least twenty percent (20%) of whose stock, entitled to vote for election of directors, is owned, or directly or indirectly controlled by a Party.

1.7 "CV² System Installation" shall mean the design, sale, installation, license, lease and/or other transfer of a single CV² System for monitoring the operation of a single unitary, integrated and stand alone process or apparatus used in the conduct of such process, whether in the paper, printing or other industry, (i.e. paper making machine, off machine coater, super calender, winder, etc.) or upgrades to a single existing installed CV² System.

1.8 "Reporting Period" shall mean each semiannual period during the term of this Agreement, the first of which shall commence on the Effective Date of this Agreement and shall end on December 31, 1998, the second of which shall be from January 1, 1999 until June 30, 1999, the third of which shall be from July 1, 1999 until December 31, 1999, and the subsequent periods from January 1 until June 30 and July 1 until December 31 of the following years of the term of this agreement.

1.9 "Commercial Sale" shall mean the CV² System Installation by LICENSEE and/or Subsidiaries of LICENSEE to a bona fide purchaser in good faith who is the user of the CV² System and does not include internal sales or transfers by and between LICENSEE and Subsidiaries of LICENSEE.

1.10 "Net Sales Price" shall mean the sum of the Cost of Services and the gross price of Commercial Sales of CV² System less packaging charges, transportation charges; insurance against loss or damage in transit; sales, excise use and similar taxes directly incurred by LICENSEE in connection with the relevant Commercial Sale; importation duties and levies and selling commissions by resellers and agents who are not Subsidiaries of LICENSEE. If CV² System are sold, licensed, installed, designed, leased or otherwise transferred as components of a combined system, the Net Sales Price for CV² System shall be calculated by multiplying the Net Sales Price of said combined system as determined above by a fraction, the denominator of which is equal to the total list price of said combined system and the numerator of which is equal to the list price of said CV² System.

## ARTICLE II-LICENSE GRANT

FEB-27-2008 17:40 STEIN SEEPLING 301 838 3250 P.21/42
Case 1:07-cv-11163-NRB Document 31-2 Filed 09/03/2008 Page 4 of 48

OCT-18-2006 23:48 P.38/61

2.1    Effective as of the Effective Date of this Agreement, CHAMPION grants to LICENSEE and LICENSEE accepts the worldwide, non-transferable, non-exclusive right and license under Patent Rights to make, use, and sell $CV^2$ System.

2.2    LICENSEE shall have the right to grant sublicenses to customers of the $CV^2$ System from LICENSEE and Subsidiaries of LICENSEE provided that a royalty has been paid to CHAMPION in accordance with ARTICLES III and IV below.

2.3    Except as expressly set forth in this ARTICLE II, no other licenses or rights are granted to LICENSEE or any other party under this Agreement with respect to any patent, patent application, trade secret, copyright, proprietary information or any other property right belonging to CHAMPION.

## ARTICLE III - ROYALTIES

3.1    During the term of this Agreement for each $CV^2$ System Installation by LICENSEE and Subsidiaries of LICENSEE to person, business, corporation, partnership or the like which is not a bona fide purchaser in good faith who is the user of the System of said $CV^2$ System Installation (i.e. distributors, resellers, and the like other than Subsidiaries of Licensee), LICENSEE shall pay to CHAMPION a running royalty of EIGHT PERCENT (8%) of the Net Sales Price of $CV^2$ System for each of said $CV^2$ Installations.

3.2    During the term of this Agreement for each $CV^2$ System Installation by LICENSEE and Subsidiaries of LICENSEE to person, business, corporation, partnership or the like which is a bona fide purchaser in good faith who is the user of the System of said $CV^2$ System Installation (i.e. printers, paper makers, article manufacturers and the like), LICENSEE shall pay to CHAMPION a running royalty of FIVE PERCENT (5%) of the Net Sales Price of $CV^2$ System for each of said $CV^2$ Installations.

3.3.    Internal sales and transfers by and between LICENSEE and Subsidiaries of LICENSEE as set forth in Paragraph 1.9. are excluded from Paragraphs 3.1. and 3.2. and do not require a royalty payment hereunder where the purchaser or transferee of the $CV^2$ System is not the manufacturer of product for commercial sale.

3.4    During the term of this Agreement and beginning January 1, 1999 , LICENSEE shall pay to LICENSOR minimum guaranteed annual fees of TWENTY-FIVE THOUSAND DOLLARS ($25,000.00) per calendar year. Minimum guaranteed annual fees shall be paid to LICENSOR within thirty (30) days after the end of the calendar year for which such fees are due and payable. With respect to any calendar year, LICENSEE shall be entitled to a credit for any royalties under paragraphs 3.1 and 3.2 actually paid to LICENSOR under this Article III during such calendar year against minimum guaranteed annual fees for such year.

## ARTICLE IV-STATEMENTS AND PAYMENTS

4.1    LICENSEE shall render to CHAMPION all royalties fees due and payable to CHAMPION on account of sales of $CV^2$ System during the preceding Reporting Period. All payments of royalties and fees shall be paid to CHAMPION, without discount or offset, in United States of America Dollars.

4.2    All royalties due and payable on account of sales where the currency of sale is other than United States of America Dollars shall be converted into United States Dollars at the rate of exchange quoted in the Wall Street Journal on the business day of the sale. All payments of royalties and fees shall be net, and any taxes, duties, fees, and imposts of any and every kind which may be levied by any taxing authority by reason of the execution and performance of this Agreement or of payment of any royalty or fee hereunder including but not limited to income taxes, turnover taxes, Value Added Taxes and any other taxes of a similar kind shall be borne and paid by LICENSEE, except taxes imposed directly on CHAMPION or its Subsidiaries by any taxing authority.

4.3    Accompanying each royalty payment shall be a written report showing the computation of such royalty payment with supporting information in sufficient detail for CHAMPION to understand the basis for such computation. LICENSEE shall render such written statement even if no royalty payment is due and payable to CHAMPION for a Reporting Period. Payments of royalty and rendering of written statements shall be made at the address provided in Article XXI hereof or at such other location as may be specified from time to time by notice in writing given to LICENSEE by CHAMPION.

4.4 Acceptance by CHAMPION of any payment tendered hereunder, whether or not the amount thereof shall be in dispute, shall not constitute acceptance of the account or written statement on which such payment is based.

## ARTICLE V - RECORDS

5.1 LICENSEE shall keep full, true and accurate books of accounts and other records containing all particulars which may be necessary to properly ascertain and verify the license fee payments due and payable to CHAMPION by LICENSEE hereunder. LICENSEE shall upon CHAMPION's written request to LICENSEE, permit CHAMPION to examine or have examined, at reasonable times during regular business hours, such of LICENSEE's business records and those of LICENSEE's Subsidiaries as may be necessary to determine the accuracy of any written statement or license fee payment.

## ARTICLE VI - COMMERCIALIZATION EFFORTS

6.1    It is understood by the parties hereto that the license fees due and payable to CHAMPION hereunder is dependent upon the efforts exerted by LICENSEE to commercialize $CV^2$ System. LICENSEE shall promote and commercially exploit $CV^2$ System and satisfy the demand for said $CV^2$ System as it does with its other major business activities and in accordance with its regular practices of promoting and exploiting its major process monitoring systems. In the performance of LICENSEE's duties and obligations under this ARTICLE VI, LICENSEE shall have the right to use its own business and promotion names in accordance with its normal practices.

## ARTICLE VII - CONFIDENTIALITY

7.1    As used herein, "Confidential Information" shall include any and all information disclosed to LICENSEE by or through CHAMPION, including any information obtained by LICENSEE visually through an inspection of any sample, device, document or like tangible thing submitted to LICENSEE by or through CHAMPION or by observation at facilities of CHAMPION or CHAMPION Subsidiaries excluding, however, such information which:

7.1.1 Is at the time of disclosure, or thereafter becomes, a part of the public domain through no act or omission by LICENSEE, or its employees; or

7.1.2 Had been independently developed by the LICENSEE or was otherwise in LICENSEE's lawful possession prior to disclosure, as shown by written records; or

7.1.3 Is hereafter lawfully disclosed to the LICENSEE by a third party which did not acquire the information under an obligation of confidentiality from or through CHAMPION.

7.1.4 Is disclosed by LICENSEE pursuant to judicial action or governmental regulation or requirement; provided that LICENSEE shall notify CHAMPION of any order or request to disclose Information in sufficient time to allow CHAMPION a reasonable time to oppose the disclosure.

For the purposes of this Paragraph 7.1, specific disclosures made to LICENSEE shall not be considered to be within the exceptions above merely because they are embraced by general disclosures in the public domain. In addition, any combination of features disclosed to LICENSEE shall not be considered to be within the exceptions above merely because individual features are separately in the public domain.

7.2 During the term of this Agreement and for a period of ten (10) years from the termination date of this Agreement or any extensions thereto, LICENSEE shall hold Confidential Information in confidence employing the same precautions, but not less than reasonable precautions, that LICENSEE employs to maintain the confidentiality of its own information of like character and shall not disclose the same to any third party, without the prior written consent of the CHAMPION by an authorized officer. Notwithstanding the foregoing, LICENSEE may disclose Confidential Information to the minimum number of its directors, officers and/or employees who require access thereto for the purposes hereof and to Subsidiaries of LICENSEE assisting LICENSEE in the exercise of its rights and the performance of its obligations hereunder; provided, however, that prior to such disclosure each such director, officer, employee, Subsidiary shall be informed of his/its obligations under this Agreement relative to the confidentiality and to the restricted use of Confidential Information, and further provided that prior to such disclosure each such Subsidiary shall execute or shall have executed written agreements obligating such Subsidiary to comply with each and every obligation of LICENSEE under this ARTICLE VII and each such director, employee and/or officer shall execute or shall have executed LICENSEE's standard employment agreement which LICENSEE warrants and represents obligates each such director, employee and/or officer to comply with the terms and conditions of confidentiality and restricted use set forth in this ARTICLE VII.

7.3 LICENSEE shall use Confidential Information only for the purposes of this Agreement, and shall make no other use of such Confidential Information without the prior written consent of CHAMPION by an authorized officer.

7.4 LICENSEE agrees that all documentary, electronic or like tangible Confidential Information, including drawings, designs, specifications, computer programs, flowsheets , sketches, descriptions, data an the like obtained from or through CHAMPION and documentary, electronic or like tangible Confidential Information which is generated by or for LICENSEE which embodies or is based upon Confidential Information are and shall remain the exclusion property of CHAMPION, and LICENSEE shall maintain the said documentary, electronic or like tangible Confidential Information at all times in its custody and subject to its control. Promptly on termination or

expiration of this Agreement, Recipient shall return all such documentary, electronic or like tangible Confidential Information, as well as all copies thereof, to CHAMPION.

## ARTICLE VIII - THE INSTALLATION OF $CV^2$ SYSTEM AT FACILITIES OF CHAMPION AND CHAMPION SUBSIDIARIES

8.1    LICENSEE hereby grants to CHAMPION an option to purchase and install, in CHAMPION facilities and the facilities of CHAMPION Subsidiaries, up to ten (10) units of the $CV^2$ System at a cost not to exceed the Fully Absorbed Manufacturing and Installation Cost of such units and subject to the terms and conditions generally required by Champion in its equipment purchase agreements and agreed to by LICENSEE. The option granted to CHAMPION hereunder shall remain in force and effect in perpetuity or until the purchase and installation of the aforesaid ten (10) units of $CV^2$ System. CHAMPION may at anytime exercise its option for purchase of up to ten (10) units of the $CV^2$ System by providing written notice to LICENSEE to such effect. In such event, LICENSEE shall sell to CHAMPION or a CHAMPION Subsidiary and install at the relevant facility the very next available $CV^2$ System manufactured or have manufactured by LICENSEE or by Subsidiary of LICENSEE.

8.2    CHAMPION may purchase units of $CV^2$ System in addition to the said ten (10) units of the $CV^2$ System. The terms and conditions of such purchase sale or installation shall be no less favorable to CHAMPION than the most favorable terms and conditions offered to a third party for the purchase sale or installation a $CV^2$ System as of the date of purchase/sale or license to CHAMPION less the license fee which would have been due and payable to CHAMPION if such purchase/sale had been made to a third party.

8.3    All $CV^2$ System sold to CHAMPION or to Subsidiaries of CHAMPION hereunder shall meet mutually agreeable performance specification and guarantees, and shall be warranted by LICENSEE. The said performance specification, guarantees and warranties shall be at least as favorable to CHAMPION or to Subsidiaries of CHAMPION as the most favorable specifications, guarantees and warranties granted by LICENSEE to its other customers for $CV^2$ System as of the date of sale or license of $CV^2$ System to CHAMPION or to Subsidiaries of CHAMPION.

8.4    All persons selected and sent to facilities of a party to this Agreement in connection with any purchase, sale or installation of a $CV^2$ System under this Article VIII shall remain the employees of their respective employers as the case may be. All such persons shall observe such safety and other regulations as have been established at such facilities. Each employer shall indemnify, defend and hold harmless a party to this Agreement and its directors, officers, agents and employees against any and all loss, cost, expense or liability arising out of or resulting from any visit to facilities of such other party, by reason of injury or loss suffered by, or claim brought by, or on behalf of, any employee of such employer sent to facilities of a party pursuant to the provisions of this Agreement.

## ARTICLE IX - PUBLICITY AND PROMOTION

9.1    LICENSEE shall have no right to use any business name or trademark of CHAMPION or the name of any CHAMPION employee in any manner whatsoever, including use for any publicity or promotion of the $CV^2$ System, publications pertaining to the $CV^2$ System and the like without the prior written consent of CHAMPION by an authorized officer.

FEB-27-2008 12:10 STEIN SPERLING 301 838 3250 P.25/42

OCT-18-2006 23:49 P.42/61

## ARTICLE X - MAINTENANCE AND FILING OF PATENTS

10.1  CHAMPION shall not be obligated to pay any charges or perform any acts whatsoever, whether required by law or otherwise, for the purpose of maintaining active or enforceable any Patent Rights, and failure of CHAMPION to do so shall not relieve LICENSEE of any obligation hereunder.

## ARTICLE XI - REPRESENTATIONS AND WARRANTIES

11.1  CHAMPION WARRANTS AND REPRESENTS THAT IT IS THE OWNER OF PATENT RIGHTS BY ASSIGNMENT AND HAS THE LAWFUL RIGHT AND AUTHORITY TO GRANT THIS LICENSE. EXCEPT AS EXPRESSLY SET FORTH IN THE PRECEDING SENTENCE, THERE ARE NO WARRANTIES OR REPRESENTATIONS WHATSOEVER, EITHER EXPRESSED OR IMPLIED, WITH RESPECT TO $CV^2$ SYSTEM OR PATENT RIGHTS, INCLUDING BUT NOT LIMITED TO:

11.1.1 A WARRANTY OF MERCHANTABILITY;

11.1.2 A WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE;

11.1.3 A WARRANTY THAT ANY PARTICULAR RESULT WILL BE OBTAINED THROUGH EXERCISE OF THE RIGHTS GRANTED HEREUNDER;

11.1.4 A WARRANTY OR REPRESENTATION AS TO THE VALIDITY OR SCOPE OF ANY PATENT RIGHTS; AND

11.1.5 A WARRANTY OR REPRESENTATION THAT $CV^2$ SYSTEM OR PATENT RIGHTS, OR ANY USE, LICENSE OR SUBLICENSE THEREOF OR ANY OTHER EXERCISE OF THE RIGHTS GRANTED HEREUNDER WILL BE FREE OF INFRINGEMENT OF ANY PATENTS OR OTHER PROPRIETARY RIGHTS OF A THIRD PARTY.

11.2  IN NO EVENT SHALL CHAMPION BE RESPONSIBLE OR LIABLE FOR ANY DAMAGES, LOSSES, CLAIMS, DEMANDS OR EXPENSES WHATSOEVER RESULTING FROM OR ARISING OUT OF THE SALE, LEASE, LICENSE OR OTHER TRANSFER OF, OR MANUFACTURE OR INSTALLATION OF, OR USE OF THE $CV^2$ SYSTEM BY CUSTOMERS OF LICENSEE OR SUBSIDIARIES OF LICENSEE INCLUDING ANY DIRECT, INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSSES, CLAIMS, DEMANDS OR EXPENSES.

11.3. NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS AGREEMENT, IN NO EVENT SHALL LICENSEE BE RESPONSIBLE OR LIABLE FOR ANY INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSSES, CLAIMS, DEMANDS OR EXPENSES WHATSOEVER RESULTING FROM OR ARISING OUT OF THIS AGREEMENT.

## ARTICLE XII - MOST FAVORED LICENSE

12.1 If Champion hereafter grants a license to a third party (other than a Subsidiary of LICENSEE) to practice all of the subject matter licensed under this Agreement and subject to more favorable royalty

FEB-27-2008  17:43    STEIN SPERLING    301 838 3250    P.26/42
Case 1:07-cv-11163-NRB    Document 31-2    Filed 09/03/2008    Page 9 of 48

OCT-18-2006  23:49    P.43/61

terms than those set forth in ARTICLE III of this Agreement, CHAMPION shall promptly notify LICENSEE in writing of said more favorable royalty terms. Upon written request given by LICENSEE in writing within sixty (60) days after receipt of such notice, LICENSEE shall be entitled to the benefit of such more favorable terms as and from the date they became effective and only so long as they remain in effect with such third party; provided, however, that LICENSEE accepts all other applicable terms and conditions of such third party license; and provided further that in comparing royalty terms CHAMPION may assign a reasonable monetary value to any rights received from said third party by way of consideration for such third party license.

## ARTICLE XIII- DISCLAIMER AND NEGATION OF AGENCY

13.1    It is agreed and understood by the parties hereto that LICENSEE is an independent contractor, and that nothing herein contained shall be deemed to create an agency, partnership, joint venture or like relationship between the parties. Neither party hereto is authorized or empowered to act as the agent for the other party for any purpose, and shall not on behalf of such other party enter into any contract, undertaking or agreement of any sort or make any promise, warranty or representation with respect to any matter.

13.2    It is mutually understood and agreed that any act or failure to act under this Agreement by or on behalf of LICENSEE or Subsidiaries of LICENSEE including but not limited to the design, manufacture, installation and use of and sale, lease, license or the transfer of $CV^2$ System is solely under the supervision, direction and control of LICENSEE or Subsidiaries of LICENSEE, and CHAMPION shall not be responsible for any such activities. LICENSEE assumes all responsibility for any and all warranties and for any and all costs, expenses, damages, judgments, claims and liabilities resulting from or arising out of any action or failure to take any action under this Agreement by or on behalf of LICENSEE or Subsidiaries of LICENSEE, and agrees to hold CHAMPION harmless, and to defend and indemnify CHAMPION, from any such costs, expenses, judgments, damages, claims or liabilities resulting from or arising out of the manufacture, installation, use or sale of $CV^2$ System, including but not limited to claims of patent or trade secret infringement or claims of customers, end-users, of the public or of any government or agency thereof, except in cases which are set forth in Paragraph 11.3 above.

## ARTICLE XIV - PATENT MARKING

14.1    LICENSEE and Subsidiaries of LICENSEE shall mark all $CV^2$ System sold by them in the United States under the license granted herein with the words "U.S. Patent" or "U.S. Patents" and the number(s) of the Patent Rights applicable thereto, or with such other patent marking as CHAMPION may from time to time reasonably direct.

## ARTICLE XV - GOVERNMENT MARKETING CLEARANCE

15.1    Prior to marketing any $CV^2$ System in any country, LICENSEE and Subsidiaries of LICENSEE shall have such System cleared for marketing by the responsible government agencies of that country requiring such clearance.

## ARTICLE XVII - TERM AND TERMINATION

16.1   This Agreement shall commence on the Effective Date of this Agreement, and shall continue in full force and effect for the term of the last to expire Patent Rights unless this Agreement is earlier terminated as herein provided.

16.2   If LICENSEE shall fail to make any payment of a royalty owed to CHAMPION under ARTICLE III hereof or shall default in or breach any other term or provision of this Agreement, and also shall fail to remedy such default or breach within thirty (30) days after receipt of written notice specifying the default or breach and the particulars thereof from CHAMPION, then CHAMPION may at its option and in addition to any other remedies which it may have at law or in equity terminate this Agreement by giving written notice thereof to LICENSEE to such effect, in which event, this Agreement shall terminate on the thirty-first (31st) day after sending such notice.

16.3   LICENSEE shall have the right to terminate this Agreement upon thirty (30) days prior written notice to CHAMPION to such effect in the event that:

16.3.1   All the material claims of Patent Rights have been held invalid in a final unappealable judgment of a court of competent jurisdiction; or

16.3.2   A patent or proprietary right infringement dispute arises with respect to Patent rights between CHAMPION or its Subsidiary and a third party, based upon the facts of which an intellectual property attorney of ordinary skill in the art could conclude should be resolved in said third party's favor; or

16.3.3   Other material events or reasons making it impossible or unreasonable for LICENSEE to continue its performance under this Agreement.

16.4   No termination of this Agreement pursuant to this ARTICLE shall release either party from any obligations which have accrued prior to the effective date of termination including but not limited to obligations under ARTICLE III hereof to make payments due or which become due and under ARTICLE VII hereof to maintain the confidentiality of Confidential Information.

16.5   In the event that this Agreement is terminated pursuant to Paragraph 16.2, LICENSEE shall immediately cease the design, manufacture, sale and installation of $CV^2$ System, except where such design, manufacture, sale, installation, license or lease would not infringe a claim of Patent Rights which has not been held invalid in a final unappealable judgment of a court of competent jurisdiction.

16.6   If during the term of this Agreement, party shall become bankrupt or insolvent, or is subject to liquidation, or if the business of party shall be placed in the hands of a receiver or trustee, whether by the voluntary act of party or otherwise, or if party is obliged to make an assignment of assets for the benefit of creditors, or if party takes or is subject to any other action under law based on its inability to meet its financial obligations or if substantially all of party's assets are seized or attached in connection with any action against party or are sold or attempted to be sold, this Agreement shall terminate automatically without notice.

16.7   Failure on the part of CHAMPION to notify LICENSEE of any default or breach of this Agreement, or to terminate this Agreement because of any default or breach that would give CHAMPION the right to terminate, shall not constitute a condonation of such breach or default or a waiver of future breaches or defaults.

Caroteck.CV² License          9

⌐ FEB-39-2009    12:13    STEIN SPERLING    301 838 3250    P.28/42
Case 1:07-cv-11163-NRB    Document 31-2    Filed 09/03/2008    Page 11 of 48

P.45/61

OCT-18-2006  23:49

## ARTICLE XVII - SEVERABILITY

17.1    If any provision of this Agreement shall be held to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

## ARTICLE XVIII - GOVERNING LAW

18.1    This Agreement shall be construed and the legal relations between the parties shall be determined, in accordance with the laws of the State of New York, without recourse to the conflict of laws of said State which would direct the use of laws of another jurisdiction.  Any suit brought by either party against the other party on the basis of any controversy or claim arising out of or relating to this Agreement or a breach thereof shall be brought in the United States District Court for the Southern District of New York, and, if the United States District Court declines jurisdiction for any reason then in the Supreme Court First Department of the State of New York. The parties hereby consent to the personal jurisdiction of the courts and hereby designate the Secretary of State of the State of New York for receipt of service of process.

## ARTICLE XIX - HEADINGS

19.1    The heading of each ARTICLE is inserted for convenience of reference only, and is not intended to be a part of or to affect the meaning or interpretation of this Agreement.

## ARTICLE XX - AGREEMENT MODIFICATION

20.1    Any agreement changing the terms of this Agreement in any way shall be valid only if the change is made in writing executed by authorized representative of the Parties hereto.

## ARTICLE XXI - COMMUNICATIONS

21.1    It shall be sufficient giving any notice, report, or other communication hereunder, if the party giving same shall deposit a copy thereof in the Post Office in a registered or certified envelope, by postage prepaid certified mail, or delivered by messenger or air courier addressed to the other party at the address provided hereinbelow or at such other address as may hereafter be designated in writing.

If to CHAMPION:

For Business Matters:
Champion International Corporation
1 CHAMPION Plaza
Stamford, CT 06921

ATTN: Richard Piela
Director, Capital Project
Support and MRO

For Legal Matters:
Champion International Corporation
1 Champion Plaza
Stamford, CT 06921

ATTN: Richard C. Stewart, II
Chief Patent Counsel

If to LICENSEE:

Carotek Inc.
700 Sam Newell Road
P.O. Box 1395
Matthews, North Carolina 28106

ATTN: Addison Bell

Payments shall be made to the address indicated hereinabove for notices relating to business matters. The date of giving any such notice, invoice or other communication, and the date of making any such payment, provided that such payment is received, shall be the date on which such envelope is deposited. The Post Office receipt showing the date of such deposit shall be prima facie evidence of these facts.

## ARTICLE XXII - ASSIGNABILITY

22.1    LICENSEE may not assign this Agreement without CHAMPION's express prior written consent by an authorized officer; provided, however, that LICENSEE may assign this agreement without CHAMPION's consent to the successor of LICENSEE's business provided that such successor agrees in writing to assume each and every duty and obligation of LICENSEE under this Agreement and to be bound to the terms and conditions of this Agreement to the same extent that LICENSEE is bound. A copy of the assumption agreement shall be promptly provided to CHAMPION.

22.2    CHAMPION may assign this Agreement and the rights granted to CHAMPION as CHAMPION in its sole discretion deems fit; provided, however, that if this Agreement is assigned to a competitor of LICENSEE or its Subsidiaries, LICENSEE shall have the right to terminate this

Agreement forthwith by giving written notice thereof to CHAMPION and assignee and subject to the terms and conditions of Paragraphs  16.4 and 16.5.

22.3    Except as expressly provided in this ARTICLE  XXII, any purported assignment shall be null and void.

### ARTICLE XXIII - BINDING EFFECT - BENEFIT

23.1    This Agreement shall insure to the benefit of and be binding upon the parties hereto and their respective successors in interest and permitted assigns.

### ARTICLE XXIV - ENTIRE AGREEMENT

24.1    This Agreement represents the entire understanding and agreement between the parties hereto with respect to the subject matter hereof, and supersedes all prior agreements, discussions and writings with respect thereto, either expressed or implied, between the parties.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their authorized representatives.

CHAMPION INTERNATIONAL
CORPORATION

By: _Gerard P. Closet_

Name: _GERARD  P. CLOSET_

Title: _VICE  PRESIDENT_

CAROTEK INC.

By: _J. Addison Bell_

Name: _J. Addison Bell_

Title: _CEO_

FEB-20-2008  12:13     STEIN SREPLING     301 838 3250   P.31/42

OCT-18-2006  23:50                                          P.48/61

## SCHEDULE A

## PATENT RIGHTS

1) U.S. Patent No. 5, 717, 456;

2) U.S. Patent No. 5, 821, 990;

3) Australian Patent Application No. 38274/95;

4) Brazilian Patent Application No. PI 9510548-4;

5) Chilean Patent Application No. 1898-95;

6) Finnish Patent Application No. 973611;

7) Indonesian Patent Application No. P952441;

8) Japanese Patent Application No. 8-526826;

9) South Korean Patent Application No. 1997-706231;

10) Malaysian Patent Application No. PI9703058;

11) Mexican Patent Application No. 976703;

12) New Zealand Patent No.295027;

13) Norwegian Patent Application No. 974012;

14) South African Patent No 95/9613; and

15) European Patent Application No. 95 936 260.9.

16) Canadian Patent Application No. 2,214,724

17) US Patent No.5,821,990
XXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXXX

# EXHIBIT 2

## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF NEW YORK

KOBAYASHI VENTURES, LLC,                :
                                        :
              Plaintiff                 :
                                        :
      v.                                :        Case No. 1:08-cv-04450-LAP
                                        :
PAPERTECH INC.,                         :
                                        :
              Defendant.                :
                                        :
                                        :

**KOBAYASHI VENTURES' NOTICE OF OPPOSITION AND OPPOSITION TO
PT PAPERTECH, INC.'S "MOTION TO DISMISS KOBAYASHI VENTURES'
FIRST AMENDED COMPLAINT FOR FAILURE TO STATE A CLAIM
PURSUANT TO FRCP 12(b)(6), AND IN THE ALTERNATIVE FOR
SUMMARY JUDGMENT UNDER FRCP 56"**

Plaintiff, Kobayashi Ventures, LLC ("KV" or "Plaintiff"), by and through its attorneys,

Jeffrey M. Schwaber, Alexia Kent Bourgerie, and Stein, Sperling, Bennett, De Jong, Driscoll &

Greenfeig, P.C., opposes PT Papertech Inc.'s Motion to Dismiss for Failure to State a Claim

Pursuant to Fed. R. Civ. P. 12(b)(6) or in the Alternative for Summary Judgment under Fed. R.

Civ. P. 56 ("Defendant's Motion"), for the grounds set forth in Kobayashi Ventures' Brief in

Opposition to Defendant's Motion filed simultaneously herewith.

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

By:  _____/s/_____

Jeffrey M. Schwaber, NY Bar No. 4529699
Alexia Kent Bourgerie, *pro hac* admission
Attorneys for Plaintiff, Kobayashi Ventures, LLC
Stein, Sperling, Bennett, De Jong, Driscoll & Greenfeig, P.C.
25 West Middle Lane
Rockville, Maryland 20850

| | | |
|---|---|---|
| Telephone | : | (301) 838-3210 (Jeffrey M. Schwaber) |
| Facsimile | : | (301) 354-8110 (Jeffrey M. Schwaber) |
| Email | : | jschwaber@steinsperling.com |
| Telephone | : | (301) 838-3232 (Alexia Kent Bourgerie) |
| Facsimile | : | (301) 354-8132 (Alexia Kent Bourgerie) |
| Email | : | abourgerie@steinsperling.com |

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 31st day of July, 2008, I will electronically file the foregoing with the Clerk of Court using the ECF system, which will then send a notification of such filing (NEF) to the following:

Oren J. Warshavsky
Jason S. Oliver
Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York 10111

Dabney Jefferson Carr, IV
Troutman Sanders, LLP
PO Box 1122
Richmond, VA 23218-1122

And I hereby certify that I will mail the document by U.S. mail to the following non-filing user(s):

J. Rick Taché (*pro hac* admission)
Janet Lynn Hickson (*pro hac* admission)
Elizabeth Weldon
Snell & Wilmer, LLP
600 Anton Blvd., Suite 1400
Costa Mesa, CA 92626

_____/s/_____
Jeffrey M. Schwaber

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

L:\CLIENTS\K\KobayashiVentures.LLC\Papertech.007\PLEADINGS\418 Cover Opp mtn dismiss and MSJ.doc

2

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

KOBAYASHI VENTURES, LLC,                  :
                                          :
          Plaintiff                       :
                                          :
     v.                                   :      Case No. 1:08-cv-04450-LAP
                                          :
PAPERTECH INC.,                           :
                                          :
          Defendant.                      :
                                          :

---

**KOBAYASHI VENTURES' NOTICE OF OPPOSITION AND OPPOSITION TO
PT PAPERTECH, INC.'S "MOTION TO DISMISS KOBAYASHI VENTURES'
FIRST AMENDED COMPLAINT FOR FAILURE TO STATE A CLAIM
PURSUANT TO FRCP 12(b)(6), AND IN THE ALTERNATIVE FOR
SUMMARY JUDGMENT UNDER FRCP 56"**

---

# TABLE OF CONTENTS

Table of Authorities ................................................................................................... ii

I.      Introduction........................................................................................................1

II.     Pertinent Facts.................................................................................................. 2

III.    Applicable Law and Argument ........................................................................5

    A.  Standard for Motion to Dismiss Under Fed. R. Civ. P. 12(b)(6) .................5

    B.  The Court Should Deny Defendant's Motion to Dismiss............................5

    C.  Standard for Motion for Summary Judgment .............................................7

    D.  The Court Should Deny Defendant's Motion for Summary Judgment .......8

IV.     Conclusion ......................................................................................................13

L:\CLIENTS\K\KobayashiVentures.LLC\Papertech.007\PLEADINGS\10 table of contents.opposition to motion to dismiss.07.31.08.doc

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

# TABLE OF AUTHORITIES

**Cases**

Agron v. Trustees of Columbia Univ., 1993 WL 118495 (S.D.N.Y. 1993) ................................ 12

Airco Alloys Division, Airco, Inc. v. Niagra Mohawk Power Corp., 430 N.Y.S.2d 179, 186
    (1980) ............................................................................................................................. 10

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) .............................................. 7

Ashfar v. Procon Inc., 442 F. Supp. 887 (1977), ........................................................... 12

Beller v. William Penn Life Ins. Co. of N.Y., 778 N.Y.S.2d 82, 85 (2004) ................................ 10

Bernheim v. Litt, 79 F.3d 318, 321 (2d Cir. 1996) ........................................................ 5

Cities Serv. Helex, Inc. v. United States, 543 F.2d 1306, 1313 (Ct. Cl. 1976 .............................. 11

Conley v. Gibson, 355 U.S. 41, 45-46 (1957) ............................................................... 5

DeKonty v. United States, 922 F.2d 826, 827-28 (Fed. Cir. 1991) .............................................. 11

Dow Chem. Co. v. United States, 226 F.3d 1334, 1344 (Fed. Cir. 2000) .................................... 11

Ediciones Quiroga, S.L. v. Fall River Music, Inc., 1998 U.S. Dist. LEXIS 19039
    (S.D.N.Y. 1998) ................................................................................................................ 12

Guilbert v. Gardner, 480 F.3d 140, 150 (2d Cir. (NY) 2007) ....................................... 10

In re Livent, Inc. Noteholders Sec. Litig., 355 F. Supp. 2d 722, 734 (S.D.N.Y. 2005) ................. 7

Ives v. Mars Metal Corp., 196 N.Y.S.2d 247, 249 (1960) ........................................................ 9,10

Joyce v. Joyce Beverages, Inc., 571 F.2d 703, 706 (2d Cir. 1978) ................................................. 5

McDonnell Douglas Corp. v. United States, 182 F.3d 1319, 1327 (Fed. Cir. 1999) .................. 11

Mobile Oil Exploration & Producing Southeast, Inc. v. United States, 530 U.S. 604 (2000) ..... 11

St. Paul Plow-Works v. Starling, 140 U.S. 184 (1891) ................................................................ 11

Stalis v. Sugar Creek Stores, Inc., 744 N.Y.S.2d 586, 587 (2002) ............................................. 10

TIG Ins. Co. v. Newmont Mining Corp., 413 F. Supp. 273, 280 (S.D.N.Y. 2005) ....................... 6

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

U.S. Broadcasting Co. Corp. v. National Broadcasting Co., Inc., 439 F. Supp. 8
   (D. Ma. 1977)...........................................................................................................................9

**Statutes**

C.P.L.R. § 213(2)........................................................................................................................10

**Rules**

Fed. R. Civ. P. 12(d) ....................................................................................................................7

Fed. R. Civ. P. 56(c) ....................................................................................................................7

Federal Rule of Civil Procedure 56(e) ........................................................................................7

**Treatises**

Restatement (Second) of Contracts (1979)\ ..................................................................................8

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

iii

# UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| KOBAYASHI VENTURES, LLC, | : | |
| Plaintiff | : | |
| | : | |
| v. | : | Case No. 1:08-cv-04450-LAP |
| | : | |
| PAPERTECH INC., | : | |
| Defendant. | : | |
| | : | |

## KOBAYASHI VENTURES' BRIEF IN OPPOSITION TO PT PAPERTECH, INC.'S MOTION TO DISMISS KOBAYASHI VENTURES' FIRST AMENDED COMPLAINT AND ALTERNATIVE MOTION FOR SUMMARY JUDGMENT

Plaintiff, Kobayashi Ventures, LLC ("KV" or "Plaintiff"), by and through its attorneys, Jeffrey M. Schwaber, Alexia Kent Bourgerie, and Stein, Sperling, Bennett, De Jong, Driscoll & Greenfeig, P.C., submits this brief in opposition to PT Papertech Inc.'s Motion to Dismiss for Failure to State a Claim Pursuant to Fed. R. Civ. P. 12(b)(6) or in the Alternative for Summary Judgment under Fed. R. Civ. P. 56 ("Defendant's Motion"), and states as follows:

I.      INTRODUCTION

The linchpin of Defendant's Motion is a set of material facts alleged by Defendant in Defendant's Motion—which genuinely are disputed, for which there is no verified support in the record, and as to which to date there has been no discovery whatsoever.

Specifically, Defendant rests its motion on a purported September 27, 2000 letter (the "Purported Letter") from its general manager, Kari Hilden, to the then licensor International Paper Company ("International Paper"), which states in pertinent part, "termination will go into effect 30 days following your receipt of this Notice." Defendant posits without <u>any</u> support that the Purported Letter was sent and properly was directed. In fact, International Paper has no

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

1

record of ever receiving the Purported Letter, by either Champion or International Paper. See Affidavit of Inger H. Eckert on behalf of International Paper, attached hereto as Exhibit 1 and adopted herein by reference. Regardless, assuming arguendo that this Purported Letter was sent, (i) on its face such a letter did not provide a notice in the manner required by the express terms of the License Agreement; (ii) there is no verification whatsoever of receipt; and (iii) in KV's view, based on these circumstances any such letter as misdirected and apparently not received did not operate to terminate the License Agreement and Defendant's obligations thereunder. Applying the standards applicable to Defendant's Motion and as fully discussed below, KV is entitled to proceed with its First Amended Complaint against Defendant, and Defendant's Motion in its entirety necessarily must be denied.

II.    PERTINENT FACTS

In Opposition to Motion to Dismiss

1.    On or about November 12, 1998, Defendant entered into the License Agreement acquiring patent rights to what now is known as KV's Patented Technology.[1]

2.    The License Agreement provides for certain royalties to be paid by Defendant.

3.    On the topic of the legal matter of a notice of termination, the License Agreement provides in pertinent part as follows:

> 21.1    It shall be sufficient giving any notice, report, or other communication hereunder, if the party giving same shall deposit a copy thereof in the Post office in a registered or certified envelope, by postage prepaid certified mail, or delivered by messenger or air courier addressed to the other party at the address provided hereinbelow or at such other address as may hereafter be designated in writing.

> If to CHAMPION:    For Business Matters:

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

---

[1] First Amended Complaint at ¶ 9 and the License Agreement which is attached thereto as Exhibit 3 and incorporated therein by reference.

2

Champion International Corporation
1 CHAMPION Plaza
Stamford, CT  06921
**ATTN:  Richard Piela**
**Director, Capital Project**
**Support and MRO**


For Legal Matters:

Champion International Corporation
1 CHAMPION Plaza
Stamford, CT  06921
**ATTN:  Richard C. Stewart, II**
**Chief Patent Counsel**

[Emphasis added.]

4.      On the topic of notice of termination, the License Agreement states in pertinent

part as follows:

16.3      LICENSEE shall have the right to terminate this Agreement upon
thirty (30) days prior written notice to CHAMPION to such effect, in which
event, this Agreement shall terminate on the thirty-first (31st) day after sending
such notice.[2]

5.      Defendant acknowledged and made certain royalty payments under the above-

referenced License Agreement, but thereafter stopped making payments, and continues to this

day to make, cause to be made, use, sell, and offer for sale products embodying KV's Patented

Technology, without complying with its contractual obligations.[3]

6.      A number of times, beginning July 16, 2004 and thereafter on or about November

1, 2007, Defendant has been notified in writing of its failure to make contractually-mandated

royalty payments.[4]

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

---

[2] First Amended Complaint at Exhibit 3 (License Agreement).
[3] First Amended Complaint at ¶ 13, and 20-22.
[4] First Amended Complaint at ¶ 14.

