UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------X
CAROTEK, INC.,

                    Plaintiff,

        - against -                          **MEMORANDUM AND ORDER**

                                             07 Civ. 11163 (NRB)
KOBAYASHI VENTURES, LLC; EQUAPHOR, INC.;
and JAMES DECHMAN,

                    Defendants.
---------------------------------------X
EVENT CAPTURING SYSTEMS, INC.,

                    Plaintiff,

        - against -
                                             08 Civ. 5706 (NRB)
KOBAYASHI VENTURES, LLC; EQUAPHOR, INC.;
and JAMES DECHMAN,

                    Defendants.
---------------------------------------X
**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

        Plaintiffs Carotek, Inc. ("Carotek") and Event Capturing

Systems, Inc. ("ECS") filed separate actions, now consolidated,

seeking, inter alia, a declaratory judgment that three patents

owned by defendant Kobayashi Ventures, LLC ("Kobayashi") are

invalid and unenforceable, and monetary relief based on unfair

trade practices, interference with prospective advantage, fraud,

and defamation. Kobayashi has asserted counterclaims for patent

infringement and breach of a license agreement. Presently before

us are the parties' cross-motions for summary judgment on these

claims and related affirmative defenses.

For the reasons stated herein, we grant plaintiffs' motion to invalidate the independent claims of the patents containing the claim term "control means" but deny it as to the claim term "extract." We also grant plaintiffs' motion to invalidate one of Kobayashi's patents as anticipated, until September 14, 2010, when a certificate of correction was issued. Additionally, we deny plaintiffs' motion as to a finding of non-infringement.

Moreover, we grant defendants' motion as to the return of licensing fees to Carotek. Although we cannot find that federal patent law preempts plaintiffs' state claims, we nevertheless grant defendants' motions on those claims because plaintiffs have not demonstrated that Kobayashi's actions caused them damages. Finally, we grant defendants' motions with respect to plaintiff's individual claims against James Dechman.

## BACKGROUND[1]

### I.   The Patents

Kobayashi currently holds the three patents that are at issue in this litigation: U.S. patent numbers 5,717,456 (the

---

[1] We assume familiarity with the background of this case as discussed in our prior decisions. See Carotek, Inc. v. Kobayashi Ventures, LLC ("Carotek I"), Nos. 07 Civ. 11163, 08 Civ. 5706, 2009 U.S. Dist. LEXIS 79812 (S.D.N.Y. Aug. 31, 2009); Carotek, Inc. v. Kobayashi Ventures, LLC ("Carotek II"), Nos. 07 Civ. 11163, 08 Civ. 5706, 2010 U.S. Dist. LEXIS 37800 (S.D.N.Y. Apr. 12, 2010); Carotek, Inc. v. Kobayashi Ventures, LLC ("Carotek III"), Nos. 07 Civ. 11163, 08 Civ. 5706, 2011 U.S. Dist. LEXIS 102014 (S.D.N.Y. Sept. 8, 2011). We highlight only those facts pertinent to the instant motions, which -- unless otherwise noted -- are derived from the undisputed or improperly disputed facts in the parties' Statements of Material Facts pursuant to Local Rule 56.1, the uncontroverted record evidence, and this Court's prior decisions.

"'456 Patent"), 5,821,990 (the "'990 Patent"), and 6,211,905 (the "'905 Patent") (collectively, the "Patents"). The Patents belong to a family of patents and contain materially identical disclosures. They relate to a system for monitoring a continuous manufacturing process (for instance, the process by which paper is manufactured) and detecting flaws or deviations in the product or process. The system includes some means of monitoring production -- such as multiple video cameras positioned along the process -- and recording video, which is then converted into digitized data and digitally stored. A control device, such as a computer, interfaces with the digital storage devices, extracts video clips reflecting any detected deviations, and displays them for viewing, presumably so the problem can be identified and remedied.

The prosecution history of the Patents is convoluted.[2] Kobayashi filed application number 08/399,235 (the "'235 Application") on March 6, 1995, from which the '456 Patent

---

[2] The ownership of the Patents is likewise full of twists and turns. Kobayashi was not the original holder of the Patents. Rather, they were assigned in the first instance to Champion International Corp. ("Champion"), which thereafter merged into International Paper Co. ("International Paper") on December 31, 2000. Later the Patents were sold to Jacklin Associates, Inc., before being transferred to Kobayashi on December 10, 2007. Kobayashi assigned its rights in the Patents to Monitoring Technology Corp. ("MTC") on October 23, 2009. MTC subsequently changed its name to Equaphor, Inc. ("Equaphor"), approximately one year prior to its filing for Chapter 7 liquidation on December 16, 2010. In the ensuing bankruptcy proceeding, Kobayashi repurchased the rights to the Patents and still retains them. In light of the complexities of this history, we refer to the owner of the Patents at all times as "Kobayashi" and do not differentiate between it and the other companies just described unless necessary. Similarly, references to "Equaphor" also encompass MTC.

issued on February 10, 1998. While the '235 Application was pending, Kobayashi filed a patent application with a similar specification in South Africa; that application was published and issued as a patent on August 28, 1996 (the "South African Patent").

On September 3, 1997, still prior to the issuance of the '456 Patent, Kobayashi filed application number 08/929,231 (the "'231 Application") as a division[3] of the '235 Application. The '990 Patent, claiming priority to the '235 Application and the '456 Patent, issued from the '231 Application on October 13, 1998. Prior to the '990 Patent's issuance, Kobayashi disclaimed the portion of its patent term extending beyond that of the '456 Patent. The two patents thus expire on the same date.

Before the '990 Patent issued, on July 30, 1998, Kobayashi filed a continuing prosecution application ("CPA")[4] of the '231 Application. Kobayashi, however, had filed the CPA in error, and on April 5, 1999 it petitioned pursuant to 37 C.F.R. § 1.183 to modify the CPA to become a division of the '231 Application. (Decl. of Deanna L. Peters in Supp. of Kobayashi Ventures LLC's Opp'n to Carotek's and ECS' Mot. for Summ. J. ("Peters Decl."),

---

[3] A divisional application or "division" is "[a] later application for an independent or distinct invention, carved out of a pending application and disclosing and claiming only subject matter disclosed in the earlier or parent application." U.S. Patent & Trademark Office, Manual of Patent Examining Procedure ("MPEP") § 201.06 (2010).

[4] A CPA is treated as an amended, rather than new, application and acts as an abandonment of the prior application. See generally MPEP § 201.06(d).

Ex. 11, Petition Under 37 CFR § 1.183 Suspension of Rules (the "Petition").) The Petition was granted on September 29, 1999, and the resulting application was assigned number 09/398,528 (the "'528 Application"). In September of the following year, Kobayashi disclaimed the portion of the term of the patent to issue from the '528 Application that exceeded the patent term of the '990 Patent. At the same time, upon request from the United States Patent and Trademark Office (the "PTO"), Kobayashi submitted a new inventors' declaration for the '528 Application,[5] which declaration claimed the benefit of the '235 Application and '456 Patent.

On April 3, 2001, the '905 Patent issued from the '528 Application, claiming priority only to the '231 Application and '990 Patent. On August 12, 2010, after the priority of the '905 Patent became an issue in this litigation, Kobayashi requested from the PTO a certificate of correction pursuant to 35 U.S.C. §§ 254 and 255 to change the patent's claim of priority to the '235 Application and '456 Patent. Kobayashi paid the PTO's fee for the change (Oral Arg. Tr. 41:2-5), and the request was granted on September 14, 2010 (Peters Decl., Ex. 17, Certificate of Correction (the "Certificate")).

---

[5] The inventors' declaration initially submitted with the '528 Application was identical to the declarations filed with the '235 and '231 Applications. The PTO, however, deemed its third iteration illegible and requested a new declaration.

The relevant information pertaining to the various applications and patents is summarized in the table below.

| Date Filed | Application Number | Type | Patent Number | Date Issued |
|---|---|---|---|---|
| March 6, 1995 | '235 | Parent | '456 | February 10, 1998 |
| November 13, 1995 | n/a | South African | n/a | August 28, 1996 |
| September 3, 1997 | '231 | Division of '235 Application | '990 | October 13, 1998 |
| July 30, 1998 | n/a | CPA of '231 Application | n/a | n/a |
| September 29, 1999 | '528 | Division of '231 Application | '905 | April 3, 2001 |
| August 12, 2010 | n/a | Correction | n/a | September 14, 2010 |

## II.  Plaintiffs' Business

Carotek, among other pursuits, used to market and sell an event-capturing system for monitoring industrial processes, particularly packaging and paper-making. Carotek sold its monitoring-systems business to ECS on December 31, 2007,[6] and ECS has continued to develop the product. Together, plaintiffs have developed a number of versions of the monitoring system, and

---

[6] Although there is no documentation of the transaction in the record, the parties appear to agree that ECS paid Carotek $1 for the transfer of the business. There is also no evidence that Carotek sold any video monitoring systems after December 31, 2007, although it did invoice customers and receive payment for systems sold prior to that date, and it is disputed whether, at any point after 2007, Carotek continued to service products that it had previously sold or that ECS was selling.

Kobayashi accuses, in particular, ECS View versions 4 through 11, Modular RetroSpek, RetroSpek II, and RetroSpek IV of infringing the Patents. ECS View version 11 -- the most recent version of Carotek and ECS's system -- was completed in July of 2009, and ECS began selling that version around September 2009.

### III. Licensing Agreements

Effective December 8, 1998, Carotek entered into a licensing agreement with Kobayashi for the technology that Kobayashi was in the process of patenting. (Peters Decl., Ex. 1, License Agreement (the "Agreement").) That agreement provides a system for calculating royalty payments to be made to the holder of the Patents, including a minimum of $25,000 to be paid each year. (Id. ¶ 3.4); see also Carotek II, 2010 U.S. Dist. LEXIS 37800, at *23-24. Between 1999 and 2005, Carotek paid $123,421.79 to Kobayashi, and it ceased making royalty payments entirely no later than June 2005.

The Agreement also contains a "most favored licensee" provision, obligating Kobayashi to notify Carotek if Kobayashi enters into any licenses for the Patents with third parties on terms more favorable than Carotek's. (Agreement ¶ 12.1); see also Carotek I, 2009 U.S. Dist. LEXIS 79812, at *6-9.

Kobayashi had entered into a similar licensing agreement with Papertech, Inc. ("Papertech") on November 12, 1998. See id. at *4. Papertech stopped making payments under that agreement as

early as September 27, 2000. <u>See</u> <u>id</u>. Kobayashi and its predecessors did not sue for these payments until years later. <u>See</u> <u>id</u>. at *8-9.

At some point during International Paper's time as owner of the Patents, Equaphor also acquired a license to use the patented technology. Eventually Equaphor, like Papertech, ceased paying its royalties, which were not pursued for a period of at least two years. (Decl. of Michael Autuoro in Supp. of Carotek, Inc. and Event Capturing Systems, Inc.'s Responses to Mot. for Partial Summ. J. Filed by Kobayashi Ventures, LLC and James Dechman, Ex. 1A, Tr. of Equaphor Bankr. Hr'g, No. 10-20490-SSM, at 102:20-103:2 (Bankr. E.D. Va. May 2, 2011).)

## IV.  **The Letters**

On April 24, 2008 -- as discussed in more detail below, after Kobayashi had already filed its counterclaims against Carotek -- Kobayashi's counsel, Jeffrey M. Schwaber, Esq., sent letters (the "Letters") on behalf of Kobayashi to ten companies -- Sappi Fine Paper ("Sappi"), Procter & Gamble ("P&G"), NewPage Corp. ("NewPage"), Kimberly-Clark Corp. ("Kimberly-Clark"), J.D. Irving, Ltd. ("JDI"), Georgia-Pacific Corp. ("Georgia-Pacific"), Domtar Corp. ("Domtar"), AbitibiBowater Inc. ("AbitibiBowater"), Sonoco, and Quebecor World ("Quebecor") (collectively, the

"Customers," and each a "Customer") -- that had purchased event-monitoring systems from Carotek or ECS.[7]

The Letters are the same in all material respects and informed the Customers of the pending litigation between Carotek and Kobayashi. In most relevant part, they state that Kobayashi "has sued Carotek for Patent Infringement and Breach of License Agreement" and "suspects [the Customers] unwittingly may be using unlicensed Products, either acquired directly from Carotek, from a distributor, or from a third party," which "would expose [the Customers] to potential liability." The Letters further state that Carotek "is no longer in the business of selling or servicing the Products on which it once paid royalties under the License Agreement," which may put the Customers "in the unfortunate position of ultimately being held legally and financially responsible for Patent Infringement." The Letters conclude by requesting "a list of all Products . . . acquired from Carotek after December 8, 1998" -- the effective date of the licensing agreement between Carotek and Kobayashi -- and noting that Kobayashi "has no desire to disrupt the operations at [the Customers'] facilities."

---

[7] Sappi, NewPage, and JDI were customers of Carotek only with respect to the monitoring-systems business. The other companies also patronized other aspects of Carotek's business.

## V.   <u>Relevant Procedural History</u>

Carotek initiated this lawsuit on December 11, 2007. On February 11, 2008, Kobayashi filed its answer and counterclaims. ECS filed its own suit against Kobayashi on June 24, 2008, and the Court consolidated the two cases on July 18, 2008. Kobayashi subsequently answered ECS's complaint and filed counterclaims against ECS on September 2, 2008.