3

7.    In a letter dated June 27, 2008, KV notified Defendant of its default under the License Agreement and gave to Defendant an opportunity to cure by fulfilling its obligations under the License Agreement.[5] Defendant has failed to so cure.

8.    Since on or about December 10, 2007, KV has been the owner of the Patented Technology.[6]

<u>In Opposition to Motion for Summary Judgment</u>

9.    The Declaration of counsel attached to Defendant's Motion is not based on first-hand knowledge as would be required for consideration in connection with a motion for summary judgment ("Defective Declaration").

10.    The only "fact" alleged in the Defective Declaration of counsel is that the Purported Letter attached to the Declaration is a true copy of such a letter.  That "fact" is immaterial, and entirely misses the point.

11.    There is no verification that the Purported Letter was or was not sent, when and as addressed, or otherwise.

12.    There is no verification as to how the Purported Letter was sent (such as regular mail, certified mail, registered mail).

13.    There is no verification that the Purported Letter was received, as addressed or otherwise.  Upon information and belief, such a letter was not received until 2007.

14.    The Affidavit of Inger H. Eckert on behalf of International Paper, <u>Exhibit 1</u> hereto, verifies nonreceipt of the Purported letter stating in pertinent part, "There was no indication from the File Materials that any such letter or notice dated September 27, 2000 ever was received by Champion or International Paper."

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

---

[5] First Amended Complaint at ¶ 15.

4

15.     Based on the circumstances, the Purported Letter did not operate to terminate the License Agreement and Defendant's obligations thereunder.[7]

## III.     APPLICABLE LAW AND ARGUMENT

Applying the applicable standard, the Court should deny Defendant's Motion to Dismiss.

### A.     Standard for Motion to Dismiss Under Fed. R. Civ. P. 12(b)(6)

Pursuant to Fed. R. Civ. P. 12(b)(6), "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957). Further, the Court must accept plaintiff's allegations as true. See Joyce v. Joyce Beverages, Inc., 571 F.2d 703, 706 (2d Cir. 1978). Defendant's Motion also recites the standard, "the court 'must accept the factual allegations of the complaint as true and must draw all reasonable inferences in favor of the plaintiff.'" Defendant's Motion at III.A. (citing Bernheim v. Litt, 79 F.3d 318, 321 (2d Cir. 1996)).

### B.     The Court should deny Defendant's Motion to Dismiss.

Defendant states two grounds for seeking dismissal: (1) alleging no contract between the parties; and (2) alleging that the statute of limitations bars KV's claims. As to both alleged grounds, the first alleging no contract and the second alleging the bar of the statute of limitations based on Defendant's factual allegation that the License Agreement terminated as a result of a letter dated September 27, 2000, accepting as true Plaintiff's allegations as stated in the First Amended Complaint and as in part re-stated in Section II (Pertinent Facts) above, the Court

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850
TELEPHONE 301/340-2020

---

[6] First Amended Complaint at ¶ 6.

[7] In fact, on July 28, 2008, pursuant to ¶ 16.2 of the License Agreement, termination occurred on the 31st day following KV's June 27, 2008 termination letter to Defendant.

necessarily must reject both alleged grounds for dismissal of Plaintiff's First Amended Complaint.

As to the first alleged ground, to establish a claim for breach of a contract, KV must prove the following: (1) a contract, (2) performance of the contract by one party, (3) breach by the other party, and (4) damages." See TIG Ins. Co. v. Newmont Mining Corp., 413 F. Supp. 273, 280 (S.D.N.Y. 2005) (internal citations omitted). Accepting as true KV's allegations as stated in the First Amended Complaint and as in part re-stated in Section II (Pertinent Facts) above, a valid contract existed between KV and Defendant until July 28, 2008.[8] Defendant does not dispute the fact that it neither has paid nor reported royalties, as the License Agreement requires, since September 2000. See Defendant's Motion at III.D.2. Instead, Defendant simply asserts that it somehow terminated the License Agreement. This issue is self-evidently contested, and there is no legal support for Defendant's notion that merely because it says it terminated, that "fact" becomes true. Defendant's alleged failure to make and report royalty payments unequivocally would constitute material breaches of the License Agreement. KV has sustained and alleges that it has sustained monetary damages as the result of Defendant's material breaches.[9]

Defendant's second alleged basis for dismissal is statute of limitations. The set of material facts alleged by Defendant in Defendant's Motion genuinely are disputed. There is no verified support in the record for Defendant's "facts," and to which to date there has been no discovery whatsoever. Defendant raises this set of material facts from matters outside the First Amended Complaint—specifically with a Defective Declaration which on its face is not based

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

---

[8] See, for example, First Amended Complaint at ¶¶ 9 and 19-23 and the License Agreement which is attached thereto as Exhibit 3 and incorporated therein by reference.
[9] First Amended Complaint at ¶ 22.

6

on first-hand knowledge. More importantly, as to these matters outside the pleadings raised by

Defendant, from a substantive standpoint the Defective Declaration completely misses the mark.

Again and as stated above, any such letter if sent, was misdirected and apparently was not

received until 2007. Defendant's misguided statute of limitations argument, which requires the

Court to consider facts outside the First Amended Complaint, is addressed further below in

opposition to the alternative motion for summary judgment. See generally Fed. R. Civ. P. 12(d),

"Result of Presenting matters Outside the Pleadings."[10]

<div align="center">

Applying the applicable standard, the Court should deny
Defendant's alternative Motion for Summary Judgment.

</div>

C.      Standard for Motion for Summary Judgment

The Court only may grant a motion for summary judgment if there are no genuine issues

of material fact and if "the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(c).    The Court must accept all of the nonmoving party's assertions as true and view all

reasonable inferences in favor of the nonmoving party. Anderson v. Liberty Lobby, Inc., 477

U.S. 242, 255 (1986). Federal Rule of Civil Procedure 56(e) entitled, "Affidavits; Further

Testimony," states in pertinent part, "A supporting or opposing affidavit must be made on

personal knowledge, set out facts that would be admissible in evidence, and show that the affiant

is competent to testify on the matters stated." See also In re Livent, Inc. Noteholders Sec. Litig.,

355 F. Supp. 2d 722, 734 (S.D.N.Y. 2005).

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

---

[10] Fed. R. Civ. P. 12(d) states, "If, on a motion under Rule 12(b)(6) or 12(c), matters outside the
pleadings are presented to and not excluded by the court, the motion must be treated as one for
summary judgment under Rule 56. All parties must be given a reasonable opportunity to present
all the material that is pertinent to the motion."

<div align="center">7</div>

D.    The Court should deny Defendant's Motion for Summary Judgment.

The central fact Defendant disputes in Defendant's Motion is that it still was obligated under the License Agreement after September of 2000. Defendant claims that it effectively terminated the License Agreement by mailing notice in an unspecified manner to Richard Piela, to whom such a notice was not properly directed under the License Agreement. KV disputes Defendant's bald, unsupported assertion of a material fact that it gave proper notice of termination pursuant to the License Agreement by sending the Purported Letter. The Purported Letter on its face improperly was addressed to Mr. Piela as the business contact. Any such letter must have been addressed to Mr. Stewart as the legal contact pursuant to the License Agreement. The Purported Letter on its face was not sent in an indicated method for which there would have been a proof of receipt such as certified or registered mail. The Purported Letter on its face states that it intended to be effective 30 days from its receipt. There is nothing in the record on the topic of actual receipt of such a letter by a proper person, or anyone for that matter. The Affidavit of Inger H. Eckert on behalf of International Paper, Exhibit 1 hereto, verifies to the contrary. Defendant cites no authority to support its bald contention that it allegedly sent notice, or that it sent it to the proper person.[11] In fact, the suggestion strains credulity that a purported termination of the License Agreement would be sent without counsel, in an unspecified manner, to the wrong person, with no proof of mailing or delivery.

On July 16, 2004, the licensor wrote to Defendant, by Kari Hilden, demanding payment of the outstanding royalties.[12] More than a month later, on August 23, 2004, E. Michael Heaven, General Manager of Defendant, responded but tellingly -- and with no explanation now offered -

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301-340-2020

---

[11] In the absence of authority to support this assertion it should be noted that Defendant has cited a number of unpublished opinions, as well as a case from the 19th Century.
[12] First Amended Complaint at ¶ 14.

8

- did not attach the Purported Letter. Upon KV's information and belief, it was not until that time that the licensor had any knowledge of Defendant's purported earlier attempt to terminate the License Agreement.

The cases Defendant cites are inapposite. Defendant relies on two cases to support the proposition that requiring a party to send notice to the person specified in a contract is "hypertechnical in the extreme." Defendant's Motion at 11. Defendant first relies on <u>Ives v. Mars Metal Corp.</u>, 196 N.Y.S.2d 247, 249 (1960), which held, "where <u>actual</u> notice of termination has in fact been given, the form is of little import..." (underscore added). In KV's case, no actual notice was given. As discussed, there is nothing verified in the record to support Defendant's naked assertion. Secondly, the <u>Ives</u> case does not discuss whether the contract at issue provided specific notice provisions, as does the subject License Agreement. The defendant in <u>Ives</u> provided notice to plaintiff's counsel rather than to plaintiff itself. <u>Ives</u>, 196 N.Y.S.2d at 249. In KV's case, had Defendant provided proper written notice to licensor's counsel, Mr. Stewart, pursuant to the express notice terms of the License Agreement, the fact and timing of any notice easily could be demonstrated. Instead, unlike <u>Ives</u>, Defendant has <u>no</u> evidence of actual notice, and simply posits that assertion, as if to make it so.

Defendant also relies on the case of <u>U.S. Broadcasting Co. Corp. v. National Broadcasting Co., Inc.</u>, 439 F. Supp. 8 (D. Ma. 1977). The <u>U.S. Broadcasting</u> case is inapposite similarly in that the party receiving the notice had <u>actual</u> notice. 439 F. Supp. at 10. The plaintiff in <u>U.S. Broadcasting</u> responded to defendant's termination notice within days of defendant sending the letter. In contrast, in KV's case, licensor did not receive the Purported Letter for more than seven (7) years—until 2007. The court in <u>U.S. Broadcasting</u> based its decision upon a finding that, "it is clear that plaintiff and plaintiff's counsel timely received both

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 300/340-2020

notices and it would be hypertechnical in the extreme to hold that notice <u>actually</u> received was ineffective." <u>Id.</u> at 10 (underscore added) (citing <u>Ives v. Mars Metal Corp.</u>, 196 N.Y.S.2d 247, 249 (1960)). No such actual notice exists here.

KV's Complaint is well within the statute of limitations. Under New York law, pursuant to C.P.L.R. § 213(2) the statute of limitations on a breach of contract claim is six years. "If, however, a contract requires continuing performance over a period of time, each successive breach may begin the statute of limitations running anew." <u>Guilbert v. Gardner</u>, 480 F.3d 140, 150 (2d Cir. (NY) 2007). <u>See also</u> <u>Beller v. William Penn Life Ins. Co. of N.Y.</u>, 778 N.Y.S.2d 82, 85 (2004); <u>Stalis v. Sugar Creek Stores, Inc.</u>, 744 N.Y.S.2d 586, 587 (2002); <u>Airco Alloys Division, Airco, Inc. v. Niagra Mohawk Power Corp.</u>, 430 N.Y.S.2d 179, 186 (1980).

Defendant admits, "The License Agreement ... required Papertech to report and pay royalties twice a year." Defendant's Motion at III.D.2. Paragraph 1.8 of the License Agreement requires the semiannual reports and payments the Defendant cites "during the term of this Agreement..." Paragraph 16.1 of the License Agreement states that the License Agreement "shall continue in full force and effect for the term of the last to expire Patent Rights..." By its express, unambiguous terms, the License Agreement is a contract that "requires a continuing performance over a period of time." <u>See</u> <u>Guilbert</u>, 480 F.3d at 150.

Defendant also concedes that it did not make payments or reports after September of 2000. Therefore, Defendant did not fulfill the continuing performance that it was required to fulfill under the License Agreement. Defendant was in material breach of the License Agreement when it failed to make payments and reports in 2000, and it continued to be in material breach of the continuing nature of the License Agreement until the License Agreement terminated pursuant to proper notice by KV effective July 28, 2008.

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

Defendant argues that its "failure to timely make the royalty payment and provide the associated reports" constituted an unequivocal breach of the license agreement on March 1, 2001. KV agrees. However, § 16.7 of the License Agreement makes it abundantly clear that a failure to notify or to terminate does not condone the breach or constitute a waiver of future breaches or defaults. See generally Dow Chem. Co. v. United States, 226 F.3d 1334, 1344 (Fed. Cir. 20000) ("Repudiation is a statement by the obligor to the obligee indicating that the obligor will commit a breach that would itself give the obligee a claim for damages for total breach") (quoting Mobile Oil Exploration & Producing Southeast, Inc. v. United States, 530 U.S. 604, 607-08 (2000) (citing Restatement (Second) of Contracts (1979))). Repudiation occurs when one party refuses to perform and communicates that refusal distinctly and unqualifiedly to the other party. See DeKonty v. United States, 922 F.2d 826, 827-28 (Fed. Cir. 1991) (citation omitted). The injured party can choose between terminating the contract or continuing it. See St. Paul Plow-Works v. Starling, 140 U.S. 184 (1891); McDonnell Douglas Corp. v. United States, 182 F.3d 1319, 1327 (Fed. Cir. 1999); Cities Serv. Helex, Inc. v. United States, 543 F.2d 1306, 1313 (Ct. Cl. 1976).

Without distinguishing each of the many cases cited by Defendant for the proposition that a cause of action for a breach of contract claim accrues at the time of the breach, none of the cases cited by Defendant presents facts analogous to KV's case. None of the cases cited by Defendant involves a situation in which there is a dispute over both the nature and timing of the breach. The Court "must draw all reasonable inferences in favor of the plaintiff."[13]

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

---

[13] Defendant's Motion at III.A.

Defendant cites several inapposite cases to address KV's then anticipated argument regarding continuing performance.[14] First, the case of <u>Ashfar v. Procon Inc.</u>, 442 F. Supp. 887 (1977), involves a situation wherein there is no dispute as to whether the contract at issue was terminated, and if so, when. In contrast to this case, in the <u>Ashfar</u> case, the agreement unequivocally was terminated on a certain date; and that the date of termination was the date from which the statute should run, as the agreement was not one which imposed a continuing duty on the Defendant. <u>Id.</u>

Second, Defendant relies in part on the case of <u>Ediciones Quiroga, S.L. v. Fall River Music, Inc.</u>, 1998 U.S. Dist. LEXIS 19039 (S.D.N.Y. 1998)  This unreported case involves a clear, proper, and unequivocally communicated notice of termination of the underlying agreement—in contrast to this case. Third, Defendant relies in part on the case of <u>Agron v. Trustees of Columbia Univ.</u>, 1993 WL 118495 (S.D.N.Y. 1993). The unpublished <u>Agron</u> case does not even address a contract requiring a continuing performance. The plaintiff in <u>Agron</u> was denied admission to Columbia University after the University promised her that it would readmit her. 1993 WL 118495 at *1. Columbia University had no continuing obligation to perform for Agron. It simply had a one-time obligation to admit her to the university. Therefore the <u>Agron</u> case also is inapposite.

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850
TELEPHONE 301/340-2020

---

[14] In Defendant's Motion at III.D.3, Defendant states, "Kobayashi is likely to argue that it is not suing for wrongful termination of the License Agreement, but rather that it is suing for each failure to make royalty payments with the six year statute of limitations period.

12

\* \* \*

WHEREFORE, in consideration of the forgoing grounds and the record herein, Plaintiff respectfully requests that this Honorable Court deny Defendant's Motion in its entirety and grant to Plaintiff such other and further relief as the Court deems just and proper.

By: _____/s/_____

Jeffrey M. Schwaber, NY Bar No. 4529699
Alexia Kent Bourgerie, *pro hac* admission
Attorneys for Plaintiff, Kobayashi Ventures, LLC
Stein, Sperling, Bennett, De Jong, Driscoll & Greenfeig, P.C.
25 West Middle Lane
Rockville, Maryland 20850

| | | |
|---|---|---|
| Telephone | : | (301) 838-3210 (Jeffrey M. Schwaber) |
| Facsimile | : | (301) 354-8110 (Jeffrey M. Schwaber) |
| Email | : | jschwaber@steinsperling.com |
| Telephone | : | (301) 838-3232 (Alexia Kent Bourgerie) |
| Facsimile | : | (301) 354-8132 (Alexia Kent Bourgerie) |
| Email | : | abourgerie@steinsperling.com |

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

13

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 31st day of July, 2008, I will electronically file the foregoing with the Clerk of Court using the ECF system, which will then send a notification of such filing (NEF) to the following:

> Oren J. Warshavsky
> Jason S. Oliver
> Baker & Hostetler LLP
> 45 Rockefeller Plaza
> New York, New York 10111

> Dabney Jefferson Carr, IV
> Troutman Sanders, LLP
> PO Box 1122
> Richmond, VA 23218-1122

And I hereby certify that I will mail the document by U.S. mail to the following non-filing user(s):

> J. Rick Taché (*pro hac* admission)
> Janet Lynn Hickson (*pro hac* admission)
> Elizabeth Weldon
> Snell & Wilmer, LLP
> 600 Anton Blvd., Suite 1400
> Costa Mesa, CA 92626

_____/s/_____
Jeffrey M. Schwaber

L:\CLIENTS\K\Kobayashi Ventures.LLC\Papertech.007\PLEADINGS\418 Opp mtn dismiss and MSJ rev 07 31 08 withaff.FINAL.doc

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF NEW YORK

KOBAYASHI VENTURES, LLC,                     :
                                             :
            Plaintiff                        :
                                             :
v.                                           :  Case No. 1:08-cv-04450-LAP
                                             :
PAPERTECH INC.,                              :
                                             :
            Defendant.                       :

## AFFIDAVIT OF INGER H. ECKERT, CHIEF COUNSEL, INTELLECTUAL PROPERTY OF INTERNATIONAL PAPER COMPANY

I, Inger H. Eckert, an employee of International Paper Company ("International Paper"), solemnly affirm under the penalties of perjury that the contents of the following paper are true based upon my actual knowledge.

1.      I am employed by International Paper as its Chief Counsel, Intellectual Property.

2.      There was a written Patent Purchase Agreement entered into by and between International Paper and Jacklin Associates, Inc. ("Jacklin"), wherein Jacklin became the owner, *inter alia*, of all right, title, and interest in and to certain letters patent and was assigned certain license agreements relating thereto, including the License Agreements on certain terms and conditions contained therein ("Assignment Transaction").

3.      It is my understanding that in connection with the parties' due diligence for and consummation of the Assignment Transaction, International Paper provided copies of all file materials in the possession, custody or control of its patent department at

that time relating to such letters patent, including but not limited to the License

Agreements and all associated correspondence sent and received between Champion

International Corporation ("Champion") and/or International Paper after Champion had

become part of International Paper through a merger (collectively "File Materials"). I

have reviewed these File Materials and have not found any purported letter or notice

dated September 27, 2000 from Papertech Inc. or Kari Hilden for Papertech Inc.

("Papertech"). There was no indication from the File Materials that any such letter or

notice dated September 27, 2000 ever was received by Champion or International Paper.

    4.    Also in the File Materials was a letter which International Paper sent to

Papertech on or about July 16, 2004 requesting royalty payments and reports under the

License Agreement. With a letter dated August 23, 2004, Papertech responded to

International Paper's letter of July 16, 2004 claiming termination several years ago.

There is no indication that any earlier letter was attached to the July 16, 2004 letter from

Papertech

I DO SOLEMNLY DECLARE AND AFFIRM UNDER THE PENALTIES OF PERJURY THAT THE FOREGOING IS TRUE.

By: _____

Inger H. Eckert
Chief Counsel, Intellectual Property
International Paper Company.

STATE OF _OHIO_    :
COUNTY OF _CLERMONT_    :

    I hereby certify that on this _31st_ day of July, 2008, before me, a Notary Public of the State of _OHIO_, personally appeared _INGER Eckert_, known to me (or satisfactorily proven) to be the person whose name is subscribed to the within Affidavit, who acknowledged that she executed the same as stated therein.

    WITNESS my hand and Notarial Seal.

_____
Notary Public

My commission expires:

Jane A. Tomlinson
Notary Public, State of Ohio
My Commission Expires
June 19, 2012

# EXHIBIT 3

# CAROTEK, INC.

June 7, 2005.

JUN 1 4 2005

Mr. Richard C. Stewart, II
Chief Counsel
International Property Department
International Paper
Manufacturing Technology Center
6285 Tri-Ridge Boulevard
Loveland, OH 45140-8318

Re:   License Agreement Dated September 8, 1998 Between Champion International and
      Carotek, Inc.

Dear Mr. Stewart:

It is our understanding that Papertech, Inc., whom we believe is a licensee of Champion's CV2
System Patents, has not paid any royalties on the patents for a considerable time period.

We are aware that Papertech has sold numerous systems in the United States and abroad and
since they are not paying royalties it places Carotek at a competitive disadvantage.

We attach a letter from our intellectual property attorneys stating their advice to Carotek.  We
would appreciate your review.

Very truly yours,

J. Addison Bell
CEO

JAB:hf

Enc.

cc:  Deryl Bell, President – Carotek, Inc.
     Joe C. Young, Attorney

# EXHIBIT 4

## STEIN, SPERLING, BENNETT, DE JONG, DRISCOLL & GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850-2204

www.steinsperling.com

TELEPHONE (301) 340-2020

WRITER'S DIRECT DIAL
(301) 838-3210

WRITER'S DIRECT FAX
(301) 354-8110

WRITER'S E-MAIL ADDRESS:
jschwaber@steinsperling.com

FRED A. BALKIN·
MILLARD S. BENNETT·
ALEXIA KENT BOURGERIE·
DAVID S. DE JONG·
JOLIE S. DEUTSCHMAN·
DAVID C. DRISCOLL, JR.·
STUART S. GREENFEIG·
ANN G. JAKABCIN·
JEFFREY M. SCHWABER·
DARCY A. SHOOP·
DONALD N. SPERLING·
PAUL T. STEIN·

MD., DC., VA., FL.·
MD., DC., VA., NY.·
MD., DC., PA., NJ.·
MD., DC., VA.·
MD., DC., NY.·
MD., VA., NC.·
MD., DC.·
MD. ONLY·

RONALD M. BOLT·
E. ANDREW COLE·
JAMES W. DAWSON, JR.·
BRIAN R. DELLA ROCCA·
FRANK W. DUNHAM, III·
JEFFREY FENSTER·
ROBERT J. GARAGIOLA·
MELIHA PÉREZ HALPERN·
MONICA G. HARMS·
JONATHAN F. LIEBERMAN·
IVONNE C. LINDLEY·
MARY CRAINE LOMBARDO·
DARLA J. MCCLURE·
DEANNA L. PETERS·
DIEGO J. ROJAS·
DAVID A. ROSEN·
KAREN N. SHAPIRO·

OF COUNSEL:
KEVIN P. FAY·
ALAN S. KERXTON·
SUE ANN MAHAFFEY·
BETH McINTOSH IRVING·
DAVID R. PODOLSKY·
WILLIAM J. SCOTT·

OUR FILE NUMBER
2070656-1

November 26, 2007

***VIA FEDERAL EXPRESS & FIRST CLASS MAIL***

J. Addison Bell
Chief Executive Officer
Carotek, Inc.
700 Sam Newell Road
P.O. Box 1395
Matthews, NC  28106

Joe C. Young
Joe C. Young, P.A.
1515 Mockingbird Lane, Suite 520
Charlotte, NC  28209

RE:  *Default Notice to Carotek, Inc. from Kobayashi Ventures, LLC*

Gentlemen:

As you know, this law firm represents Kobayashi Ventures, LLC, assignee of all right, title and interest of Champion International Corporation pursuant to that certain license agreement between Carotek, Inc. and Champion dated December 8, 1998 (the "Agreement"). I am taking the liberty of writing to both of you since it is unclear from Mr. Bell's correspondence whether Mr. Young is indeed representing Carotek in this matter and since Mr. Young has not responded to my November 9, 2007 letter. Please let me know with whom I should communicate going forward.

J. Addison Bell
Joe C. Young
November 26, 2007
Page 2

I wrote to Mr. Bell on October 29, 2007, and I wrote in follow up to Mr. Young on November 9, 2007. As of this date, I have not received a substantive response to my two attempts to have Carotek reconcile its responsibilities under the Agreement, including but not limited to making the overdue royalty payments owed pursuant to Article 3 thereof. As a result, Carotek is hereby placed upon formal notice of default, for its breaches, *inter alia* of Articles 3, 4 and 5 of the Agreement. Further pursuant to §16.2, this Agreement shall terminate on the thirty-first (31st) day after the date of this letter.

Please note that pursuant to §16.5 of the Agreement, upon termination, Carotek must immediately cease the design, manufacture, sale and installation of the technology or any derivation thereof covered under the following patents to monitor any continuous process, including but not limited to paper, pulp, printing, non-woven, films, rubber, metals, plastics, glass or any other continuous processes (the "Technology"):

U.S. Patent No. 5,717,456

U.S. Patent No. 5,821,990

U.S. Patent No. 6,211,905

Australian Patent Application No. 38274/95

Brazilian Patent Application No. PI 9510548-4

Chilean Patent Application No. 1898-95

Finish Patent Application No. 973611

Indonesian Patent Application No. P952441

Japanese Patent Application No. 8-526826

South Korean Patent Application No. 1997-706231

Malaysian Patent Application No. PI9703058

Mexican Patent Application No. 976703

New Zealand Patent Application No. 295027

Norwegian Patent Application No. 974012

South African Patent Application No. 95/9613

Canadian Patent Application No. 2,214,724

# EXHIBIT 5

## PATENT ASSIGNMENT

WHEREAS, Jacklin Associates, Inc., with a principal business office of 259 North Radnor Chester Road, Suite 210, Wayne, Pennsylvania 19087 are the owners of those Patents set forth on the attached Exhibit A, which include a United States Patent No. for each Patent and the date of issuance (the "Patents").

WHEREAS, Kobayashi Ventures LLC referred to as "Assignee" and whose principal business office address is Kobayashi Ventures, LLC, 12587 Fair Lakes Circle, Suite 308, Fairfax, Virginia 22033.

is desirous of acquiring the entire right, title and interest in and to said Patents.

NOW, THEREFORE, in consideration of the sum of Ten Dollars ($10.00) in hand paid and other valuable consideration, the receipt whereof is hereby acknowledged, Jacklin Associates, Inc. have sold, assigned and transferred, and by these presents do sell, assign and transfer unto Assignee the full and exclusive right, title and interest in and to the Patents.

Jacklin Associates, Inc. hereby authorizes and requests the United States Patent and Trademark Office officials to send all future correspondence pertaining to the Patents to said Assignee.

IN TESTIMONY WHEREOF, I have hereunto set my hand as of this _10th_ day of _December_, 2007.

Jacklin Associates, Inc.

By: _[signature] John N. Irwin_

On this _10_ day of _Dec_, 2007, personally appeared before me the above named President of Jacklin Associates, Inc. to me known and known to me to be the person described in, and who executed, the foregoing instrument and acknowledged the same to be his free act and deed in and for the purposes set forth in said instrument.

(SEAL)

_[signature] Nancy Vanning_
NOTARY PUBLIC

My Commission Expires:

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
Nancy N Vanning, Notary Public
Radnor Twp, Delaware County
My commission expires Aug 23, 2011

FEB-27-2008 17:06          STEIN SPERLING                          301 838 3250        P.04/42
Case 1:07-cv-11163-NRB          Document 31-2          Filed 09/03/2008          Page 46 of 48

MAR-19-1996 05:54                                                                          P.02/02

Exhibit A

5,821,990  System for monitoring a continuous manufacturing process
5,899,959  Measurement of visual characteristics of paper
6,613,195  Method for conditioning paper and paperboard webs
6,207,020  Method for conditioning paper and paperboard webs
5,717,456  System for monitoring a continuous manufacturing process
6,211,905  System for monitoring a continuous manufacturing process

The above Patents, together with all divisions, continuations, reexaminations, foreign counterparts and continuations-in-part of said patents, and any patents reissuing on any of the aforesaid patents, as well as all license agreements and other entitlements to receive royalties to which Seller is a party with respect to the patents ("Patent Materials").

# EXHIBIT 6

VIDEOTAPED DEPOSITION OF JAMES ADDISON BELL
CONDUCTED ON MONDAY, MAY 12, 2008

12

1    company called ECS?

2            A.    When?

3            Q.    At any point?

4            A.    Yes.

5            Q.    And what is the full name of ECS?

6            A.    Event Capture Systems, Incorporated.

7            Q.    When was it formed?

8            A.    It was incorporated, I believe,

9    November 2007.

10            Q.    Was it formed prior to its

11    incorporation -- to its formal incorporation?

12            A.    Its genesis goes back to December 2006.

13            Q.    And what was the genesis?

14            A.    In 2006 Carotek decided to get out of

15    the ECS business.  And we were approached by one of

16    the salesman in the company to take over the

17    business.

18            Q.    Who is that?

19            A.    John Larkin.

20            Q.    When you say we were approached, who

21    was approached?

22            A.    Carotek.

# Exhibit 7

# United States Patent [19]

## Rudt et al.

[11] **Patent Number:** 5,717,456

[45] **Date of Patent:** Feb. 10, 1998

[54] **SYSTEM FOR MONITORING A CONTINUOUS MANUFACTURING PROCESS**

[75] Inventors: **Robert J. Rudt**, Highland Mills, N.Y.; **Leonard F. Fiore**, Foley, Minn.; **Kenneth D. Grapes**, Indian Springs, Ohio

[73] Assignee: **Champion International Corporation**, Stamford, Conn.

[21] Appl. No.: **399,235**

[22] Filed: **Mar. 6, 1995**

[51] Int. Cl.$^6$ .................................................. H04N 7/18

[52] U.S. Cl. ........................ 348/88; 348/86; 348/125

[58] Field of Search .................................. 348/88, 86, 8, 348/92, 125, 128, 94; H04N 7/18

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,172,264 | 10/1979 | Taylor et al. | 348/194 |
| 4,337,482 | 6/1982 | Coutta | 348/143 |
| 4,481,533 | 11/1984 | Alzmann et al. | 348/88 |
| 4,519,041 | 5/1985 | Fant et al. | 364/552 |
| 4,583,181 | 4/1986 | Gerber et al. | 248/88 |
| 4,675,730 | 6/1987 | Adomaitis et al. | 348/88 |
| 4,701,961 | 10/1987 | Hongo | 382/34 |
| 4,737,846 | 4/1988 | Tokuno et al. | 348/86 |
| 4,752,897 | 6/1988 | Zoeller et al. | 364/550 |
| 4,794,453 | 12/1988 | Gnuechtel et al. | 348/132 |
| 4,805,019 | 2/1989 | Holliday | 348/86 |
| 4,814,869 | 3/1989 | Oliver, Jr. | 348/143 |
| 4,941,660 | 7/1990 | Winn et al. | 272/76 |
| 4,951,223 | 8/1990 | Wales et al. | 364/507 |
| 4,955,720 | 9/1990 | Blecha et al. | 356/429 |
| 5,023,714 | 6/1991 | Lemelson | 348/88 |
| 5,034,811 | 7/1991 | Palm | 348/154 |
| 5,073,952 | 12/1991 | Wantanabe | 382/8 |
| 5,113,454 | 5/1992 | Marcantonio et al. | 382/27 |
| 5,134,574 | 7/1992 | Beaverstock et al. | 364/551.01 |
| 5,140,436 | 8/1992 | Blessinger | 386/68 |
| 5,229,850 | 7/1993 | Toyoshima | 348/153 |
| 5,239,376 | 8/1993 | Dittmann et al. | 348/88 |
| 5,365,596 | 11/1994 | Dante et al. | 382/8 |

### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 0526080 | 2/1993 | European Pat. Off. | G05B 19/417 |
| 2667182 | 3/1992 | France | G06K 9/28 |
| 2 250 156 | 5/1992 | United Kingdom | H04N 7/18 |
| WO 96/27864 | 9/1996 | WIPO | G08B 15/00 |

### OTHER PUBLICATIONS

Video Surveillance Trouble Shooting at I.S.P.I. 1994 Engineering Conference p. 531 J.A. DeWitte et al.

*Primary Examiner*—Tommy P. Chin
*Assistant Examiner*—Vu Le

[57] **ABSTRACT**

The invention is a system for monitoring a process in which process data relating to a predetermined characteristic of the process is collected and stored in digital format and extracted based upon a predetermined criterion for display. A plurality of monitors are strategically positioned at various locations of interest to observe the predetermined characteristic. Data obtained by the monitors are converted into digital format and stored. A central control is provided for retrieving the digital data in accordance with a predetermined criterion and transmitting the retrieved data to a display unit. The predetermined criterion for display may be specified as a deviation from the predetermined characteristic, and a plurality of deviation detectors may be coupled to the system for obtaining and relaying information relating to such deviations. Upon deviation, the central control may be adapted to retrieve digital data based on time and location of the deviation.

**19 Claims, 1 Drawing Sheet**





FIG. I

5,717,456

1

# SYSTEM FOR MONITORING A CONTINUOUS MANUFACTURING PROCESS

## BACKGROUND OF THE INVENTION

### I. Field of the Invention

This invention relates generally to a system for monitoring a process. More particularly, this invention relates to such a system in which process data relating to a predetermined characteristic of the process is collected and stored in digital format and extracted based upon a predetermined criterion for display.

### II. Description of the Prior Art

Processes are known for the continuous production or handling of a product. Illustrative of such processes are those for the production or handling of continuous products, as for example polymeric films, paper webs, metallic webs, roll printing processes and the like. Other such processes include those for production or handling of discrete products such as sheet printing processes, packaging processes and the like.

A desired objective of these processes is that the product have certain pre-determined characteristics, as for example characteristics which insure that the product is of acceptable quality. A failure to detect and correct deviations from these pre-determined characteristics is an extreme disadvantage adversely affecting the economics of the process as for example because of lost production time, discarding of unacceptable product, and the like.

As a result, systems for inspecting and observing the product by continuous processes have been developed. See for example the systems described in U.S. Pat. Nos. 4,951,223; 4,814,869; 5,239,376; and the like. These systems usually involve the monitoring through use of one or more video cameras strategically placed along the production line, storage of video output on video tapes, means for shutting down production of the product in the event of deviations from pre-determined characteristics and playback of video tapes to determine the cause of the deviations so that corrections can be made in a timely fashion. These known monitoring systems suffer from one or more disadvantages which adversely affect their performance. For example, these prior processes are manual and require re-winding of the tape which results in down time of the system and long processing times. Moreover, tapes often degrade and it is difficult to access those portions of the tape containing relevant information or to make good copies. In these systems the tapes are not networked or tied together and the system cannot simultaneously recorded and played back. The system of this invention obviates one or more of these disadvantages.

## SUMMARY OF THE INVENTION

This invention provides a monitoring system for continuously monitoring the operations of a machine for the continuous manufacture of a product. More particularly, the system of this invention comprises:

a plurality of monitoring means for continuously monitoring a pre-determined characteristic of the process and collecting monitored data, each monitoring means addressing a different location of interest of said process, and capable of monitoring and collecting real time data relative to said location;

data converting means for converting said output data into digitized data;

digital data storage means capable of storing segments of said digitized data, each of said segments comprised of

2

a plurality of digitized data clips, said segments and said clips of predetermined lengths which cover the operations of said process at a relevant location over a predetermined period of time, said digitized data segments being stored such that as new digitized data is stored in said segment, the earliest prior stored digitized data in said segment is displaced from said segment to maintain said segment at said predetermined length; and

control means for controlling said monitoring system, said control means in communication with said digital data storage means and capable of extracting one or more digitized data clips according to predetermined criterion to form one or more extracted clips, and capable of displaying said extracted clips.

As used herein, "compression" means applying data reduction means such as an appropriate algorithim, technique, technology or the like to digitalized data for a real time event at a location in a process to reduce the amount of digitized data required to recreate the event. As used herein, "process" means an action, change or function or a series of actions, changes or functions that bring about a result or end, as for example a system of operations in the production of something. As used herein, "clip" means a digitalized data series for a location of a process during a pre-determined period of time. As used herein, "digitized" or "digitization" means to convert to or to collect in a digital format as for example conversion of an analog signal of a visual image to a digital format or collection of a visual image directly into a digital format. As used herein, "digital" means information in a binary format, or zeros and ones, usual for storage in a digital data storage means such as a computer. As used herein, "segment" means a portion of the digital data storage means containing one or more digitized data clips.

In a preferred embodiment of the invention, said process is a continuous process for the manufacture of a product, and said deviation event is a deviation in a pre-determined characteristic of said product.

In a more preferred embodiment of the invention, the system comprises a plurality of storage means, each of which comprises at least one digitized data segment, at least one of said storage means capable of storing digitized data monitored and collected from first monitoring means at a first location of the process and at least one of said storage means capable of storing data monitored and collected from a second monitoring means at a second location of the process. Preferably, the control means is capable of extracting clips from segments stored in two or more of said plurality of said storage means such that said extracted clips are time synchronized to chronologically show the pre-determined characteristic of a single discrete product or a portion of a continuous product as said product passes by each location of the digitized data in said extracted clips. Alternatively, the control means is capable of extracting the event clip recording said event and the clip immediately preceding said event clip from the segment containing data from a single location of the process, and optionally the data clip immediately following the event clip, splicing said clips in chronological order to form a display clip and displaying said display clip.

In another preferred embodiment, the process comprises a plurality of steps and wherein there is at least one monitoring means, data converting means and data storage means for said step.

In still another preferred embodiment, the process is controlled by a distributive control system in communication with said control means, said control system having one

5,717,456

3

or more deviation detectors for monitoring said pre-determined characteristic, each of said detectors addressing a different location of interest along the process and capable of detecting deviation events and communicating a signal of said deviation event, and the time and location of said event to said control means;

wherein on receipt of said deviation event signal said control means capable of identifying data storage means containing the digitized data segment corresponding to said deviation event, extracting the deviation event clip and displaying said display clip, and wherein said distributive control system is preferably capable of communicating process data relating to the operation of the process and the time of break to said control means.

In yet another preferred embodiment, the control means is capable of extracting the event clip recording said event and the clips immediately preceding and optionally the clip immediately following said event clip, splicing said clips into a display clip chronological order and displaying said display clip.

A most preferred embodiment of this invention relates to a monitoring system for monitoring the manufacture of a continuous web of paper having one or more pre-determined characteristics in a paper manufacturing machine comprising:

a plurality of monitoring means which comprises one or more video cameras for monitoring the paper web, each monitoring means addressing the paper web at a different location of interest along the paper manufacturing machine and capable of producing a video image of the paper web at the location;

digital converting means for converting the video image into a digitized video signal;

digital data storage means capable of receiving said digitized video signal and storing digitized segments thereof, each of which comprises a plurality of digitized clips, said digitized segments and clips of a predetermined length covering real time operation of said machine, said digitized segments being stored such that the earliest prior stored digitized data in said segment is displaced as new digitized data, is stored in said segment to maintain said stored segment at said predetermined length;

Computer control means for controlling the operations of said system, said means in communication with said digital data storage means and capable of controlling same, said computer control means in communication with a distributive control system for controlling said machine, said system having one or more deviation detectors for detecting deviations from predetermined characteristics as said paper web passes through said machine said control system capable of communication process master time and date information to said computer control system; and

one or more video monitors in communication with said computer control means and capable of displaying the image of digitized video signals under the control of said computer control means;

wherein on occurrence of a deviation from the predetermined characteristics of said web, said distributive control system transmits a deviation signal comprising the time, date and location of said deviation event to said computer control means, and in response thereto said computer control means identifying the digitized data segment corresponding to said deviation event,

4

extracting the deviation event clip, the preceding clip preceding said break event clip to form a display clip and displaying said display clip on a video monitor.