The Court issued its first opinion in the consolidated matter on August 31, 2009, addressing most relevantly whether Kobayashi had violated the most favored licensee provision of the Agreement. <u>See</u> <u>Carotek I</u>, 2009 U.S. Dist. LEXIS 79812. On April 12, 2010, the Court issued its second pertinent decision, discussing, inter alia, whether Carotek owed minimum fees under the Agreement. <u>See</u> <u>Carotek II</u>, 2010 U.S. Dist. LEXIS 37800. Following resolution of these matters, the Court issued its <u>Markman</u> decision construing various claim terms on September 8, 2011. <u>See</u> <u>Carotek III</u>, 2011 U.S. Dist. LEXIS 102014.

In light of the Court's claim-construction ruling, the parties cross-moved for summary judgment on various issues on December 19, 2011. Briefing was completed on January 24, 2012, and oral argument was held on May 24, 2012.

## DISCUSSION

### I.   Legal Standards

A motion for summary judgment is appropriately granted when
"there is no genuine issue as to any material fact and the
movant is entitled to judgment as a matter of law." Fed. R. Civ.
P. 56(a). In this context, "[a] fact is 'material' when it might
affect the outcome of the suit under governing law," and "[a]n
issue of fact is 'genuine' if the evidence is such that a
reasonable jury could return a verdict for the nonmoving party."
McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 202 (2d Cir.
2007) (internal quotation marks omitted). When making this
determination, "we are required to resolve all ambiguities and
draw all permissible factual inferences in favor of the party
against whom summary judgment is sought." Gorzynski v. JetBlue
Airways Corp., 596 F.3d 93, 101 (2d Cir. 2010) (citing Anderson
v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)).

On a motion for summary judgment, "[t]he moving party bears
the initial burden of demonstrating 'the absence of a genuine
issue of material fact.'" FDIC v. Great Am. Ins. Co., 607 F.3d
288, 292 (2d Cir. 2010) (quoting Celotex Corp. v. Catrett, 477
U.S. 317, 323 (1986)). Where that burden is carried, the
nonmoving party "must come forward with specific evidence
demonstrating the existence of a genuine dispute of material
fact." Id. (citing Anderson, 477 U.S. at 249). The non-moving

11

party "must do more than simply show that there is some metaphysical doubt as to the material facts and may not rely on conclusory allegations or unsubstantiated speculation." Brown v. Eli Lilly & Co., 654 F.3d 347, 358 (2d Cir. 2011) (internal quotation marks and citation omitted).

## II.   Sufficiency of the Patents

### A.   Requirements Under 35 U.S.C. § 112

#### 1.   Requirements Under Paragraph 1

A patent's specification must describe the invention "in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains . . . to make and use the same." 35 U.S.C. § 112, ¶ 1. This written description requirement mandates that the specification "describe the invention sufficiently to convey to a person of skill in the art that the patentee had possession of the claimed invention at the time of the application." LizardTech, Inc. v. Earth Res. Mapping, Inc., 424 F.3d 1336, 1345 (Fed. Cir. 2005).

The specification must thus demonstrate that "the inventor actually invented the invention claimed." Ariad Pharm., Inc. v. Eli Lilly & Co., 598 F.3d 1336, 1351 (Fed. Cir. 2010). Whether "a skilled person 'could' identify" or "envision" the invention is irrelevant; the question is "whether the application necessarily discloses that particular device." Goeddel v. Sugano, 617 F.3d 1350, 1355-56 (Fed. Cir. 2010) (internal

quotation marks omitted). However, "the amount of detail that must be included in the specification depends on the subject matter that is described and its role in the invention as a whole, in view of the existing knowledge in the field of the invention." Typhoon Touch Techs., Inc. v. Dell, Inc., 659 F.3d 1376, 1385 (Fed. Cir. 2011). With respect to software, "it is generally sufficient if the functions of the software are disclosed, it usually being the case that creation of the specific source code is within the skill of the art." Robotic Vision Sys., Inc. v. View Eng'g, Inc., 112 F.3d 1163, 1166 (Fed. Cir. 1997).

It is a question of fact whether a patent satisfies the written description requirement of paragraph 1 of Section 112. See Ariad Pharm., 598 F.3d at 1355 (citing Ralston Purina Co. v. Far-Mar-Co, Inc., 772 F.2d 1570, 1575 (Fed. Cir. 1985)). Any claim not supported by adequate description in the specification is invalid. See id. at 1358.

### 2.   Requirements Under Paragraphs 2 and 6

All claims in a patent must "particularly point[] out and distinctly claim[] the subject matter which the applicant regards as his invention." 35 U.S.C. § 112, ¶ 2. This definiteness requirement provides "notice to the public of the extent of the legal protection afforded by the patent." All Dental Prodx, LLC v. Advantage Dental Prods., Inc., 309 F.3d

774, 779-80 (Fed. Cir. 2002); see also Datamize, LLC v. Plumtree Software, Inc., 417 F.3d 1342, 1347 (Fed. Cir. 2005) ("[T]he purpose of the definiteness requirement is to ensure that the claims delineate the scope of the invention using language that adequately notifies the public of the patentee's right to exclude.").

The claims in the Patents are of a variety known as "means plus function." For any "means or step for performing a specified function" in those claims, there must be some "corresponding structure, material, or acts described in the specification and equivalents thereof." 35 U.S.C. § 112, ¶ 6. In other words, "a generic means expression for a claim limitation" is acceptable in means-plus-function claims, "provided that the specification indicates what structure(s) constitute(s) the means." Atmel Corp. v. Info. Storage Devices, Inc., 198 F.3d 1374, 1381 (Fed. Cir. 1999) (emphasis omitted). If the specification fails to provide a structure -- here, some computer-based algorithm -- corresponding to any limitation in a means-plus-function claim, "the claim will be found invalid as indefinite" under paragraph 2 of Section 112. Biomedino, LLC v. Waters Techs. Corp., 490 F.3d 946, 950 (Fed. Cir. 2007); see also Aristocrat Techs. Austl. PTY Ltd. v. Int'l Game Tech., 521 F.3d 1328, 1338 (Fed. Cir. 2008).

Patents issued by the PTO are presumed to be valid, but that presumption may be overcome by a showing of clear and convincing evidence that those skilled in the art would not understand the limitations in a claim. See Young v. Lumenis, Inc., 492 F.3d 1336, 1345-46 (Fed. Cir. 2007). A claim may be invalidated upon such a showing, the sufficiency of which is a question of law. See Aero Prods. Int'l, Inc. v. Intex Recreation Corp., 466 F.3d 1000, 1015-16 (Fed. Cir. 2006). The appeal to the understanding of a person skilled in art, however, "'has no application'" when "the specification discloses no algorithm." Noah Sys., Inc. v. Intuit, Inc., 675 F.3d 1302, 1313 (Fed. Cir. 2012) (quoting Aristocrat, 521 F.3d at 1337). When no algorithm is disclosed, the claim must be found invalid as indefinite. See id.; Aristocrat, 521 F.3d at 1337.

### B.   Claims Containing the Term "Control Means"

Every independent claim in the '456 and '990 Patents and independent claims 1 and 16 of the '905 Patent contain the term "control means." The Court has already determined that the specification does not adequately identify an associated structure for this claim term. See Carotek III, 2011 U.S. Dist. LEXIS 102014, at *29-33. We found, in fact, that the language in the specification purportedly disclosing the algorithm "simply describes the function to be performed, not the corresponding structure" and that the specification "does not even purport to

15

describe a structure" for many of the Patents' claimed functions. Id. at *30, 33. Accordingly, the independent claims of the '456 and '990 Patents and claims 1 and 16 of the '905 Patent are invalid under paragraphs 2 and 6 of Section 112.

Kobayashi, recognizing the implications of Carotek III's holding, asks us to reconsider our construction of "control means" in light of Typhoon Touch, 659 F.3d 1376, and Ronald A. Katz Technology Licensing LP v. American Airlines, Inc. (In re Katz Interactive Call Processing Patent Litigation), 639 F.3d 1303 (Fed. Cir. 2011). While reconsideration is procedurally improper,[8] we also reject it on substantive grounds.

In Typhoon Touch, the Federal Circuit evaluated a specification's elaboration of the means-plus-function term "means for cross-referencing." 659 F.3d at 1383-86. The court

---

[8] Kobayashi has not specified whether it seeks reconsideration under Federal Rule of Civil Procedure 60 or Local Rule 6.3, but neither provides the relief it seeks. Rule 60 admits reconsideration in only two situations: (1) when there has been a clerical error or other oversight or omission which has obscured the court's intent, Fed. R. Civ. P. 60(a); see also Aalmuhammed v. Kesten, No. 98 Civ. 171, 2002 U.S. Dist. LEXIS 25295, at *14-15 (S.D.N.Y. July 30, 2002) (citing Hodge v. Hodge, 269 F.3d 155, 158 (2d Cir. 2001)); and (2) when any of a variety of circumstances obtain which call into question the validity of a final order, Fed. R. Civ. P. 60(b). Kobayashi does not allege any clerical mistake, and Markman opinions are not final orders, see Intellectual Prop. Dev., Inc. v. UA-Columbia Cablevision of Westchester, Inc., No. 94 Civ. 6296, 2002 U.S. Dist. LEXIS 17, at *14 (S.D.N.Y. Jan. 3, 2002) (citing Cybor Corp. v. FAS Techs., Inc., 138 F.3d 1448, 1479 (Fed. Cir. 1998) (Newman, J., dissenting)); see also Kittay v. Korff (In re Palermo), No. 08 Civ. 7421, 2011 U.S. Dist. LEXIS 11681, at *11-12 (S.D.N.Y. Feb. 7, 2011) (declining to decide a motion for reconsideration under Rule 60 because the order was not final). Local Rule 6.3, on the other hand, requires that motions for reconsideration be filed within fourteen days of entry of the judgment. Here, Kobayashi has not even moved for reconsideration but simply requested it as part of its opposition brief, which was filed more than four months after Carotek III was decided and more than two months after Typhoon Touch was decided. Katz was issued prior even to Carotek III.

there found the steps of the algorithm -- "data entry, then storage of data in memory, then the search in a library of responses, then the determination if a match exists, and then reporting action if a match is found," id. at 1386 -- to consist of "known computer-implement operations," which "are readily implemented by persons of skill in computer programming," id.

The same cannot be said of the steps of the algorithm purportedly described in the Patents. Kobayashi contends that its expert, Dr. Robert L. Stevenson, has identified similar steps in the Patents' specifications. Specifically, Dr. Stevenson suggested that the specifications disclose steps including, among others, (i) scanning all digitized storage means, (ii) selecting clips from all means containing data collected at the appropriate times, (iii) scanning each clip to identify the deviation event, (iv) identifying the monitoring means most proximate to the location of the deviation event, and (v) selecting a clip from the digitized storage means for the monitoring means. (Peters Decl., Ex. 19, Decl. of Robert Stevenson ("Stevenson Decl.") ¶¶ 25-26.)

Putting to the side for the moment the question of whether these steps are even to be found in the specification,[9] this

---

[9] We previously determined that Dr. Stevenson's testimony was directed only to "the contention that one of ordinary skill in the art would be able to make and use the invention," Carotek III, 2011 U.S. Dist. LEXIS 102014, at *31, rather than the relevant question, which is "'whether the specification contains a sufficiently precise description of the "corresponding structure"

algorithm is not akin to that under discussion in Typhoon Touch. While both contain the concepts of searching or scanning, which may be "carried out by known computer-implement operations," Typhoon Touch, 659 F.3d at 1386, Kobayashi's purported algorithm also contains identification and selection steps that hinge crucially on unspecified criteria. The record contains no meaningful evidence that these steps may be "readily implemented by persons of skill in computer programming," id., and the claims and specification describe these functions in nearly identical language, which is a far cry from the Typhoon Touch specification's elaboration on the meaning of "cross-reference."

Nor does Typhoon Touch alter our third independent reason for finding that "control means" did not have an adequately identified structure: "the Patents do not disclose a structure that corresponds to each of the identified functions." Carotek III, 2011 U.S. Dist. LEXIS 102014, at *32-33. In this respect, Katz is more on point, but it also does not change our analysis. The Federal Circuit there made clear that when a patent "has not claimed a specific function performed by a special purpose computer, but has simply recited . . . functions [that] can be achieved by any general purpose computer without special programming," the specification need not disclose a structure

---

to satisfy section 112, paragraph 6,'" id. at *32 (quoting Blackboard, Inc. v. Desire2Learn Inc., 574 F.3d 1371, 1385 (Fed. Cir. 2009)).

corresponding to those functions. 639 F.3d at 1316. The court identified "processing," "receiving," and "storing" as functions that did not require elaboration. Id. The record here contains no evidence that the functions identified in Katz are comparable to many of the functions the Patents claim the control means performs but for which no corresponding structure is disclosed, such as, for instance, "controlling the monitoring system," "forming an extracted clip," "identifying a video camera proximate to the deviation detector," "gradient edge enhancement," "image sharpening," and "interpolation," Carotek III, 2011 U.S. Dist. LEXIS 102014, at *26-27.

Typhoon Touch and Katz thus do not change our assessment of the definiteness, and therefore the validity, of claims in the Patents containing the term "control means." They are invalid.