The system of this invention obviates one or more disadvantages of prior art monitoring systems. For example, There no loss or substantially no loss of data due to rewinding, no or substantially no deterioration in the stored data and good copies of the data can be made. The system can be easily used in an automatic mode an allows simultaneous observation and collection/storage of data. The system allows the monitoring of the process from a central location or from one or more other locations, and allows correlations between collected/recorded data and other process operations data.

BRIEF DESCRIPTION OF THE DRAWINGS

The invention and the advantages attendant thereto will become apparent upon a reading of the following detailed description of the invention taken in conjunction with the accompanying drawings, in which:

FIG. 1 is a depiction of a preferred embodiment of this invention showing a schematic of a paper making machine, including a possible configuration of surveillance cameras and web failure detection devices.

DETAILED DESCRIPTION OF THE INVENTION

The present invention is directed to a system for monitoring a machine or process for manufacture of a product. While the preferred embodiment of FIG. 1 depicts the system in use to monitor a paper manufacturing process and machine. The nature of the process may vary provided that the process has a pre-determined characteristic. The process may be batch, semi-continuous or continuous, or automatic or manual. For example, the process may monitor people or things entering or leaving a building or a room in a building or a process for the manufacture or handling of discrete or continuous products. In the preferred embodiments of the invention, the process is for the manufacture or handling of a product. Processes for manufacturing and handling discrete products include processes for extruding, packaging, filing, bottling, sheet fed printing, conveying, converting, wrapping, stamping, or assembling a discrete product. Process for manufacturing or handling a continuous product include those for the manufacture of a continuous web material such as a polymeric or metal sheet or film, printed paper, carpet, woven material, non-woven material, textile material or photographic film which has certain predetermined characteristics which must not be deviated from. The system can be conveniently used to monitor the manufacture of such continuous or discrete products to monitor for any deviations from the desired pre-determined characteristic(s).

The system is especially useful in paper manufacture as depicted in more detail in FIG. 1. FIG. 1 depicts a schematic representation of a paper making machine in which the wet end forming section is at the top and the final product section is at the bottom. As depicted in the figure, the machine consists of five sections, denoted by A, B, C, D and E. A denotes the forming section; B denotes the pressing section; C denotes the drying section; D denotes the calendaring section; and E denotes the coating section. As shown on FIG. 1, monitoring means 10 are strategically positioned at various locations of interest along the paper making machine. Observing means 10 may vary widely and depends on a pre-determined characteristic of the product being monitored for deviation events. Illustrative of useful observing

5,717,456

means are those which employ coherent or non-coherent visual, gamma, infra-red, ultraviolet, thermal and nuclear radiation, sonics, ultrasonics, magnetic fields, pressure, odor and the like. The particular observing means 10 used in any particular situation will normally depend on the pre-determined characteristics of the product being observed and the event which indicates a deviation from the pre-determined characteristic. For example, if the pre-determined characteristic is continuity of the web of paper and the deviation is a break or hole in the web, then monitoring means which employs visual radiation such as a video camera can be conveniently employed. On the other hand, if the pre-determined characteristics are moisture content, surface texture, color, gloss and the like monitoring means which involve the use of visual and infra-red radiation may be used.

In the preferred embodiment of this invention depicted in FIG. 1, monitoring means is a plurality of video cameras 10. While seven cameras 10 are depicted in the figure, the number of cameras employed may vary widely, and any number capable of providing the desired degree of monitoring can be employed. The positioning of various monitoring means 10 may vary widely depending on the needs of the user. In the preferred embodiment depicted in FIG. 1, where the pre-determined characteristic of the web being monitored is web continuity and deviations in this characteristic being detected are break events, hole events or a combination thereof, the number of cameras 10 and camera positions are such that locations where breaks are most likely to occur are covered. For example, as depicted in FIG. 1, cameras 10 are positioned at the drawing section, coating section, size pressing section, center rolls section, sheet pick-up section and reeling device section.

The system of this invention also includes digital converting 12 means for converting data obtained or generated by monitoring means 10 into a digital format. Digital converting means employed may vary widely and any such means capable of performing this function may be used. Illustrative of suitable digital converting means 12 are electronic circuit boards, converting signal processors, video boards, micro-chips, and assorted software. The number of digital converting means 12 and the relationship of digital converting means 10 to monitoring means 10 may vary widely, the only requirement is that relevant monitored data is eventually converted into digital format. For example, there may be a single digital converting means 12 for each monitoring means 10 or there may be one or more digital converting means 12 for all monitoring means 10 or various other combinations of converting means 12 and monitoring means 10 may be employed. Digital converting means 12 and monitoring means 10 may be separate devices as depicted in FIG. 1, or these functions may be performed by the same device as for example a digital video camera 10 which directly monitored data in a digital format, which data is conveyed directly to digital data storage means 18 via conductor 11.

As depicted in FIG. 1, each video camera 10 monitors the web and monitored data is generated in an analog format. The analog data is then conveyed to digital converting means 12 via conductor 14 where the analog data is converted to digital format by digital converting means 12, with or without data compression. The digitized data is then conveyed via conductor 16 to digital data storage means 18.

The specific digital data storage means 18 may vary widely provided that such means allows storage of segments of digitized data having a pre-determined length which covers data obtained by monitoring means 10 which cover the real time operations of the machine over a predetermined period of time. The segment, in turn, is comprised of a plurality of digitized data clips which are also of a pre-determined length which also cover the real time operations of the machine over a predetermined period of time. The segments and clips are in chronological order and are preferably identified by date and time at which the data was collected which greatly facilitates access to relevant data clips on occurrence of a deviation event. Preferably, the clips are also stored such that clips can be readily identified by time and date, and can be extracted or copied from the segment. A further requirement of the digital memory storage means 18 is that it can be controlled by a control means 20 such that specific clips can be extracted from the digital data storage means 18 as desired and as will be described hereinbelow in more detail. In the operations of the digital data storage means 18, the segment is maintained at or about the pre-determined length during the operations of the system such that as new digitized real time data is added to digital data storage means 18, the oldest or most prior data is erased, deleted or otherwise removed from storage means 18 maintaining said segment at or about some pre-determined length. The advantages of this storage means 10 becomes readily apparent in that stored digital data showing normal operations to produce the product having the pre-determined characteristic is constantly removed from storage means 18 such that upon storage of deviating digitized data of a deviation from the pre-determined characteristic, as for example a break event, such deviating data can be more easily isolated from the relatively small amount of data comprising the segment.

The pre-determined length of the segment and the clips may vary widely initially and during the operation of the system, usually depending upon function and capacity of the digital data storage means, duration of the deviation event and the like. The length of the segments are preferably less than about 60 minutes, more preferably from about 15 to about 60 minutes, and most preferably from about 15 to about 30 minutes. The length of the clips comprising a segment is preferably less than about 60 secs., more preferably from about 5 to about 60 secs., more preferably from about 5 to about 20 to 30 secs and most preferably from about 5 to about 10 secs.

The digitized data storage means 18 utilized in any particular situation may vary widely. Illustrative of useful data storage means 18 are hard drive, tape, diskette, CD rom, magnetic optical drive, solid state memory, flash memory, optical device, and the like. Preferred digitized data storage means 18 are hard drives and CD roms. As depicted in FIG. 1, the most preferred digitized data storage means 18 is a hard drive and is in communication with control means 20 by way of connector 22. Control means 20 functions to control the system. Useful control means 20 may vary widely, the only requirement is that means 20 is in the event of a deviation event able to locate the data clip containing data of such event, to extract such data clip and to display said data clip. Illustrative of useful control means 20 are analog control system and a digital computer.

As depicted in FIG. 1, control means 20 is a digital computer which communicates via connector 24 to a plurality of display means 26 which in the embodiment of FIG. 1 are video monitors. Useful display means 26 may vary widely the only is that such means is capable of displaying data to the satisfaction of the operator. Other useful display means 26 are printers, projection systems, photographic imagers and the like. Also connected to control means 20 by way of cable 28 is for example a VCR 30 for recording for

5,717,456

| 7 | 8 |

wider distribution of data and a library 32 for storage of data by way of cable 34. As depicted in the figure, library 32 can be accessed from various locations by remote access means 36 such as a local area network, wide area network, e-mail services, satellite, compact disk and the like connected to library 32 via cable 40.

FIG. 1 also depicts a plurality of deviation detectors 38 strategic positioned along the machine in a well known manner to detect deviations in the pre-determined characteristics in the product being monitored. Detectors 38 are connected to the machine control or distributive control system 46 via cable 42 for transmission of a deviation signal to system 46. System 46 also communicates with control 20 via cable 44 such that various information can be transmitted to control 20 from system 46 in the event of a deviation from the pre-determined characteristic as for example a break in a web. Such information includes the detection of a deviation event, time of detection of the deviation event and such other process data relating to the operations of the machine at the time of deviation event deemed appropriate.

In operation, monitoring means 10 continuously monitors a pre-determined characteristic of the product being produced by the machine. The monitored data is conveyed via cable 14 to digital conversion means 12 where the data is converted to a digital format, and the digitized data is conveyed to digital data storage means 18 via cable 16 for storage. In those embodiments of the invention where the monitored data is collected in digital format by monitoring means 10, as for example by a digital video camera, the digitized data is converted directly to digital data storage means 18 via cable 11. During operations where there are no deviations from the pre-determined characteristics, digitized data flows continuously into storage means 18 such that only a pre-determined amount of data converting a pre-determined period of time during the operation of the machine is always maintained in storage and that as new data is stored the oldest or most prior data is deleted or erased.

If a deviation in the pre-determined characteristics of the product occurs, it is detected by a deviation detector 38. Detector 38 sends a deviation signal to distributive control system 46 via cable 42, and the signal is relayed to control means 20 via cable 44. In addition to a deviation signal, detector 38 may also inform control system 40 of the identity of detector 38 detecting the deviation event, the time of the deviation event and location in the process of the deviation event. This information together with other process data such as type of product being manufactured, machine operation parameters, machine speed, draw ratios, furnish, types, additives, coating components, calendaring pressures, coating thickness, basis weight of the paper and the like are conveyed to control means 20. On receipt of the deviation event signal, control means 20 is capable of identifying the clip most likely to have digitized data relating to the deviation event, and extracting such clip and displaying the extracted clip with display means 26. For example, control means 20 can perform this function by coordinating the time at which deviation event detector 38 detected the deviation event with the clip or clips corresponding in time. This coordination can be done in any suitable manner. For example, control 20 can scan all digitized data storage means 18, select clips from all means 18 containing data collected at the appropriate time and can then scan each clip to identify the deviation event and display same. Alternatively, control means 20 can identify the monitoring means 10 most proximate to the location of the deviation event, select a clip or clips from the digitized data storage

means 18 for such monitoring means 10 and display such clip. In order to insure that all suitable data is displayed in the fastest possible time, preferably control means 20 will also extract digitized data clips immediately preceding and following the clip or clips most likely containing data for the deviation event and will splice the deviation event clip and the following and preceding clips into a display clip for display. By splicing the event, preceding and following clips, She operation of the machine prior to, during and subsequent to the deviation event can be observed. After a deviation is detected, the machine is usually stopped and the digitized data storage means 18 is frozen to prevent loss of critical data.

The clips can be displayed automatically or manually at any suitable speed. The clips can be displayed frame by frame, in various sizes. The clips can also be viewed in reversed mode. This function combined with a pause, playback and resizing can enhance the ability of the operators to locate the exact point of interest on the display clip, for study showing the deviation event as it occurred. Of course, many other functions may be provided by control means 20 including zooming, edge enhancement, image sharpening, gradient edge enhancement, de-specking, filtering, cropping, desizing, dithering, interpolation, image intensity, format conversion, color inversion, contrast control, brightness control, embossing and the like. Manual/automatic control of all functions may be provided.

In this manner, the control means 20 becomes the driver which also manages the logistics of the system including monitoring, displaying, storage, etc., and can additionally be used to supervise the status of each device in the system as desired. In addition, other peripherals can be provided as needed.

The ability to review the critical period just prior to the deviation event at any desired speed provides the input necessary to evaluate the cause of the problem so that necessary adjustments and/or repairs can be started quickly and the machine restored to normal operation. If only a defect in the product is to blame, this, too, often will show up. In this manner, valuable time can be saved.

The clip or clips covering the deviation event are displayed, the cause of the deviation event can be discovered and appropriate action can be taken to correct the cause of the event. The process or machine and the monitoring system can then be reactivated.

The clips relating to the deviation event together with any other process data associated with the deviation event are conveyed via line 34 to library 32 for storage. In this manner, a collection of deviation clips and associated process data is formed which can be accessed by remote access 36 via connector 40 for suitable purposes as for example for accessing, and correlating or otherwise evaluating accessed data based on one or more variables such as process times, properties, products, types or modes of deviation events, recorded observations, types of machines, and like process or product characteristics, and to document machine or process defects such as a hole in the felt or wire. The clips and associated process data may also be conveyed via connector 28 to video recorder 30 for storage on a video tape.

This invention has been described in this application in considerable detail in order to comply with the Patent Statutes and to provide those skilled in the art with the information needed to apply the novel principles and to construct and use such specialized components as are required. However, it is to be further understood that the

5,717,456

9

invention can be carried out by specifically different equipment and devices and that various modifications both as to equipment and procedure details can be accomplished without departing from the scope of the invention.

What is claimed is:

1. A monitoring system for monitoring the manufacture of a continuous web of paper having one or more predetermined characteristics in a paper manufacturing machine comprising:

a plurality of monitoring means which comprises one or more video cameras for monitoring the paper web, each monitoring means addressing the paper web at a different location of interest along the paper manufacturing machine and for producing a video image of the paper web at the location;

digital converting means for converting the video image into a digitized video signal;

digital data storage means for receiving said digitized video signal and storing digitized segments thereof, each of which comprises a plurality of digitized clips, said digitized segments and clips of a predetermined length covering real time operation of said machine, said digitized segments being stored such that earlier prior stored digitized data in said segment is removed as new digitized data is stored in said segment to maintain said stored segment at or about said predetermined length;

computer control means for controlling the operations of said monitoring system, said means in communication with said digital data storage means, said computer control means in communication with a distributive control system for controlling said machine, said control system having one or more deviation detectors for detecting deviations from predetermined characteristics as said paper web passes through said machine; and

one or more video monitors in communication with said computer control means and for displaying the image of digitized video signals under the control of said computer control means;

wherein an occurrence of a deviation from the predetermined characteristics of said web, said distributive control system transmits a deviation signal comprising the time, date and location of said deviation event to said computer control means, and in response thereto said computer control means identifying the digitized data segment corresponding to said deviation event, extracting the deviation event clip, the preceding clip preceding said break event clip to form a display clip and displaying said display clip on a video monitor.

2. System of claim 1 wherein at least one digital converting means is in communication with at least one video camera and at least on digital data storage means is in communication with at least one digital converting means.

3. System of claim 2 wherein on receipt of said deviation event signal at the time of said deviation, said computer control means identifies a video camera proximate to said deviation detector detecting said deviation event, freezes operations of digital memory storage means for such camera, identifies the digitized data segment corresponding to said deviation event by correlating the time of said segment with the time of said deviation event, extracting the deviation event clip which correlates to the time of said deviation event and the preceding clip preceding said deviation event clip and the subsequent clip following said deviation event clip, splicing said deviation event clip, said preceding clip and said subsequent in chronological order to form a display clip and displaying said display clip on said video monitor.

10

4. System of claim 3 which further comprises:

means for transmitting process data from the distributive control system with said break event signal;

library means for storage of display clips and associated process data; and

means for accessing said display clips and process data stored in said library.

5. System of claim 1 wherein said event is selected from the group consisting of a break in said web, a hole in said web and a change in a surface characteristic of said web.

6. System of claim 1 wherein said computer control means is also for controlling said digital data storage means.

7. System of claim 1 wherein said distributive control system is also for communicating process master time and date information to said computer control system.

8. A monitoring system for continuously monitoring a process for the manufacture of a product, said process comprising:

a plurality of monitoring means for continuously monitoring a pre-determined characteristic of the process and collecting monitored data, each monitoring means addressing a different location of interest of the process, and each said monitoring means for monitoring and collecting data in real time relative to said location;

data converting means for converting said collected data into digitized data;

digital data storage means for storing segments of said digitized data, each of said segments comprised of one or more digitized data clips, said segments and said clips of pre-determined lengths which cover the operations of said process at a relevant location over a pre-determined period of time, said digitized data segments being stored such that as new digitized data is stored in said segment, earlier prior stored digitized data in said segment is removed from said segment to maintain said segment at or about said pre-determined length;

a distributive control system for controlling the process, said control system having one or more deviation detectors for monitoring said pre-determined characteristic and for detecting deviation events in said pre-determined characteristic, each of said detectors addressing a different location of interest along the process and for transmitting a signal of said deviation event, and the time and location of said event; and

control means in communication with said control system and said digital data storage means, said control means for controlling said monitoring system and for extracting one or more digitized data clips on receipt of said deviation event signal to form one or more extracted clips, said control means also for identifying data storage means containing said digitized data segment corresponding to the time and the location of said deviation event, for extracting said deviation event clip to form a display clip and for displaying said display clip.

9. System of claim 8 wherein said process is a continuous process for the manufacture of a product.

10. System of claim 9 wherein said process comprises a plurality of steps and wherein there is at least one monitoring means for each of said steps.

11. System of claim 8 wherein a plurality of monitoring means address a single location, each in communication with a digital data converting means which is in communication with a digital data storage means, said control means extracts one or more digitized data clips from each of said storage means and displays said extracted clips.

5,717,456

11

**12.** A system of claim **11** wherein each of said monitoring means monitors a different pre-determined characteristic.

**13.** A system of claim **12** wherein said monitoring means are different.

**14.** System of claim **8** wherein said distributive control system is also for communicating process data relating to the operation of the process to said control means.

**15.** System of claim **14** which further comprises:

library means in communication with said control means for storage of display clips and process data relating to the operation of the machine at the time of deviation. said library also for display of said stored display clips and process data.

**16.** System of claim **15** wherein said control means extracts the event clip recording said event and the clip

12

immediately preceding said event clip, splicing said clips in chronological order to form a display clip and displaying said display clip.

**17.** System of claim **16** wherein said control means extracts the event clip recording said event. the clip immediately preceding said event clip, the clip immediately following said event clip, splicing said clips in chronological order to form a display clip and displaying said display clip.

**18.** System of claim **8** wherein said pre-determined criterion is a deviation event in which there is a deviation in said pre-determined characteristic.

**19.** System of claim **8** wherein the process is a continuous process for the manufacture of a product.

\*    \*    \*    \*    \*

US005821990A

## United States Patent [19]

### Rudt et al.

[11]    Patent Number:       5,821,990

[45]    Date of Patent:    *Oct. 13, 1998

[54]    SYSTEM FOR MONITORING A CONTINUOUS MANUFACTURING PROCESS

[75]    Inventors: **Robert J. Rudt**, Highland Mills, N.Y.; **Leonard F. Fiore**, Foley, Minn.; **Kenneth D. Grapes**, Indian Springs, Ohio

[73]    Assignee: **Champion International Corporation**, Stamford, Conn.

[ * ]    Notice:    The term of this patent shall not extend beyond the expiration date of Pat. No. 5,717,456.

[21]    Appl. No.: **929,231**

[22]    Filed:    **Sep. 3, 1997**

### Related U.S. Application Data

[62]    Division of Ser. No. 399,235, Mar. 6, 1995, Pat. No. 5,717,456.

[51]    Int. Cl.$^6$ .............................................. H04N 7/18
[52]    U.S. Cl. ............................... 348/88; 348/86; 348/125
[58]    Field of Search ........................... 348/88, 86, 125, 348/92, 94, 128; 356/429, 430, 240; 382/141

[56]    **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| H1616 | 12/1996 | Wolfe | 348/88 |
| 4,675,730 | 6/1987 | Adomaitis et al. | 348/88 |
| 4,752,897 | 6/1988 | Zoeller et al. | 364/550 |
| 4,805,019 | 2/1989 | Holliday | 348/86 |
| 4,951,223 | 8/1990 | Wales et al. | 364/507 |
| 5,023,714 | 6/1991 | Lemelson | 348/88 |
| 5,134,574 | 7/1992 | Beaverstock et al. | 364/551.01 |
| 5,239,376 | 8/1993 | Dittmann et al. | 348/88 |
| 5,305,099 | 4/1994 | Morcos | 348/88 |
| 5,365,596 | 11/1994 | Dante et al. | 348/125 |
| 5,680,473 | 10/1997 | Kanzaka et al. | 382/141 |
| 5,717,456 | 2/1998 | Rudt et al. | 348/88 |

#### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| WO 93/05477 | 3/1993 | WIPO | G06F 11/22 |
| WO 94/11821 | 5/1994 | WIPO | G06F 15/40 |

*Primary Examiner*—Tommy P. Chin
*Assistant Examiner*—Vu Le
*Attorney, Agent, or Firm*—Richard C. Stewart, II

[57]    **ABSTRACT**

A system for continuously monitoring a process such as a paper making process wherein a plurality of video cameras are positioned at various positions along the process to monitor one or more pre-determined characteristics of the process. The system further includes device for converting the monitored characteristics into digital format and a digital data storage device, such as a circular memory, for storage of such data such that as new data is stored earlier stored data is removed. The system includes a control device such as a computer which is capable of communicating with the data storage device and with a detector for detecting deviations from the monitored predetermined characteristic such that on receipt of a deviation signal the control device extracts from the digital data storage device digitized data corresponding to the deviation and displays such extracted deviation digitized data as for example on a video monitor.

**66 Claims, 1 Drawing Sheet**





FIG. I

5,821,990

1

# SYSTEM FOR MONITORING A
# CONTINUOUS MANUFACTURING PROCESS

This is a division of application Ser. No. 08/399,235, filed Mar. 6, 1995 pending

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

This invention relates generally to a system for monitoring a process. More particularly, this invention relates to such a system in which process data relating to a predetermined characteristic of the process is collected and stored in digital format and extracted based upon a predetermined criterion for display.

### 2. Description of the Prior Art

Processes are known for the continuous production or handling of a product. Illustrative of such processes are those for the production or handling of continuous products, as for example polymeric films, paper webs, metallic webs, roll printing processes and the like. Other such processes include those for production or handling of discrete products such as sheet printing processes, packaging processes and the like.

A desired objective of these processes is that the product have certain pre-determined characteristics, as for example characteristics which insure that the product is of acceptable quality. A failure to detect and correct deviations from these pre-determined characteristics is an extreme disadvantage adversely affecting the economics of the process as for example because of lost production time, discarding of unacceptable product, and the like.

As a result, systems for inspecting and observing the product by continuous processes have been developed. See for example the systems described in U.S. Pat. Nos. 4,951,223; 4,814,869; 5,239,376; and the like. These systems usually involve the monitoring through use of one or more video cameras strategically placed along the production line, storage of video output on video tapes, means for shutting down production of the product in the event of deviations from the pre-determined characteristics and playback of video tapes to determine the cause of the deviations so that corrections can be made in a timely fashion. These known monitoring systems suffer from one or more disadvantages which adversely affect their performance. For example, these prior processes are manual and require re-winding of the tape which results in down time of the system and long processing times. Moreover, tapes often degrade and it is difficult to access those portions of the tape containing relevant information or to make good copies. In these systems the tapes are not networked or tied together and the system cannot simultaneously recorded and played back. The system of this invention obviates one or more of these disadvantages.

## SUMMARY OF THE INVENTION

This invention provides a monitoring system for continuously monitoring the operations of a machine for the continuous manufacture of a product. More particularly, the system of this invention comprises:

a plurality of monitoring means for continuously monitoring a pre-determined characteristic of the process and collecting monitored data, each monitoring means addressing a different location of interest of said process, and capable of monitoring and collecting real time data relative to said location;

2

data converting means for converting said output data into digitized data;

digital data storage means capable of storing segments of said digitized data, each of said segments comprised of a plurality of digitized data clips, said segments and said clips of predetermined lengths which cover the operations of said process at a relevant location over a predetermined period of time, said digitized data segments being stored such that as new digitized data is stored in said segment, the earliest prior stored digitized data in said segment is displaced from said segment to maintain said segment at said predetermined length; and

control means for controlling said monitoring system, said control means in communication with said digital data storage means and capable of extracting one or more digitized data clips according to predetermined criterion to form one or more extracted clips, and capable of displaying said extracted clips.

As used herein, "compression" means applying data reduction means such as an appropriate algorithm, technique, technology or the like to digitalized data for a real time event at a location in a process to reduce the amount of digitized data required to recreate the event. As used herein, "process" means an action, change or function or a series of actions, changes or functions that bring about a result or end, as for example a system of operations in the production of something. As used herein, "clip" means a digitalized data series for a location of a process during a pre-determined period of time. As used herein, "digitized" or "digitization" means to convert to or to collect in a digital format as for example conversion of an analog signal of a visual image to a digital format or collection of a visual image directly into a digital format. As used herein, "digital" means information in a binary format, or zeros and ones, usual for storage in a digital data storage means such as a computer. As used herein, "segment" means a portion of the digital data storage means containing one or more digitized data clips.

In a preferred embodiment of the invention, said process is a continuous process for the manufacture of a product, and said deviation event is a deviation in a pre-determined characteristic of said product.

In a more preferred embodiment of the invention, the system comprises a plurality of storage means, each of which comprises at least one digitized data segment, at least one of said storage means capable of storing digitized data monitored and collected from first monitoring means at a first location of the process and at least one of said storage means capable of storing data monitored and collected from a second monitoring means at a second location of the process. Preferably, the control means is capable of extracting clips from segments stored in two or more of said plurality of said storage means such that said extracted clips are time synchronized to chronologically show the pre-determined characteristic of a single discrete product or a portion of a continuous product as said product passes by each location of the digitized data in said extracted clips. Alternatively, the control means is capable of extracting the event clip recording said event and the clip immediately preceding said event clip from the segment containing data from a single location of the process, and optionally the data clip immediately following the event clip, splicing said clips in chronological order to form a display clip and displaying said display clip.

In another preferred embodiment, the process comprises a plurality of steps and wherein there is at least one monitoring means, data converting means and data storage means for said step

5,821,990

**3**

In still another preferred embodiment, the process is controlled by a distributive control system in communication with said control means, said control system having one or more deviation detectors for monitoring said predetermined characteristic, each of said detectors addressing a different location of interest along the process and capable of detecting deviation events and communicating a signal of said deviation event, and the time and location of said event to said control means;

wherein on receipt of said deviation event signal said control means capable of identifying data storage means containing the digitized data segment corresponding to said deviation event, extracting the deviation event clip and displaying said display clip, and wherein said distributive control system is preferably capable of communicating process data relating to the operation of the process and the time of break to said control means.

In yet another preferred embodiment, the control means is capable of extracting the event clip recording said event and the clips immediately preceding and optionally the clip immediately following said event clip, splicing said clips into a display clip chronological order and displaying said display clip.

A most preferred embodiment of this invention relates to a monitoring system for monitoring the manufacture of a continuous web of paper having one or more pre-determined characteristics in a paper manufacturing machine comprising:

a plurality of monitoring means which comprises one or more video cameras for monitoring the paper web, each monitoring means addressing the paper web at a different location of interest along the paper manufacturing machine and capable of producing a video image of the paper web at the location;

digital converting means for converting the video image into a digitized video signal;

digital data storage means capable of receiving said digitized video signal and storing digitized segments thereof, each of which comprises a plurality of digitized clips, said digitized segments and clips of a predetermined length covering real time operation of said machine, said digitized segments being stored such that the earliest prior stored digitized data in said segment is displaced as new digitized data, is stored in said segment to maintain said stored segment at said predetermined length;

Computer control means for controlling the operations of said system, said means in communication with said digital data storage means and capable of controlling same, said computer control means in communication with a distributive control system for controlling said machine, said system having one or more deviation detectors for detecting deviations from predetermined characteristics as said paper web passes through said machine said control system capable of communication process master time and date information to said computer control system; and

one or more video monitors in communication with said computer control means and capable of displaying the image of digitized video signals under the control of said computer control means;

wherein on occurrence of a deviation from the predetermined characteristics of said web, said distributive control system transmits a deviation signal comprising the time, date and location of said deviation event to

**4**

said computer control means, and in response thereto said computer control means identifying the digitized data segment corresponding to said deviation event, extracting the deviation event clip, the preceding clip preceding said break event clip to form a display clip and displaying said display clip on a video monitor.

The system of this invention obviates one or more disadvantages of prior art monitoring systems. For example, There no loss or substantially no loss of data due to rewinding, no or substantially no deterioration in the stored data and good copies of the data can be made. The system can be easily used in an automatic mode an allows simultaneous observation and collection storage of data. The system allows the monitoring of the process from a central location or from one or more other locations, and allows correlations between collected recorded data and other process operations data.

BRIEF DESCRIPTION OF THE DRAWINGS

The invention and the advantages attendant thereto will become apparent upon a reading of the following detailed description of the invention taken in conjunction with the accompanying drawings, in which:

FIG. 1 is a depiction of a preferred embodiment of this invention showing a schematic of a paper making machine, including a possible configuration of surveillance cameras and web failure detection devices.

DETAILED DESCRIPTION OF THE INVENTION

The present invention is directed to a system for monitoring a machine or process for manufacture of a product. While the preferred embodiment of FIG. 1 depicts the system in use to monitor a paper manufacturing process and machine. The nature of the process may vary provided that the process has a pre-determined characteristic. The process may be batch, semi-continuous or continuous, or automatic or manual. For example, the process may monitor people or things entering or leaving a building or a room in a building or a process for the manufacture or handling of discrete or continuous products. In the preferred embodiments of the invention, the process is for the manufacture or handling of a product. Processes for manufacturing and handling discrete products include processes for extruding, packaging, filing, bottling, sheet fed printing, conveying, converting, wrapping, stamping, or assembling a discrete product. Process for manufacturing or handling a continuous product include those for the manufacture of a continuous web material such as a polymeric or metal sheet or film, printed paper, carpet, woven material, non-woven material, textile material or photographic film which has certain predetermined characteristics which must not be deviated from. The system can be conveniently used to monitor the manufacture of such continuous or discrete products to monitor for any deviations from the desired pre-determined characteristic(s).

The system is especially useful in paper manufacture as depicted in more detail in FIG. 1. FIG. 1 depicts a schematic representation of a paper making machine in which the wet end forming section is at the top and the final product section is at the bottom. As depicted in the figure, the machine consists of five sections, denoted by A, B, C, D and E. A denotes the forming section; B denotes the pressing section, C denotes the drying section. D denotes the calendaring section; and E denotes the coating section. As shown on FIG. 1, monitoring means 10 are strategically positioned at various locations of interest along the paper making machine.

5,821,990

| 5 | 6 |

Observing means 10 may vary widely and depends on a pre-determined characteristic of the product being monitored for deviation events. Illustrative of useful observing means are those which employ coherent or non-coherent visual, gamma, infra-red, ultraviolet, thermal and nuclear radiation, sonics, ultrasonics, magnetic fields, pressure, odor and the like. The particular observing means 10 used in any particular situation will normally depend on the pre-determined characteristics of the product being observed and the event which indicates a deviation from the pre-determined characteristic. For example, if the pre-determined characteristic is continuity of the web of paper and the deviation is a break or hole in the web, then monitoring means which employs visual radiation such as a video camera can be conveniently employed. On the other hand, if the pre-determined characteristics are moisture content, surface texture, color, gloss and the like monitoring means which involve the use of visual and infrared radiation may be used.

In the preferred embodiment of this invention depicted in FIG. 1, monitoring means is a plurality of video cameras 10. While seven cameras 10 are depicted in the figure, the number of cameras employed may vary widely, and any number capable of providing the desired degree of monitoring can be employed. The positioning of various monitoring means 10 may vary widely depending on the needs of the user. In the preferred embodiment depicted in FIG. 1, where the pre-determined characteristic of the web being monitored is web continuity and deviations in this characteristic being detected are break events, hole events or a combination thereof, the number of cameras 10 and camera positions are such that locations where breaks are most likely to occur are covered. For example, as depicted in FIG. 1, cameras 10 are positioned at the drawing section, coating section, size pressing section, center rolls section, sheet pick-up section and reeling device section.

The system of this invention also includes digital converting 12 means for converting data obtained or generated by monitoring means 10 into a digital format. Digital converting means employed may vary widely and any such means capable of performing this function may be used. Illustrative of suitable digital converting means 12 are electronic circuit boards, converting signal processors, video boards, micro-chips, and assorted software. The number of digital converting means 12 and the relationship of digital converting means 10 to monitoring means 10 may vary widely, the only requirement is that relevant monitored data is eventually converted into digital format. For example, there may be a single digital converting means 12 for each monitoring means 10 or there may be one or more digital converting means 12 for all monitoring means 10 or various other combinations of converting means 12 and monitoring means 10 may be employed. Digital converting means 12 and monitoring means 10 may be separate devices as depicted in FIG. 1, or these functions may be performed by the same device as for example a digital video camera 10 which directly monitored data in a digital format, which data is conveyed directly to digital data storage means 18 via conductor 11.

As depicted in FIG. 1, each video camera 10 monitors the web and monitored data is generated in an analog format. The analog data is then conveyed to digital converting means 12 via conductor 14 where the analog data is converted to digital format by digital converting means 12, with or without data compression. The digitized data is then conveyed via conductor 16 to digital data storage means 18.

The specific digital data storage means 18 may vary widely provided that such means allows storage of segments of digitized data having a pre-determined length which covers data obtained by monitoring means 10 which cover the real time operations of the machine over a predetermined period of time. The segment, in turn, is comprised of a plurality of digitized data clips which are also of a pre-determined length which cover the real time operations of the machine over a predetermined period of time. The segments and clips are in chronological order and are preferably identified by date and time at which the data was collected which greatly facilitates access to relevant data clips on occurrence of a deviation event. Preferably, the clips are also stored such that clips can be readily identified by time and date, and can be extracted or copied from the segment. A further requirement of the digital memory storage means 18 is that it can be controlled by a control means 20 such that specific clips can be extracted from the digital data storage means 18 as desired and as will be described hereinbelow in more detail. In the operations of the digital data storage means 18, the segment is maintained at or about the pre-determined length during the operations of the system such that as new digitized real time data is added to digital data storage means 18, the oldest or most prior data is erased, deleted or otherwise removed from storage means 18 maintaining said segment at or about some pre-determined length. The advantages of this storage means 10 becomes readily apparent in that stored digital data showing normal operations to produce the product having the pre-determined characteristic is constantly removed from storage means 18 such that upon storage of deviating digitized data of a deviation from the pre-determined characteristic, as for example a break event, such deviating data can be more easily isolated from the relatively small amount of data comprising the segment.

The pre-determined length of the segment and the clips may vary widely initially and during the operation of the system, usually depending upon function and capacity of the digital data storage means, duration of the deviation event and the like. The length of the segments are preferably less than about 60 minutes, more preferably from about 15 to about 60 minutes, and most preferably from about 15 to about 30 minutes. The length of the clips comprising a segment is preferably less than about 60 secs., more preferably from about 5 to about 60 secs., more preferably from about 5 to about 20 to 30 secs and most preferably from about 5 to about 10 secs.

The digitized data storage means 18 utilized in any particular situation may vary widely. Illustrative of useful data storage means 18 are hard drive, tape, diskette, CD rom, magnetic optical drive, solid state memory, flash memory, optical device, and the like. Preferred digitized data storage means 18 are hard drives and CD roms. As depicted in FIG. 1, the most preferred digitized data storage means 18 is a hard drive and is in communication with control means 20 by way of connector 22. Control means 20 functions to control the system. Useful control means 20 may vary widely, the only requirement is that means 20 is in the event of a deviation event able to locate the data clip containing data of such event, to extract such data clip and to display said data clip. Illustrative of useful control means 20 are analog control system and a digital computer.

As depicted in FIG. 1, control means 20 is a digital computer which communicates via connector 24 to a plurality of display means 26 which in the embodiment of FIG. 1 are video monitors. Useful display means 26 may vary widely the only is that such means is capable of displaying data to the satisfaction of the operator. Other useful display means 26 are printers, projection systems, photographic

5,821,990

7

imagers and the like. Also connected to control means 20 by way of cable 28 is a video recorder 30 as for example a VCR for recording for wider distribution of data and a library 32 for storage of data by way of cable 34. As depicted in the figure, library 32 can be accessed from various locations by remote access means 36 such as a local area network, wide area network, e-mail services, satellite, compact disk and the like connected to library 32 via cable 40.

FIG. 1 also depicts a plurality of deviation detectors 38 strategic positioned along the machine in a well known manner to detect deviations in the pre-determined characteristics in the product being monitored. Detectors 38 are connected to the machine control or distributive control system 46 via cable 42 for transmission of a deviation signal to system 46. System 46 also communicates with control 20 via cable 44 such that various information can be transmitted to control 20 from system 46 in the event of a deviation from the pre-determined characteristic as for example a break in a web. Such information includes the detection of a deviation event, time of detection of the deviation event and such other process data relating to the operations of the machine at the time of deviation event deemed appropriate.

In operation, monitoring means 10 continuously monitors a pre-determined characteristic of the product being produced by the machine. The monitored data is conveyed via cable 14 to digital conversion means 12 where the data is converted to a digital format, and the digitized data is conveyed to digital data storage means 18 via cable 16 for storage. In those embodiments of the invention where the monitored data is collected in digital format by monitoring means 10, as for example by a digital video camera, the digitized data is converted directly to digital data storage means 18 via cable 11. During operations where there are no deviations from the pre-determined characteristics, digitized data flows continuously into storage means 18 such that only a pre-determined amount of data converting a pre-determined period of time during the operation of the machine is always maintained in storage and that as new data is stored the oldest or most prior data is deleted or erased.

If a deviation in the pre-determined characteristics of the product occurs, it is detected by a deviation detector 38. Detector 38 sends a deviation signal to distributive control system 46 via cable 42, and the signal is relayed to control means 20 via cable 44. In addition to a deviation signal, detector 38 may also inform control system 46 of the identity of detector 38 detecting the deviation event, the time of the deviation event and location in the process of the deviation event. This information together with other process data such as type of product being manufactured, machine operation parameters, machine speed, draw ratios, furnish, types, additives, coating components, calendaring pressures, coating thickness, basis weight of the paper and the like are conveyed to control means 20. On receipt of the deviation event signal, control means 20 is capable of identifying the clip most likely to have digitized data relating to the deviation event, and extracting such clip and displaying the extracted clip with display means 26. For example, control means 20 can perform this function by coordinating the time at which deviation event detector 38 detected the deviation event with the clip or clips corresponding in time. This coordination can be done in any suitable manner. For example, control 20 can scan all digitized data storage means 18, select clips from all means 18 containing data collected at the appropriate time and can then scan each clip to identify the deviation event and display same. Alternatively, control means 20 can identify the monitoring

8

means 10 most proximate to the location of the deviation event, select a clip or clips from the digitized data storage means 18 for such monitoring means 10 and display such clip. In order to insure that all suitable data is displayed in the fastest possible time, preferably control means 20 will also extract digitized data clips immediately preceding and following the clip or clips most likely containing data for the deviation event and will splice the deviation event clip and the following and preceding clips into a display clip for display. By splicing the event, preceding and following clips, the operation of the machine prior to, during and subsequent to the deviation event can be observed. After a deviation is detected, the machine is usually stopped and the digitized data storage means 18 is frozen to prevent loss of critical data.