### C.   Claims Containing the Term "Extract"

The remaining independent claims of the '905 Patent -- claims 21, 38, and 43 -- claim a computer "configured to extract a deviation digitized video signal" or "data." The parties disagree over whether the claim term "extract" is sufficiently explicated in the specification to satisfy the written description requirement of paragraph 1 of Section 112.

Although we previously defined "extract," see Carotek III, 2011 U.S. Dist. LEXIS 102014, at *36-39, we did not reach the precise issue of whether the specification includes enough

detail with respect to the term in order to disclose the claimed system. Our discussion in Carotek III is nevertheless useful for present purposes. The construction we gave to "extract" -- "to remove" -- was intended to encapsulate the notion that extracted data is preserved rather than overwritten, to prevent the equation of "extract" and "identify," and to admit the possibility that extraction may occur through means other than moving and copying data. See id. The construction, drawing from the specifications and claims from all of the Patents, evinces a meaningful understanding of how the '905 Patent uses the term "extract."

Kobayashi points to several segments of the '905 Patent's specification as explaining the meaning of the term along the lines of the Court's construction. It highlights, in particular, the following three passages:

> [T]his invention relates to . . . a [monitoring]
> system in which process data relating to a
> predetermined characteristic of the process is
> collected and stored in digital format and extracted
> based upon a pre-determined criterion for display.

'905 Patent, col. 1, ll. 11-14.

> Preferably, the clips are also stored such that clips
> can be readily identified by time and date, and can be
> extracted or copied from the segment. A further
> requirement of the digital memory storage 1 means 18
> is that it can be controlled by a control means 20
> such that specific clips can be extracted from the
> digital data storage means 18 as desired and as will
> be described hereinbelow in more detail. In the
> operations of the digital data storage means 18, the

segment is maintained at or about the pre-determined
length during the operations of the system such that
as new digitized real time data is added to digital
data storage means 18, the oldest or most prior data
is erased, deleted or otherwise removed from storage
means 18 maintaining said segment at or about some
pre-determined length. The advantages of this storage
means 10 becomes [sic] readily apparent in that stored
digital data showing normal operations to produce the
product having the pre-determined characteristic is
constantly removed from storage means 18 such that
upon storage of deviating digitized data of a
deviation from the pre-determined characteristic, as
for example a break event, such deviating data can be
more easily isolated from the relatively small amount
of data comprising the segment.

Id., col. 6, ll. 11-33.

On receipt of the deviation event signal, control
means 20 is capable of identifying the clip most
likely to have digitized data relating to the
deviation event, and extracting such clip and
displaying the extracted clip with display means 26.
For example, control means 20 can perform this
function by coordinating the time at which deviation
event detector 38 detected the deviation event with
the clip or clips corresponding in time. This
coordination can be done in any suitable manner. For
example, control 20 can scan all digitized data
storage means 18, select clips from all means 18
containing data collected at the appropriate time and
can then scan each clip to identify the deviation
event and display same. Alternatively, control means
20 can identify the monitoring means 10 most proximate
to the location of the deviation event, select a clip
or clips from the digitized data storage means 18 for
such monitoring means 10 and display such clip. In
order to insure that all suitable data is displayed in
the fastest possible time, preferably control means 20
will also extract digitized data clips immediately
preceding and following the clip or clips most likely
containing data for the deviation event and will
splice the deviation event clip and the following and
preceding clips into a display clip for display.

Id., col. 7, l. 54 to col. 8, l. 10.

These passages teach, inter alia, that extraction of data and clips occurs based on pre-determined criteria, that copying is a method of extraction, that extracted data is removed and isolated from other data in order to ensure its preservation, that identification and extraction are separate processes performed by the control means, and that extraction may encompass data or clips beyond just those containing the deviation event.

Carotek argues that this disclosure is insufficient, comparing it to the specification at issue in In re Kaslow, 707 F.2d 1366 (Fed. Cir. 1983). In that case, the claimed invention -- a system of gathering data from UPC codes -- "emphasize[d]" the transmittal of collected data "to a central computer in order to provide an audit." Id. at 1371. The specification described what the claim meant by the ability "to provide an audit" by noting that the invention "simplif[ied] auditing and redemption procedures" and enabled "a check [to be] made on the overall volume of coupon traffic." Id. at 1375 (emphasis omitted). The Federal Circuit found that the specification "[did] not describe any particular auditing or checking procedure to be carried out as part of the invention" even though the claim language "implie[d] that there is some mechanism or step which is a part of the invention and which

performs an audit on the data transmitted to the central computer." Id. The claim was therefore invalid.

The description in the '905 Patent's specification of "extract" does not resemble the description of "audit" under discussion in Kaslow. Rather, this case more closely resembles Ven-Tel, Inc. v. Hayes Microcomputer Products, Inc. (In re Hayes Microcomputer Products, Inc. Patent Litigation), 982 F.2d 1527, 1533-34 (Fed. Cir. 1992), where the Federal Circuit found that "one of ordinary skill in the art would understand how to implement" a relatively minimal description of a component of a means-plus-function patent. Holding that "the adequacy of the description of an invention depends on its content in relation to the particular invention," the court noted that "an inventor is not required to describe every detail of his invention" so long as "[o]ne skilled in the art would know how to program . . . the necessary steps described in the specification." Id. at 1534 (emphasis omitted).

As discussed above, the '905 Patent does describe a method of extraction, inasmuch as it identifies a specific process by which extraction may occur and provides certain criteria by which to determine whether data has been extracted or, rather, simply deleted. Cf. Robotic Vision, 112 F.3d at 1166 (a software specification is sufficient "if the functions of the software are disclosed"). Given this description in the specification,

23

Dr. Stevenson's earlier testimony,[10] and the role extraction plays in the larger claimed invention, we are unable to conclude that there is no genuine issue of material fact with respect to whether the remaining claims in the '905 Patent are adequately supported by the written description in the specification. We therefore do not invalidate independent claims 21, 38, and 43 of the '905 Patent.

## III. __Anticipation__

### A.    **Relevant Patent Procedures**

A patent is anticipated by another, and therefore invalid, if it was "patented or described in a printed publication in this or a foreign country . . . more than one year prior to the date of the application for patent in the United States." 35 U.S.C. § 102(b); see also Cordance Corp. v. Amazon.com, Inc., 658 F.3d 1330, 1337 (Fed. Cir. 2011). A foreign patent may serve to invalidate a later-filed domestic one, even if the rights granted by the foreign government are not "coextensive with the exclusive rights granted under U.S. law, so long as the foreign rights are both substantial and exclusive in nature." In re Carlson, 983 F.2d 1032, 1036 (Fed. Cir. 1992). While anticipation is a question of fact, like other fact-dependent

---

[10] We accepted Dr. Stevenson's testimony with respect to the meaning of "extract" in Carotek III, 2011 U.S. Dist. LEXIS 102014, at *37. Among other things, Dr. Stevenson testified that "there are many well-known techniques for extracting, in this case a video clip, from a set of data," and one skilled in the art would therefore understand that the specification disclosed to the claimed invention. (Stevenson Decl. ¶ 28.)

issues, "it may be decided on summary judgment if the record reveals no genuine dispute of material fact." Leggett & Platt, Inc. v. VUTEk, Inc., 537 F.3d 1349, 1352 (Fed. Cir. 2008) (internal quotation marks omitted).

A patent will not be anticipated and thereby invalidated by another if the later patent can properly claim priority to one filed before, or within one year of, the earlier of the other two. See, e.g., Encyclopaedia Britannica, Inc. v. Alpine Elecs. of Am., Inc., 609 F.3d 1345, 1347 (Fed. Cir. 2010) ("[I]f the patents in suit are entitled to a priority date not later than one year after [the publication date of the foreign patent], the foreign publication would not anticipate."). An application claiming priority to an earlier application "shall have the same effect . . . as though filed on the date of the prior application, [1] if filed before the patenting or abandonment of or termination of proceedings on the first application or on an application similarly entitled to the benefit of the filing date of the first application and [2] if it contains or is amended to contain a specific reference to the earlier filed application." 35 U.S.C. § 120; see also Encyclopaedia Britannica, 609 F.3d at 1349-50 (discussing the requirements of Section 120). The "specific reference" to a prior application required by Section 120 should be included in an application data sheet or in the

first sentence of the specification. <u>See</u> 37 C.F.R.
§ 1.78(a)(2)(iii).[11]

If a patent is issued and contains a mistake, such as
failing to claim priority to an appropriate earlier-filed
patent, regardless of whose fault the mistake is, it may be
corrected by petitioning the PTO for a certificate of
correction. <u>See</u> 35 U.S.C. §§ 254 (certificate of correction when
mistake is fault of the PTO), 255 (certificate of correction
when mistake is not fault of the PTO). When the error lies with
the PTO, the correction shall be issued "without charge";
otherwise it will be issued only "upon payment of the required
fee." <u>Id.</u>

**B.   The Patents' Chain of Priority**

Kobayashi filed a patent application in South Africa on
November 13, 1995, and the patent was published and issued on
August 28, 1996. It is undisputed that the South African Patent
contained a specification substantially similar to that of the
'905 Patent, and that patent rights under South African law are
sufficient to invalidate domestic patents subsequently filed.[12]

---

[11] The version of the regulation in effect on July 30, 1998, the filing date
of the '905 Patent, required the specific reference to be in the first
sentence of the specification; no provision was made for its inclusion in a
data sheet. <u>See</u> 37 C.F.R. § 1.78(a)(2) (1997). The change in the regulation
is immaterial, however, because no application data sheet appears in the
prosecution history of the '905 Patent.

[12] <u>See</u> Patents Act 57 of 1978 § 45(1) (S. Afr.) ("The effect of a patent shall
be to grant to the patentee in the Republic, . . . for the duration of the
patent, the right to exclude other persons from making, using, exercising,

It is similarly undisputed that the '235 Application, from which the '456 Patent issued, was filed on March 6, 1995, prior to the South African Patent's publication, while the '231 Application, from which issued the '990 Patent, was not filed until September 3, 1997, more than one year after the South African Patent was published. What the parties do dispute is when, if ever, the '905 Patent properly claimed priority to the '235 Application and '456 Patent.

> 1.   Whether the '905 Patent Properly Claimed Priority When It Was Issued

The first sentence of the '528 Application notes that the application is a division of the '231 Application and '990 Patent. When it issued from the '528 Application, the '905 Patent contained the same reference to the '231 Application and '990 Patent on its cover page. Neither the '528 Application nor the '905 Patent references either the '235 Application or the '456 Patent. Despite the '990 Patent's reference to the earlier application and patent, the '905 Patent is facially unable to claim the same priority. See Sampson v. Ampex Corp., 463 F.2d 1042, 1044-45 (2d Cir. 1972) ("[Section] 120 has been interpreted . . . to require that for a subsequent application to have the benefit of the filing date of an earlier application, it must contain the 'specific reference' to the

disposing or offering to dispose of, or importing the invention, so that he or she shall have and enjoy the profit and advantage accruing by reason of the invention.").

application the filing date of which the applicant seeks to have the benefit.").

Kobayashi contends that this failure to claim priority to the first patent in the chain is due to error on the part of the PTO. It argues that the '528 Application was originally a CPA of the '231 Application and the CPA automatically received the benefit of the '235 Application and '456 Patent. See 37 C.F.R. § 1.78(a)(2)(i) (requiring any nonprovisional application, "[e]xcept for a continued prosecution application," to contain a reference to any earlier-filed application of which it claims the benefit), (iv) ("The request for a continued prosecution application under § 1.53(d) is the specific reference required by 35 U.S.C. 120 to the prior-filed application."). Kobayashi further contends that when the PTO converted the CPA to a division pursuant to the Petition under 37 C.F.R. § 1.183, the PTO should have carried forward the priority date of the '235 Application and failed to do so. (Peters Decl., Ex. 13 (reflecting the Examiner's handwritten note on the CPA that the converted application would be a division of the '231 Application and '990 Patent).) It concludes by arguing that the mistake must be taken as legally insignificant clerical error for which it may suffer no adverse consequences.

We disagree with Kobayashi that the '528 Application's failure to include a reference to the '235 Application and '456

Patent was the fault of the PTO and that it may not be held accountable for any such error. It is beyond dispute that the initial error was Kobayashi's: Kobayashi erroneously filed a CPA rather than a division, not the PTO. (Petition 1 ("This application was inadvertently filed as a CPA . . . .").) Moreover, the PTO did nothing more than grant the request put to it by Kobayashi. The Petition clearly requested that the CPA be "modif[ied] . . . to a Divisional application of [the '231 Application] now issued [as the '990 Patent]."[13] (Id.) It nowhere requested that the newly issued application be given priority to the '235 Application and '456 Patent.