The clips can be displayed automatically or manually at any suitable speed. The clips can be displayed frame by frame, in various sizes. The clips can also be viewed in reversed mode. This function combined with a pause, playback and resizing can enhance the ability of the operators to locate the exact point of interest on the display clip, for study showing the deviation event as it occurred. Of course, many other functions may be provided by control means 20 including zooming, edge enhancement, image sharpening, gradient edge enhancement, de-specking, filtering, cropping, desizing, dithering, interpolation, image intensity, format conversion, color inversion, contrast control, brightness control, embossing and the like. Manual/automatic control of all functions may be provided.

In this manner, the control means 20 becomes the driver which also manages the logistics of the system including monitoring, displaying, storage, etc., and can additionally be used to supervise the status of each device in the system as desired. In addition, other peripherals can be provided as needed.

The ability to review the critical period just prior to the deviation event at any desired speed provides the input necessary to evaluate the cause of the problem so that necessary adjustments and/or repairs can be started quickly and the machine restored to normal operation. If only a defect in the product is to blame, this, too, often will show up. In this manner, valuable time can be saved.

The clip or clips covering the deviation event are displayed, the cause of the deviation event can be discovered and appropriate action can be taken to correct the cause of the event. The process or machine and the monitoring system can then be reactivated.

The clips relating to the deviation event together with any other process data associated with the deviation event are conveyed via line 34 to library 32 for storage. In this manner, a collection of deviation clips and associated process data is formed which can be accessed by remote access 36 via connector 40 for suitable purposes as for example for accessing, and correlating or otherwise evaluating accessed data based on one or more variables such as process times, properties, products, types or modes of deviation events, recorded observations, types of machines, and like process or product characteristics, and to document machine or process defects such as a hole in the felt or wire. The clips and associated process data may also be conveyed via connector 28 to video recorder 30 for storage on a video tape.

This invention has been described in this application in considerable detail in order to comply with the Patent Statutes and to provide those skilled in the art with the information needed to apply the novel principles and to

5,821,990

| 9 | 10 |

construct and use such specialized components as are required. However, it is to be further understood that the invention can be carried out by specifically different equipment and devices and that various modifications both as to equipment and procedure details can be accomplished without departing from the scope of the invention.

What is claimed is:

1. A monitoring system for continuously monitoring a process comprising:

a plurality of monitoring means for continuously monitoring a predetermined characteristic of the process and collecting monitored data, each monitoring means addressing a different location of interest of said process, and each said monitoring means for monitoring and collecting data relative to said location;

data converting means for converting said collected data into digitized data;

digital data storage means for storing segments of said digitized data, each of said segments comprised of one or more digitized data clips, said segments which cover the operations of said process over a predetermined period of time, said digitized data segments being stored such that as new digitized data is stored in one of said segments, earlier prior stored digitized data in said segment is removed from said segment to maintain said segment at or about said pre-determined length; and

control means for controlling said monitoring system, said control means for communicating with said digital data storage means and for communicating with one or more deviation detectors for detecting a deviation from said predetermined characteristic and for transmitting a deviation signal of said detected deviation to said control means, wherein on receipt of said deviation signal said control means for extracting a deviation clip from said segments stored in said digital data storage means and means for displaying said extracted clip.

2. System of claim 1 wherein said process is a continuous process for the manufacture of a product, and said deviation is a deviation in a pre-determined characteristic of said product.

3. System of claim 2 wherein said process comprises a plurality of monitoring steps and wherein there is at least one monitoring means for each of said steps.

4. System of claim 1 which comprises a plurality of storage means, each of which comprises at least one of said digitized data segment, at least one of said storage means for storing digitized data monitored and collected from first monitoring means at a first location of the process and at least one of said storage means for storing data monitored and collected from a second monitoring means at a second location of the process.

5. System of claim 4 wherein each of said plurality of storage means stores digitized data monitored and collected by a single monitoring means.

6. System of claim 1 wherein a plurality of monitoring means address a single location, each in communication with a digital data converting means which is in communication with a digital data storage means, said control means for extracting one or more digitized data clips from each of said storage means and for displaying said extracted clips.

7. A system of claim 6 wherein each of said monitoring means monitors a different pre-determined characteristic.

8. A system of claim 7 wherein each of said monitoring means is different.

9. System of claim 1 wherein said process is controlled totally or in part by a distributive control system in communication with said control means, said distributive control system comprising said one or more deviation detectors, said distributive control system for communicating a signal of said detected deviation and the time, location or time and location of said deviation to said control means;

wherein on receipt of said deviation signal said control means for identifying the stored segment containing a digitized data clip corresponding to said deviation, extracting the deviation clip to form a display clip and displaying said display clip.

10. System of claim 9 wherein said distributive control system is also for communicating process data relating to the operation of the process to said control means.

11. System of claim 10 which further comprises.

library means in communication with said control means for storage of display clips and process data relating to the operation of the process at the time of said deviation, said library means also for providing said stored display clips and process data for display.

12. System of claim 1 wherein on receipt of said deviation signal said control means is for extracting the deviation clip recording said deviation and one or more preceding clips preceding said deviation clip in time or time and location, such that said extracted clips are time synchronized to chronologically show the predetermined characteristics as said product passes by each monitored location of the digitized data in said extracted clips, said control means for splicing said extracted clips in chronological order to form a display clip and displaying said display clip.

13. System of claim 12 wherein said control means for extracting the deviation clip recording said deviation, the clip immediately preceding said deviation clip in time or in time and location, the clip immediately following said deviation clip in time or time and location, splicing said extracted clips in chronological order to form a display clip and displaying said display clip.

14. System of claim 1 wherein said monitoring means are video cameras and wherein at least one digital converting means is in communication with at least one video camera and at least one digital data storage means is in communication with at least one digital converting means.

15. System of claim 14 wherein on receipt of said deviation signal at the time of said deviation, said control means identifies a video camera proximate to said deviation detector detecting said deviation, freezes operations of digital memory storage means for such camera, identifies the digitized data segment corresponding to said deviation by correlating the time of said segment with the time of said deviation event, extracting the deviation event clip which correlates to the time of said deviation event and the preceding clip preceding said deviation event clip and the subsequent clip following said deviation event clip, splicing said deviation event clip, said preceding clip and said subsequent in chronological order to form a display clip and displaying said display clip on said display means.

16. System of claim 15 which further comprises:

means for transmitting process data from a distributive control system with a break event signal;

library means for storage of display clips and associated process data; and

means for accessing said display clips and process data stored in said library means.

17. System of claim 1 wherein said process is a continuous product and said deviation is selected from the group consisting of a break in said continuous product, a hole in said continuous product and a change in a surface characteristic of said continuous product.

5,821,990

11

18. System of claim 1 wherein each of said monitoring means and said data converting means are combined in a digital camera.

19. System for claim 1 wherein said control means is a computer.

20. System of claim 1 wherein:

a product of said process is a continuous web of paper and said process is for printing or manufacturing said web of paper;

said plurality of monitoring means comprises one or more cameras for monitoring said web of paper, each monitoring means for addressing said product at a different location of interest along said process and for producing an image of said product at the location of interest;

digital converting means for converting the image into a digitized image;

digital data storage means for receiving said digitized image and storing said digitized image in a digitized segment comprising one or more digitized images, said digitized segment of a predetermined length covering real time operation of said process, said digitized images being stored such that earlier prior stored digitized images in said digitized segment are displaced as new digitized images are stored in said digitized segment to maintain said stored digitized segment at or about said predetermined length;

computer control means for controlling the operations of said system, said computer control means for communicating with said digital data storage means and for communicating with a distributive control system for controlling all or a portion of said process, said distributive control system having said one or more deviation detectors for detecting deviations from predetermined characteristics of said product as said product passes through said process, said distributive control system for communicating to said computer control system information comprising the time, location or time and location of said deviations, information relative to said operations of said process or a combination thereof; and

one or more monitors in communication with said computer control means for displaying said digitized images under the control of said computer control means;

wherein on occurrence of said deviation said distributive control system transmits said deviation signal comprising the location or time, and location of said deviation to said computer control means, and in response thereto said computer control means identifies said digitized segment or said digitized image corresponding to said deviation or a combination thereof, extracts said digitized image comprising said deviation and displays said extracted digitized image on a monitor.

21. System of claim 20 wherein each of said monitoring means and digital converting means are combined in a digital camera.

22. System of claim 1 wherein each of said monitoring means and one or more said detectors are combined in a camera.

23. System of claim 1 wherein said deviation signal comprises the time, location or time and location of said detected deviation.

24. System of claim 23 wherein said deviation signal comprises the location of said detected deviation.

25. A monitoring system for continuously monitoring a process comprising:

12

a plurality of monitoring means for continuously monitoring a pre-determined characteristic of the process and collecting monitored data, each monitoring means addressing a different location of interest of said process, and each said monitoring means for monitoring and collecting data relative to said location;

digital converting means for converting said collected data into digitized data;

digital data storage means for storing segments of said digitized data, said segments of which cover the operations of said process at a relevant location over a pre-determined period of time, said digitized data segments being stored such that as new digitized data is stored in a segment, earlier prior stored digitized data in said segment is removed from said segment to maintain said segment at or about a pre-determined length; and

control means for controlling said monitoring system, said control means for communicating with said digital data storage means and for communicating with one or more deviation detectors for detecting a deviation from said predetermined characteristic and for transmitting a deviation signal of said detected deviation to said control means; wherein on receipt of said deviation signal said control means for extracting from said digital data storage means deviation digitized data corresponding to said detected deviation to form extracted digitized data and said control means for displaying said extracted digitized data.

26. System of claim 25 wherein said system further comprises a monitor and wherein said extracted digitized data is displayed visually on said monitor.

27. System of claim 25 wherein on receipt of said deviation signal said control means for extracting the deviation digitized data and preceding digitized data preceding said digitized data in time or time and location such that said extracted preceding and deviation digitized data are time synchronized to chronologically show the monitored predetermined characteristics as said process passes by each monitored location of the digitized data in said extracted clips, and said control means for controlling said means for displaying said extracted clips.

28. System of claim 27 wherein said control means for extracting the deviation digitized data, the preceding digitized data, and the digitized data immediately following extracting said deviation digitized data in time or time and location and said control means for controlling said means for displaying said extracted digitized data.

29. System of claim 25 wherein said data converting means and each of said monitoring means are combined in a digital camera.

30. System of claim 25 wherein said monitoring means is a video camera.

31. System of claim 25 wherein said pre-determined characteristic is a characteristic of said process.

32. System of claim 25 wherein said control means is a computer.

33. System of claim 25 wherein:

a product of said process is a continuous web of paper and said process is a process for printing or manufacturing said web of paper;

said plurality of monitoring means comprises one or more cameras, each camera addressing said product at a different location of interest along said process and producing an image of said product at said location of interest.

5,821,990

| 13 | 14 |

digital converting means for converting the image into a digitized image;

digital data storage means for receiving said digitized image and storing said digitized image in a digitized data segment comprising one or more digitized images, said digitized data segment of a pre-determined length covering real time operation of said process, said digitized images being stored such that earlier prior stored digitized images in said digitized segment are displaced as new digitized images are stored in said digitized segment to maintain said stored digitized segment at or about said predetermined length;

computer control means for controlling the operations of said system, said computer control means for communicating with said digital data storage means and for communicating with a distributive control system for controlling all or a portion of said process, said distributive control system having said one or more deviation detectors for detecting deviations from predetermined characteristics of said product as said product passes through said process, said distributive control system for communicating to said computer control system information comprising the location or time and location of said deviations; information relative to the operations of said process or a combination thereof; and

one or more monitors in communication with said computer control means for displaying the digitized images under the control of said computer control means;

wherein on occurrence of said deviation, said distributive control system transmits said deviation signal comprising the location or time and location of said deviation to said computer control means, and in response thereto said computer control means identifies said digitized segment or said digitized image corresponding to said deviation or a combination thereof, extracts said digitized image comprising said deviation and displays said digitized image on said monitor.

34. System of claim 33 wherein each of said monitoring means and digital converting means are combined in a digital camera.

35. System of claim 25 wherein each of said monitoring means and one or more of said detectors are combined in a camera.

36. System of claim 25 wherein said deviation signal comprises the time, location or time and location of said detected deviation.

37. System of claim 36 wherein said deviation signal comprises the location of said detected deviation.

38. A monitoring system for continuously monitoring a process for manufacturing a product comprising:

a plurality of monitoring means for continuously monitoring a pre-determined characteristic of the process and collecting monitored data, and each said monitoring means for monitoring and collecting data relative to said process;

data converting means for converting said collected data into digitized data;

digital data storage means for storing segments of said digitized data, said segments which cover the operations of said process over a predetermined period of time, said digitized data segments being stored such that as new digitized data is stored in a segment, earlier prior stored digitized data in said segment is removed from said segment to maintain said segment at or about a pre-determined length;

one or more deviation detectors for monitoring said pre-determined characteristic, and for detecting a deviation therefrom; and

control means for controlling each of said monitoring means, said control means in communication with said digital data storage means and with said deviation detectors, wherein on receipt of a deviation signal said control means for extracting deviation digitized data corresponding to said detected deviation from said digital data storage means to form extracted deviation digitized data and said control means for controlling the display said extracted deviation digitized data.

39. System of claim 38 wherein said monitoring means is a camera.

40. System of claim 38 wherein each of said monitoring means and said data converting means are combined in a digital camera.

41. System of claim 38 wherein each of said monitoring means and said one or more detectors are combined in a camera.

42. System of claim 38 wherein said control means is one or more computers.

43. System of claim 38 wherein said deviation signal comprises the time, location or time and location of said detected deviation.

44. System of claim 43 wherein said deviation signal comprises the location of said detected deviation.

45. A monitoring system for continuously monitoring a process for manufacture of a product comprising:

a plurality of monitoring means for continuously monitoring a pre-determined characteristic of the process and collecting monitored data, each monitoring means addressing a different location of interest of said process, and each said monitoring means for monitoring and collecting data relative to said location;

digital converting means for converting said collected data into digitized data;

digital data storage means for storing segments of said digitized data, said segments which cover the operations of said process at a relevant location over a pre-determined period of time, said digitized data segments being stored such that as new digitized data is stored in a segment, earlier prior stored digitized data in said segment is removed from said segment to maintain said segment at or about a pre-determined length;

one or more deviation detectors for monitoring said pre-determined characteristics and for detecting a deviation therefrom; and

control means for controlling each of said monitoring means, said control means in communication with said digital data storage means and with said deviation detectors, wherein on receipt of a deviation signal said control means for identifying a deviation digitized data corresponding to said deviation and extracting said identified deviation digitized data from said stored segments of digitized data in said digital data storage means to form extracted deviation digitized data, and said control means for controlling the display said extracted deviation digitized data.

46. System of claim 45 wherein said monitoring means is a camera.

47. System of claim 45 wherein each of said monitoring means and said data converting means are combined in a digital camera.

48. System of claim 45 wherein each of said monitoring means and said one or more detectors are combined in a camera.

5,821,990

15

49. System of claim 45 wherein each of said control means is one or more computers.

50. System of claim 45 wherein said deviation signal comprises the time, location or time and location of said detected deviation.

51. System of claim 50 wherein said deviation signal comprises the location of said detected deviation.

52. A monitoring system for continuously monitoring a process for the manufacture of a product comprising a continuous web of paper, said system comprising:

a plurality of monitoring means comprising a plurality of video cameras for monitoring a predetermined characteristic of the process and collecting monitored data, said cameras addressing locations of interest of said process and said cameras for producing video images relative to said locations;

digital data converting means for converting said video images into digitized video signals;

digital data storage means for receiving said digitized video signals and for storing segments of said digitized video signals, said segments which cover the operations of said process over a predetermined period of time, said digitized video signals being stored such that as new digitized video signals are stored in a segment, earlier prior stored digitized video signals in said segment are removed from said segment to maintain said segment at or about a pre-determined length; and

control means for controlling each of said monitoring means, said control means comprising one or more computers, said control means for communicating with said digital data storage means and for communicating with one or more deviation detectors for detecting a deviation from said predetermined characteristics and for transmitting a deviation signal of said detected deviation to said control means, wherein on receipt of said deviation signal said control means for extracting a deviation digitized video signal from said segments stored in said digital data storage means and for controlling the display of said extracted deviation digitized video signal or an image thereof.

53. System of claim 52 wherein said system further comprises one or more video monitors for displaying said

16

image of said extracted deviation digitized video signal; and said control means for controlling the display of an image of said extracted deviation digitized video signal on one or more of said one or more video monitors.

54. System of claim 52 wherein said system further comprises one or more deviation detectors for monitoring said predetermined characteristics and for detecting deviations therefrom.

55. System of claim 54 wherein said monitoring means and said one or more detectors are combined in said video cameras.

56. System of claim 52 wherein said process is for printing said web of paper.

57. System of claim 52 wherein said process is for manufacturing said web of paper.

58. System of claim 57 wherein each predetermined characteristic is a characteristic of said product.

59. System of claim 58 wherein said predetermined characteristic is a continuity of said web.

60. System of claim 59 wherein said deviation is a break or hole in said web.

61. System of claim 60 wherein said deviation detectors further comprises one or more deviation detectors for monitoring said predetermined characteristics and for detecting deviations therefrom.

62. System of claims 61 whereas each of said monitoring means and said deviation detectors are combined in said video camera.

63. System of claim 61 wherein said deviation signal comprises the time, location or time and location of said detected deviation.

64. System of claim 52 wherein said predetermined characteristic is a characteristic of said product.

65. System of claim 52 wherein each of said monitoring means and said data converting means are combined in a digital camera.

66. System of claim 52 wherein said deviation signal comprises the time, location or time and location of said detected deviation.

*    *    *    *    *

US006211905B1

(12) **United States Patent**
Rudt et al.

(10) Patent No.: **US 6,211,905 B1**
(45) Date of Patent: **\*Apr. 3, 2001**

(54) **SYSTEM FOR MONITORING A CONTINUOUS MANUFACTURING PROCESS**

(76) Inventors: **Robert J. Rudt**, 17 Butternut Ct., Highland Mills, NY (US) 10930; **Leonard F. Fiore**, 11610 45th St. NE., Foley, MN (US) 56329; **Kenneth D. Grapes**, 193 Challedon Cir., Pataskala, OH (US) 43062

(\*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **09/398,528**

(22) Filed: **Jul. 30, 1998**

**Related U.S. Application Data**

(62) Division of application No. 08/929,231, filed on Sep. 3, 1997, now Pat. No. 5,821,990.

(51) Int. Cl.7 .................................................. **H04N 7/18**
(52) U.S. Cl. ............................. **348/88**; 348/86; 348/125
(58) Field of Search .............................. 348/86, 88, 92, 348/94, 125, 128; 356/429–430, 240; 382/141

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| H1616 | \* | 12/1996 | Wolfe ........................................ 348/88 |
| 4,675,730 | \* | 6/1987 | Adomaitis et al. ..................... 348/88 |
| 4,752,897 | \* | 6/1988 | Zoeller et al. ......................... 364/550 |
| 4,805,019 | \* | 2/1989 | Holliday ................................. 348/86 |
| 4,951,223 | \* | 8/1990 | Wales et al. ......................... 364/507 |
| 5,023,714 | \* | 6/1991 | Lemelson ............................... 348/88 |
| 5,134,792 | \* | 7/1992 | Beaverstock et al. ......... 364/551.01 |
| 5,239,376 | \* | 8/1993 | Cittmann et al. ..................... 348/88 |
| 5,305,099 | \* | 4/1994 | Morcos .................................. 348/88 |
| 5,365,596 | \* | 11/1994 | Dante et al. ......................... 348/125 |
| 5,680,473 | \* | 10/1997 | Kanzaka et al. ..................... 382/141 |
| 5,717,456 | \* | 2/1998 | Rudt et al. .............................. 348/88 |
| 5,821,990 | \* | 10/1998 | Rudt et al. .............................. 348/88 |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 0526080A2 | \* | 2/1993 | (EP) ........................... G05B/19/417 |
| 2667182 | \* | 9/1991 | (FR) ............................. G06K/9/28 |
| 2250156 | \* | 5/1995 | (GB) ........................... H04N/7/18 |
| WO 93/05477 | \* | 3/1993 | (WO) ......................... G08B/15/00 |
| WO94/11821 | \* | 5/1994 | (WO) ......................... G06F/11/22 |
| WO96/27864 | \* | 9/1996 | (WO) ......................... G08B/15/00 |

\* cited by examiner

*Primary Examiner*—Vu Le
(74) *Attorney, Agent, or Firm*—Richard C. Stewart, II

(57) **ABSTRACT**

This invention relates to a system for monitoring a process which includes a plurality of monitoring means such as video camera which collects data relative to the process. The collected data is converted into a digital format and the digitized data stored in digital data storage device such that as new data is stored earlier stored data is removed to maintain about the same volume of stored data. The system also includes a control such as a computer which communicates with the digital data storage device. In the event of a deviation from a process parameter, the control is adapted to extract and display the digitized data corresponding to the deviation.

**47 Claims, 1 Drawing Sheet**



U.S. Patent          Apr. 3, 2001          US 6,211,905 B1



FIG. I

US 6,211,905 B1

1

## SYSTEM FOR MONITORING A CONTINUOUS MANUFACTURING PROCESS

This application is a division of Ser. No. 08/929,231, filed Sep. 3, 1997, now U.S. Pat. No. 5,821,990.

## BACKGROUND OF THE INVENTION

### I. Field of the Invention

This invention relates generally to a system for monitoring: a process. More particularly, this invention relates to such a system in which process data relating to a predetermined characteristic of the process is collected and stored in digital format and extracted based upon a pre-determined criterion for display.

### II. Description of the Prior Art

Processes are known for the continuous production or handling of a product. Illustrative of such processes are those for the production or handling of continuous products, as for example polymeric films, paper webs, metallic webs, roll printing processes and the like. Other such processes include those for production or handling of discrete products such as sheet printing processes, packaging processes and the like.

A desired objective of these processes is that the product have certain pre-determined characteristics, as for example characteristics which insure that the product is of acceptable quality. A failure to detect and correct deviations from these pre-determined characteristics is an extreme disadvantage adversely affecting the economics of the process as for example because of lost production time, discarding of unacceptable product, and the like.

As a result, systems for inspecting and observing the product by continuous processes have been developed. See for example the systems described in U.S. Pat. Nos. 4,951,223; 4,814,869; 5,239,376; and the like. These systems usually involve the monitoring through use of one or more video cameras strategically placed along the production line, storage of video output on video tapes, means for shutting down production of the product in the event of deviations from pre-determined characteristics and playback of video tapes to determine the cause of the deviations so that corrections can be made in a timely fashion. These known monitoring systems suffer from one or more disadvantages which adversely affect their performance. For example, these prior processes are manual and require re-winding of the tape which results in down time of the system and long processing times. Moreover, tapes often degrade and it is difficult to access those portions of the tape containing relevant information or to make good copies. In these systems the tapes are not networked or tied together and the system cannot simultaneously recorded and played back. The system of this invention obviates one or more of these disadvantages.

## SUMMARY OF THE INVENTION

This invention provides a monitoring system for continuously monitoring the operations of a machine for the continuous manufacture of a product. More particularly, the system of this invention comprises:

    a plurality of monitoring means for continuously monitoring a pre-determined characteristic of the process and collecting monitored data, each monitoring means addressing a different location of interest of said process, and capable of monitoring and collecting real time data relative to said location;

2

    data converting means for converting said output data into digitized data;

    digital data storage means capable of storing segments of said digitized data, each of said segments comprised of a plurality of digitized data clips, said segments and said clips of predetermined lengths which cover the operations of said process at a relevant location over a predetermined period of time, said digitized data segments being stored such that as new digitized data is stored in said segment, the earliest prior stored digitized data in said segment is displaced from said segment to maintain said segment at said predetermined length; and

    control means for controlling said monitoring system, said control means in communication with said digital data storage means and capable of extracting one or more digitized data clips according to predetermined criterion to form one or more extracted clips, and capable of displaying said extracted clips.

As used herein, "compression" means applying data reduction means such as an appropriate algorithm, technique, technology or the like to digitalized data for a real time event at a location in a process to reduce the ammout of digitized data required to recreate the event. As used herein, "process" means an action, change or function or a series of actions, changes or functions that bring about a result or end, as for example a system of operations in the production of something. As used herein, "clip" means a digitalized data series for a location of a process during a pre-determined period of time. As used herein, "digitized" or "digitization" means to convert to or to collect in a digital format as for example conversion of an analog signal of a visual image to a digital format or collection of a visual image directly into a digital format. As used herein, "digital" means information in a binary format, or zeros and ones, usual for storage in a digital data storage means such as a computer. As used herein, "segment" means a portion of the digital data storage means containing one or more digitized data clips.

In a preferred embodiment of the invention, said process is a continuous process for the manufacture of a product, and said deviation event is a deviation in a pre-determined characteristic of said product.

In a more preferred embodiment of the invention, the system comprises a plurality of storage means, each of which comprises at least one digitized data segment, at least one of said storage means capable of storing digitized data monitored and collected from first monitoring means at a first location of the process and at least one of said storage means capable of storing data monitored and collected from a second monitoring means at a second location of the process. Preferably, the control means is capable of extracting clips from segments stored in two or more of said plurality of said storage means such that said extracted clips are time synchronized to chronologically show the pre-determined characteristic of a single discrete product or a portion of a continuous product as said product passes by each location of the digitized data in said extracted clips. Alternatively, the control means is capable of extracting the event clip recording said event and the clip immediately preceding said event clip from the segment containing data from a single location of the process, and optionally the data clip immediately following the event clip, splicing said clips in chronological order to form a display clip and displaying said display clip.

In another preferred embodiment, the process comprises a plurality of steps and wherein there is at least one monitoring means, data converting means and data storage means for said step.

US 6,211,905 B1

3

In still another preferred embodiment, the process is controlled by a distributive control system in communication with said control means, said control system having one or more deviation detectors for monitoring said predetermined characteristic, each of said detectors addressing a different location of interest along the process and capable of detecting deviation events and communicating a signal of said deviation event, and the time and location of said event to said control means;

wherein on receipt of said deviation event signal said control means capable of identifying said data storage means containing the digitized data segment corresponding to said deviation event, extracting the deviation event clip and displaying said display clip, and wherein said distributive control system is preferably capable of communicating process data relating to the operation of the process and the time of break to said control means.

In yet another preferred embodiment, the control means is capable of extracting the event clip recording said event and the clips immediately preceding and optionally the clip immediately following said event clip, splicing said event clips into a display clip chronological order and displaying said display clip.

A most preferred embodiment of this invention relates to a monitoring system for monitoring the manufacture of a continuous web of paper having one or more pre-determined characteristics in a paper manufacturing machine comprising:

a plurality of monitoring means which comprises one or more video cameras for monitoring the paper web, each monitoring means addressing the paper web at a different location of interest along the paper manufacturing machine and capable of producing a video image of the paper web at the location;

digital converting means for converting the video image into a digitized video signal;

digital data storage means capable of receiving said digitized video signal and storing digitized segments thereof, each of which comprises a plurality of digitized clips, said digitized segments and clips of a predetermined length covering real time operation of said machine, said digitized segments being stored such that the earliest prior stored digitized data in said segment is displaced as new digitized data, is stored in said segment to maintain said stored segment at said predetermined length;

Computer control means for controlling the operations of said system, said means in communication with said digital data storage means and capable of controlling same, said computer control means in communication with a distributive control system for controlling said machine, said system having one or more deviation detectors for detecting deviations from predetermined characteristics as said paper web passes through said machine said control system capable of communication process master time and date information to said computer control system; and

one or more video monitors in communication with said computer control means and capable of displaying the image of digitized video signals under the control of said computer control means;

wherein on occurrence of a deviation from the predetermined characteristics of said web, said distributive control system transmits a deviation signal comprising the time, date and location of said deviation event to

4

said computer control means, and in response thereto said computer control means identifying the digitized data segment corresponding to said deviation event, extracting the deviation event clip, the preceding clip preceding said break event clip to form a display clip and displaying said display clip on a video monitor.

The system of this invention obviates one or more disadvantages of prior art monitoring systems. For example, There no loss or substantially no loss of data due to rewinding, no or substantially no deterioration in the stored data and good copies of the data can be made. The system can be easily used in an automatic mode an allows simultaneous observation and collection\storage of data. The system allows the monitoring of the process from a central location or from one or more other locations, and allows correlations between collected\recorded data and other process operations data.

BRIEF DESCRIPTION OF THE DRAWINGS

The invention and the advantages attendant thereto will become apparent upon a reading of the following detailed description of the invention taken in conjunction with the accompanying drawings, in which:

FIG. 1 is a depiction of a preferred embodiment of this invention showing a schematic of a paper making machine, including a possible configuration of surveillance cameras and web failure detection devices.

DETAILED DESCRIPTION OF THE
INVENTION

The present invention is directed to a system for monitoring a machine or process for manufacture of a product. While the preferred embodiment of FIG. 1 depicts the system in use to monitor a paper manufacturing process and machine. The nature of the process may vary provided that the process has a pre-determined characteristic. The process may be batch, semi-continuous or continuous, or automatic or manual. For example, the process may monitor people or things entering or leaving a building or a room in a building or a process for the manufacture or handling of discrete or continuous products. In the preferred embodiments of the invention, the process is for the manufacture or handling of a product. Processes for manufacturing and handling discrete products include processes for extruding, packaging, filing, bottling, sheet fed printing, conveying, converting, wrapping, stamping, or assembling a discrete product. Process for manufacturing or handling a continuous product include those for the manufacture of a continuous web material such as a polymeric or metal sheet or film, printed paper, carpet, woven material, non-woven material, textile material or photographic film which has certain predetermined characteristics which must not be deviated from. The system can be conveniently used to monitor the manufacture of such continuous or discrete products to monitor for any deviations from the desired pre-determined characteristic(s).

The system is especially useful in paper manufacture as depicted in more detail in FIG. 1. FIG. 1 depicts a schematic representation of a paper making machine in which the wet end forming section is at the top and the final product section is at the bottom. As depicted in the FIGURE, the machine consists of five sections, denoted by A, B, C, D and E. A denotes the forming section; B denotes the pressing section; C denotes the drying section; D denotes the calendaring section; and E denotes the coating section. As shown on FIG. 1, monitoring means 10 are strategically positioned at various locations of interest along the paper making machine.

US 6,211,905 B1

5

Observing means 10 may vary widely and depends on a pre-determined characteristic of the product being monitored for deviation events. Illustrative of useful observing means are those which employ coherent or non-coherent visual, gamma, infra-red, ultraviolet, thermal and nuclear radiation, sonics, ultrasonics, magnetic fields, pressure, odor and the like. The particular observing means 10 used in any particular situation will normally depend on the pre-determined characteristic of the product being observed and the event which indicates a deviation from the pre-determined characteristic. For example, if the pre-determined characteristic is continuity of the web of paper and the deviation is a break or hole in the web, then monitoring means which employs visual radiation such as a video camera can be conveniently employed. On the other hand, if the pre-determined characteristics are moisture content, surface texture, color, gloss and the like monitoring means which involve the use of visual and infrared radiation may be used.

In the preferred embodiment of this invention depicted in FIG. 1, monitoring means is a plurality of video cameras 10. While seven cameras 10 are depicted in the FIGURE, the number of cameras employed may vary widely, and any number capable of providing the desired degree of monitoring can be employed. The positioning of various monitoring means 10 may vary widely depending on the needs of the user. In the preferred embodiment depicted in FIG. 1, where the pre-determined characteristic of the web being monitored is web continuity and deviations in this characteristic being detected are break events, hole events or a combination thereof, the number of cameras 10 and camera positions are such that locations where breaks are most likely to occur are covered. For example, as depicted in FIG. 1, cameras 10 are positioned at the drawing section, coating section, size pressing section, center rolls section, sheet pick-up section and reeling device section.

The system of this invention also includes digital converting 12 means for converting data obtained or generated by monitoring means 10 into a digital format. Digital converting means employed may vary widely and any such means capable of performing this function may be used. Illustrative of suitable digital converting means 12 are electronic circuit boards, converting signal processors, video boards, micro-chips, and assorted software. The number of digital converting means 12 and the relationship of digital converting means 10 to monitoring means 10 may vary widely, the only requirement is that relevant monitored data is eventually converted into digital format. For example, there may be a single digital converting means 12 for each monitoring means 10 or there may be one or more digital converting means 12 for all monitoring means 10 or various other combinations of converting means 12 and monitoring means 10 may be employed. Digital converting means 12 and monitoring means 10 may be separate devices as depicted in FIG. 2, or these functions may be performed by the same device as for example a digital video camera 10 which directly monitored data in a digital format, which data is conveyed directly to digital data storage means 18 via conductor 11.

As depicted in FIG. 1, each video camera 10 monitors the web and monitored data is generated in an analog format. The analog data is then conveyed to digital converting means 12 via conductor 14 where the analog data is converted to digital format by digital converting means 12, with or without data compression. The digitized data is then conveyed via conductor 16 to digital data storage means 18.

The specific digital data storage 1 means 18 may vary widely provided that such means allows storage of segments

6

of digitized data having a pre-determined length which covers data obtained by monitoring means 10 which cover the real time operations of the machine over a predetermined period of time. The segment, in turn, is comprised of a plurality of digitized data clips which are also of a pre-determined length which also cover the real time operations of the machine over a predetermined period of time. The segments and clips are in chronological order and are preferably identified by date and time at which the data was collected which greatly facilitates access to relevant data clips on occurrence of a deviation event. Preferably, the clips are also stored such that clips can be readily identified by time and date, and can be extracted or copied from the segment. A further requirement of the digital memory storage 1 means 18 is that it can be controlled by a control means 20 such that specific clips can be extracted from the digital data storage means 18 as desired and as will be described hereinbelow in more detail. In the operations of the digital data storage means 18, the segment is maintained at or about the pre-determined length during the operations of the system such that as new digitized real time data is added to digital data storage means 18, the oldest or most prior data is erased, deleted or otherwise removed from storage means 18 maintaining said segment at or about some pre-determined length. The advantages of this storage means 10 becomes readily apparent in that stored digital data showing normal operations to produce the product having the pre-determined characteristic is constantly removed from storage means 18 such that upon storage of deviating digitized data of a deviation from the pre-determined characteristic, as for example a break event, such deviating data can be more easily isolated from the relatively small amount of data comprising the segment.

The pre-determined length of the segment and the clips may vary widely initially and during the operation of the system, usually depending upon function and capacity of the digital data storage means, duration of the deviation event and the like. The length of the segments are preferably less than about 60 minutes, more preferably from about 15 to about 60 minutes, and most preferably from about 15 to about 30 minutes. The length of the clips comprising a segment is preferably less than about 60 secs., more preferably from about 5 to about 60 secs., more preferably from about 5 to about 20 to 30 secs and most preferably from about 5 to about 10 secs.

The digitized data storage means 18 utilized in any particular situation may vary widely. Illustrative of useful data storage means 18 are hard drives, tape, diskette, CD rom, magnetic optical drive, solid state memory, flash memory, optical device, and the like. Preferred digitized data storage means 18 are hard drives and CD roms. As depicted in FIG. 1, the most preferred digitized data storage means 18 is a hard drive and is in communication with control means 20 by way of connector 22. Control means 20 functions to control the system. Useful control means 20 may vary widely, the only requirement is that means 20 is in the event of a deviation event able to locate the data clip containing data of such event, to extract such data clip and to display said data clip. Illustrative of useful control means 20 are analog control system and a digital computer.

As depicted in FIG. 1, control means 20 is a digital computer which communicates via connector 24 to a plurality of display means 26 which in the embodiment of FIG. 1 are video monitors. Useful display means 26 may vary widely the only is that such means is capable of displaying data to the satisfaction of the operator. Other useful display means 26 are printers, projection systems, photographic

US 6,211,905 B1

7

imagers and the like. Also connected to control means 20 by way of cable 20 is a 30 as for example a VCR for recording for wider distribution of data and a library 32 for storage of data by way of cable 34. As depicted in the FIGURE, library 32 can be accessed from various locations by remote access means 36 such as a local area network, wide area network, e-mail services, satellite, compact disk and the like connected to library 32 via cable 40.

FIG. 1 also depicts a plurality of deviation detectors 38 strategic positioned along the machine in a well known manner to detect deviations in the pre-determined characteristics in the product being monitored. Detectors 38 are connected to the machine control or distributive control system 40 via cable 42 for transmission of a deviation signal to system 40. System 40 also communicates with control 20 via cable 40 such that various information can be transmitted to control 20 from system 40 in the event of a deviation from the pre-determined characteristic as for example a break in a web. Such information includes the detection of a deviation event, time of detection of the deviation event and such other process data relating to the operations of the machine at the time of deviation event deemed appropriate.

In operation, monitoring means 10 continuously monitors a pre-determined characteristic of the product being produced by the machine. The monitored data is conveyed via cable 16 to digital conversion means 12 where the data is converted to a digital format, and the digitized data is conveyed to digital data storage means 18 via cable 16 for storage. In those embodiments of the invention where the monitored data is collected in digital format by monitoring means 10, as for example by a digital video camera, the digitized data is converted directly to digital data storage means 18 via cable 11. During operations where there are no deviations from the pre-determined characteristics, digitized data flows continuously into storage means 18 such that only a pre-determined amount of data converting a pre-determined period of time during the operation of the machine is always maintained in storage and that as new data is stored the oldest or most prior data is deleted or erased.

If a deviation in the pre-determined characteristics of the product occurs, it is detected by a deviation detector 38. Detector 38 sends a deviation signal to distributive control system 40 via cable 42, and the signal is relayed to control means 20 via cable 48. In addition to a deviation signal, detector 38 may also inform control system 40 of the identity of detector 38 detecting the deviation event, the time of the deviation event and location in the process of the deviation event. This information together with other process data such as type of product being manufactured, machine operation parameters, machine speed, draw ratios, furnish, types, additives, coating components, calendaring pressures, coating thickness, basis weight of the paper and the like are conveyed to control means 20. On receipt of the deviation event signal, control means 20 is capable of identifying the clip most likely to have digitized data relating to the deviation event, and extracting such clip and displaying the extracted clip with display means 26. For example, control means 20 can perform this function by coordinating the time at which deviation event detector 38 detected the deviation event with the clip or clips corresponding in time. This coordination can be done in any suitable manner. For example, control 20 can scan all digitized data storage means 18, select clips from all means 18 containing data collected at the appropriate time and can then scan each clip to identify the deviation event and display same. Alternatively, control means 20 can identify the monitoring

8

means 10 most proximate to the location of the deviation event, select a clip or clips from the digitized data storage means 18 for such monitoring means 10 and display such clip. In order to insure that all suitable data is displayed in the fastest possible time, preferably control means 20 will also extract digitized data clips immediately preceding and following the clip or clips most likely containing data for the deviation event and will splice the deviation event clip and the following and preceding clips into a display clip for display. By splicing the event, preceding and following clips, the operation of the machine prior to, during and subsequent to the deviation event can be observed. After a deviation is detected, the machine is usually stopped and the digitized data storage means 18 is frozen to prevent loss of critical data.