Nor is it apparent that the PTO should have assumed that Kobayashi desired that the '528 Application have that priority. Kobayashi explicitly disclaimed its intent to have ever filed a CPA, noting in the Petition that "[i]t was not the Applicants' intention to file a CPA with the abandonment of Parent." (Id.) It therefore would seem unlikely that an application that was intended to be a division, not a CPA, but did not include a reference to the first application in the patent family was

---

[13] Because the '990 Patent had already issued by the time Kobayashi realized its mistake, Kobayashi had to convert the CPA to a division rather than simply file a new divisional application, as such applications must be filed while the earlier application is still pending. See 35 U.S.C. § 120; Encyclopaedia Britannica, 609 F.3d at 1349-50.

nevertheless intended to claim the benefit of that first application.[14]

Moreover, it is not even clear that a CPA automatically receives the benefit of all patents in the chain. While "[t]he request for a continued prosecution application . . . is the specific reference . . . to the prior-filed application," 37 C.F.R. § 1.78(a)(2)(iv), the "prior-filed application" referred to is likely the one abandoned as a result of the CPA.[15] See id. § 1.53(d) (using the term "prior application" to refer to the application to be abandoned); MPEP § 201.11 ("A request for a CPA filed under 37 CFR 1.53(d) is itself the specific reference required by 35 U.S.C. 120 and 37 CFR 1.78(a)(2) to every application assigned the same application number

---

[14] An applicant may choose not to claim the earliest priority it is entitled to in an effort to increase the duration of its patent protection. As discussed further infra, Kobayashi disclaimed the life of any patent issuing from the '528 Application that extended beyond that of the '990 Patent, and Kobayashi had previously disclaimed the terminal part of the '990 Patent extending beyond the expiration of the '456 Patent. (Peters Decl., Ex. 14 at 14-15.) It therefore would have gained no extended patent life by claiming priority only to the '231 Application and '990 Patent rather than to the '235 Application and '456 Patent. However, the '528 Application's terminal disclaimer was not filed until September 5, 2000, well after the Petition was filed and nearly a year after it was granted. The PTO, therefore, could not have known that Kobayashi would not benefit by claiming priority to the '235 Application and '456 Patent. Likewise, the second inventors' declaration Kobayashi filed with the '528 Application -- which does claim the benefit of the '235 Application and '456 Patent -- was also filed on September 5, 2000. (Peters Decl., Ex. 16.)

[15] The second sentence of this provision, which enables a CPA to claim priority to an earlier-abandoned application if it comes in a string of CPAs, supports this conclusion. See 37 C.F.R. § 1.78(a)(2)(iv) ("The identification of an application by application number under this section is the identification of every application assigned that application number necessary for a specific reference required by 35 U.S.C. 120 to every such application assigned that application number.").

identified in the request."). A reference to an intermediate patent in a chain is not sufficient to receive priority to the earliest patent in the chain.[16] See Sampson, 463 F.2d at 1044-45.

Because the CPA was intended to have been filed as a division and did not claim priority to the '235 Application and '456 Patent, and because Kobayashi never expressed an intention that the '528 Application should claim that priority, there was no error on the part of the PTO; the gap in the chain of priority was, rather, Kobayashi's fault.[17] As a result of

_____

[16] Even had the CPA been given the benefit of the '235 Application and '456 Patent, the CPA itself was "disregarded" by the PTO pursuant to the Petition (Peters Decl., Ex. 12, Decision Granting Petition) and is therefore legally irrelevant.

[17] As noted earlier, if a petitioner is required to pay a fee for a certificate of correction to be issued, the PTO has determined that the petitioner is at fault for the error. See 35 U.S.C. § 255 ("Whenever a mistake . . . which was not the fault of the [PTO] appears in a patent . . . , the Director may, upon payment of the required fee, issue a certificate of correction . . . ." (emphasis added)); 37 C.F.R. § 1.323 ("The Office may issue a certificate of correction under the conditions specified in 35 U.S.C. 255 at the request of the patentee or the patentee's assignee, upon payment of the fee set forth in § 1.20(a)."). A certificate of correction may also be issued pursuant to Section 254, if the error to be corrected was the fault of the PTO, in which case the petitioner need not pay a fee. See 35 U.S.C. § 254.
    Upon the filing of its request for a certificate of correction, Kobayashi implicitly recognized that it may have been at fault for the '905 Patent's failure to claim priority to the '235 Application and '456 Patent by making its request under both Section 254 and Section 255. (Peters Decl., Ex. 14, Request to Issue a Certificate of Correction 1.) Further, at oral argument, Kobayashi indicated that it had been required to pay a fee for the Certificate (Oral Arg. Tr. 41:2-5), supporting our conclusion that Kobayashi was to blame for the gap in the chain of priority. However, eighteen days after argument and more than two years after the close of fact discovery, Kobayashi submitted to the Court -- unaccompanied by any affidavit or declaration -- e-mails between Joe Parisi, one of Kobayashi's lawyers, and Virginia Tolbert, a PTO employee. In his e-mail, Parisi recounts a telephone conversation he apparently had with Tolbert on June 11, 2012, during which Tolbert related that she had, at Parisi's request, reviewed the '905 Patent's file and determined that the Certificate was issued under Section 254. Parisi further notes that Tolbert had "indicated that you have also refunded the fee that was paid when the [Petition] was filed." Tolbert's response, in its

Kobayashi's error, the '905 Patent did not claim priority to the '235 Application and '456 Patent. The '528 Application referenced only the '231 Application and '990 Patent, and that is all the issuing patent could claim the benefit of.

Kobayashi argues that the '528 Application did contain the requisite reference, inasmuch as the original inventors' declaration filed with it was identical to the inventors' declaration that had been filed with the '235 Application (and the '231 Application) and the second inventors' declaration affirmatively claimed the benefit of the '235 Application and '456 Patent. These declarations, however, do not satisfy the

---

entirety, indicates that "[i]nspection of [the '528 Application] (issued as [the '905 Patent]) reveals that the error was the fault of the office and not the attorney, as a result a refund of $100.00 was issued."

Even were these e-mails not inadmissible hearsay (and Parisi's e-mail double hearsay), cf. Morisseau v. DLA Piper, 532 F. Supp. 2d 595, 621 n.163 (S.D.N.Y. 2008), they would not alter our analysis. While "deference is owed to decisions of the PTO in interpreting [its] regulations," In re Lovin, 652 F.3d 1349, 1353 (Fed. Cir. 2011), that deference is not absolute, see id. ("[T]he PTO must still follow judicial interpretations of PTO regulations set forth in the decisions of our court."), and informal interpretations of regulations are due a smaller degree of deference, see Estate of Landers v. Leavitt, 545 F.3d 98, 106 (2d Cir. 2008). In this case the decision to refund Kobayashi's fee was made solely on the basis of ex parte communications, without the benefit of the substantial briefing we have had at our disposal, outside of any notice-and-comment process or formal adjudication, and absent any written justification. We therefore do not find it persuasive. Cf. id. We believe Kobayashi should not have received a refund based on a plain reading of the relevant regulations, Kobayashi's own errors in prosecuting its patent, and its multiple unutilized opportunities to correct those errors.

We note further that our decision does not turn on whose fault the mistake was. As discussed infra, a certificate of correction is the mechanism by which a mistake in a patent may be corrected, and a certificate has the same legal effect regardless of whether it was issued under Section 254 or Section 255. Compare 35 U.S.C. § 254, with id. § 255; see also Nova Indus., L.P. v. Micro Molds Corp., 350 F.3d 1348, 1356 (Fed. Cir. 2003). We have discussed the issue only to address equitable concerns.

"specific reference" requirement.[18] The language of the regulation is unequivocal: to claim the benefit of an earlier patent, "the specification must contain or be amended to contain such reference in the first sentence(s) following the title." 37 C.F.R. § 1.78(a)(2)(iii); see also Encyclopaedia Britannica, 609 F.3d at 1350 ("There is nothing in the language or legislative history of § 120 to suggest that an application is entitled to an earlier priority date even if it fails to make a specific reference to an earlier application."). While there may be some leeway given if the reference is obvious even if not included in the specification, see Broad. Innovation, L.L.C. v. Charter Commc'ns, Inc., 420 F.3d 1364, 1367 (Fed. Cir. 2005) (noting that the relevant statute and regulation "require some reference to earlier filed applications (i.e., in the specification or on the cover page) to qualify for priority based on . . . earlier filings"), Kobayashi has pointed us to no authority supportive of the sufficiency of the declarations.

The '905 Patent was thus anticipated by the South African Patent when it was issued. The patent is therefore invalid, unless the Certificate effectively enabled it to claim priority to the '235 Application and '456 Patent.

---

[18] Nor do they provide sufficient notice, as discussed infra, to warrant a departure from the wording of this requirement.

2.   Whether the Certificate of Correction Gives the
'905 Patent Priority to the '456 Patent

On August 12, 2010, Kobayashi -- recognizing that the '905 Patent as it stood did not properly claim the benefit of the '456 Patent -- requested a certificate of correction "noting the correct priority date" "in the above-captioned patent." (Peters Decl., Ex. 14, Request to Issue a Certificate of Correction 1.) Although Kobayashi included a proposed certificate of correction with its request, it nowhere specified whether the correction should be made to the cover page of the patent or to the specification. When the Certificate issued on September 14, 2010, it noted only the error on item 62 of the title page, which was corrected to reference each of the prior applications and patents.

Plaintiffs contend that, under the relevant statutory and regulatory language, the correction should be deemed ineffective for the purpose of granting earlier priority to the '905 Patent. Section 120 requires that, in order to claim priority, "[a]n application" must "contain[] or [be] amended to contain a specific reference to the earlier filed application," yet the correction issued only to the patent itself, not the application, and Kobayashi did not request a correction to the application. Moreover, the "specific reference" must be included in the first sentence of the specification, see 37 C.F.R.

§ 1.78(a)(2)(iii), yet that sentence was not corrected and therefore still contains a reference only to the '231 Application and '990 Patent. Plaintiffs argue that these failings are fatal to the '905 Patent's claim of priority.

We do not agree. The purpose of the "specific reference" requirement is clearly to ensure that someone examining a patent claiming the benefit of one earlier filed is readily able to assess the patent's priority date. Cf. Sampson, 463 F.2d at 1045 ("The information required to be disclosed [by Section 120] is information that would enable a person searching the records of the [PTO] to determine with a minimum of effort the exact filing date upon which a patent applicant is relying to support the validity of his application or the validity of a patent issued on the basis of one of a series of applications."). Including the reference to the '235 Application and '456 Patent on the cover page of the '905 Patent does exactly that; the notice function is served as well as, if not better than, if the reference had been placed in the specification. See Broad. Innovation, 420 F.3d at 1367; MPEP § 201.11 ("If the specific reference is only contained in the application data sheet, then the benefit claim information will be included on the front page of any patent or patent application publication, but will not be included in the first sentence(s) of the specification."); cf. E.I. du Pont de Nemours & Co. v. MacDermid Printing Solutions,

35

L.L.C., 525 F.3d 1353, 1361-62 (Fed. Cir. 2008) (treating a corrected patent title page as sufficient to claim priority).

The Federal Circuit has, moreover, suggested that some lenity in this arena may be appropriate when a failure is only technical in nature and the public has received sufficient notice of a patent claim. See Superior Fireplace Co. v. Majestic Prods. Co., 270 F.3d 1358, 1371-72 (Fed. Cir. 2001) (emphasizing "the public notice function of patent claims" and permitting Section 255 to be used for "broadening correction[s]"). If the correction were not effective for its intended purpose, we could discern no other reason the PTO would have granted the Certificate.

In light of these considerations and simple notions of fairness, cf. Biotec Biologische Naturverpackungen GmbH & Co. KG v. Biocorp, Inc., 249 F.3d 1341, 1348 (Fed. Cir. 2001) (noting that, if it would be "apparent to the interested reader that an error was made, such that it would be unfair to enforce the error," errors in the prosecution record should be forgiven), we find the '905 Patent to have effectively claimed priority to the '235 Application and '456 Patent as of the issuance of the certificate of correction. Thus, though invalid upon issuance, the '905 Patent became valid as of September 14, 2010.

## IV.   <u>Infringement</u>

Certificates of correction, however, are effective only prospectively, not retrospectively. <u>See</u> 35 U.S.C. §§ 254, 255 (a certificate of correction has "the same effect and operation in law on the trial of actions for causes thereafter arising" as if the patent had originally been issued in the corrected form); <u>see also, e.g.</u>, <u>Sw. Software, Inc. v. Harlequin Inc.</u>, 226 F.3d 1280, 1295 (Fed. Cir. 2000) ("[F]or causes arising before its issuance, the certificate of correction is not effective."); <u>Nova Indus., L.P. v. Micro Molds Corp.</u>, 350 F.3d 1348, 1356 (Fed. Cir. 2003). The '905 Patent, therefore, gets the benefit of its claim to the priority of the '235 Application and '456 Patent only as of September 14, 2010, the date the Certificate was issued. As a result, Kobayashi cannot recover for acts of infringement occurring prior to that point. <u>Cf.</u> <u>E.I. du Pont de Nemours</u>, 525 F.3d at 1362 (because "each act of infringement gives rise to a separate cause of action," infringement occurring after the issuance of a correction is properly the subject of suit).

### A.   Whether the ECS Software Infringes the Patents

Plaintiffs contend that the only version of their software that could possibly be at issue is ECS View version 11, which was completed and offered for sale in 2009. ECS has provided an uncontradicted declaration from its principal software engineer

Eddy Tam, who avers that it is "ECS's ordinary business practice not to sell older versions of software when newer versions are available" and that ECS has not sold any version older than version 11 since September 14, 2010.[19] (Decl. of Eddy Tam ("Tam Decl.") ¶¶ 11-12.) We therefore need determine only whether version 11 infringes the '905 Patent.