The clips can be displayed automatically or manually at any suitable speed. The clips can be displayed frame by frame, in various sizes. The clips can also be viewed in reversed mode. This function combined with a pause, playback and resizing can enhance the ability of the operators to locate the exact point of interest on the display clip, for study showing the deviation event as it occurred. Of course, many other functions may be provided by control means 20 including zooming, edge enhancement, image sharpening, gradient edge enhancement, de-specking, filtering, cropping, desizing, dithering, interpolation, image intensity, format conversion, color inversion, contrast control, brightness control, embossing and the like. Manual/automatic control of all functions may be provided.

In this manner, the control means 20 becomes the driver which also manages the logistics of the system including monitoring, displaying, storage, etc., and can additionally be used to supervise the status of each device in the system as desired. In addition, other peripherals can be provided as needed.

The ability to review the critical period just prior to the deviation event at any desired speed provides the input necessary to evaluate the cause of the problem so that necessary adjustments and/or repairs can be started quickly and the machine restored to normal operation. If only a defect in the product is to blame, this, too, often will show up. In this manner, valuable time can be saved.

The clip or clips covering the deviation event are displayed, the cause of the deviation event can be discovered and appropriate action can be taken to correct the cause of the event. The process or machine and the monitoring system can then be reactivated.

The clips relating to the deviation event together with any other process data associated with the deviation event are conveyed via line 34 to library 32 for storage. In this manner, a collection of deviation clips and associated process data is formed which can be accessed by remote access 36 via connector 38 for suitable purposes as for example for accessing, and correlating or otherwise evaluating accessed data based on or more variables such as process times, properties, products, types or modes of deviation events, recorded observations, types of machines, and like process or product characteristics, and to document machine or process defects such as a hole in the felt or wire. The clips and associated process data may also be conveyed via connector 38 to video recorder 30 for storage on a video tape.

This invention has been described in this application in considerable detail in order to comply with the Patent Statutes and to provide those skilled in the art with the information needed to apply the novel principles and to construct and use such specialized components as are

US 6,211,905 B1

9

required. However, it is to be further understood that the invention can be carried out by specifically different equipment and devices and that various modifications both as to equipment and procedure details can be accomplished without departing from the scope of the invention.

What is claimed is:

1. A monitoring system for continuously monitoring a process comprising:

a plurality of monitoring means for continuously monitoring a pre-determined characteristic of the process and collecting monitored data, each monitoring means addressing a different location of interest of said process, and capable of monitoring and collecting real time data relative to said location;

data converting means for converting said output data into digitized data;

digital data storage means capable of storing segments of said digitized data, each of said segments comprised of a plurality of digitized data clips, said segments and said clips of predetermined lengths which cover the operations of said process at a relevant location over a predetermined period of time, said digitized data segments being stored such that as new digitized data is stored in said segment, the earliest prior stored digitized data in said segment is displaced from said segment to maintain said segment at said predetermined length; and

control means for controlling said monitoring system, said control means in communication with said digital data storage means and capable of extracting one or more digitized data clips according to predetermined criterion to form one or more extracted clips, and capable of displaying said extracted clips.

2. System of claim 1 wherein said pre-determined criterion is a deviation event in which there is a deviation in said pre-determined characteristic.

3. System of claim 2 wherein said process is a continuous process for the manufacture of a product, and said deviation event is a deviation in a pre-determined characteristic of said product.

4. System of claim 3 which comprises a plurality of storage means, each of which comprises at least one digitized data segment, at least one of said storage means capable of storing digitized data monitored and collected from first monitoring means at a first location of the process and at least one of said storage means capable of storing data monitored and collected from a second location of the process.

5. System of claim 4 wherein each of said plurality of storage means is capable of storing digitized data monitored and collected by a single monitoring means.

6. System of claim 5 wherein said control means is capable of extracting clips from segments stored in two or more of said plurality of said storage means such that said extracted clips are time synchronized to chronologically show the pre-determined characteristic of a single discrete product or a portion of a continuous product as said product passes by each location of the digitized data in said extracted clips, splicing said extracted clips in chronological order to form a display clip and displaying said display clip.

7. System of claim 3 wherein said process comprises a plurality of steps and wherein there is at least one monitoring means for each of said steps.

8. System of claim 7 wherein said control means is capable of extracting the event clip recording said event and the clip immediately preceding said event clip, splicing said clips in chronological order to form a display clip and displaying said display clip.

10

9. System of claim 8 wherein said control means is capable of extracting the event clip recording said event, the clip immediately preceding said event clip, the clip immediately following said event clip, splicing said clips in chronological order to form a display clip and displaying said display clip.

10. System of claim 3 wherein said process is controlled by a distributive control system in communication with said control means, said control system having one or more deviation detectors for monitoring said pre-determined characteristic, each of said detectors addressing a different location of interest along the process and capable of detecting deviation events and communicating a signal of said deviation event, and the time and location of said event to said control means;

wherein on receipt of said deviation event signal said control means capable of identifying data storage means containing the digitized data segment corresponding to said deviation event, extracting the deviation event clip to form a display clip and displaying said display clip.

11. System of claim 10 wherein said distributive control system is further capable of communicating process data relating to the operation of the process and the time of break to said control means.

12. System of claim 11 which further comprises:

library means in communication with said control means for storage of display clips and process data relating to the operation of the machine at the time of break, said library capable of providing for display of said stored display clips and process data.

13. System of claim 1 wherein a plurality of monitoring means address a single location, each in communication with a digital data converting means which is in communication with a digital data storage means, said control means capable of extracting one or more digitized data clips from each of said storage means and capable of displaying said extracted clips.

14. A system of claim 13 wherein each of said monitoring means monitors a different pre-determined characteristic.

15. A system of claim 14 wherein said monitoring means are different.

16. A monitoring system for monitoring the manufacture of a continuous web of paper having one or more predetermined characteristics in a paper manufacturing machine comprising:

a plurality of monitoring means which comprises one or more video cameras for monitoring the paper web, each monitoring means addressing the paper web at a different location of interest along the paper manufacturing machine and capable of producing a video image of the paper web at the location;

digital converting means for converting the video image into a digitized video signal;

digital data storage means capable of receiving said digitized video signal and storing digitized segments thereof, each of which comprises a plurality of digitized clips, said digitized segments and clips of a predetermined length covering real time operation of said machine, said digitized segments being stored such that the earliest prior stored digitized data in said segment is displaced as new digitized data, is stored in said segment to maintain said stored segment at said predetermined length;

Computer control means for controlling the operations of said system, said means in communication with said

US 6,211,905 B1

11                                                                              12

digital data storage means and capable of controlling same, said computer control means in communication with a distributive control system for controlling said machine, said system having one or more deviation detectors for detecting deviations from predetermined characteristics as said paper web passes through said machine said control system capable of communication process master time and date information to said computer control system; and

one or more video monitors in communication with said computer control means and capable of displaying the image of digitized video signals under the control of said computer control means;

wherein on occurrence of a deviation from the predetermined characteristics of said web, said distributive control system transmits a deviation signal comprising the time, date and location of said deviation event to said computer control means, and in response thereto said computer control means identifying the digitized data segment corresponding to said deviation event, extracting the deviation event clip, the preceding clip preceding said break event clip to form a display clip and displaying said display clip on a video monitor.

17. System of claim 16 wherein at least one digital converting means is in communication with at least one video camera and at least on digital data storage means is in communication with at least one digital converting means.

18. System of claim 17 wherein on receipt of said deviation event signal at the time of said deviation, said computer control means identifies a video camera proximate to said deviation detector detecting said deviation event, freezes operations of digital memory storage means for such camera, identifies the digitized data segment corresponding to said deviation event by correlating the time of said segment with the time of said deviation event, extracting the deviation event clip which correlates to the time of said deviation event and the preceding clip preceding said deviation event clip and the subsequent clip following said deviation event clip, splicing said deviation event clip, said preceding clip and said subsequent in chronological order to form a display clip and displaying said display clip on said video monitor.

19. System of claim 18 which further comprises:

means for transmitting process data from the distributive control system with said break event signal;

library means for storage of display clips and associated process data; and

means for accessing said display clips and process data stored in said library.

20. System of claim 16 wherein said event is selected from the group consisting of a break in said web, a hole in said web and a change in a surface characteristic of said web.

21. A monitoring system for continuously monitoring a process comprising:

a plurality of monitoring means for continuously monitoring a pre-determined characteristic of the process and collecting monitored data, each monitoring means addressing a different location of interest of said process, and capable of monitoring and collecting real time date relative to said location;

data converting means for converting said collected data into digitized data;

digital data storage means for storing segments of said digitized data, and each of said segments comprised of one or more digitized data clips, said segments and said clips of predetermined lengths which cover the operations of said process over a predetermined period of time, said digitized data segments being stored such that as new digitized data is stored in said system, earlier prior stored digitized data in said segment is removed from said segment to maintain said segment at or about said pre-determined length; and

at least one computer in communication with said digital data storage means, and configured to extract a deviation digitized data from one or more of said segments of digitized data after receipt of a signal of a deviation from said predetermined characteristics, and further configured to display said extracted deviation digitized data.

22. System of claim 21 wherein said digital data storage means in selected from the group consisting of a computer hardware, tape, diskette, CD ROM, magnetic optical drive, solid state memory, flash memory and optical drive.

23. System of claim 21 wherein said monitoring means is one or more video cameras.

24. System of claim 23 wherein said process is for the manufacture of a product.

25. System of claim 24 wherein said product comprises a continuous web of paper.

26. System of claim 25 wherein said process is for printing said web of paper.

27. System of claim 25 wherein said process is for manufacturing said web of paper.

28. System of claim 25 wherein said predetermined characteristic is a characteristic of said web.

29. System of claim 28 wherein said predetermined characteristic is continuity of said web.

30. System of claim 29 wherein said deviation is a break or hole in said web.

31. System of claim 28 wherein said system further comprises one or more deviation detectors for monitoring said predetermined characteristics and for detecting deviations therefrom.

32. System of claims 28 where in said monitoring means and said deviation detectors are combined in said video camera.

33. System of claim 28 wherein each of said monitoring means and said data converting means are combined in a digital camera.

34. System of claim 28 wherein said deviation signal comprises the time, location or time and location of said detected deviation.

35. System of claim 21 wherein said system further comprises one or more deviation detectors for monitoring said predetermined characteristics and for detecting deviations therefrom.

36. System of claim 35 wherein said monitoring means and said one or more detectors are combined in said video cameras.

37. System of claim 21 wherein said deviation signal comprises the time, location or time and location of said detected deviation.

38. A monitoring system for continuously monitoring a process for the manufacture of a product comprising a continuous web of paper, said system comprising:

a plurality of monitoring mean comprising a plurality of video cameras for monitoring a predetermined characteristic of the process and collecting monitored data, said cameras addressing locations of interest of said process and said cameras for producing video images relative to said locations;

digital data converting means for converting said video images into digitized video signals;

US 6,211,905 B1

13

digital data storage means for receiving said digitized video signals and for storing segments of said digitized video signals, said segments which cover the operations of said process over a predetermined period of time, said digitized video signals being stored such that as new digitized video signals are stored in a segment, earlier prior stored digitized video signals in said segment are removed from said segment to maintain said segment at or about a predetermined length; and

at least one computer in communication with the digital data storage means, and configured to receive a deviation signal in the event of a deviation from said predetermined characteristics and to extract a deviation digitized video signal from at least one of the segments of digitized video signals after the deviation signal is received, and further configured to display the extracted deviation digitized video signal.

39. System of claim 38 wherein said system further comprises a plurality of deviation detectors configured to detect a deviation from the predetermined characteristic and to transmit a deviation signal indicating the detected deviation to said at least one computer.

40. System of claim 38 wherein said system further comprises one or more video monitors for displaying an image defined by the extracted deviation digitized video signal and wherein at least one computer is further configured to control the display of the image on at least one of said one or more video monitors.

41. System of claim 38 wherein said deviation is a break or hole in said web.

42. System of claims 38 where in said deviation signal comprises the time, location or time and location of said detected deviation.

43. A monitoring system for continuously monitoring a process for the manufacture of a product comprising a continuous web of paper, said system comprising:

a plurality of video cameras positioned at locations of interest in the process and configured to produce video

14

images of the locations of interest so to monitor a predetermined characteristic of the process;

at least one digital data converter in communication with the plurality of video cameras and configured to convert the video images into digitized video signals;

at least one digital data storage device in communication with the at least one digital data converter and configured to receive and store the digitized video signals as segments so that as new digitized video signals are added, earlier prior stored digitized video signals are removed in order to maintain the segments at or about a predetermined length; and

at least one computer in communication with the at least one digital data storage device and the plurality of deviation detectors, and configured to extract a deviation digitized video signal from at least one of the segments of digitized video signals after the deviation signal is received, and further configured to transmit the extracted deviation digitized video signal for display.

44. System of claim 43 wherein said system further comprises a plurality of deviation detectors configured to detect a deviation from the predetermined characteristic and to transmit a deviation signal indicating the detected deviation to said at least one computer.

45. System of claim 43 wherein said system further comprises one or more video monitors for displaying an image defined by the extracted deviation digitized video signal and wherein at least one computer is further configured to control the display of the image on at least one of said one or more video monitors.

46. System of claim 43 wherein said deviation is a break or hole in said web.

47. System of claim 43 wherein said deviation signal comprises the time, location or time and location of said detected deviation.

*     *     *     *     *

# Exhibit 8

DEPOSITION OF JAMES DECHMAN
CONDUCTED ON FRIDAY, JUNE 13, 2008

66

BY MR. ADAMS:

Q    Okay.  And what's the purpose of Kobayashi

Ventures as a business entity?

A    Kobayashi primarily is in the management of

technology and patents.

Q    Okay.  And I believe you testified earlier

that Kobayashi, I mean, that you and Mr. John Fiore

each own 50% of Kobayashi; is that correct?

A    Yes.

Q    How did you come up with the name

Kobayashi?

A    Actually Kobayashi is -- it's a name in a

movie that we enjoyed, so we used it.

Q    A name in a movie?

A    Yes.

Q    Which movie?

A    "The Usual Suspects."

Q    I take it Kobayashi doesn't have any formal

Japanese affiliations --

A    No.

Q    -- is that correct?  Okay.

Are there any written agreements between

111

t as phrased.

BY MR. ADAMS:

    Q   Well, based on your own knowledge, Mr. Dechman, at this point without regard to where you got it, what was the reason that the license went from International Paper to Jacklin before it went to Kobayashi?

    A   Again, as I said, I relied on our attorney to guide that structure.

    Q   Is Jacklin & Associates still in existence?

    A   To my knowledge, yes.

    Q   Okay.  Where is it located?

    A   I believe it's located in Pennsylvania.

    Q   Do you know where in Pennsylvania?

    A   To the best of my knowledge it's in the Philadelphia area.

    Q   Okay.  Did Kobayashi pay Jacklin & Associates anything for the transfer of the license from Jacklin to Kobayashi?

    A   Yes.

    Q   How much did it pay?

    A   Kobayashi paid Jacklin, I believe, $80,000.

Case 1:07-cv-01080... DEPOSITION OF JAMES DECHMAN - 6/13/08 Document 31-6 Filed 09/03/2008 Page 4 of 4
***CONFIDENTIAL PORTION ONLY***

112

Q    And do you know how much, if anything, cklin paid International Paper for the transfer of e license from International Paper to it?

A    To my knowledge they paid $75,000.

Q    So Jacklin & Associates paid International paper $75,000 to acquire the license, correct?

MS. BOURGERIE:  Objection to form.

THE WITNESS:  Jacklin entered into an agreement -- to the best of my knowledge, Jacklin entered into an agreement with International Paper. That agreement contains many provisions of which the cash transfer up front, I believe, was $75,000.

BY MR. ADAMS:

Q    Okay.  And then Kobayashi paid Jacklin $80,000 to acquire it from Jacklin, correct?

MS. BOURGERIE:  Objection to form.

THE WITNESS:  Kobayashi entered into an agreement with Jacklin that had several provisions, and one of those provisions was to pay $80,000 up front to Jacklin.

BY MR. ADAMS:

Q    Does Kobayashi have any existing

# Exhibit 9

## STEIN, SPERLING, BENNETT, DE JONG, DRISCOLL & GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND  20850-2204

www.steinsperling.com

TELEPHONE (301) 340-2020

WRITER'S DIRECT DIAL
(301) 838-3210

WRITER'S DIRECT FAX
(301) 354-8110

WRITER'S E-MAIL ADDRESS
jschwaber@steinsperling.com

FRED A BALKIN*
MEL LAID S BENNETT*
ALEXIA KENT BOURGERIE*
DAVIDS DE JONG*
JOLLES DEUTSCHMAN*
DAVID C DRISCOLL, JR *
STUARTS GREENFEIG*
ANN C JAKABCIN*
JEFFREY M SCHWABER*
DARCY A SHOOP*
DONALD N SPERLING*
PAUL T STEIN*

MD , DC , VA , FL *
MD , DC , VA  NY *
MD , DC , PA , NJ *
MD , DC , VA *
MD , DC , NY *
MD , VA , NC *
MD , DC *
MD  ONLY*

RONALD M  BOLT*
E ANDREW COLE*
JAMES W. DAWSON, JR.*
BRIAN R DELLA ROCCA*
FRANK W. DUNHAM, III*
JEFFREY FENSTER*
ROBERT J. GARAGIOLA*
MELIHA PÉREZ HALPERN*
MONICA G. HARMS*
JONATHAN F. LIEBERMAN*
IVONNE C. LINDLEY*
MARY CRAINE LOMBARDO*
DARLA J. MCCLURE*
DEANNA L PETERS*
DIEGO J. ROJAS*
DAVID A. ROSEN*
KAREN N. SHAPIRO*

OF COUNSEL:
KEVIN P. FAY*
ALAN S. KERXTON*
SUE ANN MAHAFFEY*
BETH McINTOSH IRVING*
DAVID R. PODOLSKY*
WILLIAM J. SCOTT*

OUR FILE NUMBER

October 29, 2007

*VIA FEDERAL EXPRESS & FIRST CLASS MAIL*
J. Addison Bell
Chief Executive Officer
Carotek, Inc.
700 Sam Newell Road
P.O. Box 1395
Matthews, NC  28106

RE:    *Royalty Payments due to Kobayashi Ventures*

Dear Mr. Bell:

This law firm has been engaged to represent Kobayashi Ventures, LLC, assignee of all right, title and interest of Champion International Corporation pursuant to that certain License Agreement between your company and Champion dated December 8, 1998 (the "Agreement").  Kobayashi is in the process of assessing and pursuing its claims arising, inter alia, out of that Agreement and out of the patent rights associated with the proprietary process monitoring system referenced therein.

Please provide me within ten (10) days of the date of this letter with a copy of your most recent license agreement with Champion International Corporation, along with an accounting of any and all payments made by your company either pursuant to the Agreement or otherwise as a result of your use of the proprietary process monitoring system and related technology as referenced therein.  To the extent you have not already done so, please provide promptly the minimum guaranteed annual fees set forth in Paragraph 3.4 of the license agreement for each of the years since the execution of that agreement. These funds should be made payable to Kobayashi Ventures, LLC, and remitted to my attention within the same ten (10) day period delineated above.  Upon receipt of the minimum royalty payments, we will apply those sums to your company's account, which will more fully be assessed upon receipt of the documents requested herein.

# Exhibit 10

# STEIN, SPERLING, BENNETT, DE JONG, DRISCOLL & GREENFEIG, P.C.

### ATTORNEYS AT LAW
### 25 WEST MIDDLE LANE
### ROCKVILLE, MARYLAND 20850-2204

www.steinsperling.com

TELEPHONE (301) 340-2020

WRITER'S DIRECT DIAL
(301) 838-3210

WRITER'S DIRECT FAX
(301) 354-8110

WRITER'S E-MAIL ADDRESS
jschwaber@steinsperling.com

FRED A BALKIN•
MILLARD S. BENNETT•
ALEX LA KENT BOURGERIE•
DAVID S. DE JONG•
JOLIE S. DEUTSCHMAN•
DAVID C DRISCOLL, JR •
STUARTS GREENFEIG•
ANN G JAKABCIN•
JEFFREY M SCHWABER•
DARCY A. SHOOP•
DONALD N. SPERLING• '
PAUL T STEIN•

MD. DC. VA. FL •
MD. DC. VA. NY •
MD. DC. PA. NJ •
MD. DC.. VA.•
MD. DC. NY •
MD. VA.. NC.•
MD. DC.•
MD. ONLY'

RONALD M BOLT•
E. ANDREW COLE•
JAMES W. DAWSON, JR•
BRIAN R. DELLA ROCCA•
FRANK W. DUNHAM, III•
JEFFREY FENSTER•
ROBERT J GARAGIOLA•
MELINA PÉREZ HALPERN•
MONICA G HARMS•
JONATHAN F. LIEBERMAN•
IVONNE C LINDLEY•
MARY CRAINE LOMBARDO•
DARLA J MCCLURE•
DEANNA L. PETERS•
DIEGO J. ROJAS•
DAVID A. ROSEN•
KAREN N. SHAPIRO•

OF COUNSEL.
KEVIN P. FAY•
ALAN S. KERXTON•
SUE ANN MAHAFFEY•
BETH McINTOSH IRVING•
DAVID R PODOLSKY•
WILLIAM J. SCOTT•

OUR FILE NUMBER
2071656-1

November 9, 2007

***VIA FEDERAL EXPRESS***
Joe C. Young
Joe C. Young, P.A.
1515 Mockingbird Lane, Suite 520
Charlotte, NC 28209

RE:  *Royalty Payments due from Carotek, Inc. to Kobayashi Ventures*

Dear Mr. Young:

This law firm represents Kobayashi Ventures, LLC with regard to its claim against your client Carotek, Inc. I am receipt of an October 31, 2007 letter from J. Addison Bell on behalf of Carotek, Inc. in response to my letter dated October 29, 2007. I have enclosed Mr. Bell's letter as well as my October 29, 2007 letter for your convenient reference. Mr. Bell indicated he was leaving the country for a few weeks, but also indicated that he had referred the matter to you as his counsel. In light of the fact that you now have this matter and presumably have had a chance to review the referenced Agreement, I would appreciate hearing from you promptly regarding the issues raised in my letter. Of particular importance is the need to bring current the arrearage on the minimum royalty payments set forth in the Agreement.

To the extent for some reason you need to wait for Mr. Bell's return to the country, please let me know what is that reason as well as when specifically he is expected to return.

# Exhibit 11

FILED

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

KOBAYASHI VENTURES, LLC                :
12587 Fair Lakes Circle, Suite 308
Fairfax, VA  22033,                    :

      Plaintiff                       :

      v.                              :    CA No. 2:07CV612

PAPERTECH INC.                         :    JURY TRIAL DEMANDED
108 – 245 Fell Avenue
North Vancouver, B.C., Canada,         :    **COMPLAINT**

      Serve:  Kari K.  Hilden       :

      Defendant.                      :


### INTRODUCTION

This is an action brought by Kobayashi Ventures, LLC ("Kobayashi Ventures") for

patent infringement arising under the patent laws of the United States, Title 35, United States

Code.  Kobayashi Ventures exclusively owns, among other things, three U.S. patents and a

variety of foreign patents that relate to the invention(s) of synchronizing cameras to the speed of

a moving web.  Defendant Papertech Inc. ("Papertech") willfully and materially has infringed

upon such patents belonging to Kobayashi Ventures ("Kobayashi's Patented Technology,"

detailed in ¶ 6 below).

Kobayashi's Patented Technology has been pivotal in the web monitoring industry and its

direct customers, the paper, plastics and printing industries—facilitating digital monitoring and

capturing of events during the manufacturing process to increase production efficiencies.

Kobayashi's Patented Technology has accomplished that which previously had not been

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE: 301 340-2020

possible, enabling the production of higher quality product at great savings to manufacturers and ultimately to consumers. With conscious disregard for the patent laws of the United States of America and of Kobayashi's Patented Technology, Papertech has been violating U.S. patent laws and the legal rights of Kobayashi Ventures, among others. In this Complaint, Kobayashi Ventures seeks necessary injunctive relief and legal damages in its favor and against Papertech.

## PARTIES

1.    Kobayashi Ventures is a limited liability company organized and existing under the laws of the State of Delaware with an office located in the Commonwealth of Virginia. The business of Kobayashi Ventures is to manage, market, consult, develop, manufacture, create, own, distribute, purchase, sell and/or license patents and other intellectual property.

2.    Papertech is a corporation organized and existing under the laws of the Canada with its principal place of business in North Vancouver, B.C., Canada, and sales and service offices and operations in the United States of America. Papertech provides systems and equipment used in the production of paper and other products and touts itself as a market leader committed to the development of the paper industry's leading event capturing camera systems. These systems in fact incorporate and rely on Kobayashi's Patented Technology.

## JURISDICTION AND VENUE

3.    Jurisdiction is based on 28 U.S.C. §§ 1331 and 1338(a) and 35 U.S.C. § 281.

4.    This Court has personal jurisdiction over Papertech because Papertech conducts business in the Commonwealth of Virginia, has availed itself of the rights and benefits of Commonwealth law, and has engaged in substantial and continuing contacts with and within the Commonwealth.

5.    Venue is proper under 28 U.S.C. §1391 and 28 U.S.C. 1400(b).

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

## FACTUAL ALLEGATIONS

6.    On or about December 10, 2007, by written assignment executed and delivered by Jacklin Associates, Inc. to Kobayashi Ventures, Kobayashi Ventures became, and now is, the owner, *inter alia*, of all right, title, and interest in and to such letters patent (previously and hereinafter referenced as "Kobayashi's Patented Technology"), having the exclusive right to make, use, sell, offer for sale, and import into the U.S. the following inventions:

> U.S. Patent No. 5,717,456
> U.S. Patent No. 5,821,990
> U.S. Patent No. 6,211,905
> Australian Patent Application No. 38274/95
> Brazilian Patent Application No. PI 9510548-4
> Chilean Patent Application No. 1898-95
> Finnish Patent Application No. 973611
> Indonesian Patent Application No. P952441
> Japanese Patent Application No. 8-526826
> South Korean Patent Application No. 1997-706231
> Malaysian Patent Application No. PI9703058
> Mexican Patent Application No. 976703
> New Zealand Patent Application No. 295027
> Norwegian Patent Application No. 974012
> South African Patent Application No. 95/9613
> Canadian Patent Application No. 2,214,724

Attached hereto as <u>Exhibit 1</u> and incorporated herein by reference is the Patent Assignment.  Such Patent Assignment was recorded in the Patent and Trademark Office on December 11, 2007 at Reel/Frame 020218/0844.

7.    On or about October 19, 2007, by written assignment executed and delivered by International Paper Company ("International Paper") to Jacklin Associates, Inc., Jacklin Associates became the owner, *inter alia*, of all right, title, and interest in and to such letters patent (identified in ¶ 6 above), then having the exclusive right to make, use, and sell Kobayashi's Patented Technology.  Attached hereto as <u>Exhibit 2</u> and incorporated herein by reference is the Patent Purchase Agreement, Exhibit D of which is the Assignment of Patent

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

3

Rights. Such Assignment of Patent Rights was recorded in the Patent and Trademark Office on December 11, 2007 at Reel/Frame 020218/0823.

8.    International Paper became the owner of all right, title, and interest in and to such letters patent (identified in ¶ 6 above) by virtue of assignment from each of the inventors to its predecessor company Champion International Corporation ("Champion"), which became International Paper through a merger. The inventors' assignment was executed March 2, 1995 and recorded in the Patent and Trademark Office on March 6, 1995 at Reel/Frame 007382/0557, and the merger document was executed December 31, 2000 and recorded in the Patent and Trademark Office on November 26, 2007 at Reel/Frame 020143/0440.

9.    On or about November 12, 1998, Papertech entered into a License Agreement with Champion, acquiring patent rights to what is now known as Kobayashi's Patented Technology. Attached hereto as <u>Exhibit 3</u> and incorporated herein by reference is the License Agreement.

10.    On July 31, 2000, Papertech made a five percent (5%) royalty payment under the above referenced License Agreement of $21,084.54, on $468,545.48 of sales, of which $274,362 were to the acquiring owner International Paper. Attached hereto as <u>Exhibit 4</u> and incorporated herein by reference is documentation of such payment.

11.    On August 23, 2000, Richard Stewart, Chief Counsel—Intellectual Property Department of International Paper (formerly of Champion) sent a letter to Papertech by its General Manager, Kari Hilden offering a "fully paid up license under the lump sum payment terms of the Honeywell-Measurex license" for the sum of $1.13 million. Attached hereto as <u>Exhibit 5</u> and incorporated herein by reference is this letter.

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301 340-2020

4

12.    In a letter dated September 27, 2000, Papertech by its General Manager, Kari Hilden, allegedly sent a letter to Richard Piela of Champion, "Subject:  Termination of the License Agreement between Champion International Corp. ("Champion") and PT Papertech Inc. ("Papertech")" which claimed termination effective thirty (30) days after receipt by International Paper "as per the agreement Article 16."  Attached hereto as <u>Exhibit 6</u> and incorporated herein by reference is this letter.

13.    On August 23, 2004, Papertech by its General Manager E. Michael Heaven sent a letter to Richard Stewart, Chief Counsel—Intellectual Property Department International Paper. Papertech's letter was in response to a July 16, 2004 letter from International Paper demanding royalty payments under the License Agreement.  In this letter, Papertech claimed, "That agreement was terminated several years ago . . ."  Attached hereto as <u>Exhibit 7</u> and incorporated herein by reference is this letter.

14.    Section 16.5 of the License Agreement states in pertinent part, "in the event that this Agreement is terminated pursuant to Paragraph 16.2, LICENSEE shall immediately cease the design, manufacture, sale and installation of CV2 System, except where such design, manufacture, sale, installation, license or lease would not infringe a claim of Patent Rights which as not been held invalid in a final unappealable judgment of a court of competent jurisdiction." This section of the License Agreement makes it abundantly clear that Papertech proactively was given an effective actual notice of infringement by way of termination of the License Agreement, if it chose to continue to make, cause to be made, used, sold, and offered for sale products embodying the Kobayashi Patented Technology.

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

15.     After termination of the License Agreement, Papertech continued and continues to this day to make, causes to be made, uses, sells, and offers for sale products embodying Kobayashi's Patented Technology.

16.     A number of times, including the above mentioned August of 2004 letter and thereafter on or about November 1, 2007, International Paper and Kobayashi Ventures, respectively, notified Papertech in writing of its failure to make royalty payments and thereby its infringement of Kobayashi's Patented Technology.

17.     Papertech has responded, including on November 6, 2007, stating in pertinent part that it had "no knowledge of a license agreement or any other agreement with Champion International Corporation including in particular, any agreement dated November 12, 1998."

18.     Most recently, on or about November 27, 2007, Kobayashi Ventures provided to Papertech additional written notice of its patent infringement.  Attached hereto as <u>Exhibit 8</u> and incorporated herein by reference is the written notice of infringement.

19.     In summary, Papertech's actions include the following:

   o  1998:  Entered into the License Agreement;

   o  1998 to License Agreement termination:  Failed to pay all royalties due under the License Agreement;

   o  2000:  Attempted to unilaterally terminate the License Agreement but failed to give proper notice;

   o  2000 to present:  Willfully infringed upon Kobayashi's Patented Technology;

   o  2004:  Ignored requests for payment to International Paper due under the License Agreement prior to termination;

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

- 2007:  Denied ever having been a party to the License Agreement;

- 2001 to present:  Evaded payment of an estimated $750,000 in royalties;

- 2001 to present:  Benefited to the detriment of the licensees who have paid nearly $2,250,000 in royalties from an unfair advantage in the marketplace by its willful infringement of Kobayashi's Patented Technology; and

- 2001 to present:  Through its willful infringement has gained market share to the detriment of its competitors, growing from less than ten percent (10%) to an estimated thirty percent (30%) of market sales.

20.    Through its actions such as those identified hereinabove, Papertech willfully has infringed upon Kobayashi's Patented Technology.

21.    Further, at all times relevant hereto, Papertech has been obligated, among other things, to mark on its products and integrated systems which use Kobayashi's Patented Technology the words, "U.S. Patent(s) [and the number(s) of the patent rights applicable thereto]" or such other patent marking as Papertech reasonably may have been directed from the then holder of Kobayashi's Patented Technology.  Upon information and belief Papertech consistently has failed to do so.

22.    Since about September 27, 2000, Papertech has, with full knowledge of the ownership by others identified above, of Kobayashi's Patented Technology, infringed upon

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

Kobayashi's Patented Technology within the judicial district of this Court and elsewhere by engaging in conduct such as the following:

        (a)     making, causing to be made, using, selling, and offering for sale, without marking, license, permission and/or payment, products such as the following:

WebVision and WebVison Plus
WebInspector
PerfectVison

These products among others, marketed and sold by Papertech, embody Kobayashi's Patented Technology; and

        (b)     actively inducing and causing others (i) to induce manufacturers and owner operators of such products to make, cause to be made, use, sell, and offer for sale products which embody Kobayashi's Patented Technology, without marking, license, permission, and/or payment, and/or (ii) to modify such products so that they embody Kobayashi's Patented Technology.

23.     Papertech will continue its acts of infringement unless enjoined by this Court. At the least, Papertech should be immediately barred from the continued use of technology it admittedly agreed to license under the License Agreement subsequently terminated.

24.     Since Papertech's "termination" in September of 2000, Papertech by its own admission has installed over 250 WebVision systems in twenty four (24) countries worldwide. It has utilized a network of over twenty-five (25) distributors, third-party representatives and licensees to further its misappropriation of Kobayashi's Patented Technology. Unknowingly, these middlemen and the end customers who have purchased the systems have become unwitting accomplices to Papertech's willful infringement as Papertech has induced these parties into

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

believing that Kobayashi's Patented Technology incorporated into the Webvision system has been appropriately licensed, paid for and marked.

25.     Absent entry of an injunction, the rights of the web monitoring industry and its direct customers, the paper, plastics and printing industries, likely will be irreparably harmed. Specifically, failure to provide to Kobayashi Ventures the equitable relief requested herein would allow Papertech to force its unfair advantage upon the marketplace as Papertech's competitors are under a royalty fee obligation.  If Papertech's infringement effectively were to be condoned by not granting to Kobayashi Ventures the equitable relief sought herein, then Papertech will continue to gain market share at the expense of its royalty paying competitors and use its infringement to further its unfair competitive advantage.  Such unfair competitive advantage would be harmful to the web monitoring industry as a whole, to the paper, plastics and printing industries, and to Kobayashi Ventures and the licensees of Kobayashi's Patented Technology.

26.     Remedies available at law are inadequate to compensate for an injury such as that described in herein.

27.     The balance of hardships between Kobayashi Ventures and Papertech, warrants granting to Kobayashi Ventures an equitable remedy.  Denying the legitimate royalty paying operators in the web monitoring industry and Kobayashi Ventures the equitable relief sought herein will cause Kobayashi Ventures to suffer additional immediate and real irreparable harm. This is due to the fact that for example there are multiple pending web monitoring projects up for competitive bid at this time.  A failure to grant the equitable relief sought herein would amount to a tacit consent allowing Papertech to win business at the expense of the other legitimate royalty paying bidders.  Papertech should not be purporting to legitimately bid on these contracts since it lacks a valid license to Kobayashi's Patented Technology.  Granting to Papertech not

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850
TELEPHONE 301/340-2020

9

only the ongoing ability to bid but also the ongoing ability to benefit from a significant pricing advantage as a direct result of its ill-gotten price disparity would be doubly damaging to the market. The resulting damage to the web monitoring industry and its customers would be impossible to reverse after the fact, given that the legitimate winning bid amount and bidder would be indeterminate and the well poisoned. In contrast, granting the limited equitable relief sought simply would place Papertech in the rightful position it chose to be in after September 27, 2000, had it legitimately terminated the License Agreement, paid all past due royalties and immediately ceased the use of Kobayashi's Patented Technology. But as we now know, Papertech instead chose to willfully and flagrantly take that which does not belong to it, and absent the relief sought, Papertech would continue to profit from its theft at the expense of the legitimate licensees and customers in the web monitoring industry.

28.    For reasons described hereinabove, the public interest would be well served by granting to Kobayashi Ventures the equitable relief sought herein. The very purpose of the United States Patent and Trademark Office as well as the statutory scheme governing intellectual property rights throughout the United States of America will be threatened if companies are permitted to misappropriate protected, patented and/or otherwise proprietary technology for themselves without cost or ramification. A denial of the equitable relief sought herein materially would also disserve the public interest in the manner described in ¶¶ 25 and 27 above.

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

## COUNT I
### Patent Infringement

29.    Kobayashi Ventures incorporates herein by reference the allegations set forth in ¶¶ 1 through 28 above.

30.    Papertech has committed acts of infringement pursuant to 35 U.S.C. § 271, including without authority, making, using, offering to sell, and/or selling Kobayashi's Patented Technology.

31.    Papertech's patent infringement proximately has caused and continues to cause Kobayashi Ventures to sustain damages, and Kobayashi Ventures is threatened with the injury described and inferred from the allegations herein.

## COUNT II
### Patent Infringement (Inducement)

32.    Kobayashi Ventures incorporates herein by reference the allegations set forth in ¶¶ 1 through 28 above.

33.    Papertech has committed acts of infringement pursuant to 35 U.S.C. § 271, including without authority, actively inducing and causing others (i) to induce manufacturers and owner operators of such products to make, cause to be made, use, sell, and offer for sale products which embody Kobayashi's Patented Technology, and/or (ii) to modify such products so that they embody Kobayashi's Patented Technology.

34.    Papertech's patent infringement proximately has caused and continues to cause Kobayashi Ventures to sustain damages, and Kobayashi Ventures is threatened with the injury described and inferred from the allegations herein.

* * *

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301-340-2020

WHEREFORE, Plaintiff, Kobayashi Ventures, L.L.C. respectfully requests that this Honorable Court grant to it the following relief:

a.      a preliminary injunction followed by a permanent injunction (i) enjoining Papertech from engaging in patent infringement as detailed in this Complaint, (ii) enjoining Papertech from inducing others to engage in patent infringement as detailed in this Complaint, and (iii) mandating that Papertech provide immediate written notice of the infringement to customers to whom Papertech has sold products and/or systems containing Kobayashi's Patented Technology;

b.      an interim order mandating Papertech to escrow five (5%) percent of the net sales price of all products and systems it has at any time sold which use Kobayashi's Patented Technology, including pre-judgment interest calculated from the date of sale to present at the applicable prime interest rate(s);

c.      an order requiring Papertech to account for and pay to Kobayashi Ventures damages for patent infringement, including interest on damages;

d.      treble damages pursuant to 35 U.S.C. § 284;

e.      an order granting to Kobayashi Ventures costs and reasonable attorneys' fees to be assessed against Papertech, particularly in view of ongoing, willful infringement; and

f.      such other and further relief which the Court deems just and proper.

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

STEIN, SPERLING, BENNETT, DE JONG,
DRISCOLL & GREENFEIG, P.C.