       1.   Whether Dr. Stevenson's Report Is Conclusory with Respect to Version 11 of the Software

    Kobayashi's expert Dr. Stevenson has offered his opinion that all accused versions of the ECS software infringe the '905 Patent. (Peters Decl., Ex. 7, Expert R. of Dr. Robert L. Stevenson Regarding Infringement of U.S. Patent No. 6,211,905 ("Stevenson R.") ¶ 105.) He asserts that, in coming to this conclusion, he "ha[s] analyzed the Carotek ECS system versions 4 through 11, Modular RetroSpek, RetroSpek II and Retrospek IV," as well as numerous versions of the file that he claims contains most of the functionality related to the '905 Patent. (Id. ¶¶ 97, 104.) Nevertheless, his actual analysis rests predominantly on ECS version 9, which Dr. Stevenson claims is "representative of the entire Carotek line." (Id. ¶ 105.) Plaintiffs argue that Dr. Stevenson's analysis with respect to

---

[19] The testimony from Tam's deposition does not call into question the basis for his knowledge of these facts. Although he testified that he does not make use of a formal version-control system and that he does not know which version of the software any particular customer is using (Dep. of Eddy C. Tam 42:22-44:19 (Mar. 4, 2010)), these statements are not inconsistent with his representation that ECS does not sell older versions of the software after a new version has been compiled.

versions other than version 9 is speculative, conclusory, or otherwise without factual basis and must therefore be excluded. See Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 311 (2d Cir. 2008); see also Fed. R. Evid. 702(b)-(c) (admitting experts reports only if they are "based on sufficient facts or data" and "the product of reliable principles and methods"); Fed R. Civ. P. 26(a)(2)(B)(i), (ii) (requiring expert reports to provide "a complete statement of all opinions the witness will express and the basis and reasons for them" and "the facts or data considered by the witness in forming them").

Dr. Stevenson's report is far from conclusory. It examines each of the claims of the '905 Patent that is allegedly infringed and notes how the Carotek/ECS system is encompassed by the claims. (Stevenson R., Ex. C.) Although the report largely speaks in terms of ECS View version 9, Dr. Stevenson explicitly provided that "[a]ny important difference [between version 9 and any other version] that is relevant to the infringement analysis will be specifically cited." (Id. ¶ 105.) Indeed, Dr. Stevenson noted on several occasions that differences existed between the versions. (See, e.g., id., Ex. C, at 4 (noting that the number of video clips stored in the system has varied between versions), 11 (noting that a certain version of the system began to support digital cameras); see also Peters Decl., Ex. 9, Supplemental Decl. of Dr. Robert L. Stevenson Regarding

Infringement of U.S. Patent No. 6,211,905 ("Stevenson Suppl. Decl.") ¶¶ 10, 12 (discussing the use of a particular command throughout versions of the software).) The only reasonable inference is that, if no difference was noted, Dr. Stevenson is of the opinion that no material difference exists between version 9 and the other versions of the software. The report is thus functionally a report on every version of the software, including version 11, not just version 9.

An expert opinion is inadmissible as conclusory if it "cannot reasonably be assessed for reliability." Comm. Note to Fed. R. Evid. 702 (2000). However, if the report "makes clear the evidence [the expert] is relying on to form his conclusions," then "[i]t is clearly possible to test those conclusions objectively" and the report should not be excluded. Lesser ex rel. Lesser v. Camp Wildwood, 282 F. Supp. 2d 139, 144 (S.D.N.Y. 2003). Dr. Stevenson's report painstakingly lays out the basis for his conclusions, and plaintiffs are fully able to attempt to debunk them (and, indeed, have tried to do so (Tam Decl. ¶¶ 32-37)). Because the report "cannot be deemed to be substantially incomplete," Tokio Marine & Nichido Fire Ins. Co. v. Calabrese, No. 07 Civ. 2514, 2011 U.S. Dist. LEXIS 135987, at

*34 (E.D.N.Y. Nov. 28, 2011), we cannot preclude our consideration of it on this motion.[20]

    2.   Whether Version 11 Infringes the '905 Patent

In order to prove infringement, "every element and limitation of a claim of the patent must be found in the accused device, literally or in accordance with the doctrine of equivalents."[21] Gen. Elec. Co. v. ITC, 670 F.3d 1206, 1214 (Fed. Cir. 2012). Conversely, the absence of any limitation or its equivalent precludes a finding of infringement. See Research Plastics, Inc. v. Fed. Packaging Corp., 421 F.3d 1290, 1297 (Fed. Cir. 2005); Key Mfg. Grp., Inc. v. Microdot, Inc., 925 F.2d 1444, 1449 (Fed. Cir. 1991). Plaintiffs argue that ECS View version 11 does not infringe the '905 Patent because it does not "extract" clips as provided in that patent.[22]

---

[20] Even were we to conclude that Dr. Stevenson's report was less than wholly inclusive of his analysis, Rule 26 "contemplates that the expert will supplement, elaborate upon, explain and subject himself to cross-examination upon his report." City of New York v. Exxon Mobil Corp. (In re MTBE Prods. Liab. Litig.), 643 F. Supp. 2d 471, 482 (S.D.N.Y. 2009) (internal quotation marks omitted).

[21] Under the doctrine of equivalents, an element in the accused device is equivalent to a claim limitation "if the only differences between the two are insubstantial" or "if it performs substantially the same function in substantially the same way to obtain substantially the same result." Voda v. Cordis Corp., 536 F.3d 1311, 1326 (Fed. Cir. 2008) (internal quotation marks omitted).

[22] Although the term "extract" is not used in every claim in the '905 Patent, it is used in all of the independent claims, and "[a] conclusion of noninfringement as to the independent claims requires a conclusion of noninfringement as to the dependent claims." Muniauction, Inc. v. Thomson Corp., 532 F.3d 1318, 1328-29 n.5 (Fed. Cir. 2008).

Plaintiffs substantiate this claim with two related arguments. First, they argue that Dr. Stevenson's infringement analysis depends on the use of the standard Windows system routine MoveFileEx() (Stevenson R., Ex. C, at 7 (noting that clips to be extracted are moved to new locations using MoveFileEx())), which, though used in version 9 of the software, is not used in version 11.[23] Second, they contend that version 11 does not extract files at all; it leaves event clips in the same folder and physical storage location as where they were originally recorded, until they are deleted, when they can no longer be displayed. (Tam Decl. ¶¶ 30-37.) This process, they contend, does not constitute "removing" the files, and therefore is not extracting them either. See Carotek III, 2011 U.S. Dist. LEXIS 102014, at *39 (defining "extract" as "remove").

These arguments are insufficient to carry the day. We do not read Dr. Stevenson's analysis as hinging in any way on the use of the MoveFileEx() routine; he has simply mentioned it in his discussion of extraction for the sake of specificity. His broader point -- that the software extracts clips, regardless of what commands it utilizes to do so -- is well taken. The '905 Patent is not limited to use of the MoveFileEx() routine, and we have not read and will not read that limitation into the patent.

---

[23] Dr. Stevenson has testified that MoveFileEx() is used in certain iterations of version 11. (Stevenson Suppl. Decl. ¶ 10.) However, he acknowledged that, as of a date prior to September 14, 2010, the routine appears to be missing from the ECS software. (Id.)

With respect to plaintiffs' second argument, Dr. Stevenson disagrees with Tam about whether version 11 extracts clips. He contends that the software continues to remove event video "from the ring buffer after the receipt of a deviation signal," and the video is thereby protected from being deleted. (Stevenson Suppl. Decl. ¶¶ 12-13.) This is precisely what the extraction limitation of the '905 Patent requires. Plaintiffs have misread our discussion of the meaning of "extract" -- removal does not necessitate physical movement. The patent's limitation is that deviation digitized video signals or data must be removed from the surrounding digitized video signals or data, simply meaning that they need to be isolated for display purposes and not overwritten by subsequently digitized data. See Carotek III, 2011 U.S. Dist. LEXIS 102014, at *37-39 (noting that the construction of "extract" "reflects the concept of data preservation" and "avoids the hazard of limiting the claim term to two ways of extraction -- moving and copying -- when the Patents contain no such limitation").

On this record, we cannot grant plaintiffs summary judgment on the issue of whether ECS View version 11 infringes the '905 Patent. Cf. Gucci Am., Inc. v. Guess?, Inc., No. 09 Civ. 4373, 2012 U.S. Dist. LEXIS 18497, at *9 (S.D.N.Y. Feb. 14, 2012) ("In cases where credible expert reports conflict the case for summary judgment on the disputed issue is very weak." (citing

New Orleans Emps.' Ret. Sys. v. Omnicom Grp., Inc. (In re Omnicom Grp., Inc. Sec. Litig.), 597 F.3d 501, 512 (2d Cir. 2010))).

**B.   Whether Carotek May Be Liable for Infringement**

Carotek sold its event-capturing business to ECS on December 31, 2007. It argues that it has, since then, sold no accused products and is therefore entitled to summary judgment on Kobayashi's claims of infringement.

Kobayashi contends that Carotek continued to invoice customers for accused products after the sale, but -- even assuming the evidence reflected purchases by customers following the December 31, 2007 sale of the event-capture business to ECS -- the most recent relevant document contains a settlement date of February 17, 2009 (Peters Decl., Ex. 22), prior to the effective date of the Certificate. James Addison Bell, the Chief Executive Officer of Carotek, also testified that Carotek has neither sold any event-capturing systems since the end of 2007 nor serviced any system it had previously sold. (Decl. of Michael Autuoro ("Autuoro Decl."), Ex. 13, Dep. of James Addison Bell (May 12, 2008) ("2008 Bell Dep.") 18:4-16, 21:11-16.)

However, on June 4, 2008, ECS provided a product quotation to P&G for Version 10.x of ECS's software. (Peters Decl., Ex. 23.) That quotation represents that "Carotek phone support is available at no charge during the system life span" and that

44

"[f]ull service contact by local Carotek service technician" may be purchased. Although the quotation expired on June 30, 2009, the "system life span" may very well extend for years. (2008 Bell Dep. 21:5-10 (noting that, as of December 31, 2007, customers were still using "systems going back to the origins of the product").)

While we acknowledge that the evidence Kobayashi has presented is not definitive proof that Carotek continued its involvement with the event-capturing system business after 2007, on this motion we must construe the evidence and disputed issues of fact in the light most favorable to Kobayashi. See Gorzynski, 596 F.3d at 101. Doing so, we cannot conclude that no reasonable jury could find Carotek liable for infringement or aiding and abetting ECS's alleged infringement.

## C.   Patent Misuse Affirmative Defense

In their answers to the counterclaims, plaintiffs asserted as an affirmative defense to infringement that Kobayashi had misused its patents. (Docket no. 77, Answer to Am. Countercl. ¶ 101(h).) As we have previously discussed, see Carotek II, 2010 U.S. Dist. LEXIS 37800, at *18-19, we do not believe that Kobayashi's actions, analyzed more extensively infra, rise to the level of anticompetitive conduct recognized as constituting misuse for the purposes of this defense. See also VA Panel Corp. v. MAC Panel Co., 133 F.3d 860, 869 (Fed. Cir. 1997) (a patentee

45

contacting an infringer's customers and threatening suit did not constitute patent misuse). Our beliefs on the issue, however, are no longer relevant, as plaintiffs have withdrawn their reliance on the defense. (Oral Arg. Tr. 55:12-18.)

**V.   Amounts Owed Under the License Agreement**

Carotek seeks in its suit, among other things, monetary relief in the form of a return of the royalties it paid to Kobayashi (or Kobayashi's predecessors) pursuant to the Agreement. It asserts in support of this position both that the technology licensed under the Agreement was not covered by any of the Patents and that Kobayashi violated the terms of the Agreement by failing to extend to Carotek favorable royalty terms extended to another licensee. Kobayashi has moved for summary judgment on the issue.

**A.   Minimum Annual Fees**

It is undisputed that the Agreement provides that Carotek must pay "minimum guaranteed annual fees of TWENTY-FIVE THOUSAND DOLLARS ($25,000.00) per calendar year." (Agreement ¶ 3.4.) We have already determined that the provision is prima facie valid. See Carotek II, 2010 U.S. Dist. LEXIS 37800, at *23-24. Carotek's argument that the Patents do not cover the licensed technology -- the merits of that argument entirely apart -- is thus irrelevant. Carotek was obligated to pay Kobayashi $25,000 per year regardless of what technology the Agreement covered,

46

whether the Patents were valid, or whether Carotek even used the technology it had licensed.

It is further undisputed that between 1999 and 2004 -- the first full year that the Agreement was in effect and the last year for which Carotek paid royalties, respectively -- Carotek paid $123,421.79 to Kobayashi, during which time it would have owed $125,000.00 under the Agreement. Carotek did not remit even the minimum it owed; it therefore cannot seek the return of what it did pay unless the minimum-fee provision is void or otherwise unenforceable.

**B.   "Most Favored Licensee" Clause**

Carotek argues that a violation of the "most favored licensee" clause of the Agreement suffices to excuse it of its obligations under the minimum-fee provision. That clause provides, in relevant part, that if Kobayashi

> grants a license to a third party . . . to practice all of the subject matter licensed under this Agreement and subject to more favorable royalty terms than those set forth in ARTICLE III of this Agreement, [Kobayashi] shall promptly notify [Carotek] in writing of said more favorable royalty terms. Upon written request given by [Carotek] . . . within sixty (60) days after receipt of such notice, [Carotek] shall be entitled to the benefit of such more favorable terms . . . .