By:    *Jeffrey M. Schwaber /dep*
       Jeffrey M. Schwaber
       (Federal Bar No. 35466)
       25 West Middle Lane
       Rockville, Maryland 20850
       Telephone: (301) 340-2020
       Facsimile: (301) 354-8110

       Attorneys for Kobayashi Ventures, LLC


## DEMAND FOR JURY TRIAL

Kobayashi Ventures, LLC elects a trial by jury of all issues and claims in this action.


                              *Jeffrey M. Schwaber /dep*
                              Jeffrey M. Schwaber

L:\CLIENTS\K\Kobayashi Ventures.LLC\Papertech.007\146.complaint.12.27.07.final.doc

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

13

# Exhibit 12

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

| | | |
|---|---|---|
| KOBAYASHI VENTURES LLC | ) | |
| | ) | |
|     Plaintiff, | ) | |
| v. | ) | Case No. 2:07CV612-RGD-TEM |
| | ) | |
| PAPERTECH INC. | ) | |
| | ) | |
|     Defendant. | ) | |

**BRIEF IN SUPPORT OF PT PAPERTECH INC.'S MOTION TO DISMISS FOR
LACK OF PERSONAL JURISDICTION PURSUANT TO FEDERAL RULE OF
CIVIL PROCEDURE 12(B)(2), OR IN THE ALTERNATIVE, MOTION TO
TRANSFER VENUE PURSUANT TO 28 U.S.C. § 1406**

Defendant PT Papertech Inc. (erroneously named and sued as "Papertech Inc." and referred to herein as "Papertech") moves this Court, pursuant to Federal Rule of Civil Procedure 12(b)(2), for an order dismissing the Complaint because this Court does not have personal jurisdiction over Papertech. In the alternative, Papertech requests that the Court enforce the forum and venue selection clause in the License Agreement at issue here and transfer this case to the United Stated District Court for the Southern District of New York pursuant to 28 U.S.C. § 1406.

**I.**

**INTRODUCTION**

Plaintiff Kobayashi Ventures LLC ("Kobayashi") filed this lawsuit against Papertech alleging that Papertech is liable to Kobayashi for infringing patents purportedly now owned by Kobayashi. The Court should, however, dismiss this lawsuit because: (1) Papertech's contacts with Virginia are insufficient to establish either general or specific jurisdiction under the Due Process Clause given that, among other reasons, Kobayashi does not have the right to sue for allegedly infringing activity occurring prior to December 10, 2007, and consequently, Kobayashi's claims *cannot* arise out of Papertech's minimal contacts with Virginia, all of which

occurred before that date; and (2) personal jurisdiction over Papertech based upon Federal Rule

of Civil Procedure 4(k)(2) does not exist since Papertech is subject to jurisdiction in New York,

as evidenced by the forum and venue selection clause memorialized in the license agreement,

entered into by Papertech with the prior owner of the patents-in-suit, (hereafter the "License

Agreement"), Complaint ("Comp."), ¶9, at issue in this case.  Therefore, Papertech is not

subject to personal jurisdiction in Virginia, and the Court should grant Papertech's motion to

dismiss.

In the alternative, Papertech requests that the Court enforce the forum and venue

selection clause contained within the License Agreement and transfer this case to the United

Stated District Court for the Southern District of New York.  The Complaint arises out of the

License Agreement because Kobayashi alleges that Papertech "[f]ailed to pay all royalties due

under the License Agreement" and that Papertech "failed to give proper notice" of termination

of the License Agreement.  Comp., ¶19.  Paragraph 27 of the Complaint places in issue whether

Papertech "legitimately terminated the License Agreement," and paragraph 14 of the Complaint

quotes from and relies upon a provision of the License Agreement.  In addition, the prayer for

relief seeks an interim order placing in escrow 5% of Papertech's net sales "of all products and

systems it has *at any time* sold," which is the same percent of the Royalty payments required

under the License Agreement. (emphasis added). *See also* Comp., ¶10.  Moreover, the License

Agreement is attached as Exhibit 3 to the Complaint and is incorporated into the Complaint by

reference.  Comp., ¶9.  Kobayashi specifically brings into issue the validity and terms of the

License Agreement, and whether Papertech breached the License Agreement by failing to pay

all royalties due.  Accordingly, this case involves a controversy or claim arising out of or

relating to the License Agreement, or a breach thereof, and should have been brought in New

York in accordance with the forum and venue selection clause in the License Agreement.

## II.

## STATEMENT OF FACTS

**A.   Contractual Relationships Between the Parties and Third Party Corporations**

Kobayashi, which appears to be merely a holding company, filed the instant lawsuit alleging that certain Papertech products infringe patents purportedly owned by Kobayashi. Comp., ¶ 6. These patents were originally owned by Champion International Corporation ("Champion"). Champion granted non-exclusive licenses to use these patents (collectively referred to herein as the "Champion patents") to various companies, including Papertech. Through a series of purchase agreements and patent assignments, the Champion patents are now purportedly owned by Kobayashi.

**1.   License Agreement between Papertech and Champion/International Paper**

The Complaint alleges that Papertech entered into a License Agreement with Champion on or about November 12, 1998. Comp., ¶9. Under the License Agreement, Champion granted Papertech the non-exclusive right to make, use, and sell the patented subject matter of the Champion patents at issue in this case. *See* Comp., Ex. 3. The License Agreement contained the following forum and venue selection clause, which dictates that any suit arising out of or related to the License Agreement be filed in New York:

> 18.1   This Agreement shall be construed and the legal relations between the parties shall be determined, in accordance with the laws of the State of New York, without recourse to the conflicts of laws of said State which would direct the use of laws of another jurisdiction. *Any suit* brought by either party against the other party *on the basis of any controversy or claim arising out of or relating to this Agreement or a breach thereof shall be brought in the United States District Court for the Southern District of New York*, and, if the United States District Court declines jurisdiction for any reason, then in the Supreme Court First Department State of New York. *The Parties hereby consent to the personal jurisdiction of the courts* and hereby designate the Secretary of State of the State of New York for receipt of service of process.

*See* Comp., Ex. 3, ¶18.1 (emphasis added).

3

### 2. Plaintiff Allegedly Acquired Title to the Patents on December 10, 2007

The Complaint alleges a series of transactions by which Kobayashi allegedly acquired title to the Champion patents. According to the Complaint, International Paper Company ("International Paper") acquired Champion as a result of a merger executed on December 31, 2000, and thereby became the owner of the Champion patents. Comp., ¶ 8. Jacklin Associates, Inc. ("Jacklin") thereafter allegedly acquired title to the Champion patents on or about October 19, 2007, as a result of a Patent Purchase Agreement between International Paper and Jacklin. The Patent Purchase Agreement indicates that the License Agreement with Papertech was also assigned to Jacklin. *See* Comp., Ex. 2. International Paper expressly granted Jacklin the right to all causes of action and enforcement rights related to the patents, including remedies for past infringement. Comp., Ex. 2 at Ex. D.

Kobayashi did not acquire title to the Champion patents until December 10, 2007, as a result of an alleged assignment from Jacklin to Kobayashi ("Patent Assignment"). *See* Comp., Ex. 1. Notably, the patent assignment from Jacklin *did not* transfer to Kobayashi the right to sue for damages based on alleged infringement that occurred prior to December 10, 2007. *Id.* Because Jacklin did not expressly grant Kobayashi the right to sue for past infringement, Jacklin continues to retain the exclusive right to sue for infringement occurring prior to December 10, 2007. *See* Comp., Ex. 2.

### 3. The Disputed Termination of Papertech's License Agreement

The Complaint alleges that Papertech sent a termination letter to Champion, dated September 27, 2000, purporting to terminate the License Agreement thirty days after receipt of the letter. Comp., ¶12. This termination letter is attached to the Complaint as Exhibit 6 and is incorporated by reference. The termination letter indicates that Papertech stated that Champion was in breach of the License Agreement. Comp., Ex. 6. The Complaint includes allegations by Kobayashi that the attempted termination by Papertech was ineffective. *See* Comp., ¶19 ("[a]ttempted to unilaterally terminate the License Agreement but failed to give proper notice."); *see also* Comp., ¶27 ("...had [Papertech] legitimately terminated the License Agreement...").

4

Further indicating that Kobayashi regarded the License Agreement as still in effect, Kobayashi alleges that on or about November 1, 2007, Kobayashi Ventures "notified Papertech in writing of its failure to make royalty payments." Comp., ¶16.

Notably, more than seven years have passed since Papertech notified Champion of Papertech's termination of the License Agreement. If Papertech effectively terminated the License Agreement, the fact that Kobayashi's predecessors-in-title knew or should have known of Papertech's alleged infringement for more than six years raises defenses of laches and estoppel. If however Papertech failed to effectively terminated the License Agreement, as alleged by Kobayashi, the License Agreement is a defense to the patent infringement claims. Regardless of the interpretation of these facts, both are fatal to Kobayashi's lawsuit.

**B.** **Prior Litigation Concerning the Champion Patents Pending in New York**

In addition to the License Agreement at issue in this case, Champion entered into a similar license agreement with Carotek, Inc. ("Carotek"). Champion's license agreement with Carotek included the *identical* forum and venue selection clause as that contained within the Papertech License Agreement, in which the parties agreed to personal jurisdiction in New York. On December 11, 2007, Carotek, under threat of having its license agreement terminated by Kobayashi, filed a lawsuit for declaratory judgment against Kobayashi in the United States District Court for the Southern District of New York seeking a finding that, among other things, it had not breached its license agreement with Champion (referred to herein as the "Carotek lawsuit"). Carotek specifically claims is that Kobayashi's predecessors-in-title failed to honor the "most favored license" provision of the Carotek license agreement, whereby, *inter alia*, Carotek was entitled to the benefits of the most favorable royalty terms extended to any other licensee of the Champion patents. The centerpiece of that claim is the fact that Kobayashi's predecessor-in-interest failed to enforce the License Agreement with Papertech, which Carotek was likely unaware had been terminated, thereby removing Papertech's obligation to pay royalties.

5

Notably, Kobayashi did not challenge personal jurisdiction in the Carotek lawsuit. *See* Carotek's Complaint and Kobayashi's corresponding answer and counterclaim attached as Exhibits A and B to the Declaration of J. Rick Taché ("Taché Decl.") filed with this Motion. In the Carotek lawsuit, Carotek claimed, as part of its allegations, that Carotek did not owe any royalties to Kobayashi because Kobayashi, and all of the predecessors in interest in the Champion patents, failed to enforce the royalty provision of the License Agreement against Papertech. Kobayashi filed this lawsuit against Papertech less than two weeks after the Carotek lawsuit was filed.

## C. The Present Lawsuit

On or about December 27, 2007, and presumably in response to Carotek's declaratory judgment action against Kobayashi, Kobayashi filed the instant lawsuit against Papertech alleging that various Papertech products infringe the Champion patents.[1] In its Complaint, Kobayashi seeks both equitable and monetary relief based, in part, on allegations that the License Agreement between Champion and Papertech was never terminated. *See, e.g.,* Comp., ¶19 ("[Papertech] [a]ttempted to unilaterally terminate the License Agreement but failed to give proper notice."). Kobayashi also claims that Papertech's products improperly infringe on the Champion patents.

Kobayashi asserts that jurisdiction is based on 28 U.S.C. §§ 1331 and 1338(a), and 35 U.S.C. § 281. Kobayashi specifically alleges that "this Court has personal jurisdiction over Papertech because Papertech conducts business in the Commonwealth of Virginia, has availed

---

[1] In the interests of cooperation, Papertech waived service of process, which allowed Kobayashi to avoid serving Papertech through the Hague Convention in exchange for various discovery concessions. Papertech waived service on February 6, 2008, and so its response to Kobayashi's Complaint is due on May 6, 2008 pursuant to Fed. R. Civ. P. 12(a)(1)(A)(ii). *See* Correspondence from R. Taché to J. Schwaber dated February 26, 2008, attached as Ex. C to Taché Decl.

itself of the rights and benefits of Commonwealth law, and has engaged in substantial and continuing contacts with and within the Commonwealth." Comp., ¶ 4. Contrary to these assertions, however, Papertech has not purposefully availed itself of the rights and benefits of Virginia law and has not engaged in substantial and continuing contacts with Virginia sufficient to create personal jurisdiction over Papertech in Virginia.

**D.    Papertech's Minimal Contacts with Virginia**

Indeed, Papertech's contacts with Virginia are far from substantial and continuing. Rather, Papertech's contacts with Virginia are more appropriately characterized as sporadic, at best, and do not provide a basis for personal jurisdiction.

More specifically, Papertech is a corporation organized and existing under the laws of the province of British Columbia, Canada, with its principal place of business in Vancouver, British Columbia. Declaration of Michael Heaven ("Heaven Decl.") ¶ 6 (filed with this Motion). At its Vancouver facility, Papertech manufactures a paper process monitoring system known as the WebVision® System. *Id.* at ¶ 7.

Papertech does not take any affirmative steps to seek out contacts with Virginia. For example, Papertech is not licensed to do business in Virginia and does not pay taxes in Virginia. Papertech does not maintain agents, bank accounts, employees, or offices in Virginia. Papertech does not target marketing or advertising to Virginia and does not market its products through a distributor or sales agent in Virginia. Papertech also does not maintain either sales or service offices and operations in Virginia. Indeed, Papertech has no offices, assets, employees, contractors, or representatives of any kind in Virginia. *Id.* at ¶ 8.

Furthermore, Papertech's availability to Virginia residents is typically limited to the following avenues: (1) a generally accessible Canadian website[2]; (2) a toll free phone line through which Virginia residents can call Papertech; and (3) potential exposure to Virginia

---

[2]    Papertech's website – www.papertech.ca -- is registered as a Canadian ".ca" instead of a U.S. ".com".

residents at industry trade shows periodically held in various locations throughout the world. *Id.* at ¶¶ 9-11. All three of these avenues require a Virginia resident to initiate contact with Papertech. Moreover, while Papertech's website can process product information requests, purchases *cannot* be made through the website. In addition, Papertech's website does not focus on potential customers in any specific geographic location. With respect to trade shows, the pulp and paper industry has trade shows all over the world. For example, between October and December 2007, there were thirty two pulp and paper industry trade shows that occurred throughout the world; sixteen of which were in the United States; none were held within the Commonwealth of Virginia. Papertech has *never* attended a trade show in Virginia. *Id.*

Consistent with these facts, Papertech's contacts with Virginia are minimal, at best. Indeed, Papertech has only sold and/or delivered four WebVision® Systems to two companies with facilities in Virginia – Georgia Pacific Corporation ("Georgia Pacific")[3] and Greif Brothers – all of which occurred between July 2000 and July 2007. While Grief Brothers is a Virginia corporation with facilities in Virginia, Georgia Pacific is not, and the sales to Georgia Pacific were made through states other than Virginia. More specifically, Georgia Pacific, which, at all times relevant, was a Georgia corporation, purchased products from Papertech pursuant to a master purchase agreement between the two companies which was signed December 20, 2004 and renewed January 23, 2006. These purchases, made in accordance with the master purchase agreement negotiated with Georgia Pacific's corporate offices in Atlanta and Green Bay, included the purchase of two WebVision® Systems on July 13, 2000 and August 24, 2006 that were ultimately shipped to and installed Georgia Pacific facilities in Virginia. The four WebVision® Systems that have been sold and/or installed in Virginia represent less than one-half of 1% of Papertech's total sales between November 12, 1998 and the present. *Id.* at ¶¶ 12-15.

---

[3]     In 2005, Georgia Pacific was acquired by Koch Industries, Inc., a Kansas corporation. Heaven Decl., ¶ 12. For simplicity sake, the two entities are referred to collectively as "Georgia Pacific" in this Motion.

Moreover, although Papertech warrants its WebVision® Systems, Papertech does not maintain on-going service contracts or maintenance agreements with either Greif Brothers or Georgia Pacific. If either of these two entities experience difficulties with their WebVision® Systems, need to order replacement parts, or require other customer assistance; they are required to contact Papertech's office in Canada for assistance. Since 2002, when Papertech began recording information about customer service calls, Grief brothers and Georgia Pacific (their facilities located in Virginia) have placed only sixteen (16) such calls to Papertech. This number represents a minute fraction of the almost two thousand one hundred (2,100) such calls that have been made to Papertech throughout the world during that same time frame.[4] *Id.* at ¶¶ 16-17.

In short, all of the above facts provide strong support for this Court to dismiss this case based upon a lack of personal jurisdiction. In the alternative, these facts support this Court transferring this case to New York.

### III.

### THIS COURT DOES NOT HAVE PERSONAL JURISDICTION OVER PAPERTECH

When a defendant challenges the court's personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2), the burden is on the plaintiff to prove, by a preponderance of the evidence, that the court may properly exercise jurisdiction over the defendant. *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989). The jurisdictional facts alleged by the plaintiff must not be vague or conclusory, nor may the plaintiff merely extract the language from the Virginia long arm statute and apply it to the defendant. *Id.*

This Court may examine whether personal jurisdiction exists based on either Virginia's long-arm statute or Federal Rule of Civil Procedure 4(k)(2), which is essentially a federal long-arm statute. Here, no personal jurisdiction exists under either statute because (1) Kobayashi

---

[4] Papertech's records indicate that during this time period, it received 2084 service/parts calls from its customers worldwide.

cannot show that general or specific jurisdiction exists to satisfy the Due Process Clause of the Fifth Amendment; and (2) Rule 4(k)(2) does not apply because Papertech is subject to personal jurisdiction in New York.

**A.  Virginia's Long Arm Statute Does Not Convey Jurisdiction Over Papertech**

Virginia's long-arm statute – Va. Code Ann. § 8.01-328.1 – provides the statutory framework for determining whether personal jurisdiction exists over Papertech. Whether personal jurisdiction exists under § 8.01-328.1 is appropriately limited by the bounds of constitutional due process considerations. *See Danville Plywood Corp. v. Plain & Fancy Kitchens*, 218 Va. 533, 534-35 (1977) ("The purpose of our 'long arm statute' is to assert jurisdiction, to the extent permissible under the Due Process Clause of the Constitution of the United States, over non-residents who engage in some purposeful activity in Virginia."). Therefore, in determining whether personal jurisdiction exists over Papertech, this Court must undertake a constitutional due process analysis. *Reynolds & Reynolds Holdings, Inc. v. Data Supplies, Inc.*, 301 F. Supp. 2d 545, 550 (E.D. Va. 2004).

*International Shoe Co. v. Washington*, 326 U.S. 310, (1945), and its progeny set forth the due process framework for determining whether personal jurisdiction exists over a foreign defendant, such as Papertech. In particular, the defendant must have sufficient "minimum contacts" with the forum state so as to not offend "traditional notions of fair play and substantial justice." *International Shoe, supra*, 326 U.S. at 316. Under the "minimum contacts" test, a defendant may be subject to either specific jurisdiction or general jurisdiction. The court can exercise *specific* jurisdiction over the defendant where the cause of action "arises out of" or "relates to" the defendant's contacts with the forum state. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472-73 (1985). A defendant's contacts with the forum must be significantly more extensive before the court can exercise *general* jurisdiction over it as to causes of action not arising out of the defendant's contacts with the forum state. *Helicopteros Nacionales de Colombia, S. A. v. Hall*, 466 U.S. 408, 414-16 (1984).

## 1.    General jurisdiction does not exist

Because Papertech's contacts with Virginia are minimal, at best, this Court does not have general jurisdiction over Papertech.   In order for general jurisdiction to exist, a non-resident's contacts with the forum state must be "continuous and systematic." *Helicopteros, supra,* 466 U.S. at 416; *LSI Industries Inc., v. Hubbell Lighting, Inc.*, 232 F.3d 1369, 1375 (Fed. Cir. 2000).   Neither the Supreme Court nor the Federal Circuit has established a specific test for analyzing whether a defendant's activities within a state are "continuous and systematic."   *LSI Indus., supra,* 232 F.3d at 1375.   "Instead, a court must look at the facts of each case to make such a determination."   *Id.*

The cases dealing with general jurisdiction emphasize that jurisdiction does not exist if the non-resident defendant has no regular place of business in the forum state, is not licensed to do business in the forum state, and does not have systematic and continuous contacts with the forum state.   *Helicopteros, supra,* is instructive in that regard.   In *Helicopteros*, a federal court in Texas did not have general jurisdiction over a foreign corporation that purchased helicopters, equipment, and training services in Texas, sent its chief executive there for negotiations, sent personnel there for training, and accepted checks drawn on a Texas bank.   *Id.* at 416-18.

The contacts in *Helicopteros* were far greater than Papertech's contacts in the present case.   Again, as detailed above, Papertech is a Canadian corporation, and the only possible contacts that Papertech has with Virginia are that (1) less than one-half of 1% of its sales since November 12, 1998, have been made and/or delivered to Virginia; (2) Virginia residents must access Papertech's Canadian website or take the initiative to call Papertech to obtain product information or purchase products from Papertech; and (3) Virginia residents may be exposed to Papertech by actively attending industry trade shows occurring outside of Virginia.   These contacts are insufficient to establish general jurisdiction over Papertech.

In particular, Papertech's sales and/or deliveries of its products to Virginia constitute, at most, doing business *with* Virginia, but not doing business *in* Virginia.   *See Helicopteros, supra,* 466 U.S. at 418.   Engaging in commerce with those who do business in a forum state, or

11

residents of a forum state, does not, in and of itself, constitute the kind of activity that constitutes a "continuous and systematic presence" within a state's borders. *Id.* In addition, since 1998, the date on which Papertech entered into the License Agreement with Champion, *less than one-half of 1%* of Papertech's sales have any possible relationship with Virginia. *See Chino v. D&T Trucking Company*, 2006 U.S. Dist. LEXIS 30653 (E.D. Va. 2006) (refusing to exercise jurisdiction where only .11 percent of the non-resident defendant's business was related to Virginia). Since the date that Kobayashi allegedly acquired the Champion patents, not a single sale or installation of a Papertech product has occurred within Virginia.

Moreover, the mere fact that Virginia residents can access Papertech's Canadian website or call Papertech certainly cannot constitute continuous and systematic contacts with Virginia. Indeed, if simply having a toll free phone line or a foreign website constituted continuous and systematic contacts with Virginia, due process requirements would be meaningless. The recent U.S. District Court opinion in *Silver Ring Splint Co. v. Digisplint Inc.*, 508 F. Supp. 2d 508 (W.D. Va. 2007), is also instructive in this regard. In *Silver Ring*, the plaintiff sued a Canadian corporation in the Western District of Virginia for copyright and trade dress infringement as well as unfair practices. The defendant filed a motion to dismiss for lack of personal jurisdiction, claiming that it did not have sufficient contacts with Virginia to allow for the exercise of jurisdiction. The court found that it did not have specific or general jurisdiction over the defendant under Virginia's long-arm statute.[5]

The *Silver Ring* defendant's contacts with Virginia consisted of the following: (1) a single sale to a Virginia customer; (2) maintenance of a website accessible by Virginians; (3) distribution of information at two trade shows in the U.S. to at least one Virginian; (4) two blast e-mails that may have been sent to Virginians; (5) an advertisement in two issues of a trade

---

[5] The district court did not dismiss the case, instead finding that it had jurisdiction based on FRCP 4(k)(2). As discussed, *infra*, in section III., B., FRCP 4(k)(2) does not provide a basis for the exercise of jurisdiction in this action.

periodical with numerous Virginia subscribers; (6) an e-mail received from a Virginian and responded to by the defendant; and (7) a continued willingness to do business with Virginians should any choose to contact the defendant. *Id.* at 512. Based on these factors, the court declined to find general jurisdiction under Virginia's long-arm statute, stating, "[I]f general jurisdiction were found in this case, the limitations on personal jurisdiction would be essentially obliterated for almost any business with an online presence. To justify general jurisdiction, contacts with the state must be 'continuous and systematic.'" *Id.*

Similarly, Papertech's limited contacts with Virginia do not rise to the level of "systematic and continuous" contacts sufficient to subject it to general jurisdiction in this Court; let alone since December 27, 2007. As best stated by the district court in *Silver Ring*, "[i]n the internet age, a generally available website, some limited promotional activities, and a single sale simply cannot constitute "continuous and systematic" contacts. *Silver Ring, supra,* 508 F. Supp. 2d 512.

### 2.   Specific jurisdiction does not exist

Likewise, Papertech is not subject to specific jurisdiction in this Court. To determine whether specific jurisdiction satisfies due process, courts must consider three factors: "(1) whether the defendant purposefully directed its activities at residents of the forum; (2) whether the claim arises out of or relates to the defendant's activities with the forum; and (3) whether assertion of personal jurisdiction is reasonable and fair." *Silent Drive, Inc. v. Strong Industries, Inc.,* 326 F.3d 1194, 1202 (Fed. Cir. 2002). The plaintiff bears the burden of establishing the first two factors. If the plaintiff is successful in doing so, the burden shifts to the defendant to establish that the assertion of personal jurisdiction is not reasonable or fair. *Id.*

### a.   Papertech has not directed its activities at Virginia residents

The first prong in determining whether specific jurisdiction exists is "whether the defendant purposefully directed its activities at residents of the forum" and availed itself of the benefits and protections of the forum's laws. *Silent Drive, supra,* 326 F.3d at 1202. "The objective of the purposeful availment requirement is to provide predictability and give notice to

13

the defendant that it is subject to suit in the forum state, so that the company can act to alleviate the risk of burdensome litigation by procuring insurance, passing the expected costs on to customers, or, if the risks are too great, severing its connection with the State." *Shamsuddin v. Vitamin Research Products*, 346 F. Supp. 2d 804 (D. Md. 2004).

Again, *Silver Ring Splint Co. v. Digisplint Inc., supra*, is instructive in this determination. After declining to assert general jurisdiction over the defendant, the district court likewise declined to assert specific jurisdiction over the defendant, holding that the defendant did not purposefully direct its activities at Virginia residents based on the same contacts with Virginia detailed above in section IV(A)(1). *Silver Ring, supra,* 508 F. Supp. 2d at 512. In that regard, and relying on *Graduate Management Admission Council v. Raju*, 241 F. Supp. 2d 589 (E.D. Va. 2003), the *Silver Ring* court held that the availability and use of a website by Virginians was not the same as an intentional direction of activities toward Virginia. In so holding, the Court relied upon the Fourth Circuit's test for evaluating the sufficiency of contacts with the forum state made via electronic means, which states:

> [A] [s]tate may, consistent with due process, exercise judicial power over a person outside of the State when that person (1) directs electronic activity into the State, (2) with manifested intent of engaging in business or other interactions within the State, and (3) that activity creates, in a person within the State, a potential cause of action cognizable in the State's courts.

*ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 713-15 (4th Cir. 2002)(citing *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119, 1124 (W.D. Pa. 1997). The *Silver Ring* Court determined that the single sale initiated via fax by a Virginian and the fact that the defendants few other non-internet marketing attempts could also have been seen by Virginians, did not amount to "purposeful availment." Accordingly, the court held that the defendant's contacts with the state of Virginia were insufficient to support specific jurisdiction under the Due Process Clause. *Id.* at 513.

Much like the defendants in *Helicopteros* and *Silver Ring*, Papertech's contacts with Virginia fall far short of the extent necessary to support specific jurisdiction. Papertech's

14

contacts with Virginia are minimal, at best. Indeed, Papertech had sales and/or installations of just four WebVision® Systems in Virginia amounting to less than one-half of 1 % of its total world wide sales since 1998. Importantly, these sales and/or installations of the WebVision® System by Papertech occurred prior to Kobayashi allegedly acquiring the Champion patents. In addition, Papertech had service calls initiated by Virginia residents reaching out to Papertech; rather than as a result of any purposeful action by Papertech; totaling less than .006% of Papertech's total world wide recorded service calls during the available time periods. Just as the court in *Silver Ring* declined to exercise specific jurisdiction under similar circumstances, the result should be no different here.

Moreover, as discussed, *supra*, under *Zippo*, the exercise of personal jurisdiction over a non-resident defendant based on the ownership of a "passive" website such as Papertech's that merely posts general information or advertising, but does not allow for direct purchases to be made through the site, violates constitutional due process. *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119, 1124 (W.D. Pa. 1997). *See also Alitalia-Linee Aeree Italiane, S.p.A. v. Casinoalitalia.com*, 128 F. Supp. 2d 340, 349 (E.D. Va. 2001)(citing cases). *See also ESAB Group, Inc. v. Centricut, Inc.*, 126 F.3d 617, 625-26 (4th Cir. 1997) (holding that defendant, which conducted its business entirely through mail order and had never "targeted" advertising at the forum state, was not subject to personal jurisdiction in the forum state). Indeed, nothing on Papertech's website – which is registered as a Canadian ".ca" instead of a U.S. ".com" – suggests that Papertech intended to target Virginia residents any more than it intended to target residents of other states.

In short, the lack of sales to Virginia residents, in combination with a lack of advertising targeted to Virginia and the maintenance of a passive website, precludes any claim by Kobayashi that Papertech has purposefully directed its efforts at Virginia residents.

b.    Kobayashi's claims do not arise out of or relate to Papertech's limited
      contacts with Virginia

Kobayashi also must show that its claims "arise out of" or "relate to" Papertech's

activities within Virginia. *Silent Drive, supra*, 326 F.3d at 1202. Kobayashi cannot make this

showing.

As frequently reiterated by the Federal Circuit, a plaintiff must have held legal title at the

time of the infringement to bring a suit for damages. *Arachnid, Inc. v. Merit Industries, Inc.*,

939 F.2d 1574, 1579 (Fed. Cir. 1991). The sole exception to this rule is when an assignment of

a patent contains an *express provision* also assigning a right of action for past infringement. *Id.*

at 1579 n.7; *see also Minco, Inc. v. Combustion Engineering, Inc.*, 95 F.3d 1109, 1117 (Fed. Cir.

1996). Such an assignment must be express, and can not be inferred from an assignment of the

patent itself. *See, e.g., Jones v. Berger*, 58 F. 1006 (D. Md. 1893).

In addition, Kobayashi must have standing at the time suit was filed. Standing cannot be

conferred *nunc pro tunc. Enzo Apa & Son, Inc. v. Geapag A.G.*, 134 F.3d 1090, 1093-94 (Fed.

Cir. 1998)

> As a general matter, parties should possess rights before seeking to
> have them vindicated in court. Allowing a subsequent assignment
> to automatically cure a standing defect would unjustifiably expand
> the number of people who are statutorily authorized to sue. Parties
> could justify premature initiation of an action by averring to the
> court that their standing through assignment is imminent.
> Permitting non-owners and licensees the right to sue, so long as
> they eventually obtain the rights they seek to have redressed,
> would enmesh the judiciary in abstract disputes, risk multiple
> litigation, and provide incentives for parties to obtain assignment
> in order to expand their arsenal and the scope of litigation.
> Inevitably, delay and expense would be the order of the day.

*Enzo Apa & Son, Inc. v. Geapag A.G.*, 134 F.3d 1090, 1093-94 (Fed. Cir. 1998), *quoting from*

*Proctor & Gamble Co. v. Paragon Trade Brands, Inc.*, 917 F. Supp. 305, 310 (D. Del. 1995).

Here, Kobayashi did not have legal title to sue for any alleged infringement that occurred

before December 10, 2007 and, consequently, it did not have standing when this lawsuit was

filed and its claims cannot arise out of Papertech's limited contacts with Virginia. More

16

specifically, the plain language of the patent assignment from Jacklin to Kobayashi only gives Kobayashi the right to sue for infringement that occurred on or after December 10, 2007 – the date of the patent assignment. The right to sue for alleged infringement that occurred prior to December 10, 2007, continues to remain with Jacklin. *See* Comp., Ex. A.

Yet, all sales and installations of the allegedly infringing product to residents and/or facilities in Virginia occurred *prior to* the alleged December 10, 2007, assignment of the patents to Kobayashi. Since Papertech's minimal contacts with Virginia occurred before Kobayashi acquired the rights in the Champion patents on December 10, 2007, Kobayashi does not have standing to sue Papertech for any issues relating to these contacts and, therefore, Kobayashi's claims in this case simply cannot arise out of activities within Virginia.

c. Asserting personal jurisdiction over Papertech is not reasonable or fair

Even if this Court finds that Papertech purposefully directed its activities at residents of Virginia and that Kobayashi's claims legally arise out of those activities, jurisdiction should not be exercised over Papertech because it would be unreasonable and contrary to the traditional notions of "fair play and substantial justice." *See Akro Corp. v. Luker*, 45 F.3d 1541, 1545-46 (Fed. Cir. 1995). Courts look at the following five factors to determine whether exercising personal jurisdiction over a foreign defendant would be reasonable and fair: (1) the burden on the defendant, (2) the interests of the forum state, (3) the plaintiff's interests in obtaining relief, (4) the interstate judicial system's interesting in obtaining the most efficient resolution of controversies, and (5) the shared interest of several states in furthering substantive social policies. *Inamed Corp. v. Kuzmak*, 249 F.3d 1356, 1363 (Fed. Cir. 2001).

Here, the burden on Papertech in trying this case in Virginia is high, and Virginia's interest in this case is minimal, at best. Papertech is too far removed from Virginia for personal jurisdiction to be reasonable. Papertech's principal place of business is thousands of miles away from Virginia and in another country. It would be unduly burdensome on Papertech to be forced to defend an action so far away from its familiar locale and business operations – and in a state in which it never submitted to jurisdiction. Further, all of Papertech's corporate records

17

and personnel, as well as its manufacturing facilities, are in Vancouver. The simple factor of distance precludes Papertech from actively participating in its defense and renders personal jurisdiction over Papertech unreasonable in this matter.

Despite Kobayashi's previous motion to transfer this case between divisions within this district, which are only 180 miles apart, Kobayashi now conveniently ignores the undue burden that traveling to Virginia would place on Papertech. Moreover, Kobayashi is nothing more than a holding company that purportedly acquired the Champion patents less than two weeks before filing this lawsuit. As such, Kobayashi is not a traditional plaintiff in the sense that it likely does not possess or control any documents that will be at the heart of discovery in this case, nor does it likely employ any witnesses with knowledge relevant to this lawsuit – i.e., those involved in or familiar with: (1) the License Agreement; (2) the pulp and paper industry; (3) the technology at issue in the Champion patents; or (4) the preparation and prosecution of the Champion patents. Therefore, the bulk of discovery in this case will be directed to non-parties such as International Paper and Jacklin – none of which reside in Virginia – and little, if any, discovery will be specifically directed to Kobayashi.

Additionally, as discussed *infra* in Section III., Champion and Papertech agreed to a forum and venue selection clause when they executed the License Agreement, which specifically requires that any suits arising out of or related to the License Agreement be heard in the United States District Court for the Southern District of New York. As further detailed herein, this case arises out of or relates to the License Agreement because: (1) a central issue in this case will be whether the License Agreement is still in effect; (2) Kobayashi seeks payment for royalties under that agreement dating back to its inception in 1998; and (3) Kobayashi bases its claim of patent infringement solely on the fact that Papertech entered into and later terminated the License Agreement. In fact, immediately prior to the filing of the present action, counsel for Kobayashi made a point "to clarify" that Kobayashi's patent infringement claim "derives specifically from products that were licensed pursuant to a License Agreement which [Papertech] claims to have terminated." *See* Correspondence from J. Schwaber to R. Taché

18

dated December 6, 2007, attached as Ex. D to Taché Decl.  Thus, the terms of the License Agreement are directly at issue, and finding that personal jurisdiction exists over Papertech in Virginia would be inherently unfair and unreasonable because it would deprive Papertech of its negotiated right to have disputes related to the License Agreement heard in New York. Moreover, such a finding would reward Kobayashi's attempt to improperly enforce the License Agreement that was properly terminated by Papertech more than seven years ago, while allowing Kobayashi to selectively ignore the forum and venue selection clause negotiated and agreed to by Champion – Kobayashi's predecessor in interest in the License Agreement.

In short, Kobayashi has not and cannot show that facts exist sufficient to support specific jurisdiction over Papertech.

**B.**   **Federal Rule of Civil Procedure 4(k)(2) Does Not Convey Jurisdiction Over Papertech**

Though not specifically alleged in its Complaint, Kobayashi may belatedly attempt to hinge personal jurisdiction on Federal Rule of Civil Procedure 4(k)(2).  Rule 4(k)(2) does not convey jurisdiction over Papertech, however, because Kobayashi cannot establish all of the elements of that rule.  In particular, to establish jurisdiction under Rule 4(k)(2), a plaintiff must show: (1) the claim arises under federal law; (2) the defendant is not subject to the jurisdiction of the courts of general jurisdiction of any state; and (3) the court's exercise of jurisdiction would be consistent with the Constitution and the laws of the United States.  *Base Metal Trading, Ltd. V. OJSC Novokuznetsky Aluminum Factory*, 283 F.3d 208, 215 (4th Cir. 2002).

While patent infringement claims arise under federal law, thereby satisfying the first prong of this test, Kobayashi certainly cannot satisfy the second element of this rule because Papertech admits that it is subject to personal jurisdiction in New York based on the forum and venue selection clause in the License Agreement.  As such, personal jurisdiction does not exist under Rule 4(k)(2).

19

## IV.

## THE COURT SHOULD TRANSFER THIS CASE TO NEW YORK

When a case is improperly filed in the wrong district court, 28. U.S.C. § 1406 authorizes the court to either dismiss the case or, if it be in the interest of justice, transfer such case to any district or division in which it could have been brought. Although Papertech respectfully submits that the Court should dismiss this case for lack of personal jurisdiction for the reasons previously set forth, at a minimum the Court should enforce the forum and venue selection clause in the License Agreement and transfer the case to New York pursuant to § 1406. This Court need not decide the personal jurisdiction issue, because a court may transfer a case, even if personal jurisdiction is lacking, to a district in which the case might have been brought. *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 127 S.Ct. 1184, 1190 - 93 (2007); *Goldlawr, Inc. v. Heiman*, 82 S.Ct. 913, 915-16 (1962); *In re Carefirst of Maryland v. Carefirst Urgent Care Center*, LLC, 305 F.3d 253, 255-56 (4th Cir. 2002).

The purported assignment of the Champion patents to Kobayashi alleged in the Complaint includes the license agreements granted by the prior owners of the patents. Comp., Ex. 1. Kobayashi alleges in the Complaint that the License Agreement was not legitimately terminated and, therefore, that the License Agreement is still in effect. Comp., ¶¶ 19 and 27. Accordingly, one of the central issues in this case will involve whether Papertech properly terminated the License Agreement. Furthermore, Kobayashi also claims that Papertech "[f]ailed to pay all royalties due under the License Agreement" and, in its prayer for relief, seeks an interim escrow order of a 5% royalty for all products that Papertech "has at any time sold," which would include the time frame when the License Agreement was in effect prior to the disputed termination. Comp., ¶ 19.

In addition, as part of the alleged chain of title in the Complaint, Kobayashi relies upon and incorporates by reference the Patent Purchase Agreement assigning the Champion patents from International Paper to Jacklin, which is attached as Exhibit 2 to the Complaint. Comp., ¶7. The Patent Purchase Agreement, dated October 19, 2007, included an assignment of certain

20

listed license agreements in paragraph 3(ii), and the "Assigned Agreements," which are listed in exhibit A to the Patent Purchase Agreement, including the License Agreement with Papertech at issue in this case.[6] Comp., Ex. 2. *See also, Heidelberg Harris, Inc. v. Loebach*, 145 F.3d 1454, 1458 - 60 (Fed. Cir. 1998) (holding that patent assignment is subject to outstanding licenses); *Keystone Type Foundry v. Fastpress Co.*, 272 F. 242, 245 - 46 (2d Cir. 1921); *Sanofi v. Med-Tech Veterinarian Prods.*, 565 F.Supp. 931, 939 - 40 (D.N.J. 1983).