(Agreement ¶ 12.1.) Carotek has previously contended that Kobayashi's failure to pursue legal action against Papertech when Papertech breached its licensing agreement by not paying

the royalties it owed constituted favored treatment toward Papertech. As Carotek acknowledges, the Court has rejected that argument, holding that the breach did not "constitute[] an implied zero royalty license" and that Kobayashi's failure to notify Carotek of the breach did not "constitute[] the granting of a more favored license to Papertech." Carotek I, 2009 U.S. Dist. LEXIS 79812, at *8-9.

The revelation that Equaphor also breached its licensing agreement and was not pressed for the money it owed for a period of at least two years does not alter our analysis. Breach of an agreement that is not met with legal action does not constitute favored terms.

Carotek has thus failed to "come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." FDIC, 607 F.3d at 292. Carotek's claims seeking the return of royalties paid are accordingly dismissed.

## VI.  Plaintiffs' State Tort Claims

Plaintiffs have also asserted a variety of state and common law claims against Kobayashi arising from the Letters, including interference with prospective business advantage, libel and defamation, fraud,[24] and unfair trade practices under North

---

[24] Since filing their complaints, plaintiffs have withdrawn their claims for fraud. (Carotek, Inc.'s Response to Kobayashi Ventures, LLC's and James Dechman's Mot. for Partial Summ. J. Regarding Carotek's Affirmative Claims & Defenses 2; Oral Arg. Tr. at 56:1-4.)

Carolina General Statute § 75-1.1.[25] As a threshold matter, "federal patent law preempts state-law tort liability for a patentholder's good faith conduct in communications asserting infringement of its patent and warning about potential litigation." Globertrotter Software, Inc. v. Elan Computer Grp., Inc., 362 F.3d 1367, 1374 (Fed. Cir. 2004) (citing Zenith Elecs. Corp. v. Exzec, Inc., 182 F.3d 1340, 1355 (Fed. Cir. 1999)). Kobayashi further argues that damages is an essential element of each of plaintiffs' claims and that plaintiffs have failed to demonstrate the requisite injury. Kobayashi additionally asserts various claim-specific defenses.

**A.  Whether the Letters Were Sent in Bad Faith**

    1.  Standards of Bad Faith

Courts presume that the assertion of duly granted patent rights is made in good faith; a plaintiff must thus present "affirmative evidence of bad faith" in order to overcome federal law preemption.[26] C.R. Bard, Inc. v. M3 Sys., Inc., 157 F.3d

---

[25] The state claims are all brought under the laws of North Carolina, the state in which plaintiffs are organized. Although plaintiffs present arguments only under the statutory unfair competition standard, see N.C. Gen. Stat. § 75-16 (providing a right of action when "the business of any person, firm or corporation [is] broken up, destroyed or injured by reason of any act" in violation of any provision of that chapter), we will address each alleged tort, as libel and interference with prospective advantage may form the basis of a violation of Section 75-1.1. See Ellis v. N. Star Co., 326 N.C. 219, 225-26 (1990) (libel); cf. DaimlerChrysler Corp. v. Kirkhart, 561 S.E.2d 276, 286 (N.C. Ct. App. 2002) (failure to show a predicate tort, including tortious interference with prospective advantage and libel, precludes finding of unfair trade practices).

[26] Kobayashi does not dispute that plaintiffs have alleged that it acted in bad faith by sending the Letters.

1340, 1369 (Fed. Cir. 1998); see also Globetrotter, 362 F.3d at 1374 (requiring plaintiff to both allege and show bad faith). A plaintiff's evidence of bad faith must be "clear and convincing." See Golan v. Pingel Enter., Inc., 310 F.3d 1360, 1371 (Fed. Cir. 2002). In order to meet this standard, the evidence must show that the allegations of infringement were "objectively false" and made in bad faith -- i.e., "with knowledge of their incorrectness or falsity, or disregard for either."[27] Id. The Federal Circuit has explained that this standard requires that the assertion of infringement have been "objectively baseless," Globetrotter, 362 F.3d at 1377, meaning that no reasonable litigant could have realistically expected success on the merits, see Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc., 508 U.S. 49, 60 (1993).

A plaintiff's burden can be met by showing that the defendant had no reasonable basis to believe its patents were infringed or that it knew it was enforcing an unenforceable patent. See Golan, 310 F.3d at 1371; Zenith Elecs., 182 F.3d at 1354 ("[I]f the patentee knows that the patent is invalid, unenforceable, or not infringed, yet represents to the marketplace that a competitor is infringing the patent, a clear case of bad representations is made out."). However, simply

---

[27] Patentees are thus "allowed to make representations that turn out to be inaccurate provided they make them in good faith." Golan, 310 F.3d at 1371.

showing that the defendant intended to divert customers from the plaintiff's business is insufficient. See Mikohn Gaming Corp. v. Acres Gaming, Inc., 165 F.3d 891, 897 (Fed. Cir. 1998) (holding that "a competitive commercial purpose is not of itself improper").

### 2.   Evaluating Koabayshi's Bad Faith

After Carotek had initiated suit against Kobayashi and Kobayashi had counterclaimed, Kobayashi sent the Letters to the Customers. The Letters note that the Customers "unwittingly may be using unlicensed Products," which may "expose [the Customers] to potential liability" if they end up "in the unfortunate position of ultimately being held legally and financially responsible for Patent Infringement," and they ask for records of all products acquired from Carotek after December 8, 1998. We find that Kobayashi has not demonstrated that no reasonable jury could find that the Letters were sent to the Customers in bad faith.

We note initially that Kobayashi sent the Letters after it had initiated its counterclaims against Carotek and therefore could have made use of the provisions of Federal Rule of Civil Procedure 45 to subpoena the documents it requested. Use of that rule, however, would have required that Kobayashi, before serving any subpoena, notify Carotek of its intent to do so, see Fed. R. Civ. P. 45(b)(1), thereby providing Carotek with an

opportunity to object, see Comm. Note to Fed. R. Civ. P. 45 (1991) (noting that the purpose of the notice is "to afford other parties an opportunity to object to the production"). The fact that Kobayashi did not utilize its subpoena power to compel production -- nor did it ever follow up on the Letters (Autuoro Decl., Ex. 6, Dep. of Jeffrey M. Schwaber 24:6-11 (noting that, even though Kobayashi did not receive from any Customer the accounting of product sales requested in the Letters, it never pursued that data)) -- indicates that Kobayashi was more interested in informing the Customers of the lawsuit than it was in actually obtaining the requested documents. Though not dispositive of the issue, its actions prima facie are suggestive of bad faith. Cf. Kaplan v. Helenhart Novelty Corp., 182 F.2d 311, 314 (2d Cir. 1950).

More importantly, the actual statements that Kobayashi made in the Letters are objectively baseless. As the Federal Circuit explained in Tessera, Inc. v. ITC, 646 F.3d 1357, 1369-70 (Fed. Cir. 2011), absent specific language in the operative licensing agreement, a licensee's authorized sale to a customer does not retroactively become unauthorized if that licensee subsequently stops making royalty payments required under the licensing arrangement. In Tessera, the licensee owed "running royalty obligations which accrue[d] on products sold," though in some cases they "[did] not accrue until eight months after the

52

licensed products [were] sold." Id. at 1370. The licensee was nevertheless authorized to sell the accused products during the accrual period, even if it later failed to pay the accrued royalty obligations. Because "[n]othing in the [licensing agreement] limited the licensee's ability to sell the accused products," failure to pay royalties could not "operate[] to convert initial authorized sales into unauthorized sales." Id.

Here, as in Tessera, the Agreement grants a broad license to Carotek and contains no language implying post-sale restrictions on otherwise licensed products. (Agreement ¶¶ 2.1 (granting "the worldwide, non-transferable, non-exclusive right and license under Patent Rights to make, use, and sell" the patented monitoring system), 4.1-4.4 (conditions on payment of royalties).) Carotek ceased making royalty payments to Kobayashi in 2005; it is undisputed that, prior to that point, Carotek held a license for the products it sold to the Customers. It is clear, then, that any of Carotek's sales to the Customers made between December 8, 1998 and 2005 were not and could not have been unauthorized.[28] Kobayashi's protests that the Letters state

_____

[28] While Carotek's right to grant sublicenses to its customers is conditioned on payment of royalties (Agreement ¶ 2.2), that clause may only be read prospectively, and the language does not suggest that once-authorized sales may become unauthorized after non-payment.

Nevertheless, we do not read Tessera to suggest that even Carotek's sales of products utilizing Kobayashi's patented technology after Carotek stopped making royalty payments were necessarily authorized. Rather, we read the case to say only that sales that were authorized when made may not have that status stripped from them without a specific condition subsequent in the

that it only "suspects" the Customers "may" be using unlicensed products are to no avail: it was baseless for Kobayashi to have any such suspicions with respect to the majority of the time period it implicated in the Letters.

Moreover, the right to recovery for infringement under the patent laws extends for only six years. See 35 U.S.C. § 286; see also A.C. Aukerman Co. v. R.L. Chaides Constr. Co., 960 F.2d 1020, 1030 (Fed. Cir. 1992). Kobayashi asserted its infringement counterclaims against Carotek on February 11, 2008. It therefore could pursue recovery only for infringing acts committed after February 11, 2002, again demonstrating that its claims of potential infringement and liability extending back to 1998 were objectively baseless and hence made in bad faith. Cf. Golan, 310 F.3d at 1372 ("A party that knowingly asserts an expired, and therefore unenforceable, patent results in a clear case of bad faith.").

Taken together, these factors sufficiently raise a genuine issue of material fact about whether Kobayashi sent the Letters in bad faith such that we cannot grant defendants summary judgment on the issue of federal patent law preemption. We therefore turn to an analysis of state law.

---

Agreement. Thus, sales made after the first royalty payment that Carotek did not pay came due may not have been authorized.

### B.   Plaintiffs' Damages

Defendants maintain that plaintiffs' failure to establish that the Letters caused them damages is fatal to all of their state claims. We agree that each of the state torts requires proof of both causation and actual damages and that plaintiffs have failed to demonstrate these elements.

### 1.   What Plaintiffs Must Prove

**Tortious Interference with Prospective Advantage**

There is little disagreement that proof of both causation and damages is essential to a claim of tortious interference with prospective advantage under the law of North Carolina. See Dalton v. Camp, 548 S.E.2d 704, 709 (N.C. 2001) ("[I]nterference with a man's business, trade or occupation by maliciously inducing a person not to enter a contract with a third person, which he would have entered into but for the interference, is actionable if damage proximately ensues." (quoting Spartan Equip. Co. v. Air Placement Equip. Co., 140 S.E.2d 3, 11 (N.C. 1965) (emphasis added)); see also S.N.R. Mgmt. Corp. v. Danube Partners 141, LLC, 659 S.E.2d 442, 453 (N.C. Ct. App. 2008) (tortious interference with prospective advantage requires plaintiff to "show that the contract would have ensued but for defendants' interference" (internal quotation marks and alteration omitted) (emphasis added)); MLC Auto., LLC v. Town of S. Pines, 702 S.E.2d 68, 79 (N.C. Ct. App. 2010) ("To establish

tortious interference with prospective economic advantage, a plaintiff must show that the defendant, without justification, induced a third party to refrain from entering into a contract with the plaintiff, which would have been made absent the defendant's interference."); accord Walker v. Sloan, 529 S.E.2d 236, 242 (N.C. Ct. App. 2000). Plaintiffs are thus required to show that defendants' actions caused them damages in order to recover under this theory.

**Defamation and Libel**

Damages are not a prerequisite for recovery for libel if the allegedly defamatory statements are deemed to be libel per se. A statement is per se libelous only if it is "susceptible of but one meaning and of such nature that the court can presume as a matter of law that [it] tend[s] to disgrace and degrade the party." Nucor Corp. v. Prudential Equity Grp., LLC, 659 S.E.2d 483, 486 (N.C. Ct. App. 2008) (quoting Renwick v. News & Observer Publ'g Co., 312 S.E.2d 405, 409 (N.C. 1984)). Moreover, the statement "must be construed only in the context of the document in which [it is] contained, stripped of all insinuations, innuendo, colloquium and explanatory circumstances." Id. at 487 (internal quotation marks omitted).

Plaintiffs suggest that the Letters contain statements that are per se libelous and that they are therefore entitled to a presumption of damages. See, e.g., Gibson v. Mut. Life Ins. Co.

56

of N.Y., 465 S.E.2d 56, 59-60 (N.C. Ct. App. 1996) (damages may be presumed if, relevantly, a statement "impeach[es] one's trade or profession"). However, in light of the facts that (1) the Letters were sent after Carotek had exited the event-capture business, having sold it to ECS; (2) ECS is nowhere mentioned in the Letters; (3) the Letters do not actually allege that Carotek has done anything at all, but rather simply note that Kobayashi has sued Carotek for patent infringement and breach of contract, which is true; and (4) the Letters must be evaluated for defamatory remarks on their face, without any "explanatory circumstances," we find the Letters do not constitute libel per se. Cf. Nguyen v. Taylor, 684 S.E.2d 470, 486-88 (N.C. Ct. App. 2009) (dismissing claims of libel per se arising from statements pertaining to possible litigation).[29]

Rather, the statements in the Letters are more accurately characterized as libel per quod -- statements that are "not obviously defamatory, but when considered in conjunction with innuendo, colloquium, and explanatory circumstances [may] become[] libelous." Id. at 474. Because the Letters are at most libel per quod, plaintiffs must prove special damages in order to recover. See id.