Thus, the disputes in this case arise out of or relate to the terms of the License Agreement, and/or an alleged breach of the License Agreement. Under the terms of the License Agreement, any suit brought "on the basis of any controversy or claim arising out of or relating to this Agreement or a breach thereof" had to be brought in the United States District Court for the Southern District of New York. Comp., Ex. 3 at ¶ 18.1. The License Agreement is attached to the Complaint as Exhibit 3 and is incorporated by reference. Comp., ¶9. Therefore, the Court may consider the document on a Rule 12(b)(6) motion to dismiss without converting the motion to a summary judgment motion. *See, Simons v. Montgomery County Police Officers,* 762 F.2d 30, 32 (4th Cir. 1985); *Fellores v. Winter,* No. 2:06cv551, 2007 WL 2471527, at *1(E.D. Va. Aug. 23, 2007); *Basnight v. HRSA-ILA Mgmt,* No. 2:04cv782, 2006 WL 2850650, at *6 (E.D. Va. Sept. 28, 2006); *Norfolk Fed'n of Bus. Dists. v. Dep't of Hous. & Urban Dev.,* 932 F.Supp. 730, 736 (E.D. Va. 1996); and *Davis v. Hudgins,* 896 F.Supp. 561, 566 (E.D. Va. 1995).

Forum selection clauses, the enforceability of which is governed by federal law, are presumptively enforceable. According to the Supreme Court, forum selection clauses "are prima facie valid and should be enforced unless enforcement is shown by the resisting party to be 'unreasonable' under the circumstances." *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1,

---

[6] Given that Papertech had terminated the License Agreement *more than seven years* prior to the date of the Patent Purchase Agreement, its inclusion in the list of "Assigned Agreements" is, at best, puzzling.

10 (1972). The Supreme Court itself upheld the validity of forum selection clauses in a number

of cases. *See, e.g., Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 589-95 (1991); *Burger*

*King Corp. v. Rudzewicz*, 471 U.S. 462, 473 n.14 (1985); *Bremen, supra*, 407 U.S. at 8-18

(1972).

In accordance with these principles, "it is well-established that [forum selection] clauses

will be enforced unless it clearly can be shown that enforcement would be unreasonable and

unjust, or that the clause was invalid for such reasons as fraud or overreaching." *Karl Koch*

*Erecting Co. v. New York Convention Ctr. Dev. Corp.*, 838 F.2d 656, 659 (2d Cir. 1988). In

*Roby v. Corporation of Lloyd's*, 996 F.2d 1353 (2d Cir. 1993), the court listed the following

factors for courts to consider in determining if a forum selection clause is unreasonable:

> (1) if their incorporation into the agreement was the result of fraud
> or overreaching . . . ; (2) if the complaining party "will for all
> practical purposes be deprived of his day in court," due to the
> grave inconvenience or unfairness of the selected forum . . . ; (3)
> if the fundamental unfairness of the chosen law may deprive the
> plaintiff of a remedy . . . ; or (4) if the clauses contravene a strong
> public policy of the forum state.

*Id.* at 1363 (citations omitted).

Considering these factors in relation to the case at hand, Papertech submits that

enforcing the forum and venue selection clause in the License Agreement would not be

unreasonable. Kobayashi will not be deprived of its day in court if the case is transferred to

New York, nor will Kobayashi be deprived of a remedy if this case proceeds in New York.

Indeed, the Carotek lawsuit arising out of the Carotek license agreement, which also involves

the Champion patents, is already pending in New York, and Kobayashi has not raised any

objections to the venue. Furthermore, both the License Agreement at issue in this case, and the

Patent Purchase Agreement attached as Exhibit 2 to the Complaint, state that the agreements

shall be interpreted, construed, and enforced in accordance with the laws of the State of New

York. Comp., Ex. 2 at ¶ 8.5; Comp., Ex. 3 at ¶18.1. The New York court will presumably be

more familiar with the laws of the State of New York. Indeed, because the outcomes of both

this lawsuit and the Carotek lawsuit are potentially determinative of each other, and both of which must be decided in accordance with the laws of New York, at the very least, the forum and venue selection clause should be enforced.

Thus, if this action is not dismissed for lack of personal jurisdiction, it should be transferred to the United States District Court for the Southern District of New York.

## V.

## **CONCLUSION**

This Court should dismiss this case because the Court does not have personal jurisdiction over Papertech under either the Virginia long-arm statute or the Federal long-arm statute since (1) Papertech's limited contacts with Virginia fall far short of the necessary contacts to establish either general or specific jurisdiction and (2) Papertech is subject to personal jurisdiction in New York. In the alternative, Papertech respectfully requests that this Court enforce the forum and venue selection agreement in the License Agreement and transfer this case to the United States District Court for the Southern District of New York.

PT PAPERTECH INC.

By_____/s/_____
Of Counsel

Dabney J. Carr, IV, VSB #28679
(dabney.carr@troutmansanders.com)
TROUTMAN SANDERS LLP
P. O. Box 1122
Richmond, Virginia 23218-1122
(804) 697-1200
(804) 697-1339 (Fax)

Of Counsel:
J. Rick Taché (CA Bar #195100)
Janet L. Taché (CA Bar #198849)
SNELL & WILMER L.L.P.
600 Anton Boulevard, Suite 1400
Costa Mesa, CA  92626-7689
Telephone: (714) 427-7000
Facsimile: (714) 427-7799
Attorneys for PT Papertech, Inc.

## CERTIFICATE OF SERVICE

I certify that on the 28th day of February, 2008, I will electronically file the foregoing with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Jeffrey M. Schwaber
Stein, Sterling, Bennett, De Jong, Driscoll & Greenfeig, P.C.
25 West Middle Lane
Rockville, MD 20850
jschwaber@steinsperling.com

Alexia Kent Bourgerie
Stein, Sterling, Bennett, De Jong, Driscoll & Greenfeig, P.C.
25 West Middle Lane
Rockville, MD 20850
abourgerire@steinsperling.com

/s/
Dabney J. Carr, IV, VSB #28679
(dabney.carr@troutmansanders.com)
TROUTMAN SANDERS LLP
P. O. Box 1122
Richmond, Virginia  23218-1122
(804) 697-1238
(804) 698-5119 (Fax)

# Exhibit 13

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

```
FILED

MAY - 7 2008

CLERK, U.S. DISTRICT COURT
NORFOLK, VA
```

KOBAYASHI VENTURES, LLC,

       Plaintiff,

       v.                                       Civil No. 2:07cv612

PAPERTECH, INC.,

       Defendant.

## ORDER

      This matter comes before the Court upon the motion of Papertech, Inc., ("Papertech" or

"Defendant") to dismiss for lack of personal jurisdiction or, in the alternative, to transfer venue.

For the reasons set forth below, the Court hereby **GRANTS** Papertech's motion to transfer venue

and hereby **TRANSFERS** the case to the United States District Court for the Southern District

of New York.

## I.    FACTUAL AND PROCEDURAL HISTORY

      The three U.S. patents involved in this case purportedly relate to a "system for

monitoring a continuous manufacturing process." (Pl.'s Response at ¶ 10). On March 2, 1995,

the inventor assigned the patents to Champion International. On November 12, 1998, Champion

International licensed the patents to Papertech. On September 27, 2000, Papertech provided 30

days notice to Champion International of its intent to terminate the license agreement. On

December 31, 2000, Champion International became International Paper through a merger. On

October 19, 2007, International Paper sold the patents to Jacklin Associates. On December 10, 2007, Jacklin Associates assigned the patents to Kobayashi Ventures, LLC ("Kobayashi" or "Plaintiff"). Kobayashi is a Delaware Limited Liability Company with an office in Virginia. Papertech is a Canada Corporation with its principal place of business in Vancouver, British Columbia. Papertech manufactures "a paper process monitoring system known as the WebVision system." (Def.'s Motion at 7).

On December 27, 2007, Kobayashi filed a Complaint against Papertech for patent infringement (Count I) and patent infringement inducement (Count II), claiming that Papertech's WebVision system infringes on Kobayashi's patents. The Complaint seeks an injunction, an escrow of five percent of the net sales price of the systems sold by Papertech "at any time" plus interest, damages, treble damages, and attorneys' fees. On February 28, 2008, Papertech filed a motion to dismiss for lack of personal jurisdiction or, in the alternative, to transfer venue. On March 13, 2008, Kobayashi filed a response. On March 21, 2008, Papertech filed a reply. On March 24, 2008, Kobayashi filed a motion to strike Papertech's reply. On March 25, 2008, Papertech filed a response. On March 26, 2008, Kobayashi filed a motion to amend its motion to strike Papertech's reply. On April 28, 2008, the Court issued an order granting Kobayashi's motion to amend and denying Kobayashi's motion to strike. The motion to dismiss for lack of personal jurisdiction or, in the alternative, to transfer venue is therefore fully briefed and ripe for review by this Court.

## II.    **STANDARD OF REVIEW**

Fed. R. Civ. P. 12(b)(2) permits a party to move the court to dismiss an action if the court

2

lacks personal jurisdiction over the party. When a defendant moves to dismiss a Complaint for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2), the burden ultimately rests on the plaintiff "to prove the existence of a ground for jurisdiction by a preponderance of the evidence." Combs v. Bakker, 886 F.2d 673, 676 (4th Cir. 1989). However, a plaintiff need only make a prima facie showing of jurisdiction when the Court "rules on a Rule 12(b)(2) motion without conducting an evidentiary hearing or without deferring ruling pending receipt at trial of evidence related to the jurisdictional issue." In re Celotex Corp., 124 F.3d 619, 628 (4th Cir. 1997). In making its ruling, the Court "must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction." Combs, 886 F.2d at 676.

Although the general remedy applied by Courts lacking personal jurisdiction over a party is dismissal of the case, 28 U.S.C. § 1406(a) has been interpreted to permit transfer of the case as an alternative remedy. The statute states, in relevant part:

> The district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought.

28 U.S.C. § 1406(a). "[S]ection 1406(a) has been interpreted to authorize transfers in cases where venue is proper but personal jurisdiction is lacking or some other impediment exists that would prevent the action from going forward in that district." In re Carefirst of Maryland, Inc., 305 F.3d 253, 255-56 (4th Cir. 2002); see also Saudi v. Northrup Grumman Corp., 427 F.3d 271, 277 (4th Cir. 2005); Porter v. Groat, 840 F.2d 255, 257 (4th Cir. 1988).

3

## III.  ANALYSIS

In its motion to dismiss or, in the alternative, to transfer venue, Papertech claims that its contacts with Virginia are insufficient to establish either general or specific personal jurisdiction in this Court under the Due Process Clause. Specifically, Papertech claims that the company: (1) is not licensed to conduct business in Virginia; (2) does not pay taxes in Virginia; (3) does not have employees, accounts, or offices in Virginia; and (4) does not directly market its products in Virginia. In its response, Kobayashi claims that Papertech: (1) has sold four WebVision systems to two companies in Virginia; (2) continues to warrant and maintain those systems in Virginia; (3) operates a website containing an endorsement from a Virginia customer; (4) actively markets its products in Virginia through 11 agents of its sales and service representative Southern Paper Group ("SPG"); and (5) connects remotely to the infringing computer networks of the four systems in Virginia.

In its reply, Papertech claims that: (1) the four WebVision systems sold in Virginia represent less than one percent of Papertech's total sales since 1998; (2) the four systems were sold between July 2000 and July 2007 before Kobayashi acquired the patents; (3) although Papertech warrants the four systems, it does not continue to maintain them; (4) the 16 customer service calls placed by the purchasers of the four systems represent less than one percent of Papertech's 2,100 total service calls since 2002; (5) Papertech has only passively marketed its products in Virginia through 10 sales calls by 1 SPG agent to Virginia residents; (6) all of these calls occurred before Kobayashi acquired the patents and none of these calls resulted in sales; and (7) Papertech has connected remotely to the computer networks of the four systems in Virginia less than 16 times since 2002 and only in response to customer service calls.

4

In Virginia, a court has personal jurisdiction over a defendant if: (1) jurisdiction is authorized by Virginia's Long-Arm Statute, Va. Code § 8.01-328.1, and (2) jurisdiction comports with the Due Process Clause of the Fourteenth Amendment. Hartford Cas. Ins. Co. v. JR Marketing, LLC, 511 F. Supp. 2d 644, 647 (E.D. Va. 2007). However, "because Virginia's long-arm statute extends personal jurisdiction to the extent permitted by the Due Process Clause, the statutory inquiry necessarily merges with the constitutional inquiry, and the two inquiries essentially become one." Young v. New Haven Advocate, 315 F.3d 256, 261 (4th Cir. 2002) (internal quotations omitted).

To satisfy the Fourteenth Amendment's due process requirements, a defendant must have "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945) (internal quotations omitted). The minimum contacts analysis considers whether the "defendant's conduct and connection with the forum state are such that he should reasonably anticipate being haled into court there." World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980). Personal jurisdiction may be "general" or "specific." "[W]hen a defendant's contacts with the forum state are continuous and systematic, irrespective of whether the transaction in question had sufficient contacts with the state, a court may exercise *general* personal jurisdiction over the defendant. In the absence of continuous and systematic contacts, a court may still exercise *specific* personal jurisdiction when the contacts relate to the cause of action and create a substantial connection with the forum state." Diamond Healthcare of Ohio, Inc. v. Humility of Mary Health Partners, 229 F.3d 448, 450 (4th Cir. 2000) (internal citations omitted).

Papertech's limited contacts with Virginia provide an inadequate basis for general personal jurisdiction in this Court. Papertech operates a website accessible in Virginia, made four customer-initiated sales of WebVision systems in Virginia (less than one percent of its sales), provides customer service for those systems (less than one percent of its customer service calls), connects remotely to the computer networks of those systems to provide customer service, and marketed its products in Virginia through ten sales calls by one non-resident agent of SPG. Operation of a website, limited customer-initiated sales, and limited promotional activities are insufficient to constitute "continuous and systematic" contacts. See, e.g., Silver Ring Splint Co. v. Digisplint, Inc., 508 F. Supp. 2d 508, 512 (W.D. Va. 2007).

Papertech's contacts with Virginia are also an inadequate basis for specific personal jurisdiction in this Court. As a threshold matter, the Virginia Long-Arm Statute confers personal jurisdiction over Papertech because Papertech transacted business in Virginia and used a computer network in Virginia. See Va. Code §§ 8.01-328.1(A)(1), (B), and 18.2-152.2 ("A person 'uses' a computer or computer network when he attempts to cause or causes a computer or computer network to perform or to stop performing computer operations.") However, this Court's exercise of personal jurisdiction over Papertech must still comport with the Due Process Clause of the Fourteenth Amendment. See, e.g., Aitken v. Communications Workers of America, 496 F. Supp. 2d 653, 659 (E.D. Va. 2007). Courts apply a three-pronged test to determine whether specific personal jurisdiction passes constitutional muster: "(1) did the defendants 'purposefully avail' themselves of the privileges of conducting activities in the forum, (2) does the claim arise out of these activities, and finally (3) is the exercise of jurisdiction reasonable?" Id. at 659; see also Silent Drive, Inc. v. Strong Industries, Inc., 326

6

F.3d 1194, 1202 (Fed. Cir. 2002). Step two of this inquiry mirrors the Virginia Long-Arm

Statute's requirement that "only a cause of action arising from acts enumerated in this section

may be asserted against" the defendant. Va. Code §§ 8.01-328.1(C).

Kobayashi's claim does not arise out of Papertech's activities in Virginia under the

second prong of the specific personal jurisdiction test, and therefore it is unnecessary for the

Court to consider the first and third prongs. Generally, a plaintiff must have legal title to a patent

at the time of a defendant's infringement to bring a suit against a defendant for damages.

Arachnid, Inc. v. Merit Industries, Inc., 939 F.2d 1574, 1579 (Fed. Cir. 1991). An exception to

this general rule applies when an assignment of a patent contains an express assignment of the

right to sue for past infringement. Id. at 1579 n. 7; see also Crown Die & Tool Co. v. Nye Tool

& Mach. Works, 261 U.S. 24, 40-41 (1923). For example, in Minco, Inc., v. Combustion

Engineering, Inc., 95 F.3d 1109, 1117-8 (Fed. Cir. 1996), the court found that the assignee of a

patent could bring a suit for past infringement where the assignment expressly stated that the

assignors: (1) possessed "all rights of action and damages for past infringement"; (2) "do not

retain any right to any recoveries for infringement...[or] to sue in their own name with regard to

the [Patent]"; and (3) grant all patent rights "as fully and entirely as the same would have been

held and enjoyed by Assignors ... [as if the] agreement had not been made."

In this case, International Paper assigned the patents to Jacklin Associates on October 19,

2007. Exhibit D, "Assignment of Patent Rights," to the parties' "Patent Purchase Agreement"

states, in relevant part:

> For good and valuable consideration, the receipt of which is hereby
> acknowledged, International Paper Company, a New York corporation
> ("Assignor"), does hereby sell, assign, transfer, and convey unto Jacklin

("Assignee"), or its designees, all right, title, and interest that exist today and may exist in the future in and to any and all of the following (collectively, the "Patent Rights"):

. . .

(e)     all causes of action (whether known or unknown or whether currently pending, filed, or otherwise) and other enforcement right sunder, or account of, any of the Patents and/or any item in any of the categories (b) through (d), including, without limitation, all causes of action and other enforcement rights for:

(i)     damages,
(ii)    injunctive relief, and
(iii)   any other remedies of any kind for past, current, and future infringement, and
(iv)    all rights to collect royalties and other payments under or on account of any of the Patents and/or any item in any of the foregoing categories (b) through (h)

This language indisputably assigned International Paper's right to sue for past infringement to Jacklin Associates. Jacklin Associates assigned the patents to Kobayashi on December 10, 2007. The "Patent Assignment" states, in relevant part:

NOW, THEREFORE, in consideration of the sum of Ten Dollars ($10.00) in hand paid and other valuable consideration, the receipt whereof is hereby acknowledged, Jacklin Associates, Inc., have sold, assigned and transferred, and by these presents do sell, assign and transfer unto Assignee the full and exclusive right, title and interest in and to the Patents.

This language, in contrast, clearly is not sufficient under the standard articulated in Minco and Arachnid to assign Jacklin Associates' right to sue for past infringement to Kobayashi. The "Patent Assignment" contains no reference to past infringement whatsoever and makes no reference to the respective rights of Kobayashi and Jacklin Associates to sue for infringement that took place before the assignment was consummated. Therefore, this Court may only

8

exercise personal jurisdiction over Papertech if Kobayashi's claims arise out of Papertech's activities in Virginia occurring after December 10, 2007.

Kobayashi's claim for patent infringement is based on 28 U.S.C. § 271 which states, in relevant part, "whoever without authority makes, uses, *offers to sell, or sells* any patented invention, within the United States . . . infringes the patent" (emphasis added). Kobayashi's claim for patent infringement arises from Papertech's alleged sale of WebVision systems in Virginia and Papertech's offers to sell WebVision systems in Virginia. However, Kobayashi admits that Papertech's last sale of a WebVision system in Virginia occurred in July 6, 2007, before Kobayashi was assigned the patent. In addition, although SPG marketed WebVision systems in Virginia on Papertech's behalf, SPG has not made sales calls to Virginia residents since December 10, 2007. (Michael Heaven Aff. at ¶ 4). Kobayashi offers no evidence that any other sales of WebVision systems, or offers to sell WebVision systems, occurred subsequent to its acquisition of patent rights on December 10, 2007. However, Kobayashi appears to argue, without citing any support, that its claims against Papertech alternatively arise out of the "ongoing infringement" committed by the users of the WebVision systems in Virginia rather than out of Papertech's own activities. Although the argument would certainly support this Court's exercise of personal jurisdiction over the users of the WebVision systems themselves, it provides no basis for this Court's exercise of personal jurisdiction over Papertech because Papertech itself is not using the systems in Virginia.

Furthermore, although it is unnecessary for the Court to examine the third prong of the specific personal jurisdiction test given that the Court has resolved the issue on the second prong, the Court nevertheless notes that the exercise of jurisdiction by the United States District

9

Court for the Southern District of New York would be far more reasonable than this Court's exercise of jurisdiction because a similar case involving nearly identical issues is currently pending in the Southern District of New York. Champion International also licensed the patents to Carotek, Inc. ("Carotek") pursuant to a license agreement containing a forum selection clause identical to that contained in the Papertech license agreement. On November 26, 2007, Kobayashi notified Carotek that it was in breach of the license agreement. On December 11, 2007, Carotek filed a Complaint in the Southern District of New York seeking a declaratory judgment against Kobayashi that it had not breached the terms of the license agreement. On February 8, 2008, Kobayashi filed an Answer counterclaiming against Carotek for patent infringement (Count I), patent infringement inducement (Count II), and breach of the license agreement (Count III). Given the Court's interest in judicial economy, the competing interests of Virginia and New York in resolving the dispute, and the respective burdens on the parties, it would be unreasonable for this Court to exercise personal jurisdiction over Papertech. Therefore, because Kobayashi's claims do not arise out of Papertech's activities in Virginia and because exercising specific personal jurisdiction over Papertech would be unreasonable, the Court hereby **FINDS** that this Court lacks specific personal jurisdiction over Papertech.

Given that the Court lacks personal jurisdiction over Papertech, the Court must determine whether to dismiss the case pursuant to Fed. R. Civ. P. 12(b)(2) or to transfer the case pursuant to 18 U.S.C. § 1406(a). Papertech concedes that venue would be proper and that the company would be subject to personal jurisdiction in the United States District Court for the Southern District of New York. Furthermore, transfer of the case, rather than dismissal, would conserve the time and resources of both the parties and the courts by eliminating the need for new

10

pleadings to be prepared and by permitting consolidation of this case with the similar case already pending in the Southern District of New York. Therefore, the Court hereby **FINDS** that transfer of the case to the United States District Court for the Southern District of New York, a district in which the case could have originally been brought, is in the interest of justice pursuant to 18 U.S.C. § 1406(a).

In its motion to dismiss or, in the alternative, to transfer, Papertech also argues that this Court should transfer the case to the United States District Court for the Southern District of New York because Kobayashi is seeking royalties under Papertech's original license agreement with Champion International and because the license agreement contains a forum selection clause which states, in relevant part:

> 18.1    This Agreement shall be construed and the legal relations between the parties shall be determined, in accordance with the laws of the State of New York, without recourse to the conflicts of laws of said State which would direct the use of laws of another jurisdiction. Any suit brought by either party against the other party on the basis of any controversy or claim arising out of or relating to this Agreement or a breach thereof shall be brought in the United States District Court for the Southern District of New York, and, if the United States District Court declines jurisdiction for any reason, then in the Supreme Court First Department of the State of New York. The Parties hereby consent to the personal jurisdiction of the courts and hereby designate the Secretary of State of the State of New York for receipt of service of process.

In its response, Kobayashi claims that this forum selection clause does not apply because Papertech terminated the license agreement by providing 30 days notice to Champion International of its intent to terminate the license agreement on September 27, 2000. Because this Court lacks personal jurisdiction over Papertech, it deliberately declines to resolve the dispute between the parties over whether the license agreement applies and leaves the dispute to

11

be resolved by the United States District Court for the Southern District of New York.

## IV.    CONCLUSION

For the foregoing reasons, the Court hereby **GRANTS** Papertech's motion to transfer

venue and hereby **TRANSFERS** the case to the United States District Court for the Southern

District of New York.

The Clerk of the Court is **DIRECTED** to deliver a copy of this Order to all counsel of

record.  The Clerk of the Court is further **DIRECTED** to transfer this case to the United States

District Court for the Southern District of New York.

**IT IS SO ORDERED.**

/s/
Robert G. Doumar
Senior United States District Judge

May 7, 2008
Norfolk, Virginia

12

# EXHIBIT 14

PATENT PURCHASE AGREEMENT

This Patent Purchase Agreement (this "Agreement") is entered into, as of the Effective Date (defined below), by and between International Paper Company, a New York corporation ("Seller") and Jacklin Associates, Inc., a Pennsylvania corporation ("Purchaser").

RECITALS

WHEREAS, Seller is the owner of record of certain patent rights;

WHEREAS, Seller wishes to sell to Purchaser all of Seller's right, title, and interest in such patent rights; and

WHEREAS, Purchaser wishes to purchase from Seller all of Seller's right, title, and interest in such patent rights, free and clear of any restrictions, liens, claims, and encumbrances.

NOW THEREFORE, upon such consideration as set forth herein and all other good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, the parties hereby agree as follows:

1.    Definitions

"Assigned Agreements" means those agreements set forth on Exhibit A ("Listed Agreements") or other agreements pursuant to which Seller has granted to any third party a license or covenant not to sue under the Assigned Patent Rights ("Unlisted Agreements"); provided, that if Seller is or becomes aware of any Unlisted Agreement, Seller shall promptly notify Purchaser and, 30 days thereafter, such agreement shall be deemed a Listed Agreement.

"Assigned Patent Rights" means (a) all patents listed on Exhibit B; (b) reissues, reexaminations, extensions; and (c) foreign patents and counterparts relating to any patent listed in Exhibit B, including, without limitation, certificates of invention, utility models, industrial design protection, design patent protection, and other governmental grants or issuances.

"Contract Year" means an annual period beginning on the Effective Date or anniversary of the Effective Date.

"Deliverables" means   prosecution history files for the Assigned Patent Rights and the files for the Assigned Agreements maintained by the Seller's Intellectual Property Legal Group.

"Effective Date" means the date set forth as the Effective Date on the signature page of this Agreement.

"Minimum Payment" has the meaning set forth in Paragraph 2.2(a).

"Net Royalty Collections" means the sum of all aggregate gross revenue or payments in-kind  received by Purchaser in connection with the grant of any rights under any of the Assigned Patent Rights including without limitation from all license and/or royalty agreements (including, without limitation, the Assigned Agreements) during the Term, less all aggregate reasonable out-of-pocket costs (including, without limitation, fees and expenses for travel, attorneys, patent maintenance, third party experts and consultants and court costs) actually paid after the Effective Date by or on behalf of Purchaser in the reasonable and good faith furtherance of the negotiation or enforcement of royalty and/or license agreements (including, without limitation, the Assigned Agreements) for third party services performed after the Effective Date or the assertion and prosecution of infringement claims during the Term.  Such out-of-pocket costs specifically do not include Purchaser's internal overhead such as Purchaser's salaries of employees and infrastructure.

"Seller's Net Royalty Payment" has the meaning set forth in Paragraph 2.2(a).

"Term" means the term of this Agreement, which shall begin on the Effective Date and end on the last to expire patent within the Assigned Patent Rights.

2.    Payments

2.1    Initial Payment. Within thirty (30) days after the Effective Date, Purchaser will pay to Seller Seventy-Five Thousand Dollars ($75,000.00) via certified or cashier's check sent to Seller's address set forth in Paragraph 8.6.

2.2    Ongoing Payments.

(a)    During the Term, Purchaser may pay to Seller a minimum payment of Twenty-Five Thousand Dollars ($25,000.00) per Contract Year within thirty (30) days after the end of each Contract Year (each such payment, a "Minimum Payment"). The Minimum Payments shall be creditable against any other payments made by Purchaser to Seller pursuant to Paragraph 2.2(b). Notwithstanding the foregoing, if Seller's Net Royalty Payment exceeds the Minimum Payment in a Contract Year, each dollar over and above the Minimum Payment shall be credited against succeeding Contract Years' Minimum Payment requirement. When aggregate payments made by Purchaser under this Agreement to Seller equal or exceed Two Hundred Thousand Dollars ($200,000.00), Purchaser shall irrevocably, fully, and completely own all right, title, and interest in, to, and under the Assigned Patent Rights and all minimum payment requirements shall be fully satisfied. In the event that funds from Net Royalty Collections payable to Seller under the terms hereof are insufficient in any year to satisfy the Minimum Payment obligations, Purchaser may advance its funds to satisfy such Minimum Payment obligations. In the event that Purchaser advances its funds to satisfy the Minimum Payment obligations, Purchaser shall be entitled to recoup such advances from future Net Royalty Collections which would be distributable to Seller, it being understood that Purchaser's advances would be made to satisfy the annual Minimum Payment timing differences that might arise rather than as payments which would be in excess of Seller's percentage interest in Net Royalty Collections.

(b)    During the Term, Purchaser will pay to Seller, within thirty (30) days after the end of each Contract Year, fifty percent (50%) of the aggregate Net Royalty Collections received by Purchaser during such Contract Year ("Seller's Net Royalty Payment").

As an example:

| Year | 1 | 2 | 3 |
|---|---|---|---|
| Beginning Net | 0 | -50,000 | 0 |
| Amount obtained from licensees | 100,000 | 200,000 | 800,000 |
| Cost of collections, etc. | 125,000 | 125,000 | 100,000 |
| Payment of 50% Net to IP | 0 | 12,500 | 350,000 |
| Minimum Payment to IP | 25,000 | 12,500 | 0 |
| Ending Net | -50,000 | 0 | 0 |

2.3    Statements and Payments. All payments hereunder shall be paid to Seller, without discount or offset, in United States of America Dollars. Accompanying each payment shall be a written report showing the computation of the payment with supporting information in sufficient detail for Seller to understand the basis for such computation. Payments and rendering of written statements shall be made at the address provided herein below or at such other

location as may be specified from time to time by notice in writing given to Purchaser by Seller. Acceptance by Seller of any payment tendered hereunder, whether or not the amount thereof shall be in dispute, shall not constitute acceptance of the account or written statement on which such payment is based.

    2.4   Records.   Purchaser shall keep full, true and accurate books of accounts and other records containing all particulars which may be necessary to properly ascertain and verify the payments due and payable to Seller by Purchaser hereunder. Purchaser shall upon Seller's written request to Purchaser, permit Seller to examine or have examined, at reasonable times during regular business hours, such of Purchaser's business records as may be necessary to determine the accuracy of any written statement or payment.

3.      Transfer of Rights

Seller hereby sells, assigns, transfers, and conveys to Purchaser, free and clear of any and all restrictions, liens, claims, and other encumbrances, all of Seller's right, title, and interest in and to the following:

    (i) the Assigned Patent Rights (Exhibit B) together with all causes of action (whether known or unknown, asserted or unasserted, or whether currently pending, filed, or otherwise) and other enforcement rights under, or on account of, any of the Assigned Patent Rights and any existing rights to apply in any or all countries of the world for patents, certificates of invention, utility models, industrial design protections, design patent protections, or other governmental grants or issuances of any type. Within thirty (30) days of the Effective Date, Seller will execute and deliver to Purchaser executed and notarized assignments suitable for recording Purchaser's ownership in the applicable patent offices throughout the world in the form attached hereto (as to the United States) or equivalent form of assignment for other jurisdictions;

    (ii) the Assigned Agreements together with the right to collect royalties, license fees or other payments under or on account of any of the Assigned Agreements. Within thirty (30) days of the Effective Date, Seller will notify, pursuant to the notice requirements under the Assigned Agreements, the parties to the Assigned Agreements of such transfer and, subsequent to such notice, Seller shall have no responsibility or obligations for any liability with respect to the Assigned Agreements, except to the extent any claims, demands or causes of action are the result of Seller's breaches of or defaults under the Assigned Agreements. Purchaser accepts no, and shall not have any, responsibilities or obligations of any kind with respect to any liability, claims, demands or causes of actions that may have accrued or existed under the Assigned Agreements, or otherwise, prior to the date notice is given under the Assigned Agreements but shall be responsible for such liability, claims, demands or causes of actions that accrue with respect to Listed Agreements subsequent to the date of such notice. Any correspondence from such parties to Seller shall be immediately forwarded to Purchaser. Notwithstanding the foregoing, with respect to any agreement of which Seller is unaware and which is an Unlisted Agreement on the Effective Date, (a) Seller's obligations with respect to the assignment thereof shall be limited to such assignment as is legally permissible and (b) to the extent such assignment is not legally permissible, Seller agrees to enforce such agreement as directed by Purchaser, at Purchaser's expense, pay all resulting proceeds to Purchaser, such expenses and proceeds then being treated as having been incurred by and accrued to Purchaser for purposes of Section 2.2 hereof.

4.    PARAGRAPH INTENTIONALLY DELETED

5.    Representations and Warranties of Seller

5.1    Seller hereby represents and warrants to Purchaser, as of the Effective Date, that (i) Seller is duly formed, validly existing, and in good standing under the laws of the jurisdiction of its formation, (ii) Seller is the owner of record of the Assigned Patent Rights, and (iii) Seller has all requisite power and authority to enter into, execute, and deliver this Agreement and perform fully its obligations hereunder.

5.2    Except as expressly provide in paragraph 5.1, Assigned Patent Rights and Assigned Agreements are assigned to Purchaser by Seller "AS IS". Seller makes no warranties or representations whatsoever with respect to

the Assigned Patent Rights and Assigned Agreements, including but not limited to. (i)a warranty of merchantability; (ii) a warranty of fitness for a particular purpose; (iii) a warranty that any particular result will be obtained through exercise of the rights granted hereunder;(iv) a warranty or representation as to the validity or scope of any Assigned Patent Rights; and (v) a warranty or representation that the Assigned Patent Rights or any use, license or sublicense thereof or any other exercise of the rights granted hereunder will be free of infringement of any patents or other proprietary rights of a third party.

6.      Representations and Warranties of Purchaser

Purchaser hereby represents and warrants to Seller, as of the Effective Date, that:

6.1      Purchaser is duly formed, validly existing, and in good standing under the laws of the jurisdiction of its formation.

6.2      Purchaser has all requisite power and authority to (i) enter into, execute, and deliver this Agreement and (ii) perform fully its obligations hereunder.

7.      License

7.1      License Grant. Subject to the terms and conditions of this Agreement, Purchaser hereby grants to Licensee a fully paid, perpetual, world wide, non-exclusive, nonsublicenseable, nontransferable license, under the Assigned Patent Rights, to make, have made, use, have used, sell, have sold, offer for sale, have offered for sale, have imported and import any product. Furthermore, where Licensee hereafter acquires a product from a third party vendor ("Vendor"), solely for Licensee's own internal business use but not for resale to or use by any other person, (a) Purchaser shall not enforce the Assigned Patents against such Vendor with respect to such product acquisition by Licensee and (b) Six Percent (6%) of the price paid by Licensee shall be credited against Purchaser's Minimum Payments otherwise due to Seller. As used in this subsection, "Licensee" means Seller and other entities as to which Seller possesses either majority voting control or, in the case of any entity in a foreign jurisdiction that prohibits, by law, majority control by a United States entity, the maximum percentage of control which is legally permitted.

7.2      No Other Rights. No right or license under any intellectual property rights is granted or shall be granted by either party by implication. All such rights or licenses are or shall be granted only as expressly provided in the terms of this Agreement.

8.      Miscellaneous

8.1      Limitation of Liability. NEITHER PARTY'S TOTAL LIABILITY UNDER THIS AGREEMENT WILL EXCEED ONE HALF OF THE PAYMENTS SET FORTH IN PARAGRAPHS 2.1 AND 2.2 OF THIS AGREEMENT.    THE PARTIES ACKNOWLEDGE THAT THE LIMITATIONS ON POTENTIAL LIABILITIES SET FORTH IN THIS PARAGRAPH 8.1 WERE AN ESSENTIAL ELEMENT IN SETTING CONSIDERATION UNDER THIS AGREEMENT.

8.2      Limitation on Consequential Damages. NEITHER PARTY WILL HAVE ANY OBLIGATION OR LIABILITY (WHETHER IN CONTRACT, WARRANTY, TORT (INCLUDING WITHOUT LIMITATION NEGLIGENCE) OR OTHERWISE, AND NOTWITHSTANDING ANY FAULT, NEGLIGENCE (WHETHER ACTIVE, PASSIVE OR IMPUTED), REPRESENTATION, STRICT LIABILITY OR PRODUCT LIABILITY), FOR ANY INCIDENTAL, INDIRECT OR CONSEQUENTIAL, MULTIPLIED, PUNITIVE, SPECIAL, OR EXEMPLARY DAMAGES OR LOSS OF REVENUE, PROFIT, SAVINGS OR BUSINESS ARISING FROM OR OTHERWISE RELATED TO THIS AGREEMENT, EVEN IF A PARTY OR ITS REPRESENTATIVES HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.    THE PARTIES ACKNOWLEDGE THAT THESE EXCLUSIONS OF POTENTIAL DAMAGES WERE AN ESSENTIAL ELEMENT IN SETTING CONSIDERATION UNDER THIS AGREEMENT.

8.3     Compliance With Laws.  Notwithstanding anything contained in this Agreement to the contrary, the obligations of the parties with respect to the consummation of the transactions contemplated by this Agreement shall be subject to all laws, present and future, of any government having jurisdiction over the parties and this transaction, and to orders, regulations, directions or requests of any such government.

8.4     Confidentiality.  For a period of three (3) years from the Effective Date, the parties hereto will keep the terms and existence of this Agreement and the identities of the parties hereto and their affiliates, as well as all information (including but not limited to Common Interest Material), documents, materials and things exchanged and assigned as contemplated herein, including without limitation the Assigned Patent Rights, Assigned Agreements, and Deliverables, confidential and will not now or hereafter divulge any of this information to any third party except (a) with the prior written consent of the other party; (b) as otherwise may be required by law or legal process, including, without limitation, in confidence to legal and financial advisors in their capacity of advising a party in such matters or potential successors-in-interest or acquirers; (c) during the course of litigation, so long as the disclosure of such terms and conditions is restricted in the same manner as is the confidential information of other litigating parties; (d) in confidence to its employees, consultants, legal counsel, accountants, banks and financing sources and their advisors solely in connection with complying with its obligations under this Agreement; (e) by Purchaser, in order to perfect Purchaser's interest in the Assigned Patent Rights, with any governmental patent office (including, without limitation, recording the Executed Assignments in any governmental patent office); or (f) to enforce Purchaser's right, title, and interest in and to the Assigned Patent Rights; provided that, in (b) and (c) above, (i) to the extent permitted by law, the disclosing party will use all legitimate and legal means available to minimize the disclosure to third parties, including, without limitation, seeking a confidential treatment request or protective order whenever appropriate or available; and (ii) the disclosing party will provide the other party with at least ten (10) days' prior written notice of such disclosure.  Without limiting the foregoing, Seller will cause its agents involved in this transaction to abide by the terms of this Paragraph 8.4, including, without limitation, ensuring that such agents do not disclose or otherwise publicize the existence of this transaction with actual or potential clients in marketing materials, or industry conferences.

8.5     Governing Law; Venue/Jurisdiction.  This Agreement will be interpreted, construed, and enforced in all respects in accordance with the laws of the State of New York, without reference to any choice or conflict of law principle that would result in the application of the laws of any State other than the State of New York.

8.6     Notices.  All notices given hereunder will be given in writing and will refer to Purchaser and to this Agreement and will be delivered to the address set forth below by (i) personal delivery, or (ii) delivery postage prepaid by the following international express courier services: FedEx, U.S.P.S., DHL or UPS.

|  |  |
|---|---|
| If to Purchaser | If to Seller |
| Jacklin Associates, Inc. | International Paper Company |
| Attention: President | Attention: Chief Counsel, Intellectual Property |
| 259 North Radnor Chester Road | 6285 Tri-Ridge Blvd. |
| Suite 210 | Loveland, OH 45140 |
| Wayne, Pennsylvania 19087 | |

Notices are deemed given on (a) the date of receipt if delivered personally or by express courier or, if such delivery refused, the date of refusal.  Either party may from time to time change its address for notices under this Agreement by giving the other party written notice of such change in accordance with this Paragraph 8.6.