---

[29] For substantially similar reasons, the Letters do not fall into the category of defamation that lies between per se and per quod -- they are not on their face "capable of having both a defamatory meaning and a non-defamatory meaning." Nguyen, 684 S.E.2d at 474 (quoting Renwick, 312 S.E.2d at 408).

Moreover, in addition to providing proof of damages, plaintiffs must also demonstrate that the damages were caused by the Letters. See Griffin v. Holden, 636 S.E.2d 298, 306 (N.C. Ct. App. 2006) (affirming summary judgment on libel per quod because "plaintiff is unable to produce an evidentiary forecast sufficient to show that defendant's publications . . . caused special damage").

**Unfair Trade Practices**

Like the prior two torts, recovery for unfair trade practices under North Carolina General Statute § 75-1.1 requires a demonstration of damages, see, e.g., Piedmont Inst. of Pain Mgmt. v. Staton Found., 581 S.E.2d 68, 76 (N.C. Ct. App. 2003) ("Certain torts require as an essential element that plaintiff incur actual damage. . . . [T]hese torts include . . . unfair and deceptive trade practices." (internal quotation marks, alteration, and citations omitted)), and those damages must have been caused by the defendant. See Castle McCulloch, Inc. v. Freedman Assocs., 610 S.E.2d 416, 419 (N.C. Ct. App. 2005) (unfair trade practices requires plaintiff to "establish it suffered actual injury as a proximate result of defendants' misrepresentations or unfair conduct" (internal quotation marks omitted).

Although a few federal courts construing North Carolina law have held that a plaintiff who has failed to demonstrate actual

damages may still pursue nominal damages,[30] these decisions are not in line with the weight of North Carolina authority. See, e.g., Piedmont Inst., 581 S.E.2d at 76; Brotherton v. Point on Norman, LLC, 577 S.E.2d 361, 364-65 (N.C. Ct. App. 2003) (citing Edwards v. West, 495 S.E.2d 920, 923, cert. denied 501 S.E.2d 918 (1998)); Walker v. Branch Banking & Trust Co., 515 S.E.2d 727, 731 (N.C. Ct. App. 1999). Carotek's citation to Zumkehr v. Hidden Lakes Property Owners Assocation, No. COA02-547, 2003 N.C. App. LEXIS 1271, at *21-22 (N.C. Ct. App. July 1, 2003), does not alter our conclusion but, rather, supports it.[31] That court permitted pursuit of nominal damages only on plaintiff's claim for "damages arising from the suspension of her access to community amenities and the denial of her right to vote." Id. at *17. On the relevant claim, it specifically held that because "plaintiff has shown no actual injury, her claim for unfair and deceptive trade practices cannot stand." Id. at *21. Plaintiffs must thus demonstrate actual damages to recover on their claims of unfair trade practices.

---

[30] See, e.g., BSN Med., Inc. v. Parker Med. Assocs. LLC, No. 3:09cv15, 2011 U.S. Dist. LEXIS 130643, at *31-33 (W.D.N.C. Nov. 10, 2011) (noting that "once the elements of a cause of action are established, a plaintiff is entitled to recover at least nominal damages" and declining "to award summary judgment to either party based on their respective contentions that the other party has failed to offer sufficient proof of damages" (internal quotation marks omitted) (citing Pharmanetics, Inc. v. Aventis Pharm., Inc., No. 5:03-CV-817-FL(2), 2005 U.S. Dist. LEXIS 45768, at *48-49 (E.D.N.C. May 4, 2005))).

[31] Carotek's citation to Delaware and New York case law is wholly inapposite, given that North Carolina law is clear on this issue.

In summary, North Carolina state law requires plaintiffs to prove both that they incurred damages and that those damages were proximately caused by the Letters before they can recover for any of the alleged torts.

> ### 2. Whether Carotek Has Proven That Kobayashi Caused It Damages

As noted previously, Carotek sold its event-capture system business to ECS on December 31, 2007, approximately four months before Kobayashi sent the Letters. Three of the recipients of the Letters -- Sappi, NewPage, and JDI -- were customers of Carotek only to the extent that they purchased event-capture systems from it. Carotek, as it has conceded, thus cannot show any injury with respect to business lost from these three customers. (Decl. of Deanna L. Peters in Supplemental Supp. of Mot. for Partial Summ. J. Regarding Carotek, Inc.'s Affirmative Claims & Defenses, Ex. 5, Dep. of James Addison Bell (May 25, 2010) ("2010 Bell Dep.") 75:1-21; 135:8-12.)

The remainder of the Customers -- P&G, Kimberly-Clark, Georgia-Pacific, Domtar, AbitibiBowater, Sonoco, and Quebecor -- patronized other aspects of Carotek's business. There is, however, no evidence that any of these Customers ceased doing business with Carotek or that Carotek has suffered any loss at all. Carotek has even acknowledged that it can point to no contract or transaction with these businesses that it lost as a

result of the Letters. (<u>Id.</u> 142:21-143:20, 152:11-20, 156:22-157:19.)

With such a complete lack of evidence, we find that no reasonable jury could conclude that Carotek suffered any damages as a result of the Letters. Carotek's claims of interference with prospective advantage, libel, and unfair trade practices are dismissed.

3.   Whether ECS Has Proven That Kobayashi Caused It Damages

Kobayashi contends that there is no evidence in the record to establish that ECS suffered any damages from the Letters. It notes that plaintiffs deposed only a single one of the Customers,[32] and that deposition affirmatively negates the possibility that the Letters caused ECS to lose any sales. At that deposition, the Senior Purchases Manager (the "Manager") for one of the Customers was asked whether the letter that Customer received from Kobayashi played any role in its decision not to purchase from ECS for a project it pursued after April 24, 2008, and the Manager answered in the negative. The Manager attributed that decision instead to the Customer's three selection criteria, on which ECS fared the worst of the three

---

[32] This deposition has been designated as confidential by the parties, and it was represented to counsel for that Customer that certain documents discussed therein would be for attorneys' eyes only. On this motion, we are able to respect the Customer's desire for confidentiality by preserving its anonymity and discussing relevant topics only generally. We forego certain citations to the record in the interests of furthering that anonymity.

companies considered. The Manager was then asked more broadly about the letter's effect on the Customer's decisions to purchase from ECS. In response, the Manager testified that the letter did not ever factor into any decisions that the Customer made about buying or doing business with either Carotek or ECS. In light of the dearth of other evidence pertinent to causation in the record, this deposition satisfies Kobayashi's initial burden to "demonstrat[e] the absence of a genuine issue of material fact" on the issue of causation of damages. <u>FDIC</u>, 607 F.3d at 292 (internal quotation marks omitted).

ECS attempts to satisfy its burden to produce specific evidence creating an issue of fact by pointing first to an e-mail exchange between the Manager and a Converting Engineer at the Customer (the "Engineer"), as well as two others ("Manager E-mail"). These e-mails are hearsay[33] that do not fall within any hearsay exception. <u>See</u> <u>Morisseau v. DLA Piper</u>, 532 F. Supp. 2d 595, 621 n.163 (S.D.N.Y. 2008) ("An e-mail created within a business entity does not, for that reason alone, satisfy the business records exception of the hearsay rule." (citing Fed. R.

---

[33] Plaintiffs' contention at oral argument that the e-mails had been identified at depositions (Oral Arg. Tr. 71:15-72:9) is insufficient to admit them. First, the Engineer's deposition is not even in the record before us. Second, while the Manager did acknowledge that he or she sent one of the emails in the chain, the Manager was simply authenticating the e-mail, not adopting it, which does not eliminate "the other hurdles to admissibility." 5 Jack B. Weinstein & Margaret A. Berger, <u>Weinstein's Federal Evidence</u> § 901.02[1] (2d ed. 2012) ("An exhibit is not admissible simply because it has been authenticated."). The e-mail, moreover, falls under none of the relevant hearsay exclusions. <u>See</u> Fed. R. Evid. 801(d).

Evid. 803(6))). They are thus insufficient to oppose Kobayashi's motion for summary judgment without a showing that admissible evidence will be available at trial, see <u>Burlington Coat Factory Warehouse Corp. v. Esprit de Corp.</u>, 769 F.2d 919, 924 (2d Cir. 1985), which ECS has not done.[34]

Seeking a different tack by which to bolster its causation argument, ECS also asks us to infer causation from its assertion of lost revenue.[35] In particular, Brian Mock, co-director of ECS, testified that, "in April, 2008, the month the 10 letters were sent to ECS's customers, bookings of new or replacement event capture systems from those customers dropped precipitously, while bookings of new or replacement event capture systems from ECS's customers to whom letters were not sent continued to increase." (Autuoro Decl., Ex. 5, Decl. of Brian Mock ("Mock Decl.") ¶ 5.) Mock estimates that, due to the Letters, between 2008 and the beginning of 2012 ECS experienced a drop in revenue

---

[34] Even were we to consider the e-mails, it is not clear that they would suffice to create a genuine issue of material fact. In the e-mails, the Engineer indicated that one reason the Customer opted to purchase from MTC was that lawsuits had been brought against ECS and Papertech by a company (which goes unnamed) with an ownership interest in MTC, and the Manager clarified that MTC had a lower risk of legal and intellectual property difficulties. The Manager testified at deposition, however, that the lower risk of litigation with MTC was not a factor considered in the supplier selection criteria and therefore was not a reason that MTC was selected as the Customer's project supplier rather than ECS.

[35] We assume for the purposes of this discussion that the Customers were all aware of the connection between Carotek and ECS and would have read the Letters to refer to the latter company even though they do not mention it. While there is limited evidence in the record suggesting that this is a viable assumption (Manager E-mail (referring to Kobayashi's "suit against ECS/Carotek")), we are not convinced that it could withstand scrutiny.

from lost sales of new or replacement event-capture systems
totaling $8,891,531, representing $3,543,497 in profits. (Id.
¶¶ 6-7.) He further adds to those numbers $444,577 and $252,742
for revenue and profits respectively as a result of lost sales
of spare, replacement, and upgrade parts, software upgrades, and
related service charges. (Id. ¶¶ 8-9.)

These numbers are based on a chart apparently detailing
Carotek and ECS's total sales to the Customers on a yearly basis
from 2001 to 2011. (Id., Ex. 2.) The chart takes the difference
of the average yearly sales between 2001 and 2007 and between
2008 and 2011 and extrapolates therefrom to arrive at total
revenue lost as a result of the Letters.[36] The methodology is, to
say the least, both somewhat simplistic and suspect.

Accompanying the chart is a graph depicting Carotek and
ECS's aggregate sales both to the Customers and to customers who
did not receive the Letters, as well as an estimate of total
sales had the Letters never been sent. (Mock Decl., Ex. 2.) This
graph depicts a rather incredible three-fold increase in sales
between 2007 and 2008 in ECS's hypothetical world. The
difference between actual total sales invoiced and the estimate
is smaller -- the estimate represents only a 76% increase over

---

[36] The chart also makes other adjustments based on factors -- such as a
comparison of estimated new business and "normal" business for one Customer,
as well as a "Corporate Purchase Deal for 08" -- that pass entirely without
explanation.

the actual sales -- but the estimate still relies on the dubious methodology described above.

ECS contends -- citing only non-controlling case law -- that these comparisons of sales numbers before and after the alleged tortious incident are sufficient to demonstrate causation. ECS has not pointed us to, and we are not aware of, any North Carolina cases holding that this inference is appropriate. Indeed, the courts of North Carolina appear to have required a far more direct showing of causation. See, e.g., Bumpers v. Cmty. Bank of N. Va., 718 S.E.2d 408, 413 (N.C. Ct. App. 2011) ("[W]here an unfair or deceptive practice claim is based upon an alleged misrepresentation by the defendant, the plaintiff must show actual reliance on the alleged misrepresentation in order to establish that the alleged misrepresentation proximately caused the injury of which plaintiff complains." (internal quotation marks omitted)); Hospira Inc. v. AlphaGary Corp., 671 S.E.2d 7, 13 (N.C. Ct. App. 2009) (requiring actual reliance on deceptive statements); Belcher v. Fleetwood Enters., Inc., 590 S.E.2d 15, 19 (N.C. Ct. App. 2004) (noting in dismissing an unfair trade practices claim that plaintiff did not alter his course of action based on defendant's conduct).

Regardless, the cases ECS has cited would not sanction an inference of causation here. For instance, the court in

Brunswick v. Spirit Reel Co., 832 F.2d 513, 525-26 (10th Cir.
1987), addressed the issue of whether, after the plaintiff had
already "established entitlement to damages," it had
sufficiently shown that it had suffered actual damages. The
court held -- not that causation could be inferred from lost
profits, because the issue of causation did not need to be
addressed -- but rather that when a defendant's "wrongful
conduct has caused the difficulty in assessing damages," a
"somewhat speculative" measure of damages is acceptable for use
in determining what damages should be awarded. Id. at 526.