8.7     Severability.  If any provision of this Agreement is found to be invalid or unenforceable, then the remainder of this Agreement will have full force and effect, and the invalid provision will be modified, or partially enforced, to the maximum extent permitted to effectuate the original objective.

8.8     Waiver. Failure by either party to enforce any term of this Agreement will not be deemed a waiver of future enforcement of that or any other term in this Agreement or any other agreement that may be in place between the parties.

8.9     Successors and Assigns. Each party may sell, transfer, assign, delegate, pledge or otherwise dispose of this Agreement as such party, in its sole discretion, deems fit. Any assignment inconsistent with this Paragraph 8.9 shall be null, void, and of no effect. All validly assigned and delegated rights and obligations of the parties hereunder shall be binding upon and inure to the benefit of and be enforceable by and against the successors and permitted assigns of each of the parties, as the case may be.

8.11    Independent Contractors. Seller and Purchaser are independent contractors. Neither Seller nor Purchaser nor their respective employees, members, consultants, contractors or agents are agents, fiduciaries, employees or joint venturers of the other party, nor do they have any authority to bind the other party by contract or otherwise to any obligation.

8.12    Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument. One or more copies of this Agreement may be executed but it shall not be necessary, in making proof of the existence of this Agreement, to provide more than one original copy. Facsimile signatures shall be acceptable to render this agreement binding, but those providing facsimile signatures shall follow up with original signatures by mail within a reasonable time.

8.13    Payment of Maintenance Fees. Subject to this subsection, the payment of maintenance fees of any patent within the scope of any Assigned Patent Rights shall be the responsibility of Purchaser. In the event that Purchaser decides to discontinue the payment of maintenance fees of any patent within the scope of any Assigned Patent Rights, then all right, title and interest in such patent shall forthwith and automatically revert to Seller. Purchaser shall, within at least four (4) months before the date of any payment due, provide to Seller written notice of such decision, and shall maintain any such Assigned Patent Rights in active status up to such date of payment. Upon receipt of such notice, Seller shall have the right but shall have no obligation, to take any action at its own expense, required to such Assigned Patent Right in active status. If Seller upon receipt of such notice, decides to maintain the said patent or patent application in active status, Purchaser shall, at the written request and expense of Seller, give assistance and information as it can reasonably supply from its records, and shall execute or cause to be executed such documents as Seller may reasonably required to maintain the active status of said Assigned Patent Rights in the name of Seller.

8.14 Revocation of Sale of Assigned Patents and Assigned Agreements. If Purchaser shall fail to pay any annual minimum payment when due, then Seller, may at its option, and in addition to any other remedies which it may have at law or in equity, revoke the sale of Assigned Patent Rights and Assigned Agreements to Purchaser by giving written notice thereof to Purchaser to such effect. In that event, the entire right, title and interest in and to the said Assigned Patent Rights and Assigned Agreements shall automatically revert to Seller. Within thirty (30) days after revocation of this Agreement, Purchaser shall submit to Seller a report in accordance with the provisions of paragraph 2.3 for the Contract Year in which revocation took place and therewith shall remit the amount of Seller's Net Royalty Payment then due for such Contract Year, if any and thereafter Purchaser shall have no responsibility or obligations with respect to the Assigned Agreements or payments, minimum or otherwise, of any kind or amount.

8.15    Miscellaneous. This Agreement, including its exhibits, constitutes the entire agreement between the parties with respect to the subject matter hereof and merges and supersedes all prior and contemporaneous agreements, understandings, negotiations, and discussions. Neither of the parties will be bound by any conditions, definitions, warranties, understandings, or representations with respect to the subject matter hereof other than as expressly provided herein. The paragraph headings contained in this Agreement are for reference purposes only and will not affect in any way the meaning or interpretation of this Agreement. No amendments or modifications will be effective unless in a writing signed by authorized representatives of both parties.

*[Signature Page Follows]*

In witness whereof, intending to be legally bound, the parties have executed this Patent Purchase Agreement as of the Effective Date.

SELLER:                              PURCHASER:

International Paper Company            Jacklin Associates, Inc.

By:_____            By:_____

Name:_____            Name:_____

Title:_____           Title:_____


Effective Date:  August _____, 2007

EXHIBIT A

ASSIGNED AGREEMENTS

Carotek
Monitoring Technology Corporation
Sensodec-OY
Papertech

EXHIBIT B

<u>ASSIGNED PATENTS</u>

| <u>Patent or Application No.</u> [Patent numbers] | <u>Serial No.</u> For applications | <u>Country</u> [Country] | <u>Filing Date</u> [Filing date(s)] | <u>Title of Patent and First Named Inventor</u> [Title of patent and name of first named inventor] |
|---|---|---|---|---|
| 5,821,990 | | U.S. | | |
| 5,899,959 | | U.S. | | |
| 6,363,621 | | U.S. | | |
| 6,613,195 | | U.S. | | |
| 6,207,020 | | U.S. | | |
| 5,717,456 | | U.S. | | |
| 6,211,905 | | U.S. | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

EXHIBIT C

DELIVERABLES

Seller will cause the following to be delivered to Purchaser, or Purchaser's representative prior to or at the Effective Date:

Agreement Files and Prosecution History Files maintained in Seller's Law Department.

EXHIBIT D
ASSIGNMENT OF PATENT RIGHTS

For good and valuable consideration, the receipt of which is hereby acknowledged, International Paper Company, a New York corporation ("Assignor"), does hereby sell, assign, transfer, and convey unto Jacklin ("Assignee"), or its designees, all right, title, and interest that exist today and may exist in the future in and to any and all of the following (collectively, the "Patent Rights"):

(a)    the provisional patent applications, patent applications and patents listed in the table below (the "Patents");

(b)    all reissues, reexaminations, extensions, continuations, continuations in part, continuing prosecution applications, requests for continuing examinations, divisions, registrations of any item in any of the foregoing categories (a);

(c)    all foreign patents, patent applications, and counterparts relating to any item in any of the foregoing categories (a) through (b), including, without limitation, certificates of invention, utility models, industrial design protection, design patent protection, and other governmental grants or issuances;

(d)    all rights to apply in any or all countries of the world for patents, certificates of invention, utility models, industrial design protections, design patent protections, or other governmental grants or issuances of any type related to any item in any of the foregoing categories (a) through (c), including, without limitation, under the Paris Convention for the Protection of Industrial Property, the International Patent Cooperation Treaty, or any other convention, treaty, agreement, or understanding;

(e)    all causes of action (whether known or unknown or whether currently pending, filed, or otherwise) and other enforcement rights under, or on account of, any of the Patents and/or any item in any of the foregoing categories (b) through (d), including, without limitation, all causes of action and other enforcement rights for

(i)    damages,
(ii)    injunctive relief, and
(iii)    any other remedies of any kind for past, current, and future infringement; and
(iv)    all rights to collect royalties and other payments under or on account of any of the Patents and/or any item in any of the foregoing categories (b) through (h).

| Patent or Application No. [Patent numbers] | Serial No. For applications | Country [Country] | Filing Date [Filing date(s)] | Title of Patent and First Named Inventor [Title of patent and name of first named inventor] |
|---|---|---|---|---|
| | | | | |
| 5,821,990 | | U.S. | | |
| 5,899,959 | | U.S. | | |
| 6,613,195 | | U.S. | | |
| 6,207,020 | | U.S. | | |
| 5,717,456 | | U.S. | | |
| 6,211,905 | | U.S. | | |

Assignor represents warrants and covenants the above as set forth in Paragraphs 5.1 and 5.2.

IN WITNESS WHEREOF this Assignment of Patent Rights is executed at _Loveland OH_ on ___ _10-19-2007_ .

ASSIGNOR:

INTERNATIONAL PAPER COMPANY

By: _____
Name: _NORMAN MARSOLAN_
Title: _DIRECTOR, R+D_
(Signature MUST be notarized)

STATE OF _OHIO_        )
                       ) ss.
COUNTY OF _CLERMONT_   )

On _10-19-2007_, before me, _JANE A. TOMLINSON_, Notary Public in and for said State, personally appeared _NORMAN MARSOLAN_, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her authorized capacity, and that by his/her signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

Signature _____        (Seal)



Jane A. Tomlinson
Notary Public, State of Ohio
My Commission Expires
June 19, 2012

# EXHIBIT 15

## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF NEW YORK

KOBAYASHI VENTURES, LLC,       :

       Plaintiff           :

                     :

       v.               :      Case No. 1:08-cv-04450-LAP

                     :

PAPERTECH INC.,             :

       Defendant.        :

                     :

---

### KOBAYASHI VENTURES' NOTICE OF OPPOSITION AND OPPOSITION TO PT PAPERTECH, INC.'S "MOTION TO DISMISS KOBAYASHI VENTURES' FIRST AMENDED COMPLAINT FOR FAILURE TO STATE A CLAIM PURSUANT TO FRCP 12(b)(6), AND IN THE ALTERNATIVE FOR SUMMARY JUDGMENT UNDER FRCP 56"

Plaintiff, Kobayashi Ventures, LLC ("KV" or "Plaintiff"), by and through its attorneys,

Jeffrey M. Schwaber, Alexia Kent Bourgerie, and Stein, Sperling, Bennett, De Jong, Driscoll &

Greenfeig, P.C., opposes PT Papertech Inc.'s Motion to Dismiss for Failure to State a Claim

Pursuant to Fed. R. Civ. P. 12(b)(6) or in the Alternative for Summary Judgment under Fed. R.

Civ. P. 56 ("Defendant's Motion"), for the grounds set forth in Kobayashi Ventures' Brief in

Opposition to Defendant's Motion filed simultaneously herewith.

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850
TELEPHONE 301/340-2020

1

By: _____/s/_____
Jeffrey M. Schwaber, NY Bar No. 4529699
Alexia Kent Bourgerie, *pro hac* admission
Attorneys for Plaintiff, Kobayashi Ventures, LLC
Stein, Sperling, Bennett, De Jong, Driscoll & Greenfeig, P.C.
25 West Middle Lane
Rockville, Maryland 20850
Telephone    : (301) 838-3210 (Jeffrey M. Schwaber)
Facsimile    : (301) 354-8110 (Jeffrey M. Schwaber)
Email        : jschwaber@steinsperling.com
Telephone    : (301) 838-3232 (Alexia Kent Bourgerie)
Facsimile    : (301) 354-8132 (Alexia Kent Bourgerie)
Email        : abourgerie@steinsperling.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 31st day of July, 2008, I will electronically file the foregoing with the Clerk of Court using the ECF system, which will then send a notification of such filing (NEF) to the following:

Oren J. Warshavsky
Jason S. Oliver
Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York 10111

Dabney Jefferson Carr, IV
Troutman Sanders, LLP
PO Box 1122
Richmond, VA 23218-1122

And I hereby certify that I will mail the document by U.S. mail to the following non-filing user(s):

J. Rick Taché (*pro hac* admission)
Janet Lynn Hickson (*pro hac* admission)
Elizabeth Weldon
Snell & Wilmer, LLP
600 Anton Blvd., Suite 1400
Costa Mesa, CA 92626

_____/s/_____
Jeffrey M. Schwaber

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

L:\CLIENTS\K\KobayashiVentures.LLC\Papertech.007\PLEADINGS\418 Cover Opp mtn dismiss and MSJ.doc

2

## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF NEW YORK

KOBAYASHI VENTURES, LLC,       :
:
     Plaintiff             :
:
    v.                  :     Case No. 1:08-cv-04450-LAP
:
PAPERTECH INC.,           :
:
     Defendant.         :
:

---

## KOBAYASHI VENTURES' NOTICE OF OPPOSITION AND OPPOSITION TO PT PAPERTECH, INC.'S "MOTION TO DISMISS KOBAYASHI VENTURES' FIRST AMENDED COMPLAINT FOR FAILURE TO STATE A CLAIM PURSUANT TO FRCP 12(b)(6), AND IN THE ALTERNATIVE FOR SUMMARY JUDGMENT UNDER FRCP 56"

---

# TABLE OF CONTENTS

Table of Authorities ................................................................................................. ii

I.     Introduction...................................................................................................1

II.    Pertinent Facts............................................................................................ 2

III.   Applicable Law and Argument.......................................................................5

      A.  Standard for Motion to Dismiss Under Fed. R. Civ. P. 12(b)(6)................5

      B.  The Court Should Deny Defendant's Motion to Dismiss...........................5

      C.  Standard for Motion for Summary Judgment ...............................................7

      D.  The Court Should Deny Defendant's Motion for Summary Judgment .......8

IV.   Conclusion ...............................................................................................13

L:\CLIENTS\K\Kobayashi Ventures.LLC\Papertech.007\PLEADINGS\10 table of contents.opposition to motion to dismiss.07.31.08.doc

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

# TABLE OF AUTHORITIES

## Cases

Agron v. Trustees of Columbia Univ., 1993 WL 118495 (S.D.N.Y. 1993)................................. 12

Airco Alloys Division, Airco, Inc. v. Niagra Mohawk Power Corp., 430 N.Y.S.2d 179, 186
    (1980)............................................................................................................................. 10

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).......................................................... 7

Ashfar v. Procon Inc., 442 F. Supp. 887 (1977),.......................................................................... 12

Beller v. William Penn Life Ins. Co. of N.Y., 778 N.Y.S.2d 82, 85 (2004)................................. 10

Bernheim v. Litt, 79 F.3d 318, 321 (2d Cir. 1996) ......................................................................... 5

Cities Serv. Helex, Inc. v. United States, 543 F.2d 1306, 1313 (Ct. Cl. 1976............................. 11

Conley v. Gibson, 355 U.S. 41, 45-46 (1957) ................................................................................. 5

DeKonty v. United States, 922 F.2d 826, 827-28 (Fed. Cir. 1991) ............................................... 11

Dow Chem. Co. v. United States, 226 F.3d 1334, 1344 (Fed. Cir. 2000) ..................................... 11

Ediciones Quiroga, S.L. v. Fall River Music, Inc., 1998 U.S. Dist. LEXIS 19039
    (S.D.N.Y. 1998)............................................................................................................... 12

Guilbert v. Gardner, 480 F.3d 140, 150 (2d Cir. (NY) 2007)....................................................... 10

In re Livent, Inc. Noteholders Sec. Litig., 355 F. Supp. 2d 722, 734 (S.D.N.Y. 2005) ................. 7

Ives v. Mars Metal Corp., 196 N.Y.S.2d 247, 249 (1960)......................................................... 9,10

Joyce v. Joyce Beverages, Inc., 571 F.2d 703, 706 (2d Cir. 1978).................................................. 5

McDonnell Douglas Corp. v. United States, 182 F.3d 1319, 1327 (Fed. Cir. 1999) ................... 11

Mobile Oil Exploration & Producing Southeast, Inc. v. United States, 530 U.S. 604 (2000) ..... 11

St. Paul Plow-Works v. Starling, 140 U.S. 184 (1891) ................................................................. 11

Stalis v. Sugar Creek Stores, Inc., 744 N.Y.S.2d 586, 587 (2002)................................................ 10

TIG Ins. Co. v. Newmont Mining Corp., 413 F. Supp. 273, 280 (S.D.N.Y. 2005)......................... 6

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

U.S. Broadcasting Co. Corp. v. National Broadcasting Co., Inc., 439 F. Supp. 8
  (D. Ma. 1977)..................................................................................................................... 9

**Statutes**

C.P.L.R. § 213(2)..................................................................................................................... 10

**Rules**

Fed. R. Civ. P. 12(d) ............................................................................................................ 7

Fed. R. Civ. P. 56(c) ............................................................................................................ 7

Federal Rule of Civil Procedure 56(e) ................................................................................. 7

**Treatises**

Restatement (Second) of Contracts (1979)\.......................................................................... 8

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF NEW YORK

KOBAYASHI VENTURES, LLC,       :

         Plaintiff           :

                         :

      v.                  :       Case No. 1:08-cv-04450-LAP

                         :

PAPERTECH INC.,          :

         Defendant.       :

                         :

## KOBAYASHI VENTURES' BRIEF IN OPPOSITION TO PT PAPERTECH, INC.'S MOTION TO DISMISS KOBAYASHI VENTURES' FIRST AMENDED COMPLAINT AND ALTERNATIVE MOTION FOR SUMMARY JUDGMENT

Plaintiff, Kobayashi Ventures, LLC ("KV" or "Plaintiff"), by and through its attorneys, Jeffrey M. Schwaber, Alexia Kent Bourgerie, and Stein, Sperling, Bennett, De Jong, Driscoll & Greenfeig, P.C., submits this brief in opposition to PT Papertech Inc.'s Motion to Dismiss for Failure to State a Claim Pursuant to Fed. R. Civ. P. 12(b)(6) or in the Alternative for Summary Judgment under Fed. R. Civ. P. 56 ("Defendant's Motion"), and states as follows:

I.     <u>INTRODUCTION</u>

The linchpin of Defendant's Motion is a set of material facts alleged by Defendant in Defendant's Motion—which genuinely are disputed, for which there is no verified support in the record, and as to which to date there has been no discovery whatsoever.

Specifically, Defendant rests its motion on a purported September 27, 2000 letter (the "Purported Letter") from its general manager, Kari Hilden, to the then licensor International Paper Company ("International Paper"), which states in pertinent part, "termination will go into effect 30 days following your receipt of this Notice." Defendant posits without <u>any</u> support that the Purported Letter was sent and properly was directed. In fact, International Paper has no

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

record of ever receiving the Purported Letter, by either Champion or International Paper. See Affidavit of Inger H. Eckert on behalf of International Paper, attached hereto as Exhibit 1 and adopted herein by reference. Regardless, assuming arguendo that this Purported Letter was sent, (i) on its face such a letter did not provide a notice in the manner required by the express terms of the License Agreement; (ii) there is no verification whatsoever of receipt; and (iii) in KV's view, based on these circumstances any such letter as misdirected and apparently not received did not operate to terminate the License Agreement and Defendant's obligations thereunder. Applying the standards applicable to Defendant's Motion and as fully discussed below, KV is entitled to proceed with its First Amended Complaint against Defendant, and Defendant's Motion in its entirety necessarily must be denied.

II.    PERTINENT FACTS

In Opposition to Motion to Dismiss

1.    On or about November 12, 1998, Defendant entered into the License Agreement acquiring patent rights to what now is known as KV's Patented Technology.[1]

2.    The License Agreement provides for certain royalties to be paid by Defendant.

3.    On the topic of the legal matter of a notice of termination, the License Agreement provides in pertinent part as follows:

> 21.1    It shall be sufficient giving any notice, report, or other communication hereunder, if the party giving same shall deposit a copy thereof in the Post office in a registered or certified envelope, by postage prepaid certified mail, or delivered by messenger or air courier addressed to the other party at the address provided hereinbelow or at such other address as may hereafter be designated in writing.
>
> If to CHAMPION:    For Business Matters:

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

---

[1] First Amended Complaint at ¶ 9 and the License Agreement which is attached thereto as Exhibit 3 and incorporated therein by reference.

2

Champion International Corporation
1 CHAMPION Plaza
Stamford, CT  06921
**ATTN:  Richard Piela**
**Director, Capital Project**
**Support and MRO**


For Legal Matters:

Champion International Corporation
1 CHAMPION Plaza
Stamford, CT  06921
**ATTN:  Richard C. Stewart, II**
**Chief Patent Counsel**

[Emphasis added.]

4.     On the topic of notice of termination, the License Agreement states in pertinent

part as follows:

16.3    LICENSEE shall have the right to terminate this Agreement upon
thirty (30) days prior written notice to CHAMPION to such effect, in which
event, this Agreement shall terminate on the thirty-first (31st) day after sending
such notice.[2]

5.     Defendant acknowledged and made certain royalty payments under the above-

referenced License Agreement, but thereafter stopped making payments, and continues to this

day to make, cause to be made, use, sell, and offer for sale products embodying KV's Patented

Technology, without complying with its contractual obligations.[3]

6.     A number of times, beginning July 16, 2004 and thereafter on or about November

1, 2007, Defendant has been notified in writing of its failure to make contractually-mandated

royalty payments.[4]

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

---

[2] First Amended Complaint at Exhibit 3 (License Agreement).
[3] First Amended Complaint at ¶ 13, and 20-22.
[4] First Amended Complaint at ¶ 14.

3

7.      In a letter dated June 27, 2008, KV notified Defendant of its default under the License Agreement and gave to Defendant an opportunity to cure by fulfilling its obligations under the License Agreement.[5] Defendant has failed to so cure.

8.      Since on or about December 10, 2007, KV has been the owner of the Patented Technology.[6]

<u>In Opposition to Motion for Summary Judgment</u>

9.      The Declaration of counsel attached to Defendant's Motion is not based on first-hand knowledge as would be required for consideration in connection with a motion for summary judgment ("Defective Declaration").

10.     The only "fact" alleged in the Defective Declaration of counsel is that the Purported Letter attached to the Declaration is a true copy of such a letter.  That "fact" is immaterial, and entirely misses the point.

11.     There is no verification that the Purported Letter was or was not sent, when and as addressed, or otherwise.

12.     There is no verification as to how the Purported Letter was sent (such as regular mail, certified mail, registered mail).

13.     There is no verification that the Purported Letter was received, as addressed or otherwise.  Upon information and belief, such a letter was not received until 2007.

14.     The Affidavit of Inger H. Eckert on behalf of International Paper, <u>Exhibit 1</u> hereto, verifies nonreceipt of the Purported letter stating in pertinent part, "There was no indication from the File Materials that any such letter or notice dated September 27, 2000 ever was received by Champion or International Paper."

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

---

[5] First Amended Complaint at ¶ 15.

4

15.    Based on the circumstances, the Purported Letter did not operate to terminate the License Agreement and Defendant's obligations thereunder.[7]

## III.    APPLICABLE LAW AND ARGUMENT

Applying the applicable standard, the Court should deny Defendant's Motion to Dismiss.

### A.    Standard for Motion to Dismiss Under Fed. R. Civ. P. 12(b)(6)

Pursuant to Fed. R. Civ. P. 12(b)(6), "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957). Further, the Court must accept plaintiff's allegations as true. See Joyce v. Joyce Beverages, Inc., 571 F.2d 703, 706 (2d Cir. 1978). Defendant's Motion also recites the standard, "the court 'must accept the factual allegations of the complaint as true and must draw all reasonable inferences in favor of the plaintiff.'" Defendant's Motion at III.A. (citing Bernheim v. Litt, 79 F.3d 318, 321 (2d Cir. 1996)).

### B.    The Court should deny Defendant's Motion to Dismiss.

Defendant states two grounds for seeking dismissal: (1) alleging no contract between the parties; and (2) alleging that the statute of limitations bars KV's claims. As to both alleged grounds, the first alleging no contract and the second alleging the bar of the statute of limitations based on Defendant's factual allegation that the License Agreement terminated as a result of a letter dated September 27, 2000, accepting as true Plaintiff's allegations as stated in the First Amended Complaint and as in part re-stated in Section II (Pertinent Facts) above, the Court

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

---

[6] First Amended Complaint at ¶ 6.
[7] In fact, on July 28, 2008, pursuant to ¶ 16.2 of the License Agreement, termination occurred on the 31st day following KV's June 27, 2008 termination letter to Defendant.

necessarily must reject both alleged grounds for dismissal of Plaintiff's First Amended Complaint.

As to the first alleged ground, to establish a claim for breach of a contract, KV must prove the following: (1) a contract, (2) performance of the contract by one party, (3) breach by the other party, and (4) damages." See TIG Ins. Co. v. Newmont Mining Corp., 413 F. Supp. 273, 280 (S.D.N.Y. 2005) (internal citations omitted). Accepting as true KV's allegations as stated in the First Amended Complaint and as in part re-stated in Section II (Pertinent Facts) above, a valid contract existed between KV and Defendant until July 28, 2008.[8] Defendant does not dispute the fact that it neither has paid nor reported royalties, as the License Agreement requires, since September 2000. See Defendant's Motion at III.D.2. Instead, Defendant simply asserts that it somehow terminated the License Agreement. This issue is self-evidently contested, and there is no legal support for Defendant's notion that merely because it says it terminated, that "fact" becomes true. Defendant's alleged failure to make and report royalty payments unequivocally would constitute material breaches of the License Agreement. KV has sustained and alleges that it has sustained monetary damages as the result of Defendant's material breaches.[9]

Defendant's second alleged basis for dismissal is statute of limitations. The set of material facts alleged by Defendant in Defendant's Motion genuinely are disputed. There is no verified support in the record for Defendant's "facts," and to which to date there has been no discovery whatsoever. Defendant raises this set of material facts from matters outside the First Amended Complaint—specifically with a Defective Declaration which on its face is not based

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850
TELEPHONE 301/340-2020

---

[8] See, for example, First Amended Complaint at ¶¶ 9 and 19-23 and the License Agreement which is attached thereto as Exhibit 3 and incorporated therein by reference.
[9] First Amended Complaint at ¶ 22.

6

on first-hand knowledge. More importantly, as to these matters outside the pleadings raised by Defendant, from a substantive standpoint the Defective Declaration completely misses the mark. Again and as stated above, any such letter if sent, was misdirected and apparently was not received until 2007. Defendant's misguided statute of limitations argument, which requires the Court to consider facts outside the First Amended Complaint, is addressed further below in opposition to the alternative motion for summary judgment. See generally Fed. R. Civ. P. 12(d), "Result of Presenting matters Outside the Pleadings."[10]

<div align="center">Applying the applicable standard, the Court should deny<br>Defendant's alternative Motion for Summary Judgment.</div>

C.      Standard for Motion for Summary Judgment

The Court only may grant a motion for summary judgment if there are no genuine issues of material fact and if "the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).   The Court must accept all of the nonmoving party's assertions as true and view all reasonable inferences in favor of the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).   Federal Rule of Civil Procedure 56(e) entitled, "Affidavits; Further Testimony," states in pertinent part, "A supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated."   See also In re Livent, Inc. Noteholders Sec. Litig., 355 F. Supp. 2d 722, 734 (S.D.N.Y. 2005).

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

---

[10] Fed. R. Civ. P. 12(d) states, "If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.  All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."

<div align="center">7</div>

D.    The Court should deny Defendant's Motion for Summary Judgment.

The central fact Defendant disputes in Defendant's Motion is that it still was obligated under the License Agreement after September of 2000. Defendant claims that it effectively terminated the License Agreement by mailing notice in an unspecified manner to Richard Piela, to whom such a notice was not properly directed under the License Agreement. KV disputes Defendant's bald, unsupported assertion of a material fact that it gave proper notice of termination pursuant to the License Agreement by sending the Purported Letter. The Purported Letter on its face improperly was addressed to Mr. Piela as the business contact. Any such letter must have been addressed to Mr. Stewart as the legal contact pursuant to the License Agreement. The Purported Letter on its face was not sent in an indicated method for which there would have been a proof of receipt such as certified or registered mail. The Purported Letter on its face states that it intended to be effective 30 days from its receipt. There is nothing in the record on the topic of actual receipt of such a letter by a proper person, or anyone for that matter. The Affidavit of Inger H. Eckert on behalf of International Paper, Exhibit 1 hereto, verifies to the contrary. Defendant cites no authority to support its bald contention that it allegedly sent notice, or that it sent it to the proper person.[11] In fact, the suggestion strains credulity that a purported termination of the License Agreement would be sent without counsel, in an unspecified manner, to the wrong person, with no proof of mailing or delivery.

On July 16, 2004, the licensor wrote to Defendant, by Kari Hilden, demanding payment of the outstanding royalties.[12] More than a month later, on August 23, 2004, E. Michael Heaven, General Manager of Defendant, responded but tellingly -- and with no explanation now offered -

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850
TELEPHONE 301/340-2020

---

[11] In the absence of authority to support this assertion it should be noted that Defendant has cited a number of unpublished opinions, as well as a case from the 19th Century.

[12] First Amended Complaint at ¶ 14.

8

- did not attach the Purported Letter. Upon KV's information and belief, it was not until that time that the licensor had any knowledge of Defendant's purported earlier attempt to terminate the License Agreement.

The cases Defendant cites are inapposite. Defendant relies on two cases to support the proposition that requiring a party to send notice to the person specified in a contract is "hypertechnical in the extreme." Defendant's Motion at 11. Defendant first relies on <u>Ives v. Mars Metal Corp.</u>, 196 N.Y.S.2d 247, 249 (1960), which held, "where <u>actual</u> notice of termination has in fact been given, the form is of little import..." (underscore added). In KV's case, no actual notice was given. As discussed, there is nothing verified in the record to support Defendant's naked assertion. Secondly, the <u>Ives</u> case does not discuss whether the contract at issue provided specific notice provisions, as does the subject License Agreement. The defendant in <u>Ives</u> provided notice to plaintiff's counsel rather than to plaintiff itself. <u>Ives</u>, 196 N.Y.S.2d at 249. In KV's case, had Defendant provided proper written notice to licensor's counsel, Mr. Stewart, pursuant to the express notice terms of the License Agreement, the fact and timing of any notice easily could be demonstrated. Instead, unlike <u>Ives</u>, Defendant has <u>no</u> evidence of actual notice, and simply posits that assertion, as if to make it so.

Defendant also relies on the case of <u>U.S. Broadcasting Co. Corp. v. National Broadcasting Co., Inc.</u>, 439 F. Supp. 8 (D. Ma. 1977). The <u>U.S. Broadcasting</u> case is inapposite similarly in that the party receiving the notice had <u>actual</u> notice. 439 F. Supp. at 10. The plaintiff in <u>U.S. Broadcasting</u> responded to defendant's termination notice within days of defendant sending the letter. In contrast, in KV's case, licensor did not receive the Purported Letter for more than seven (7) years—until 2007. The court in <u>U.S. Broadcasting</u> based its decision upon a finding that, "it is clear that plaintiff and plaintiff's counsel timely received both

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

9

notices and it would be hypertechnical in the extreme to hold that notice <u>actually</u> received was ineffective." <u>Id.</u> at 10 (underscore added) (citing <u>Ives v. Mars Metal Corp.</u>, 196 N.Y.S.2d 247, 249 (1960)). No such actual notice exists here.

KV's Complaint is well within the statute of limitations. Under New York law, pursuant to C.P.L.R. § 213(2) the statute of limitations on a breach of contract claim is six years. "If, however, a contract requires continuing performance over a period of time, each successive breach may begin the statute of limitations running anew." <u>Guilbert v. Gardner</u>, 480 F.3d 140, 150 (2d Cir. (NY) 2007). <u>See also Beller v. William Penn Life Ins. Co. of N.Y.</u>, 778 N.Y.S.2d 82, 85 (2004); <u>Stalis v. Sugar Creek Stores, Inc.</u>, 744 N.Y.S.2d 586, 587 (2002); <u>Airco Alloys Division, Airco, Inc. v. Niagra Mohawk Power Corp.</u>, 430 N.Y.S.2d 179, 186 (1980).

Defendant admits, "The License Agreement … required Papertech to report and pay royalties twice a year." Defendant's Motion at III.D.2. Paragraph 1.8 of the License Agreement requires the semiannual reports and payments the Defendant cites "during the term of this Agreement…" Paragraph 16.1 of the License Agreement states that the License Agreement "shall continue in full force and effect for the term of the last to expire Patent Rights…" By its express, unambiguous terms, the License Agreement is a contract that "requires a continuing performance over a period of time." <u>See Guilbert</u>, 480 F.3d at 150.

Defendant also concedes that it did not make payments or reports after September of 2000. Therefore, Defendant did not fulfill the continuing performance that it was required to fulfill under the License Agreement. Defendant was in material breach of the License Agreement when it failed to make payments and reports in 2000, and it continued to be in material breach of the continuing nature of the License Agreement until the License Agreement terminated pursuant to proper notice by KV effective July 28, 2008.

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850
TELEPHONE 301/340-2020

Defendant argues that its "failure to timely make the royalty payment and provide the associated reports" constituted an unequivocal breach of the license agreement on March 1, 2001. KV agrees. However, § 16.7 of the License Agreement makes it abundantly clear that a failure to notify or to terminate does not condone the breach or constitute a waiver of future breaches or defaults. See generally Dow Chem. Co. v. United States, 226 F.3d 1334, 1344 (Fed. Cir. 20000) ("Repudiation is a statement by the obligor to the obligee indicating that the obligor will commit a breach that would itself give the obligee a claim for damages for total breach") (quoting Mobile Oil Exploration & Producing Southeast, Inc. v. United States, 530 U.S. 604, 607-08 (2000) (citing Restatement (Second) of Contracts (1979))). Repudiation occurs when one party refuses to perform and communicates that refusal distinctly and unqualifiedly to the other party. See DeKonty v. United States, 922 F.2d 826, 827-28 (Fed. Cir. 1991) (citation omitted). The injured party can choose between terminating the contract or continuing it. See St. Paul Plow-Works v. Starling, 140 U.S. 184 (1891); McDonnell Douglas Corp. v. United States, 182 F.3d 1319, 1327 (Fed. Cir. 1999); Cities Serv. Helex, Inc. v. United States, 543 F.2d 1306, 1313 (Ct. Cl. 1976).

Without distinguishing each of the many cases cited by Defendant for the proposition that a cause of action for a breach of contract claim accrues at the time of the breach, none of the cases cited by Defendant presents facts analogous to KV's case. None of the cases cited by Defendant involves a situation in which there is a dispute over both the nature and timing of the breach. The Court "must draw all reasonable inferences in favor of the plaintiff."[13]

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

---

[13] Defendant's Motion at III.A.

11

Defendant cites several inapposite cases to address KV's then anticipated argument regarding continuing performance.[14]  First, the case of <u>Ashfar v. Procon Inc.</u>, 442 F. Supp. 887 (1977), involves a situation wherein there is no dispute as to whether the contract at issue was terminated, and if so, when.  In contrast to this case, in the <u>Ashfar</u> case, the agreement unequivocally was terminated on a certain date; and that the date of termination was the date from which the statute should run, as the agreement was not one which imposed a continuing duty on the Defendant.  <u>Id.</u>

Second, Defendant relies in part on the case of <u>Ediciones Quiroga, S.L. v. Fall River Music, Inc.</u>, 1998 U.S. Dist. LEXIS 19039 (S.D.N.Y. 1998)   This unreported case involves a clear, proper, and unequivocally communicated notice of termination of the underlying agreement—in contrast to this case.  Third, Defendant relies in part on the case of <u>Agron v. Trustees of Columbia Univ.</u>, 1993 WL 118495 (S.D.N.Y. 1993).  The unpublished <u>Agron</u> case does not even address a contract requiring a continuing performance.  The plaintiff in <u>Agron</u> was denied admission to Columbia University after the University promised her that it would readmit her.  1993 WL 118495 at *1.  Columbia University had no continuing obligation to perform for Agron.  It simply had a one-time obligation to admit her to the university.  Therefore the <u>Agron</u> case also is inapposite.

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

---

[14] In Defendant's Motion at III.D.3, Defendant states, "Kobayashi is likely to argue that it is not suing for wrongful termination of the License Agreement, but rather that it is suing for each failure to make royalty payments with the six year statute of limitations period.

12

* * *

WHEREFORE, in consideration of the forgoing grounds and the record herein, Plaintiff

respectfully requests that this Honorable Court deny Defendant's Motion in its entirety and grant

to Plaintiff such other and further relief as the Court deems just and proper.

By:    _____
       /s/
       Jeffrey M. Schwaber, NY Bar No. 4529699
       Alexia Kent Bourgerie, *pro hac* admission
       Attorneys for Plaintiff, Kobayashi Ventures, LLC
       Stein, Sperling, Bennett, De Jong, Driscoll & Greenfeig, P.C.
       25 West Middle Lane
       Rockville, Maryland 20850
       Telephone    :  (301) 838-3210 (Jeffrey M. Schwaber)
       Facsimile    :  (301) 354-8110 (Jeffrey M. Schwaber)
       Email        :  jschwaber@steinsperling.com
       Telephone    :  (301) 838-3232 (Alexia Kent Bourgerie)
       Facsimile    :  (301) 354-8132 (Alexia Kent Bourgerie)
       Email        :  abourgerie@steinsperling.com

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850
TELEPHONE 301/340-2020

13

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 31st day of July, 2008, I will electronically file the foregoing with the Clerk of Court using the ECF system, which will then send a notification of such filing (NEF) to the following:

> Oren J. Warshavsky
> Jason S. Oliver
> Baker & Hostetler LLP
> 45 Rockefeller Plaza
> New York, New York 10111
>
> Dabney Jefferson Carr, IV
> Troutman Sanders, LLP
> PO Box 1122
> Richmond, VA 23218-1122

And I hereby certify that I will mail the document by U.S. mail to the following non-filing user(s):

> J. Rick Taché (*pro hac* admission)
> Janet Lynn Hickson (*pro hac* admission)
> Elizabeth Weldon
> Snell & Wilmer, LLP
> 600 Anton Blvd., Suite 1400
> Costa Mesa, CA 92626

/s/
_____
Jeffrey M. Schwaber

L:\CLIENTS\K\KobayashiVentures.LLC\Papertech.007\PLEADINGS\418 Opp mtn dismiss and MSJ rev 07 31 08 withaff.FINAL.doc

STEIN, SPERLING, BENNETT,
DE JONG, DRISCOLL &
GREENFEIG, P.C.

ATTORNEYS AT LAW
25 WEST MIDDLE LANE
ROCKVILLE, MARYLAND 20850

TELEPHONE 301/340-2020

14

# Exhibit 16



Monitoring
Technology

April 25, 2000

Champion International Corporation
Attn: Richard A. Piela
One Champion Plaza
Stamford, CT 06921

re: Digital Break Camera System Patent License Royalty Matter

Dear Dick:

In response to you letter inquiry of April 11, 2000, this will provide you notice of Monitoring Technology Corporation's position regarding any royalties accruing the License Agreement covering the Digital Break Camera patents, dated July 29, 1998. As you know, under Article XIV of the License Agreement, Monitoring Technology is entitled to Most Favored License terms with respect to any third party licensee. It is our understanding and belief that Champion's ongoing discussions with Honeywell in which Honeywell has not been paying a comparable license fee, runs contrary to the spirit and letter of that Article and places our company at a competitive disadvantage with respect to Honeywell.

We are taking the position that, while the terms and conditions of Honeywell's arrangement with Champion is unclear, Monitoring Technology is entitled to no less favorable terms. Thus, until we are advised by Champion to the contrary, we must assume that Honeywell has not been paying any patent royalties to Champion for the Digital Break Camera System. Thus, Monitoring Technology is not liable for any royalties for the same period in which Honeywell has been utilizing the same patent rights, royalty free. Since the certainty of whether royalties are, in fact, accruing to the benefit of Champion, those royalty payments otherwise due shall be deposited in an escrow account and held in trust for Champion. As you can surely appreciate, this intermediate measure will address the unfair competitive advantage currently enjoyed by Honeywell flowing from its not having to pay an equivalent royalty for its competing break detection system. Once the Most Favored License term has been resolved to its satisfaction, Monitoring Technology will release the escrowed funds in an amount corresponding with Honeywell's liability for its use of competing technology.

I have attached our report for 1Q00. We appreciate your understanding in this matter and look forward to a timely resolution of the same.

Very truly yours,

James Dechman

Attachment.

Attorney, Eyes, Only.