Plaintiffs here have not yet demonstrated their entitlement
to damages. Even if Brunswick stood for the proposition that ECS
asserts it does, however, there would be no difficulty in
establishing damages attributable to defendants. Plaintiffs
could have taken depositions from the small class of affected
customers to determine precisely how much, if any, business they
had lost. However, plaintiffs apparently made the business
decision not to drag their customers, aside from the one
Customer discussed above, into this litigation. While we do not
fault that decision, we cannot penalize defendants for it.

The other case ECS cites, Bracco Diagnostics, Inc. v.
Amersham Health, Inc., 627 F. Supp. 2d 384 (D.N.J. 2009), is no
more availing. While the court there was amenable to the use of
sales trends to demonstrate causation of damages, it noted that

66

"where many potential intervening factors can affect the plaintiff[']s sales, and the presence of such factors bears on the sufficiency of the plaintiff's proof, a sales trend approach will be insufficient to demonstrate causation." Id. at 487 (internal quotation marks omitted).

The sales data ECS has presented here make no attempt to account for numerous factors that may very well have influenced event-capture system sales after 2008: the sale of the business to ECS from Carotek; the fact that many of the Customers had already purchased event-capture systems and may not have needed additional ones; the general decline in the world's economy from the 2008 recession, cf. Brunswick, 832 F.2d at 525 (noting that sales of plaintiff's products "generally had decreased by six percent due to the recession"); or the decline of the paper industry in particular.[37]

Furthermore, the chart presents certain data that actually cast doubt on the proposition that the Letters were the cause of any drop in ECS's revenues. While average sales decreased for certain of the Customers between the two time periods reflected on the chart, they increased for four of the companies, one of which actually became a customer first in 2008. Sales to others

---

[37] See, e.g., U.S. Census Bureau, Statistics of U.S. Businesses: 2008: U.S. – Paper Manufacturing, http://www.census.gov/epcd/susb/2008/us/us322.htm (last visited June 25, 2012) (from 2001 to 2008, showing a decline in the number paper-manufacturing firms from 3660 to 3165 and the paid employees at such firms from 533,251 to 412,912).

of the remaining Customers had been decreasing prior to 2008 --
revenues from four of them were already decreasing between 2006
and 2007, before the Letters were ever sent. Cf. Nelson v.
Hartford Underwriters Ins. Co., 630 S.E.2d 221, 233-34 (N.C. Ct.
App. 2006) (finding that plaintiffs could not demonstrate
proximate causation when the injury had been ongoing before the
alleged tortious act). Likewise, the graph shows that ECS's
aggregate sales to the Customers dropped between 2006 and 2007,
and its total sales decreased by approximately 20% between 2005
and 2007 before increasing dramatically -- by 76% -- in 2008.
The facts that some Customers increased their purchases from ECS
after receiving the Letters, Carotek/ECS's sales had started to
decline prior to the Letters being sent, and the business's
revenues experienced a sharp increase between 2007 and 2008
strongly diminish an inference of causation.

Even could ECS show that the Letters had caused it injury,
it faces a further problem with proving its damages. There is no
direct evidence in the record of lost sales or any other
potential measure of damages. Although ECS again asks us to
adopt law from outside of North Carolina and permit the chart
and graph to serve as evidence of the appropriate measure of
damages, the relevant state law does not admit the use of such
speculation. See, e.g., Olivetti Corp. v. Ames Bus. Sys., Inc.,
356 S.E.2d 578, 585-86 (N.C. 1987) (requiring plaintiff to prove

"with reasonable certainty" both "that it was deprived of an opportunity to make profits" and "what, if any, profits it would have made"); Castle McCulloch, 610 S.E.2d at 420-21 (requiring that damages be shown "with reasonable certainty" and denying an award of lost profits "based upon hypothetical or speculative forecasts of losses").

The cases ECS cites to attempt to demonstrate the reliability of its evidence do not provide compelling analogies to the instant case. For instance, Broan admitted mathematical models prepared by an expert based in part on assumptions that "were not supported by rigorous statistical studies" because his estimates "clearly were supported by evidence in the record" and within his "compass of . . . expertise." Broan Mfg. Co. v. Associated Distribs., Inc., 923 F.2d 1232, 1239-40 (6th Cir. 1991). Mock's chart and graph, in contrast, are based on numerous assumptions detailed above that are without foundation in the record evidence, and we have been provided no information about who prepared them or their expertise, if any. We do know, however, that the estimates of lost revenue were prepared no earlier than 2011 and well after this litigation had commenced, thus calling into question their impartiality. Cf. Merriam-Webster, Inc. v. Random House, Inc., 815 F. Supp. 691, 700 (S.D.N.Y. 1993) (using projections prepared in the normal course of business as an estimate of damages).

69

ECS has thus failed to produce "specific evidence demonstrating the existence of a genuine dispute of material fact" on the issue of causation of damages. <u>FDIC</u>, 607 F.3d at 292. Accordingly, we grant summary judgment in favor of Kobayashi on each of the state claims.

## VII. <u>Claims Against Dechman in His Individual Capacity</u>

James Dechman is one of two members of Kobayashi and a manager of Equaphor. Plaintiffs have asserted that, because of his relationship to Kobayashi and Equaphor, Dechman may be personally liable for their torts based on a theory of alter ego liability. Dechman has moved for summary judgment on the claims against him.

As a diversity action, we apply New York's choice of law rules to determine which state's laws to apply in this analysis. <u>See</u> <u>Klaxon Co. v. Stentor Elec. Mfg. Co.</u>, 313 U.S. 487, 496 (1941). New York applies the law of the state of incorporation for purposes of veil piercing. <u>See</u> <u>Marino v. Grupo Mundial Tenedora, S.A.</u>, 810 F. Supp. 2d 601, 609 (S.D.N.Y. 2011). Kobayashi and Equaphor are both Delaware companies, and we therefore apply Delaware law to evaluate the issue of piercing the corporate veil. To the extent, however, that plaintiffs have advanced non-veil-piercing arguments to suggest that Dechman may be liable under state law, the law of the forum in which the claim arose is applicable.

To pierce a corporate veil under Delaware law, a plaintiff must show that the individual has "complete domination and control" over the entity such that it "no longer ha[s] legal or independent significance of [its] own." Wallace ex rel. Cencom Cable Income Partners II, L.P. v. Wood, 752 A.2d 1175, 1183 (Del. Ch. 1999). An alter-ego theory, a subset of the general veil-piercing theory, requires that the entity "be a sham and exist for no other purpose than as a vehicle for fraud." Id. at 1184.

When asked about Carotek's theory of veil-piercing, Bell indicated that its basis for the argument was no more than that Dechman is involved in the companies and was Carotek's main contact there. (2010 Bell Dep. 49:19-50:5.) Bell specifically noted that he was unaware of whether Dechman had an ownership interest in Kobayashi or Equaphor. (Id.) Mock articulated ECS's theory as relying on three factors: (1) Dechman's name was on the Letters; (2) Dechman co-owns Kobayashi; and (3) Dechman is one of the managers of Equaphor. (Decl. of Deanna L. Peters in Supplemental Supp. of Mot. for Partial Summ. J. Regarding Event Capturing Systems, Inc.'s Affirmative Claims & Defenses, Ex. 3, Dep. of Brian Mock 118:4-15.) In their briefing, plaintiffs add the fact that Dechman authorized Schwaber to send the Letters, but they have offered no further proof of domination. These

facts are far from sufficient to warrant discarding the corporate form.

The fact that Dechman owned and managed the companies is not a sufficient basis, without more, on which to say that he had "complete domination and control" over them, particularly in light of the presence of other members, investors, and directors. Cf., e.g., Wallace, 752 A.2d at 1184 (finding insufficient evidence to pierce corporate veil against officers of a partnership); Zhai v. Stein, No. 10C-11-079 (RRC), 2012 Del. Super. LEXIS 4, at *22 (Del. Super. Ct. Jan. 6, 2012) (finding insufficient evidence to pierce corporate veil against president of company). Moreover, plaintiffs have acknowledged that Kobayashi purchases, owns, and manages patents, and that it files and pays taxes. They have also acknowledged that Equaphor has -- when known as MTC -- entered into licensing agreements, engaged in the event-capture system business, sold other products, and has had multiple investors and directors. These are not the features of sham entities without their own legal significance. Veil-piercing is thus inappropriate.

Plaintiffs next argue that they do not need to pierce the corporate veil in order to reach Dechman. They contend that, under Delaware law, individuals are always responsible for their

own torts and cannot use corporations to shield themselves.[38] We need not, however, reach the question of how Delaware law would apply. Because the theory plaintiffs advance is not a theory of veil-piercing, see, e.g., State ex rel. Brady v. Preferred Florist Network, Inc., 791 A.2d 8, 21 (Del. Ch. 2001) (contrasting "[c]ases dealing with 'corporate veil piercing'" with cases where courts "found corporate officers liable for statutory violations despite the fact that their actions were taken in some official corporate capacity"), the choice-of-law analysis differs, and Delaware law is not applicable.

The forums relevant to any claims for which Dechman may potentially face liability do not accord with Delaware's rule. See, e.g., Wordtech Sys., Inc. v. Integrated Networks Solutions, Inc., 609 F.3d 1308, 1313 (Fed. Cir. 2010) (requiring veil-piercing in order to hold a corporate officer liable for acts "commit[ted] in the name of the corporation"); Balevic v. Werhmann, No. 96-1813, 1998 U.S. App. LEXIS 8509, at *11 (4th Cir. May 1, 1998) ("[A] corporate official may be held liable only 'where his acts involve individual and separate torts distinguishable from acts solely [sic] on his employer's behalf or where his acts are performed in his own interest and adverse

---

[38] See, e.g., Heronemus v. Ulrick, No. Civ.A.97C-03-168-JOH, 1997 Del. Super. LEXIS 266, at *6 (Del. Super. July 9, 1997) ("Every individual is liable for his or her own torts, and there is no exception for corporate officers. Corporate officers cannot be shielded from tort liability by claiming that the actions were done in the name of the corporation.").

to that of his firm.'" (quoting <u>Wilson v. McClenny</u>, 136 S.E.2d 569, 578 (N.C. 1964))); <u>Diagnostic Devices, Inc. v. Pharma Supply, Inc.</u>, No. 3:08-CV-149-RJC-DCK, 2009 U.S. Dist. LEXIS 85397, at *10-11 (W.D.N.C. May 11, 2009).

Because piercing the corporate veil is inappropriate and Dechman acted on behalf of the corporate entities, he may not be held personally liable for any of plaintiffs' asserted claims.

## CONCLUSION

For the foregoing reasons, plaintiffs' motion (docket no. 141) is granted in part and denied in part, and defendants' motions (docket nos. 133, 137) are granted. Specifically, we:

- invalidate all of the independent claims of the '456 and '990 Patents and independent claims 1 and 16 of the '905 Patent because the claim term "control means" is indefinite;

- do not invalidate the remaining independent claims of the '905 Patent for lack of an adequate description of the claim term "extract";

- find that the '905 Patent was invalid as anticipated through September 14, 2010, when the Certificate remedied its defective priority claim;

- find that there exist genuine issues of material fact as to whether ECS software sold after September 14, 2010 infringed the '905 Patent;

- find that there exist genuine issues of material fact as to whether Carotek infringed or aided and abetted infringement of the '905 Patent;

- grant summary judgment in favor of Kobayashi on plaintiffs' patent misuse affirmative defense;

- grant summary judgment in favor of Kobayashi on Carotek's claim that the licensing fees it paid should be returned to it;

- grant summary judgment in favor of defendants on all of Carotek's state claims because no reasonable jury could conclude that Carotek suffered any damages as a result of the Letters;

- grant summary judgment in favor of defendants on all of ECS's state claims because ECS has not demonstrated a genuine issue of material fact as to whether the Letters caused it any damages that can be shown with reasonable certainty; and

- grant summary judgment in favor of Dechman on plaintiffs' claims against him in his individual capacity because there is no genuine issue of material fact as to whether Dechman dominated Kobayashi.

**SO ORDERED.**

Dated:   New York, New York
         June 27, 2012

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

Copies of the foregoing Order have been mailed on this date to the following:

**Attorneys for Plaintiffs/Counter-Defendants**
Michael F. Autuoro, Esq.
Fish & Richardson P.C.
153 East 53rd Street, 52nd Floor
New York, NY 10022-4661

Gregory A. Madera, Esq.
Fish & Richardson, P.C.
225 Franklin Street
Boston, MA 02110-2804

W. Thad Adams III, Esq.
Shumaker, Loop & Kendrick, LLP
128 South Tryon Street
Charlotte, NC 28202

**Attorney for Defendants/Counter-Plaintiff**
Jeffrey M. Schwaber, Esq.
Deanna L. Peters, Esq.
Stein, Sperling, Bennett, De Jong, Driscoll & Greenfeig, P.C.
25 West Middle Lane
Rockville, MD 20850

Robert P. Fletcher, Esq
LeClairRyan, A Professional Corporation
1101 Connecticut Avenue, NW, Suite 600
Washington, D.C. 20036

Joseph Parisi, Esq.
J.A. Lindeman & Co. PLLC
3190 Fairview Park Drive, Suite 480
Falls Church, VA 22042